SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP
Jeffrey A. Mishkin (JM 8380)
Anthony J. Dreyer
C. Scott Lent
Four Times Square
New York, New York 10036
Tel: (212) 735-3000

PROSKAUER ROSE LLP
Howard L. Ganz
Daniel R. Halem
1585 Broadway
New York, New York 10036
Tel: (212) 969-3035

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

NATIONAL BASKETBALL ASSOCIATION,

                              Plaintiff,

       – against –

NATIONAL BASKETBALL PLAYERS ASSOCIATION,
RON ARTEST, STEPHEN JACKSON, ANTHONY
JOHNSON, and JERMAINE O'NEAL,

                              Defendants.

**RECEIVED**
DEC – 3 2004
U.S.D.C. S.D. N.Y.
CASHIERS

**JUDGE DANIELS**

**04 CV 09528**

**COMPLAINT**

**ECF CASE**

Plaintiff, by its undersigned counsel of record, for its complaint against

defendants, alleges as follows:

## NATURE OF ACTION

1.     This action arises from an improper attempt by the National

Basketball Players Association and the individual player-defendants (collectively, "Players

Association" or "NBPA") to require the National Basketball Association ("NBA") to

arbitrate before a third-party Grievance Arbitrator the propriety of suspensions imposed by

Dockets.Justia.com

the NBA for misconduct committed by players during a recent NBA game. Under the collective bargaining agreement between the NBA and the Players Association ("CBA"), claims of this kind are not to be resolved through arbitration, but rather through an appeals process to the NBA Commissioner.

2.     The underlying dispute involves a serious and unprecedented altercation that occurred between and among players and fans during a basketball game between the Indiana Pacers and the Detroit Pistons at The Palace of Auburn Hills on November 19, 2004 (the "Detroit Incident"). On November 21, 2004, the NBA Commissioner imposed suspensions on a number of players involved in the altercation, including those listed as individual defendants here. Subsequently, and predictably, the Players Association – the union representing NBA players – expressed the view that the suspensions were excessive and should be reduced. Much less predictably, on November 22, 2004, the Players Association purported to challenge these suspensions before a third-party Grievance Arbitrator (the "Purported Arbitration"). (See November 22, 2004 letter from Jeffrey Kessler, attached as Exhibit A.) On November 23, 2004, the Players Association requested that the Grievance Arbitrator convene an expedited hearing on December 3, 2004. (See November 23, 2004 letter from Jeffrey Kessler, attached as Exhibit B.)

3.     The CBA expressly provides that if the NBA and the NBPA do not agree as to the substantive arbitrability of a particular dispute, the Grievance Arbitrator is precluded from resolving that disagreement, and lacks any authority to determine his or her own jurisdiction over that dispute. (See CBA, Article XXXI, Section 5(b), attached as Exhibit C.)

2

4.    The CBA also expressly provides that any dispute involving the suspension of an NBA player for misconduct "on the playing court" is to be resolved exclusively by an appeal to the Commissioner of the NBA, and is not within the jurisdiction of the Grievance Arbitrator.  (See CBA, Article XXXI, Section 8.)

5.    On November 26, 2004, the NBA sent a letter to the Grievance Arbitrator and the Players Association, objecting – by reason of Article XXXI, Sections 5(b) and 8 of the CBA – to the commencement of the Purported Arbitration.  (See November 26, 2004 letter from Jeffrey A. Mishkin, attached as Exhibit D.)  On November 30, 2004, the Players Association responded by sending a 20-page letter (and more than 150 pages of exhibits) to the Grievance Arbitrator, asking him to rule, by December 3, 2004, that he has the authority to determine the arbitrability of the NBPA's claim and that he, rather than the NBA Commissioner, has jurisdiction to resolve it.  (See November 30, 2004 letter from Jeffrey Kessler, attached as Exhibit E, without attachments.)  On December 2, 2004, the NBA reiterated its objection to the Grievance Arbitrator's consideration of this matter, and, in order to preserve its entitlement to de novo review of these issues in federal court, refused to participate in a hearing before the Grievance Arbitrator or otherwise to respond substantively to the Players Association's arguments.  (See December 2, 2004 letter from Jeffrey A. Mishkin, attached as Exhibit F.)

6.    On December 3, 2004, the Grievance Arbitrator issued a "decision" holding that he "has jurisdiction to determine the arbitrability of this grievance."  Moreover, the Grievance Arbitrator set a hearing date of December 8, 2004 in order to consider both whether "Commissioner Stern's decision is reviewable and the propriety of the suspensions issued by him on November 21, 2004."  (See December 3, 2004 Decision of the Grievance

3

Arbitrator, attached as Exhibit G.)  Thus, it appears the Grievance Arbitrator intends to proceed directly to the merits of the underlying dispute while at the same time considering whether or not he even has jurisdiction to do so.

7.    Accordingly, the NBA seeks, and is entitled to, a declaration that (i) because the NBA and the NBPA do not agree on whether the Grievance Arbitrator has jurisdiction to hear the Players Association's claim, the Grievance Arbitrator has no authority to determine whether that dispute is arbitrable; and (ii) because the dispute the Players Association seeks to submit to arbitration involves the suspension of NBA players for conduct "on the playing court," it is not within the jurisdiction of the Grievance Arbitrator, but is instead to be resolved exclusively through an appeal to the NBA Commissioner.  The NBA also seeks to enjoin the NBPA from proceeding with the Purported Arbitration.

## JURISDICTION AND VENUE

8.    The claims asserted in this Complaint are brought under Section 301 of the Labor-Management Relations Act, 29 U.S.C. § 185, and under the Declaratory Judgment Act, 28 U.S.C. §§ 2201-02, in a case of actual controversy within the jurisdiction of this Court.

9.    Jurisdiction of this Court is based on Section 301 of the Labor-Management Relations Act, 29 U.S.C. § 185, and 28 U.S.C. §§ 1331 and 1337 and under the federal common law of contract.

10.    Jurisdiction over the defendants is based upon CPLR §§ 301 and 302. Venue is proper in this district pursuant to 29 U.S.C. § 185 and 28 U.S.C. § 1391.

## THE PARTIES

11.    Plaintiff NBA is an integrated business enterprise that engages in the production and marketing of an entertainment product known as "NBA Basketball." The NBA is organized as a joint venture, with each of its thirty member teams operating a professional basketball team in a particular geographic location in North America. The NBA negotiates as a single unit on behalf of its members with the NBPA over the terms and conditions of employment of NBA players. The NBA maintains its headquarters at 645 Fifth Avenue, New York, New York and is engaged in an industry affecting commerce within the meaning of 29 U.S.C. § 185.

12.    Defendant NBPA, an unincorporated association, is a labor organization recognized by the NBA and certified by the National Labor Relations Board as the exclusive collective bargaining representative of all NBA players. The NBPA regularly represents employees employed in this judicial district for purposes of collective bargaining, and maintains its headquarters at Two Penn Plaza, Suite 2430, New York, New York. The NBPA represents employees in an industry affecting commerce within the meaning of 29 U.S.C. § 185.

13.    Defendant Ron Artest is an NBA player employed by the Indiana Pacers whose conduct during the Detroit Incident led to a suspension by the NBA Commissioner, and on behalf of whom, and in whose interest, the NBPA has attempted to commence the Purported Arbitration. Defendant Artest resides in Zionsville, Indiana.

14.    Defendant Stephen Jackson is an NBA player employed by the Indiana Pacers whose conduct during the Detroit Incident led to a suspension by the NBA

Commissioner, and on behalf of whom, and in whose interest, the NBPA has attempted to commence the Purported Arbitration. Defendant Jackson resides in Carmel, Indiana.

15.    Defendant Anthony Johnson is an NBA player employed by the Indiana Pacers whose conduct during the Detroit Incident led to a suspension by the NBA Commissioner, and on behalf of whom, and in whose interest, the NBPA has attempted to commence the Purported Arbitration. Defendant Johnson resides in Carmel, Indiana.

16.    Defendant Jermaine O'Neal is an NBA player employed by the Indiana Pacers whose conduct during the Detroit Incident led to a suspension by the NBA Commissioner, and on behalf of whom, and in whose interest, the NBPA has attempted to commence the Purported Arbitration. Defendant O'Neal resides in Carmel, Indiana.

### The NBA/NBPA Relationship

17.    The NBA has recognized the NBPA as the exclusive collective bargaining representative of all NBA players, and pursuant to the National Labor Relations Act, 29 U.S.C. § 141 et seq., which governs the relationship between the NBA and the NBPA, the Players Association is certified as the exclusive collective bargaining representative of NBA players.

18.    As a consequence of such recognition and certification, Section 9(a) of the National Labor Relations Act, 29 U.S.C. § 159(a), requires that all terms and conditions of employment of players employed by NBA teams be negotiated on a collective basis between the NBA and the NBPA, absent an express agreement between those parties authorizing individual negotiations.

19.    The NBA and the NBPA are parties to the CBA, which covers the period from January 20, 1999, through June 30, 2004. On December 9, 2003, pursuant to

Article XXXIX, Section 2 of the CBA, the NBA exercised its option to extend the term of

the CBA to June 30, 2005.

### The NBA's Regulation of Player Conduct

20.    Pursuant to the terms of the CBA, each NBA player has entered into a

Uniform Player Contract ("UPC"), governing the terms and conditions of his employment.

The UPC is the product of collective bargaining between the NBA and the Players

Association, and sets forth the employment terms that have been agreed upon by those

parties.

21.    The conduct of NBA players is governed by various provisions of the

CBA and UPC, and by rules and regulations promulgated by the NBA and its member

teams.  Of particular relevance here, pursuant to Paragraph 5 of the UPC, each NBA player

agrees to be bound by Article 35 of the NBA Constitution & By-Laws (entitled

"Misconduct"), which empowers the Commissioner to fine and/or suspend an NBA for the

causes set forth therein.  (See UPC, Paragraph 5 attached hereto as Exhibit H.)

22.    Article 35(d) of the NBA Constitution & By-Laws provides that:

> If in the opinion of the Commissioner any other act or conduct of a
> Player at or during an Exhibition, Regular Season, or Playoff game
> has been prejudicial to or against the best interests of the Association
> or the game of basketball, the Commissioner shall impose upon such
> Player a fine not exceeding $35,000, or may order for a time the
> suspension of any such Player from any connection or duties with
> Exhibition, Regular Season, or Playoff games, or he may order both
> such fine and suspension.

(NBA Constitution & By-Laws, Article 35, attached hereto as Exhibit I.)

23.    All NBA players and the NBPA are – and have been for many years –

expressly advised in writing at the commencement of each playing season that "violence on

the court" – including engaging in "violent actions during a game" and deliberately entering

"the spectator stands during a game" – is prohibited, and that such misconduct may subject a player to ejection from the game, a fine and/or a suspension. (See, e.g., Player Conduct Memo of October 18, 2004, attached as Exhibit J.) The players and the NBPA are also advised – and have been for many years – that any player who leaves his team's bench area during an altercation will be suspended. See id.

### The Limited Jurisdiction of the Grievance Arbitrator

24.    Article XXXI of the CBA sets forth certain grievance arbitration procedures for the resolution of disputes that arise between the NBA and/or its member teams and the NBPA and/or individual NBA players. The Grievance Arbitrator, who is appointed pursuant to Article XXXI, is granted specific and limited authority to hear and resolve only certain types of disputes arising under the CBA or UPC. (See CBA, Article XXXI, Sections 1, 6, 8.)

25.    In 1998, a dispute arose between the NBA and NBPA over whether the Grievance Arbitrator or the courts had jurisdiction to determine questions of arbitrability. Following this dispute, the parties added new and explicit language to the 1999 CBA that expressly provides that the Grievance Arbitrator does not have jurisdiction or authority to resolve any disagreements over the arbitrability of the substance of a dispute (i.e., substantive arbitrability). The new language (underscored below) added to Article XXXI, Section 5(b), provides as follows:

> The Grievance Arbitrator shall not have jurisdiction or authority to add to, detract from, or alter in any way the provisions of this Agreement (including the provisions of this subsection) not any Player Contract. Nor, in the absence of agreement by the NBA and the Players Association, shall the Grievance Arbitrator have jurisdiction or authority to resolve questions of substantive arbitrability.

(CBA, Article XXXI, Section 5(b).)

8

26.    The CBA also expressly provides that disputes involving suspensions imposed for conduct by players "on the playing court" are similarly outside the scope of the Grievance Arbitrator's jurisdiction and authority.  Article XXXI, Section 8 of the CBA sets forth a special appeal procedure applicable to such disputes:

> Any dispute involving (i) a fine or suspension imposed upon a player by the Commissioner (or his designee) for conduct on the playing court (regardless of its financial impact on the player) . . . shall be processed exclusively as follows:
>
> (i)    Within twenty (20) days following written notification of the action taken by the Commissioner (or his designee), a player affected thereby or the Players Association may appeal in writing to the Commissioner.
>
> (ii)    Upon the written request of the Players Association, the Commissioner shall designate a time and place for hearing as soon as is reasonably practicable following his receipt of the notice of appeal.
>
> (iii)    As soon as reasonably practicable, but not later than twenty (20) days, following the conclusion of such hearing, the Commissioner shall render a written decision, which decision shall constitute full, final and complete disposition of the dispute, and shall be binding upon the player(s) and Team(s) involved and the parties to this Agreement.

(CBA, Article XXXI, Section 8 (emphasis added).)

27.    As Article XXXI, Section 8 makes clear, the NBA Commissioner is the only person that can hear a challenge to a fine or suspension imposed on a player for misconduct "on the playing court."  The Grievance Arbitrator lacks authority to hear any such challenge.  Moreover, the CBA expressly states that the NBA Commissioner's decision under Section 8 constitutes a "full, final and complete disposition of the dispute."  (See id.)

### The Detroit Incident

28.    The Detroit Incident occurred on November 19, 2004, with 45.9 seconds remaining in an NBA game between the Indiana Pacers and the Detroit Pistons at

9

The Palace at Auburn Hills. The Incident began when an altercation broke out on the playing court among players for the Pacers and the Pistons, following a foul committed by defendant Artest on a player for the Detroit Pistons, Ben Wallace. The altercation escalated to the point where members of the Pacers engaged in fist fights with Palace patrons in the stands and on the playing floor. Each of the individually-named defendants was involved in some aspect of the Detroit Incident.

29.    Following his confrontation with Wallace, defendant Artest deliberately entered the stands to confront a spectator, whom he subsequently pushed to the ground. He thereafter returned to the playing floor and struck another spectator in the face.

30.    Defendant Jackson attempted to instigate a fist fight with several Pistons players on the playing court and then followed defendant Artest into the stands, where he struck a spectator in the face. Defendant Jackson was involved in altercations with at least three different spectators and made an obscene gesture to the crowd in the arena following the incident.

31.    Defendant Johnson left the immediate vicinity of his team's bench and began an altercation with a spectator whom he punched and wrestled to the ground.

32.    Defendant O'Neal left the immediate vicinity of his team's bench and attempted to enter the stands, but was restrained by an usher whom O'Neal forcefully shoved away. Defendant O'Neal then proceeded to attack a spectator on the court, whom he punched in the face. Defendant O'Neal also attempted to initiate altercations with several other fans while leaving the court.

33.    On November 20, 2004, the NBA Commissioner suspended defendants Artest, Jackson, and O'Neal indefinitely pending the NBA's investigation of the

Detroit Incident. On November 21, 2004, following an investigation by the NBA, the NBA

Commissioner suspended defendant Artest for the remainder of the season, defendant

Jackson for thirty games, defendant Johnson for five games, and defendant O'Neal for

twenty-five games.

        34.     The Commissioner's suspensions of defendants Artest, Jackson,

Johnson and O'Neal were imposed for conduct "on the playing court," within the meaning of

CBA Article XXXI, Section 8. The consistent past practice and mutual understanding of the

parties to the CBA is, and for many years has been, that conduct "on the playing court"

includes and encompasses any conduct of a player at, during, or in connection with an NBA

game, whether or not all or any part of the conduct in question occurred literally on the 94 by

50 foot wooden rectangular surface known as the playing "floor." Indeed, on numerous

occasions, the Players Association has confirmed this mutual understanding by "appealing"

to the Commissioner under Article XXXI, Section 8 (or its predecessors), suspensions

imposed for misconduct outside the confines of the playing floor, including suspensions for

entering the spectator stands and attacking a fan; walking off the court and spitting on a fan;

verbally confronting a spectator in the stands from an out-of-bounds position; fighting in the

locker room; and misconduct in the exit tunnels leading to the locker rooms. Accordingly,

any challenge to the suspensions imposed by the Commissioner here can be heard only by

means of an appeal (and not by a third-party grievance arbitration) to the Commissioner

under CBA Article XXXI, Section 8.

        35.     On November 22, 2004, the NBPA initiated the Purported Arbitration

on behalf of the individually named defendants, as well as five other players who were

suspended for their involvement in the Detroit Incident. In its letter to the Grievance

Arbitrator dated November 30, 2004, the NBPA stated that it was withdrawing the Purported

Arbitration with respect to all players other than defendants Artest, Jackson, Johnson, and

O'Neal. (See Ex. E, at 6, n.3.)

36.     The NBA has objected to the exercise by the Grievance Arbitrator of

any jurisdiction over the Purported Arbitration. Under the law in this Circuit and elsewhere,

the NBA cannot participate in any proceedings before the Grievance Arbitrator relating to

the issue of the arbitrability without running a serious and substantial risk of waiving its right

to de novo judicial review of that issue.

37.     Upon information and belief, absent the granting of the relief

requested herein, the Players Association will proceed with the hearing scheduled by the

Grievance Arbitrator for December 8, 2004. Because the dispute the NBPA seeks to submit

to arbitration is not within the jurisdiction or authority of the Grievance Arbitrator, because

the NBA never agreed to submit this matter to arbitration, and since permitting the NBPA to

proceed would require the NBA unnecessarily to expend substantial time, energy, and

resources, unless the Court grants the relief requested herein, the NBA will suffer irreparable

harm, for which it has no adequate remedy at law.

## FIRST CLAIM FOR RELIEF AGAINST DEFENDANTS

38.     Plaintiff repeats and re-alleges the allegations set forth in paragraphs

1 through 37 of the Complaint as if fully set forth herein.

39.     The CBA, in Article XXXI, Section 5(b), provides that if the NBA

and the NBPA do not agree on whether the Grievance Arbitrator has jurisdiction to hear a

particular dispute under Article XXXI (i.e., whether the dispute is substantively arbitrable),

the Grievance Arbitrator has no authority to determine his own jurisdiction to hear the

dispute. The NBA and the NBPA do not agree as to the substantive arbitrability of the NBPA's challenge to the Commissioner's suspensions.

40.    Because the parties do not agree that the Grievance Arbitrator has the authority to determine his own jurisdiction, there thus exists a substantial, present and justiciable controversy between the NBA on the one hand, and defendants on the other, concerning that issue.

41.    By reason of the foregoing, the NBA requests, and is entitled to, a declaration that the Grievance Arbitrator has no authority or jurisdiction to resolve the substantive arbitrability of the alleged dispute.

## SECOND CLAIM FOR RELIEF AGAINST DEFENDANTS

42.    Plaintiff repeats and re-alleges the allegations set forth in paragraphs 1 through 41 of the Complaint as if fully set forth herein.

43.    The agreement to submit to grievance arbitration certain disputes arising from the CBA and/or the UPC does not contemplate or provide that disputes involving the NBA Commissioner's imposition of discipline for player misconduct "on the playing court" are within the jurisdiction of the Grievance Arbitrator. Rather, the CBA expressly provides that any challenge to such discipline is to be heard only by the NBA Commissioner.

44.    The dispute defendants seek to submit to grievance arbitration involves suspensions imposed upon players by the Commissioner for conduct "on the playing court," and thus the dispute can only be heard by the NBA Commissioner pursuant to the appeals process set forth in Article XXXI, Section 8 of the CBA.

45.    Despite the clear and unequivocal language of Section 8, defendants seek to arbitrate the propriety of the suspensions imposed by the NBA Commissioner. There

thus exists a substantial, present and justiciable controversy between the NBA on the one hand, and the Players Association on the other, concerning whether the dispute defendants have attempted to submit to arbitration is arbitrable.

46.    By reason of the foregoing, the NBA requests and is entitled to a declaration that the dispute defendants have attempted to submit to grievance arbitration is not arbitrable, and may be heard only by the NBA Commissioner.

WHEREFORE, Plaintiff NBA demands judgment:

(a)    declaring that, pursuant to the express terms of the CBA, because the NBA and the NBPA do not agree on whether the Grievance Arbitrator has jurisdiction to hear the dispute concerning the November 21, 2004 suspensions, the Grievance Arbitrator has no authority to resolve that dispute or to determine whether his jurisdiction is proper;

(b)    declaring that the dispute the NBPA has attempted to submit to grievance arbitration is not arbitrable and that the Grievance Arbitrator has no jurisdiction over that dispute;

(c)    declaring that the NBPA's sole remedy to challenge the November 21, 2004 suspensions of the individual player-defendants is an appeal to the NBA Commissioner pursuant to Article XXXI, Section 8 of the CBA;

(d)    preliminarily and permanently enjoining the NBPA from proceeding with the Purported Arbitration under Article XXXI of the CBA; and

(e)    awarding any such other and further relief as the Court shall

deem proper.


Dated:       December 3, 2004
             New York, New York


                        SKADDEN, ARPS, SLATE,
                          MEAGHER & FLOM LLP
                        Jeffrey A. Mishkin (JM 8380)
                        Anthony J. Dreyer
                        C. Scott Lent
                        Four Times Square
                        New York, New York  10036
                        Tel:  (212) 735-3000


                        By: _____
                            Jeffrey A. Mishkin


                        PROSKAUER ROSE LLP
                        Howard L. Ganz
                        Daniel R. Halem
                        1585 Broadway
                        New York, New York  10036
                        Tel:  (212) 969-3035


                        Attorneys for Plaintiff