UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

NATIONAL BASKETBALL ASSOCIATION,

                    Plaintiff,

      - against -

NATIONAL BASKETBALL PLAYERS
ASSOCIATION, RONALD ARTEST, STEPHEN
JACKSON, ANTHONY JOHNSON, and
JERMAINE O'NEAL,

                Defendants.

      :    04-Civ.-09528(GBD)

---

## PLAINTIFF'S MEMORANDUM OF LAW
## IN SUPPORT OF MOTION TO VACATE ARBITRATION AWARD,
## AND IN OPPOSITION TO DEFENDANTS' MOTION TO CONFIRM

**SKADDEN, ARPS, SLATE,**
**MEAGHER & FLOM LLP**
Jeffrey A. Mishkin (JM 8380)
Douglas B. Adler (DA 6013)
Anthony J. Dreyer (AD 3571)
Four Times Square
New York, New York 10036
Tel: (212) 735-3000

**PROSKAUER ROSE LLP**
Howard L. Ganz (HG 8644)
Daniel R. Halem (DH 3035)
1585 Broadway
New York, New York 10036
Tel: (212) 969-3035

Dockets.Justia.com

## TABLE OF CONTENTS

PRELIMINARY STATEMENT ................................................................. 1

ARGUMENT ........................................................................................... 3

I.   STANDARD OF REVIEW APPLICABLE TO THE MOTION TO
     VACATE ........................................................................................ 3

II.  THE COMMISSIONER HAS EXCLUSIVE AUTHORITY OVER
     CONDUCT OCCURRING AT OR DURING AN NBA GAME...................... 4

     A.   The Proper Interpretation of "Conduct on the Playing Court" Is at
          Least as Broad as Article 35(d), Which Authorizes the NBA To
          Impose Discipline for Misconduct "At or During" an NBA Game........... 4

     B.   The NBA's Interpretation of Section 8 Is Supported By Prior
          Arbitral and Judicial Authority. ................................................... 6

     C.   The Parties' Past Practice Demonstrates That "Conduct on the
          Playing Court" Broadly Encompasses Player Misconduct at NBA
          Games. .................................................................................... 9

     D.   The Players Association Was Notified of the NBA's Interpretation
          of "Conduct on the Playing Court" and Never Contested It. ................ 12

     E.   The NBA's Interpretation of Section 8 Makes Sense. ............................ 13

III. EVEN UNDER AN UNDULY RESTRICTIVE INTERPRETATION
     OF SECTION 8, THE CONDUCT ENGAGED IN DURING THE
     DETROIT INCIDENT FALLS WITHIN THE COMMISSIONER'S
     EXCLUSIVE JURISDICTION. ...................................................... 16

IV.  THE NBPA'S REMAINING ARGUMENTS ARE MERITLESS................ 18

     A.   The "Integrity of The Game" Language in Section 8 Has No Bearing
          on This Case.............................................................................. 18

     B.   The Question of Arbitrability Is Subject To *De Novo* Review. ................ 22

CONCLUSION ....................................................................................... 28

## TABLE OF AUTHORITIES

### CASES

AT&T Technologies, Inc. v. Communications Workers, 475 U.S. 643 (1986) .......................3, 23

American Almond Products Co. v. Consolidated Pecan Sales Co., 144 F.2d 448 (2d Cir.
    1944) .............................................................................................................................24

Avis Rent A Car System, Inc. v. Garage Employees Union, Local 272, 791 F.2d 22 (2d
    Cir. 1986) .......................................................................................................................26

Bear Stearns & Co. v. N.H. Karol & Associates, Ltd., 728 F. Supp. 499 (N.D. Ill. 1989) ...........26

Buder v. New York Trust Co., 82 F.2d 168 (2d Cir. 1936) ............................................................12

Cargill Rice, Inc. v. Empresa Nicaraguense Dealimentos Basicos, 25 F.3d 223 (4th Cir.
    1994) .............................................................................................................................26

Cendant Corp. v. Forbes, 70 F. Supp. 2d 339 (S.D.N.Y. 1999), aff'd mem., 205 F.3d
    1322 (2d Cir. 2000).......................................................................................................25

In re Chateaugay Corp., 891 F.2d 1034 (2d Cir. 1989) .................................................................11

Chicago Dist. Council of Carpenters Pension Fund v. K & I Constr., Inc., 270 F.3d 1060
    (7th Cir. 2001) ..............................................................................................................14

Coady v. Ashcraft & Gerel, 223 F.3d 1 (1st Cir. 2000).................................................................3

Davis v. Chevy Chase Finance Ltd., 667 F.2d 160 (D.C. Cir. 1981) .............................................3

District 2, Marine Eng'rs Beneficial Association v. Falcon Carriers, Inc., 374 F. Supp.
    1342 (S.D.N.Y. 1974).....................................................................................................23

Ewing v. Stern, No. 97 Civ. 3578 (JSR) (S.D.N.Y. May 16, 1997)...................................... passim

First Options of Chicago, Inc. v. Kaplan, 514 U.S. 938 (1995) .........................................4, 23, 27

Greene v. WCI Holdings Corp., 956 F. Supp. 509 (S.D.N.Y. 1997), aff'd, 136 F.3d 313
    (2d Cir. 1998).................................................................................................................27

Gulf Coast Industrial Workers v. Exxon Chemical Americas, 863 F. Supp. 423 (S.D.
    Tex. 1994), aff'd, 53 F.3d 1281 (5th Cir. 1995)................................................................4

Hooters of America, Inc. v. Phillips, 39 F. Supp. 2d 582 (D.S.C. 1998), aff'd, 173 F.3d
    933 (4th Cir. 1999).........................................................................................................26

Howsam v. Dean Witter Reynolds, Inc., 537 U.S. 79 (2002).........................................................24

In re John Starks, No. 00-01 (Mar. 6, 2000) ...................................................................26

John Wiley & Sons, Inc. v. Livingston, 376 U.S. 543 (1964) ......................................23

Katz v. Feinberg, 290 F.3d 95 (2d Cir. 2002) ...................................................... passim

Maryland Casualty Co. v. Realty Advisory Board, 107 F.3d 979 (2d Cir. 1997) ...........................3

Merit Insurance Co. v. Leatherby Insurance Co., 714 F.2d 673 (7th Cir. 1983)...........................24

Merrill Lynch, Pierce, Fenner & Smith Inc. v. Noonan, No. 92 Civ. 3770 (SWK), 1992
    WL 196741 (S.D.N.Y. Aug. 3, 1992)...............................................................26

NBPA (Charles Barkley) v. NBA, No. 92-3 (1992) ........................................................6

NBPA v. NBA (In re Chicago Bulls), 96-01 (Jan. 9, 1996) ..........................................11

NBA v. NBPA (Meal Expenses Allowance), (Apr. 4, 1977) ........................................11

New York State Teamsters Conference Pension & Retirement Fund v. United Parcel
    Serv., Inc., 198 F. Supp. 2d 188, 196 (N.D.N.Y. 2002), aff'd, 382 F.3d 272 (2d
    Cir. 2004) ......................................................................................................11

Paulson, Inc. v. Bromar, Inc., 808 F. Supp. 736 (D. Haw. 1992)..................................13

Prudential Securities, Inc. v. Emerson, 905 F. Supp. 1038 (M.D. Fla. 1995) .................4

Transportation-Communication Employees Union v. Union Pacific R.R. Co., 385 U.S.
    157 (1966)......................................................................................................11

United States Postal Service v. American Postal Workers Union, 204 F.3d 523 (4th Cir.
    2000) ..............................................................................................................3

World Trade Ctr. Props., 345 F.3d 154 (2d Cir. 2003)..................................................14

Zervos v. Verizon New York, Inc., 252 F.3d 163 (2d Cir. 2001)..................................27

## STATUTES

9 U.S.C. § 10(a)(4).................................................................................................................3

## MISCELLANEOUS

Black's Law Dictionary 112 (8th ed. 2004) ...................................................................25

Rest. 2d Contracts § 202(4) ........................................................................................13

11 Williston on Contracts § 32:14 (4th ed.) .................................................................13

## PRELIMINARY STATEMENT

As the Court correctly recognized during the TRO hearing on December 23, 2004, the central issue in this proceeding is whether the conduct that occurred during the November 19, 2004 game between the Detroit Pistons and the Indiana Pacers (the "Detroit Incident") -- for which the NBA Commissioner imposed suspensions on the four player-defendants – constitutes "conduct on the playing court" within the meaning of Article XXXI, Section 8 of the 1999 NBA/NBPA Collective Bargaining Agreement ("CBA"). If it does, then the Commissioner, and not the Grievance Arbitrator, has the sole and exclusive authority to hear any challenge to those suspensions, and the Grievance Arbitrator's "award" issued on December 22, 2004 should be vacated.

The NBA has urged a clear and simple interpretation of Article XXXI, Section 8: that it reserves to the Commissioner exclusive authority over conduct that occurs at or during an NBA game. The NBA has advanced four independent points supporting this interpretation – the language and structure of Section 8 and Article 35(d) of the NBA Constitution, as acknowledged previously by the Players Association; prior arbitral (Barkley) and judicial (Ewing) decisions finding conduct in the spectator stands and the bench area to be "conduct on the playing court"; prior appeals to the Commissioner by the NBPA of player conduct in the stands, on the apron, in the locker room, and otherwise off the basketball floor and outside the "flow of the game"; and prior inaction by the Players Association in the face of the NBA's open and consistent interpretation of Section 8. Furthermore, the NBA's reading of Section 8 is supported by the simple fact that it makes sense. It is the only interpretation advanced in this proceeding that clearly separates the authority possessed by the Commissioner from that of the Grievance Arbitrator, and does so in a way that would not lead to unmanageable or disputed results in this case or future cases.

In addition, as even a cursory review of the Detroit Incident makes clear, a substantial portion of the conduct for which the defendants were disciplined took place on the playing floor. Indeed, every one of the four defendants engaged in some misconduct on the playing floor, and all of the misconduct – even punches thrown in the spectator stands – was directly related to conduct that initially took place on the playing floor. Article 31, Section 8, of course, does not require that <u>all</u> of a player's misconduct occur on the playing court, but only that the dispute is one "<u>involving</u> . . . a fine or suspension imposed upon a player . . . for conduct on the playing court." (emphasis added). Thus, even under an unduly restrictive reading of Section 8 that focuses only on its literal words, the Grievance Arbitrator still lacked authority to hear this case. Accordingly, the Commissioner alone has jurisdiction to resolve that dispute.

The Players Association, in contrast to the NBA, has offered no clear interpretation of Section 8, choosing first to contend that conduct falling within its ambit must occur both "on the playing floor" and "in the flow of the game," but then, under skeptical questioning from the Court, retreating to the view that Section 8, like "the antitrust laws," should be interpreted on a "case by case" basis, in accordance with an undefined set of "facts and circumstances." There is no basis, however, for either of these arguments. The NBPA can point to <u>no</u> provision of the CBA, <u>no</u> rule or regulation, <u>no</u> prior judicial or arbitral decision, and <u>no</u> past practice of the parties to support its fanciful construction. Nor can the Players Association distinguish the decisions supporting the NBA in <u>Barkley</u> and <u>Ewing</u>, or its prior statements and actions that are consistent with the NBA's position.

Moreover, the Players Association cannot reasonably explain how its amorphous construction applies in this case, where all of the misconduct occurred during a game and much of it occurred on the playing floor, or how it would apply in future cases with different factual

settings. Thus, the NBPA's interpretation of Section 8 would only lead to more disputes between the parties, and more frequent involvement of the federal courts, since questions of arbitrability are properly resolved in this forum. That, we submit, is neither the result the parties intended when they agreed to Section 8, nor a result this Court should uphold.

## ARGUMENT[1]

### I.    STANDARD OF REVIEW APPLICABLE TO THE MOTION TO VACATE.

Two fundamental principles governing adjudication of arbitrability disputes are directly applicable here: (1) "arbitration is a matter of contract and a party cannot be required to submit to arbitration any dispute which he has not agreed to submit"; and (2) "the question of arbitrability – whether a collective-bargaining agreement creates a duty for the parties to arbitrate the particular grievance – is undeniably an issue for judicial determination." Maryland Cas. Co. v. Realty Advisory Bd., 107 F.3d 979, 982 (2d Cir. 1997) (internal quotations omitted).[2] Consistent with these governing principles, an "arbitral award regarding a matter not within the scope of the governing arbitration clause is one made in excess of authority, and a court is precluded from giving effect to such award." Davis v. Chevy Chase Fin. Ltd., 667 F.2d 160, 165 (D.C. Cir. 1981); see also Katz v. Feinberg, 290 F.3d 95, 97-98 (2d Cir. 2002).[3]  In such

---

[1]    Relevant facts will not be repeated here, as they have been submitted in the December 22, 2004 Affidavit of Richard W. Buchanan ("Buchanan Aff.") and the December 29, 2004 Supplemental Affidavit of Richard W. Buchanan ("Buchanan Supp. Aff."), and will be adduced at the hearing on December 30, 2004.

[2]    Accord AT&T Techs., Inc. v. Communications Workers, 475 U.S. 643, 648 (1986) (under LMRA § 301, "arbitration is a matter of contract and a party cannot be required to submit to arbitration any dispute which has not agreed so to submit"); Coady v. Ashcraft & Gerel, 223 F.3d 1, 10 (1st Cir. 2000) ("At bottom, arbitration remains a matter of contract between the parties; it is a way to resolve the disputes – but only those disputes – that the parties have agreed to submit to arbitration.") (internal quotations omitted).

[3]    Accord 9 U.S.C. § 10(a)(4) (allowing for vacatur where arbitrators have "exceeded their powers"); Coady, 223 F.3d at 9-11 (relying on 9 U.S.C. § 10(a) and stating "[w]e hold that the arbitrators exceeded the scope of their authority and vacate the arbitral award"); United States

circumstances, consistent with the dictates of 9 U.S.C. § 10(a)(4), the arbitration award must be

vacated. See Katz v. Feinberg, 290 F.3d at 97-98.[4]

## II.    THE COMMISSIONER HAS EXCLUSIVE AUTHORITY OVER CONDUCT OCCURRING AT OR DURING AN NBA GAME.

### A.    The Proper Interpretation of "Conduct on the Playing Court" Is at Least as Broad as Article 35(d), Which Authorizes the NBA To Impose Discipline for Misconduct "At or During" an NBA Game.

The source of the Commissioner's authority to impose fines and suspensions for player

misconduct in connection with NBA games is Article 35(d) of the NBA Constitution.  That

Article empowers the Commissioner to impose discipline for misconduct "at or during an

Exhibition, Regular Season, or Playoff Game," and is directly related to the provisions of Article

XXXI, Section 8 of the CBA, which accords the Commissioner sole, exclusive and final

jurisdiction to hear an appeal regarding "conduct on the playing court."  Simply put, Article

35(d) provides the basis for the Commissioner's authority to impose the discipline that Section 8

commits to his sole and exclusive jurisdiction.

The NBA has always understood Article 35(d) and Section 8 to be synonymous – that

discipline imposed by the Commissioner under Article 35(d) is only appealable to the

Commissioner under Section 8.  Although the Players Association now argues that these

---

Postal Serv. v. Am. Postal Workers Union, 204 F.3d 523, 527-28 (4th Cir. 2000) ("when the parties have not agreed to arbitrate a matter, the arbitrator lacks authority to resolve the matter, for arbitration is a matter of contract and a party cannot be required to submit to arbitration any dispute which he has not agreed so to submit") (internal quotations omitted).

[4]    See First Options of Chicago, Inc. v. Kaplan, 514 U.S. 938, 944-47 (1995) (affirming decision by Third Circuit that, because the parties' dispute was non-arbitrable, the district court erred in confirming, rather than vacating, the award); Prudential Sec., Inc. v. Emerson, 905 F. Supp. 1038, 1041-42, 1046 (M.D. Fla. 1995) (relying on 9 U.S.C. § 10 to vacate arbitration award that decided non-arbitrable issues); Gulf Coast Indus. Workers v. Exxon Chem. Ams., 863 F. Supp. 423, 428 (S.D. Tex. 1994), aff'd, 53 F.3d 1281 (5th Cir. 1995) (under LMRA § 301, "courts are free to examine arbitration awards to ensure that the arbitrator acted in conformity with the jurisdictional prerequisites of a collective bargaining agreement and may vacate an award that exceeds contractual authority").

provisions do not function in this way, its counsel has, on <u>two separate occasions</u> during the

course of other proceedings between the parties, candidly acknowledged and agreed with the

NBA's interpretation:

- [I]f you look, for example, in 35D [sic] [of the NBA Constitution], when they are talking about this is the commissioner's ability to discipline for conduct of a player at or during an exhibition, regular season or playoff game. So this is on-court behavior as we colloquially use that phrase.

(Buchanan Aff. ¶ 35, Opening Argument of Jeffrey Kessler in <u>NBPA (Sprewell) v. NBA</u>, at 35

(Jan. 27, 1998) (emphasis added).)

- Because if you look at Article 35 of the NBA Constitution, which both parties cite, which is attached to the Uniform Player Contract, it goes through different reasons for suspending. You could be suspended for drugs and you could be suspended for gambling and you could be suspended for crimes, and in a separate section, in Article 35, you can be suspended for on-court behavior.

(Buchanan Aff. ¶ 35, Oral Argument of Jeffrey Kessler in <u>Ewing v. Stern</u>, No. 97 Civ. 3578

(JSR), at 14 (S.D.N.Y. May 16, 1997) (emphasis added).)[5]

There can, of course, be no reasonable dispute that the misconduct at issue in this case

took place "at or during" an NBA game. Nor, if only based on the acknowledgement by the

NBPA's own counsel during the <u>Sprewell</u> and <u>Ewing</u> matters, can there be any legitimate

question that <u>both</u> the NBA <u>and</u> the Players Association have understood the language of Article

35(d) to mean "on the playing court." These facts, alone, should dictate the result in this case.[6]

---

[5]     The NBPA's anticipated attempt to distinguish these prior concessions should be unavailing. Even assuming, as the Players Association will likely argue, that the central issues in <u>Sprewell</u> and <u>Ewing</u> were unrelated to the question raised here (a conclusion that is clearly <u>not</u> the case with respect to <u>Ewing</u>), that would hardly make its counsel's statements unreliable indicators of the NBPA's position. The truth is that these statements reflect a long-held understanding of the relationship between Article 35(d) and Section 8 that has been recognized and relied upon by <u>both</u> the NBA and the Players Association.

[6]     Citing the grievance arbitration in the <u>Sprewell</u> matter, the NBPA previously argued that it is "well established that an Article 35(d) suspension by the Commissioner is subject to review by the Grievance Arbitrator." (<u>See</u> Kessler Letter of November 30, 2004, at 7-8.) This argument – like the contention at the TRO hearing that Jermaine O'Neal's misconduct did <u>not</u> occur on the

**B.    The NBA's Interpretation of Section 8 Is Supported By Prior Arbitral and Judicial Authority.**

The conclusion that the Grievance Arbitrator lacked authority to decide this matter is also compelled by prior arbitral and judicial authority – the only authorities that have previously addressed the issues now before the Court.

In a 1992 arbitration before NYU Law Professor Daniel Collins arising under the 1988 CBA, the NBPA contended that the Commissioner lacked the authority to issue a suspension without pay to a player who had engaged in an altercation with spectators. See NBPA (Charles Barkley) v. NBA, No. 92-3 (1992). In that case, during a stoppage in play, Charles Barkley walked into the out-of-bounds area underneath the basket and verbally abused and spit on spectators in the stands. (Buchanan Aff. ¶ 37.) Under the theory advanced by the NBPA here, one might have expected the Players Association to challenge the Commissioner's jurisdiction on the ground that Barkley's misconduct did not occur "on the playing court," because the player was in the out-of-bounds area and acted outside of the "flow of the game." But the Players Association made no such argument. Instead, the NBPA's only claim was that the Commissioner lacked the authority to order a suspension "without pay."

Arbitrator Collins made short work of the Players Association's attempt to avoid the Commissioner's exclusive authority, holding that the matter was "not within the Impartial

---

playing floor – is just another bald and insupportable assertion advanced by the NBPA. Sprewell was suspended pursuant to Article 35(e) of the NBA Constitution, not 35(d), as his misconduct occurred at a team practice and not "on the playing court." (See Buchanan Aff. ¶ 58.) Indeed, there has never been a suspension imposed under Article 35(d) that has been reviewed and overturned by the Grievance Arbitrator. On the one and only occasion where an NBA Arbitrator was asked to review an Article 35(d) suspension, he determined that the Arbitrator had no jurisdiction to hear the NBPA's challenge and that it could only be brought before the Commissioner. See NBPA (Charles Barkley) v. NBA, No. 92-3 (1992).

6

Arbitrator's contractual jurisdiction."[7] Moreover, he, too, agreed that the conduct engaged in by Barkley was conduct "on the playing court": "The Arbitrator finds the issue to be whether a dispute concerning a suspension of a Player by the NBA Commissioner or his designee <u>for conduct on the playing court</u> can only be processed pursuant to the Special Procedure set forth in Article XXVIII, Section 2(f)(1) of the Collective Bargaining Agreement." <u>Barkley</u> at 2 (emphasis added).[8]

Similarly, in a 1997 disciplinary dispute arising under the 1995 CBA, this Court came to the same conclusion as Arbitrator Collins in <u>Barkley</u>. <u>See</u> <u>Ewing v. Stern</u>, No. 97 Civ. 3578 (JSR) (S.D.N.Y. May 16, 1997). In that case, a dispute arose over suspensions imposed by the NBA for a player altercation occurring out-of-bounds and in the spectator seats behind the basket during a playoff game. (Buchanan Aff. ¶ 44.) Here again, the Players Association did not argue that the misconduct was not "on the playing court," but instead asserted that the rule enforced by the NBA (prohibiting players from leaving the bench area) was unreasonable. The NBPA, purporting to commence a grievance arbitration in support of this position, moved this Court for a stay of the suspensions pending resolution of the arbitration. (<u>Id.</u>) Judge Rakoff rejected the NBPA's motion, finding that the Players Association could not establish a likelihood of success

---

[7]   "The Impartial Arbitrator believes the language of Article XXVIII, Section 2(f)(1) [now Article XXXI, Section 8] <u>clearly and unambiguously provides that disputes such as those at issue here,</u> i.e., 'involving. . . a suspension imposed upon a Player by the Commissioner (or his designee),' <u>are not within the Impartial Arbitrator's contractual jurisdiction.</u> Thus, he cannot express any opinion as to the merits of such disputes, including whether the Commissioner or his designee is contractually empowered to impose a suspension without pay. <u>That question can only be addressed under the Agreement by the Commissioner.</u>" <u>Barkley</u> at 7 (emphasis added). (<u>See</u> Buchanan Aff. ¶ 42 (making clear that the language of Article XXXI, Section 8 of the current CBA is substantially identical to the language of Article XXVIII, Section 2(f)(1) of the 1988 CBA).)

[8]   <u>See also</u> <u>Barkley</u> at 7-8 ("The Impartial Arbitrator for the foregoing reasons finds that a dispute concerning a suspension of a Player by the Commissioner or his designee <u>for conduct on the playing court</u> can only be processed pursuant to the Special Procedure set forth in Article XXVIII, Section 2(f)(1) of the Collective Bargaining Agreement.") (emphasis added).

on the merits because the dispute was not arbitrable, but rather fell within the exclusive

jurisdiction of the Commissioner under Article XXXI, Section 8 of the CBA. Ewing, 97 Civ.

3578, Tr. at 59. As the court observed:

> We have an article, Article 31, <u>which is the natural place anyone would look to
> see if something is arbitrable or not</u>, because it is entitled "Grievance and
> Arbitration Procedure;" and among other pertinent things Section 8 of that article,
> entitled "Special Procedures with Respect to Player Discipline," states that "Any
> dispute involving a fine or suspension imposed upon a player by the
> Commissioner or his designee <u>for conduct on the playing court shall be processed
> exclusively as follows:</u>" And then it sets forth provisions that do not include
> reference to the arbitrators.

Id. at 58 (emphasis added).

Both Barkley and Ewing involved misconduct by players that, under the theory presented

by the Players Association here, should have been subject to challenge before the Grievance

Arbitrator because it occurred in the spectator stands and outside "the flow of the game." But the

NBPA never even advanced this position, making clear that its current view is not a longstanding

interpretation of the CBA, but merely a convenient fiction concocted by its lawyers solely for

purposes of this case. [9] Moreover, both Arbitrator Collins and Judge Rakoff independently

concluded that the conduct at issue in those cases occurred "on the playing court," and therefore

fell within the Commissioner's exclusive jurisdiction. These decisions, alone, also dictate the

proper outcome in this case.

---

[9] The Players Association has attempted to distinguish Barkley by contending that there was a
"radical" change in the disciplinary jurisdiction of the Commissioner in the 1995 CBA and that
the NBPA had no choice but to challenge the suspension imposed on Barkley (in 1991) before the
Commissioner. That argument is specious. If the NBPA, then, truly believed the argument it
advances now as to the meaning of "conduct on the playing court," it would have made this
argument to establish that Barkley's conduct did not occur "on the playing court." Further, if its
argument had been successful, the Barkley case would have been heard by the Grievance
Arbitrator. (See Buchanan Supp. Aff. ¶¶ 8-11; infra part IV at 20-21.)

8

C.   **The Parties' Past Practice Demonstrates That "Conduct on the Playing Court" Broadly Encompasses Player Misconduct at NBA Games.**

In the twelve-plus years since <u>Barkley</u> was decided, the NBPA has repeatedly recognized through its actions that "conduct on the playing court" should be broadly interpreted to encompass any player misconduct occurring at an NBA game. In particular, on numerous prior occasions, the NBPA has filed appeals with the Commissioner – and not grievances with the Grievance Arbitrator – when challenging discipline imposed for player misconduct occurring at or during an NBA game (<u>i.e.</u>, pursuant to Article 35(d)), even where the conduct took place outside the confines of the playing floor and outside the "flow of the game." These prior appeals to the Commissioner reflect the Players Association's acknowledgement and understanding that "conduct on the playing court" includes conduct occurring in all of the following off-the-floor locations:

**The Bench Area**

In accordance with Judge Rakoff's opinion in the <u>Ewing</u> matter, the Players Association has often appealed to the Commissioner in circumstances where players have been suspended for improperly leaving the bench area. Since 1997, there have been ten such appeals filed by the Players Association. (<u>See</u> Buchanan Aff. ¶ 48(a).)

**The Press Area**

In March of 2002, the NBA fined and suspended Denver's Tim Hardaway, who, after he had been ejected from a game, removed a television monitor from the press area and threw it from there onto the playing court. The NBPA appealed to the Commissioner. (<u>See id.</u>, ¶ 48(c).)

**The Scorer's Table**

In March of 2002, following the conclusion of a game, Indiana's Reggie Miller engaged in a shoving match with Kobe Bryant of the Lakers, which ended up out of bounds when Miller pushed Bryant onto the scorer's table, leading to a suspension and fine for Miller. The NBPA appealed to the Commissioner. (<u>See id.</u>, ¶ 48(d).)

**The Spectator Area**

Consistent with the decisions in <u>Barkley</u> and <u>Ewing</u>, the NBPA has appealed to the Commissioner in circumstances where players have engaged in misconduct in the spectator stands. For example, in February 1995, Houston's Vernon Maxwell entered the stands and

9

attacked a spectator, leading to a fine and suspension that was appealed to the NBA Commissioner. (See id., ¶ 48(h).)  In May 1994, Chicago's Jo Jo English was suspended for pushing an opposing player over the first row of spectator stands, starting a melee in the spectator area involving numerous players.  The discipline was appealed to the Commissioner. (See id., ¶ 48(i).)  Similarly, the NBPA appealed to the Commissioner the discipline imposed on New York's Clarence Weatherspoon, who, in 2002, threw an opposing player into the spectator area.  (See id., ¶ 48(b).)

**The Locker Room**

In January 2000, Gary Trent was fined and suspended for entering the visiting team's locker room to confront an opposing player who had been ejected from the game.  The NBPA appealed to the Commissioner. (See id., ¶ 48(f).)  Similarly, in March 2000, Ron Mercer was also fined and suspended for entering the visiting team's locker room to confront an opposing player at the completion of a game.  The NBPA appealed to the Commissioner. (See id. ¶ 48(e).)

The Players Association has also filed appeals to the Commissioner in numerous

instances where the conduct at issue occurred during a stoppage in play or after the game ended,

or where the conduct was committed by players who were on the bench or who had been ejected

from the game.  These appeals reflect the Players Association's acknowledgement and

understanding that "conduct on the playing court" includes conduct occurring outside of "the

flow of the game."  For example:

- Vernon Maxwell (altercation with a fan in the stands) and Patrick Ewing and others (leaving the bench area during an altercation) committed their misconduct after they had been sitting in the bench area.  (See id., ¶ 49(a).)

- Charles Barkley (spitting on fan in the stands) committed his misconduct after play had stopped. (See id., ¶ 49(b).)

- Gary Trent (altercation in locker room) committed his misconduct during a game in which he did not play due to injury. (See id., ¶ 49(c).)

- Tim Hardaway (throwing a television monitor) committed his misconduct after he had been ejected from the game. (See id., ¶ 49(d).)

- Ron Mercer (altercation in locker room) and Reggie Miller (shoving Kobe Bryant onto scorer's table) committed their misconduct after the game had ended.  (See id., ¶ 49(e).) The same is true of Shaquille O'Neal, who was suspended in 2004 for uttering obscenities in a live television interview after the game had concluded.  The NBPA appealed this discipline to the Commissioner. (See id., ¶ 49(f).)

10

The Players Association's actions are highly relevant in interpreting the "conduct on the playing court" language contained in Section 8. Where there is a question as to the meaning of a collectively bargained provision, a court may look to extrinsic factors such as the parties' past practice to interpret the language in question.[10] The Players Association's actions also put the lie to the newfound interpretation of Section 8 being advanced here. If, as the NBPA contends, the Commissioner's jurisdiction over "conduct on the playing court" only extends to incidents that take place on the basketball floor and within "the flow of the game," then each of the examples listed above should have been challenged before the Grievance Arbitrator, and not the NBA Commissioner. In this regard, it is noteworthy that all of the post-1995 examples involved discipline that had a financial impact of greater than $25,000 on the player. (See Buchanan Aff. ¶¶ 48-49.) Thus, the only possible basis for the NBPA's view that these matters were to be heard by the Commissioner was the fact that the conduct occurred "on the playing court."

---

[10]    See, e.g., In re Chateaugay Corp., 891 F.2d 1034, 1038 (2d Cir. 1989); NBA v. NBPA (In re Chicago Bulls), 96-01, at 16 (Jan. 9, 1996) (Dam) (noting that the NBA and NBPA agreed that past practices may be considered in construing a disputed provision of the CBA); Transp.-Comm. Employees Union v. Union Pac. R.R. Co., 385 U.S. 157, 161 (1966) ("In order to interpret [a collective bargaining] agreement it is necessary to consider . . . the practice, usage and custom pertaining to all such agreements."); New York State Teamsters Conference Pension & Ret. Fund v. United Parcel Serv., Inc., 198 F. Supp. 2d 188, 196 (N.D.N.Y. 2002) (for a collective bargaining agreement, "it is well settled that the 'parties' "practice, usage and custom" is of significance in interpreting their agreement'") (quoting Consol. Rail Corp. v. Ry. Labor Executives' Ass'n, 491 U.S. 299, 311 (1989)), aff'd, 382 F.3d 272 (2d Cir. 2004). As a former NBA Arbitrator noted:

> Although [the parties'] practice may not be in accord with the best reading of the words employed by the parties, it is entitled to greater weight in determining the nature of the bargain struck than the somewhat confusing and obscure language in the contract. Conduct of the parties, over time, demonstrating what they understood their rights and obligations to be can be more persuasive evidence of the meaning of the contract, in circumstances such as these, than the less than clear language in which they sought to express their intentions.

NBA v. NBPA (Meal Expenses Allowance), (Apr. 4, 1977) (Seitz).

11

### D.    The Players Association Was Notified of the NBA's Interpretation of "Conduct on the Playing Court" and Never Contested It.

Even if the Players Association had not actively conceded the issue by its numerous

appeals to the Commissioner, it has been repeatedly and consistently notified that the NBA

considered "conduct on the playing court" to encompass conduct at or during an NBA game, yet

never challenged that interpretation. This is evidenced not only by the NBA's consistent

assertion of Commissioner jurisdiction over conduct occurring at or during an NBA game, but

also by "Player Conduct Memos" distributed by the NBA to every player and the NBPA at the

start of each of the past six NBA seasons. These memos direct that players conform their

conduct to the highest standards "both on and off the playing court." Within the former

category, the Player Conduct Memo provides as follows:

- Under the heading "Violence On the Court," it admonishes that "any player who deliberately enters the spectator stands" during or after a game will be subject to suspension. (Buchanan Aff. ¶ 56(a).)

- Under the heading "RULES RELATING TO FIGHTING, FLAGRANT FOULS AND OTHER PLAYING COURT MISCONDUCT," it sets forth prohibitions against fighting, throwing punches, and leaving the bench area during an altercation. (Id., ¶ 56(b).)

- Under the sub-heading "OTHER RULES GOVERNING CONDUCT ON THE PLAYING COURT," it sets forth prohibitions against "stimulating or encouraging crowd disorder." (Id., ¶ 56(c).)

Despite having received a copy of the Player Conduct Memos for the past six years –

including, most recently, on October 18, 2004 – the NBPA never once disputed or challenged the

NBA's characterization of "conduct on the playing court" as described in those memos. (Id., ¶

57.) The NBPA's silence – year after year – on this issue demonstrates its agreement with the

NBA that "conduct on the playing court" encompasses far more than conduct on the basketball

floor during game play. See Buder v. New York Trust Co., 82 F.2d 168, 171 (2d Cir. 1936)

(holding that plaintiff's continued silence regarding defendant's repeated statement of its

12

understanding of a contract provision demonstrated agreement with defendant's construction of contract term).[11]

The District Court, at the TRO Hearing, questioned whether the NBA – in the section of the Player Conduct Memo entitled "Violence on the Court" – had effectively communicated its view to the Players Association that misconduct in the spectator standards constitutes conduct "on the playing court." But the Memo cannot fairly be read any other way. The Memo carefully distinguishes between "violence on the court" and "violence off the court," and allocates misconduct in the spectator standards to the former category. Moreover, the NBA asserted – and the Players Association agreed – that the Commissioner had exclusive jurisdiction over the conduct in the spectator stands that occurred in Barkley and Maxwell, among others. Thus, the Players Association has clearly been on notice for many years that the NBA regards misconduct in the spectator stands to fall within the Commissioner's exclusive jurisdiction under Section 8.

## E.    The NBA's Interpretation of Section 8 Makes Sense.

Finally, and perhaps most importantly, the Court should accept the NBA's construction of Article XXXI, Section 8, because it simply makes the most sense. While much is apparently in dispute in this case, it is at least common ground that the parties, in Section 8, attempted to create a boundary between issues properly heard by the NBA Commissioner and issues properly

---

[11]    The NBA is not contending "waiver," as the NBPA has suggested. To the contrary, the argument is simply that the NBPA's silence in the face of the NBA's open and notorious interpretation of Section 8 can be used by the Court to infer a common understanding of this provision. Accord Paulson, Inc. v. Bromar, Inc., 808 F. Supp. 736, 745 (D. Haw. 1992) (a party's silence can be interpreted to mean that certain products were not covered by parties' agreement); Rest. 2d Contracts § 202(4) ("Where an agreement involves repeated occasions for performance by either party with knowledge of the nature of the performance and opportunity for objection to it by the other, any course of performance accepted or acquiesced in without objection is given great weight in the interpretation of the agreement.") (emphasis added); 11 Williston on Contracts § 32:14 (4th ed.) ("[T]he parties' own practical interpretation of the contract – how they actually acted, thereby giving meaning to their contract during the course of performing it – can be an important aid to the court. Thus, courts give great weight to the parties' practical interpretation.").

heard by the Grievance Arbitrator. In order for this boundary to be workable and effective, it

must be clear, readily understood, and easily applied in all manner of different circumstances.

Further, the boundary rule itself should not result in competing claims of jurisdiction or

additional disputes between the parties each time a suspension is imposed pursuant to Article

35(d).

Under well-settled principles of construction, courts are required to interpret contracts in

a sensible manner, and to avoid interpretations that would lead to absurd or impracticable results.

See World Trade Ctr. Props., 345 F.3d 154, 184 (2d Cir. 2003) (holding that in construing

contract language, courts should avoid interpretation that leads to absurd results); Chicago Dist.

Council of Carpenters Pension Fund v. K & I Constr., Inc., 270 F.3d 1060, 1068 (7th Cir. 2001)

(holding that where one of two possible interpretations of agreement would lead to an

unworkable or impracticable process, that interpretation should be rejected). These principles

should lead this Court to interpret Section 8 in accordance with the NBA's view, and

accordingly, to vacate the Grievance Arbitrator's award.

There is little, if any, cause for confusion or debate in a rule that commits to the

Commissioner's exclusive jurisdiction all player conduct that occurs at or during an NBA game.

It is for this reason, we submit, that, until the highly-publicized Detroit Incident, the Players

Association had never successfully put the merits of an NBA fine or suspension for conduct at or

during an NBA game before a neutral arbitrator.[12]

---

[12]    This is so, notwithstanding the fact that the NBA regularly disciplines players for conduct at or
during NBA games and the Players Association regularly appeals such discipline to the
Commissioner. Indeed, although the NBA has imposed such discipline on almost 250 separate
occasions since the commencement of the 1999 CBA alone (and many multiples of that number
since the "conduct on the playing court" language was first included in the parties' labor contract
in 1972), in none of these 250 instances did the NBPA put the propriety of the suspension before
the Grievance Arbitrator. The NBPA did, however, challenge 78 of these 250 instances of Article
35(d) discipline before the Commissioner. (See Buchanan Supp. Aff. ¶ 7.)

In contrast, the Players Association's position is – to put it charitably – far less clear. Initially, the NBPA argued that conduct does not fall within Section 8 unless it occurs "on the playing floor" and within "the flow of the game." But the NBPA offered no support of any kind for these asserted limitations – no language within Article XXXI, no prior judicial or arbitral decision, and no prior communication to the NBA discussing such an interpretation.[13] When pressed on the matter at the TRO Hearing, counsel for the NBPA abandoned these positions, arguing instead that there is no single standard or factor that is dispositive in its analysis of conduct "on the playing court." Under this new analysis, the application of Section 8 does <u>not</u> depend on the precise location of the misconduct (<u>see</u> Tr. 87:9-12), whether the game is ongoing or over (<u>see</u> Tr. 85:19-23, 91:7-13), or whether the misconduct involves just players, or players and fans (<u>see</u> Tr. 90:14-18, 91:9-21). In the end, the NBPA's interpretation of "conduct on the playing court" appears simply to be: "they know it when they see it." This is hardly a reasonable or practical interpretation of the parties' agreement, but instead one that would raise the prospect of ancillary litigation in federal court (since arbitrability must be judicially determined) each and every time the Commissioner imposed discipline pursuant to Article 35(d) of the NBA Constitution.

---

[13]     The Players Association does contend that its interpretation of Section 8 is supported by paragraph 19 of the UPC. But that language refers to the "playing floor" and not the "playing court," and therefore supports the NBA's view that the two terms are not one and the same.

### III.   EVEN UNDER AN UNDULY RESTRICTIVE INTERPRETATION OF SECTION 8, THE CONDUCT ENGAGED IN DURING THE DETROIT INCIDENT FALLS WITHIN THE COMMISSIONER'S EXCLUSIVE JURISDICTION.

While it is obviously true that the conduct of the suspended players during the Detroit Incident took place at or during an NBA game, it is also true that this dispute is one "involving . . . a fine or suspension imposed upon a player . . . for conduct on the playing court" within the literal meanings of those words. Thus, even under an unduly restrictive interpretation of Section 8, the Grievance Arbitrator's award should still be vacated.

The Detroit Incident commenced during a game, in the waning seconds of the fourth quarter, with a hard foul and a retaliatory shove between two players on the basketball floor. Other players quickly became involved in the altercation, some as peacemakers and some as escalators, in a confrontation between the two teams that occurred on the basketball floor. Following a thrown object by a spectator, certain players engaged in continued and additional violent misconduct in the spectator stands just adjacent to the basketball floor and then again on the basketball floor itself. In particular, the following occurred:

- Defendant Johnson left the immediate vicinity of his team's bench during the altercation (in violation of NBA rules), and punched a spectator on the basketball floor;

- Defendant O'Neal left the immediate vicinity of his team's bench during the altercation (in violation of NBA rules), shoved an usher who was trying to keep him from leaving the basketball floor and entering the stands, and punched a spectator on the basketball floor;

- Defendant Artest left the basketball floor and deliberately entered the stands to confront and push a spectator, and then returned to the basketball floor to punch one spectator and push another; and

- Defendant Jackson acted as an escalator rather than as a peacemaker on the basketball floor, left the basketball floor and deliberately entered the stands, where he punched one spectator in the face and another in the back of the head. Jackson also spit at two different fans as he left the basketball floor.

(See Buchanan Aff. ¶ 8.)

16

As the foregoing makes clear, each of the defendants participated in serious misconduct that literally took place "on the playing court." Indeed, <u>all</u> the misconduct of defendants Johnson and O'Neal occurred "on the playing court," within the plain and ordinary meaning of those words.[14] Some of the misconduct of defendants Artest and Jackson took place, literally, "on the playing court," and some took place in the spectator stands, only a few feet away from the basketball floor. All the misconduct of these two players, however, and the misconduct of the other defendants, took place during an NBA game and resulted from the original foul and altercation that occurred on the playing floor.

On these facts, the only reasonable conclusion is that this conduct, in its totality, occurred "on the playing court" and therefore falls within the exclusive jurisdiction of the Commissioner. This conclusion is literally true for the conduct of defendants O'Neal and Johnson, and it is literally true for much of the conduct of defendants Artest and Jackson. For the remainder of the conduct of defendants Artest and Jackson, it is the only conclusion that makes sense, as any other interpretation, as discussed above, would lead to competing claims of jurisdiction between the Commissioner and the Grievance Arbitrator for the same incident, create the potential for inconsistent penalties, and produce potentially absurd results.

In this regard, it is important to keep clearly in mind that Section 8 does not require that <u>all</u> of a player's misconduct occur on the playing court – so long as the dispute is one "<u>involving</u> . . . a fine or suspension imposed upon a player . . . for conduct on the playing court" (emphasis

---

[14]    While a portion of defendant O'Neal's misconduct occurred in the out-of-bounds (or "apron") area, the Players Association cannot seriously contend that this does not constitute part of the "playing court" within the Commissioner's exclusive jurisdiction. The apron is certainly part of the "playing court," since important portions of the game itself take place there. (<u>See</u> Buchanan Supp. Aff. ¶¶ 2-5.) In any case, such an argument is foreclosed by Judge Rakoff's opinion in <u>Ewing v. Stern</u>, No. 97 Civ. 3578 (JSR), Tr. at 58, where he found that player misconduct in the bench area constitutes "conduct on the playing court."

17

added). Because each of the individual defendants engaged in some misconduct that occurred literally on the playing floor, defendants' challenge is inescapably and unavoidably a dispute "involving" a fine or suspension imposed upon a player for "conduct on the playing court." Accordingly, even were the Court to accept the narrowest possible interpretation of Section 8, the Commissioner alone has jurisdiction to resolve this dispute.

## IV.   THE NBPA'S REMAINING ARGUMENTS ARE MERITLESS.

### A.   The "Integrity of The Game" Language in Section 8 Has No Bearing on This Case.

The Players Association argues that its position is supported by a change in the language of Section 8 that was adopted by the parties in 1995. Prior to that time, Section 8 made clear that the Grievance Arbitrator lacked jurisdiction over: (i) disputes involving fines or suspensions for "conduct on the playing court;" and (ii) action taken by the Commissioner "concerning the preservation of the integrity of, or the maintenance of public confidence in, the game of basketball." (Buchanan Aff. ¶ 18, Ex. 19.) In the 1995 CBA, this latter provision was amended to provide that the Commissioner's exclusive jurisdiction over "integrity" matters would be limited to cases in which the financial impact on the player is "$25,000 or less." (Id.)

At the hearing before the Grievance Arbitrator, and initially in this Court, the NBPA argued that the foregoing language change directly supported the Grievance Arbitrator's jurisdiction, because the suspensions of the Indiana players assertedly involved "integrity" issues and have a financial impact on the players in excess of $25,000. But this argument is nothing but a smokescreen, and, by the end of the TRO Hearing, it appeared to have been dropped by the NBPA. (Tr. at 84.) Even in its current incarnation, Article XXXI, Section 8 still withdraws jurisdiction from the Grievance Arbitrator in two separate and distinct circumstances: (i) where, as here, the dispute involves "conduct on the playing court," or (ii) where the action taken by the

18

Commissioner concerns "integrity" issues. The NBA suspensions in this case were imposed for "conduct on the playing court," and not for "integrity" concerns, and the Players Association has no basis for asserting otherwise.[15] Indeed, in the 1997 Sprewell arbitration, counsel for the Players Association candidly conceded the point when he stated that: "Section 8 of Article XXXI provides that the Commissioner shall hear appeals of any suspension for conduct on the playing court." (See Buchanan Aff., Ex. 32 (quoting NBPA counsel Jeffrey Kessler in Sprewell).)[16]

What now remains is the NBPA's contention that the change in the "integrity" language explains away the Barkley decision and the Vernon Maxwell and Jo-Jo English appeals – cases occurring prior to 1995 in which the Players Association acknowledged and agreed that misconduct in the spectator stands was "conduct on the playing court." For several reasons, this argument, too, is meritless.

First, the Players Association's argument proceeds from the premise that, prior to 1995, all player misconduct fell into one of two categories: "conduct on the playing court or conduct raising "integrity" concerns. Because (according to the NBPA) these were the only two kinds of player misconduct, and because (according to the NBPA) both fell within the Commissioner's

---

[15]  The NBA, of course, determines the basis upon which its suspensions are issued. Although more is hardly necessary to establish this point, Article XXXI, Section 8(b) is instructive, as it allows the NBA Commissioner to "withdraw" from the Grievance Arbitrator any matter raising "integrity" concerns that has a financial impact of less than $25,000. There is no similar provision authorizing the Players Association to "withdraw" from the Commissioner a matter that it contends raises "integrity" issues.

[16]  See also Ex. 32, Argument of Jeffrey Kessler in Sprewell, Tr. at 53-54 ("The first point is that under Section 8A [sic], any fine or suspension imposed upon a player by the commissioner for conduct on the playing court cannot be grieved at all, period. So that we are not dealing [here] with conduct on the playing court because that cannot be grieved except through this special procedure where the commissioner is the ultimate decision maker.") (emphasis added).

exclusive jurisdiction prior to 1995, the Players Association had no ability to challenge the
Commissioner's discipline in the <u>Barkley</u>, <u>Maxell</u>, or <u>English</u> matters.

The premise of the NBPA's argument is fallacious. The Commissioner has <u>never</u> – either
before 1995 or afterward – had exclusive jurisdiction over <u>all</u> types of player misconduct. In
other words, there have <u>always</u> been certain acts of player misconduct, and consequent
discipline, that the NBPA could ask the Grievance Arbitrator to review. This is made clear by
numerous provisions in Article XXXI that evidence the Grievance Arbitrator's general authority
over player discipline matters – provisions that have been contained in the parties' CBA since at
least 1980. These provisions include:

- Section 14(c), which provides that, in certain "Grievances involving discipline," the issue
  to be resolved is whether "there has been just cause for the penalty imposed";

- Section 14(d), which allows the Grievance Arbitrator to provide a "make whole" remedy
  to a player who is improperly disciplined;

- Section 14(e), which provides that the Grievance Arbitrator's authority shall not be
  deemed to "limit or impair" the NBA's right to "impose discipline" on a player; and

- Section 2(a), which provides that the NBPA may not "initiate a Grievance involving
  player discipline without the approval of the player(s) concerned."

The identical provisions are contained in the 1995 CBA (<u>see</u> Buchanan Aff., Ex.19, Article
XXXI, Sections 2(a), 14(c)-(e)), the 1988 CBA (<u>see</u> Buchanan Aff., Ex. 18, Article XXVII,
Sections 2(a)(1), 3(d)-(f)), and the 1980 CBA (<u>see</u> Buchanan Aff., Ex. 17, Article XXI, Sections
2(a)(1), 3(d)-(f)), among others. If the Players Association were correct, and all challenges to
player discipline were required to be heard by the Commissioner prior to 1995, then there would
have been no purpose whatsoever for these provisions in the parties' prior agreements.[17]

---

[17]    In his "award," the Grievance Arbitrator unflinchingly accepted the NBPA's bogus argument
regarding "integrity" matters, even going so far as to find that "[t]he 1995 CBA provided <u>for the
first time</u> that discipline could only be imposed for just cause." (Buchanan Aff., Ex. 31 at 15
(emphasis added).) As the foregoing makes clear, this conclusion was just dead wrong, as the

In truth, the NBPA could have argued that the conduct of Barkley, Maxwell, and English – all of which occurred in the spectator stands and outside "the flow of the game" – did not constitute "conduct on the playing court" or raise "integrity" concerns. And, if those arguments had been successful, the Players Association would have been able to bring the merits of the Commissioner's discipline before the Grievance Arbitrator for decision. The NBPA cannot escape its prior appeals to the Commissioner by asserting otherwise.

Second, the NBPA has no support for the proposition that the NBA viewed the Barkley, Maxwell, and English matters as raising "integrity" issues, or that such a view would have been accepted if the jurisdictional issue had been contested by the Players Association. Further, the extremely broad reading of Section 8's "integrity" provision that the Players Association is advancing now is entirely inconsistent with the much narrower interpretation that it has previously held. In the 1998 proceeding, for example, the NBPA argued that the "integrity" language only applied to "gambling by players, the use of performance enhancing drugs, agreements not to win games in order to affect draft pick positions, or other conduct regarding whether the basketball games themselves are being decided other than on the merits." (Buchanan Supp. Aff., Ex. 55, NBPA Sprewell Post-Hearing Br., at 25.) Under this interpretation, which the NBPA apparently held at least through 1998, none of the conduct at issue in the Barkley, Maxwell, and English matters should have raised any "integrity" concerns. Thus, the Players Association cannot now pretend that the "integrity" provision – and not the provision governing "conduct on the playing court" – was the reason why it challenged each of these matters before the Commissioner.

_____

"just cause" standard for certain disciplinary matters has been part of the parties' collective agreement for over twenty years. This, unfortunately, is only one of many erroneous "facts" that the Grievance Arbitrator relied upon in issuing his decision on the jurisdictional issue.

Third, and in any event, the NBPA filed appeals to the Commissioner in numerous incidents that <u>post-dated</u> the language change in September 1995. If the Players Association truly believed – after September 1995 – that it was entitled to challenge before a neutral arbitrator conduct that occurred off the playing floor and outside the "flow of the game," then, thereafter, it would <u>not</u> have filed appeals to the <u>Commissioner</u> for the discipline imposed on Tim Hardaway, Shaquille O'Neal, Reggie Miller, Gary Trent, Clarence Weatherspoon, and Ron Mercer described above, and it would have made an entirely different argument in the <u>Ewing</u> proceeding before Judge Rakoff in 1997. Each of these incidents of discipline had a financial impact on the player involved of more than $25,000, and thus – under the new language added to Section 8 in 1995 – each was only appealable to the Commissioner as discipline imposed for "conduct on the playing court."

**B.   The Question of Arbitrability Is Subject To *De Novo* Review.**

The Players Association contends that the NBA is not entitled to *de novo* review of the Grievance Arbitrator's determination that he – and not the NBA Commissioner – has jurisdiction to review a challenge to the NBA's suspensions. The basis of that argument is the assertion that the jurisdictional dispute raises only an issue of "procedural arbitrability" of the kind that is typically decided by arbitration. That argument is entirely unsupportable.

First, the NBA's argument is foreclosed by the Second Circuit's recent decision in <u>Katz v. Feinberg</u>, 290 F.3d 95 (2d Cir. 2002). In that case, the parties in their governing agreement had authorized two arbitrators to resolve disputes – one with general authority under a broad arbitration clause and one with specific authority over a particular type of dispute. Plaintiff argued there, as the Players Association does here, that the question of which arbitrator should decide the dispute at issue was itself resolvable by the arbitrator with broad general authority.

22

The Second Circuit disagreed. Citing <u>First Options of Chicago, Inc. v. Kaplan</u>, 514 U.S. 938, 944 (1995), the Court noted that an arbitrator is permitted to determine his own authority to hear a dispute <u>only</u> where there is "clear and unmistakable" evidence that the parties specifically agreed to give that power to the arbitrator. <u>See id.</u> at 944; <u>accord</u> <u>AT&T Techs., Inc. v.</u> <u>Communications Workers</u>, 475 U.S. 643, 649 (1986). Moreover, in language that is directly on point here, the Court held that the existence of both broad and narrow arbitration clauses assigning jurisdiction to two different arbitrators "creates an ambiguity, which, under <u>First</u> <u>Options</u>, requires us to assign questions of arbitrability to the district court, not the arbitrator." <u>Katz</u>, 290 F.3d at 97. In this case, the same result must apply: because the CBA contains a specific grant of authority to the NBA Commissioner under Article XXXI, Section 8, the Players Association cannot establish that the parties "clearly and unmistakably" intended to confer jurisdiction in this matter to the Grievance Arbitrator, and thus the issue must, as a matter of law, be determined by the Court.[18]

Even apart from <u>Katz</u>, the question of whether the Grievance Arbitrator has jurisdiction to review the propriety of the Commissioner's suspensions is clearly a matter of "substantive arbitrability" -- a concept and phrase that is well understood to refer to the question of "whether the parties have agreed to arbitrate <u>and</u> what issues are included in that arbitration agreement." <u>Dist. 2, Marine Eng'rs Beneficial Ass'n v. Falcon Carriers, Inc.</u>, 374 F. Supp. 1342, 1346 (S.D.N.Y. 1974) (emphasis added); <u>see</u> <u>John Wiley & Sons, Inc. v. Livingston</u>, 376 U.S. 543, 557-58 (1964). "Procedural arbitrability," in contrast, refers to questions of "whether

---

[18]     That result is even clearer here, since the parties have unequivocally provided in Article XXXI, Section 5(b) of the CBA that questions of substantive arbitrability are not within the jurisdiction of the Grievance Arbitrator. Specifically, Section 5(b) states: "<u>Nor</u>, in the absence of agreement by the NBA and the Players Association, <u>shall the Grievance Arbitrator have jurisdiction or authority to resolve questions of substantive arbitrability.</u>" (emphasis added).

prerequisites such as time limits, notice, laches, estoppels and others conditions precedent to an obligation to arbitrate have been met." <u>Howsam v. Dean Witter Reynolds, Inc.</u>, 537 U.S. 79, 85 (2002). The Players Association argues, without explanation, that the question of whether the Commissioner or the Grievance Arbitrator has jurisdiction over this dispute meets the foregoing condition because it is a "condition precedent to an obligation to arbitrate," and thus a question of "procedural arbitrability." That is simply a non-sequitur. The determination of the appropriate decision maker for this dispute is not some "condition precedent" – as would be, for example, the filing of a grievance notice within the applicable limitations period – but rather the most fundamental issue of arbitrability that the parties could present.

Furthermore, the Players Association's contention that this case presents nothing more than a "procedural" choice between two "arbitrators" proceeds from a fanciful – and an entirely inaccurate – characterization. Nowhere in the CBA is there any suggestion that the Commissioner is an "arbitrator." To the contrary, the dispute resolution process before the Commissioner (set forth in Section 8) is expressly described as a "Special Procedure" that is carved out of the Grievance Arbitrator's jurisdiction and bears no relation to the arbitration proceedings before the Grievance Arbitrator. The Commissioner is not, like the Grievance Arbitrator, a disinterested third-party; he has been accorded the exclusive authority to hear appeals regarding discipline in connection with the presentation of the NBA's core product (NBA games) precisely because he is the chief executive of the NBA and responsible for the operation and success of the league.[19] An arbitration, on the other hand, is defined as a "method

---

[19] There is nothing for the NBPA to make out of the fact that the Commissioner is not a "neutral." As Judge Learned Hand stated some 60 years ago, when contracting parties determine their own method of dispute resolution, they "can ask no more impartiality than inheres in the method they have chosen." <u>American Almond Prods. Co. v. Consol. Pecan Sales Co.</u>, 144 F.2d 448, 451 (2d Cir. 1944), quoted with approval in, <u>Merit Ins. Co. v. Leatherby Ins. Co.</u>, 714 F.2d 673, 679 (7th Cir. 1983). Nor has that fact ever concerned the Players Association before. <u>See</u> <u>supra</u> n.12.

of dispute resolution involving one or more <u>neutral third parties</u>." <u>Black's Law Dictionary</u> 112

(8th ed. 2004) (emphasis added).

That the appeal procedure reserved to the Commissioner under Section 8 is not in any

sense an "arbitration" was made clear by Judge Rakoff in <u>Ewing</u>. In denying the NBPA's

request for preliminary injunctive relief, Judge Rakoff reviewed the CBA and distinguished the

grievance arbitration proceedings from the non-arbitration proceedings before the Commissioner.

Specifically, Judge Rakoff observed:

> We have an article, Article 31, which is the natural place anyone would look to
> see <u>if something is arbitrable or not</u>, because it is entitled "Grievance and
> Arbitration Procedure;" and among other pertinent things Section 8 of that article,
> entitled "Special Procedures with Respect to Player Discipline," states that "Any
> dispute involving a fine or suspension imposed upon a player by the
> Commissioner or his designee for conduct on the playing court shall be processed
> exclusively as follows:" And then it sets forth provisions that <u>do not include
> reference to the arbitrators.</u>

<u>Ewing v. Stern</u>, No. 97 Civ. 3578 (JSR), Tr. at 58 (May 16, 1997) (emphasis added). Thus,

Judge Rakoff concluded that the dispute before him was not arbitrable because it was instead

within the exclusive jurisdiction of the Commissioner.[20]

Even assuming for the sake of argument that the Commissioner could in any sense be

considered an "arbitrator," the question of whether the merits of this dispute are to be heard by

the Commissioner or the Grievance Arbitrator would nonetheless be a matter to be decided by

the court. <u>Katz</u> could not be clearer on this point. There, the Second Circuit expressly rejected

the argument advanced by the NBPA: that the issue of selecting between two dispute resolution

provisions is to be decided by one of the potential "arbitrators." Rather, the Second Circuit held

---

[20]    <u>See also</u> <u>Cendant Corp. v. Forbes</u>, 70 F. Supp. 2d 339, 342-43 (S.D.N.Y. 1999) ("When parties
enter into an agreement to submit an otherwise arbitrable question to an appraiser, it is logical to
conclude that, by entering into the appraisal agreement, they intend to remove the question from
the range of arbitrable matters and to be bound by the appraiser's findings."), <u>aff'd mem.</u>, 205
F.3d 1322 (2d Cir. 2000).

25

that the question of which arbitrator should decide the merits of the dispute was a matter <u>only</u> for

the court. <u>See</u> <u>Katz</u>, 290 F.3d at 96-97; <u>Bear Stearns & Co. v. N.H. Karol & Assocs., Ltd.</u>, 728

F. Supp. 499, 500-02 (N.D. Ill. 1989) (holding that a dispute as to whether a matter was

arbitrable before the National Association of Securities Dealers or the American Arbitration

Association was an issue for the court).[21]

The NBPA's reliance on the 1998 decision by John D. Feerick, the former Grievance

Arbitrator, is misplaced. That decision preceded (and indeed was the impetus for) the 1999

amendment of Section 5(b) that expressly prohibited the Grievance Arbitrator from deciding his

own jurisdiction. (Buchanan Aff. ¶ 19.) Moreover, Arbitrator Feerick was not deciding whether

the Grievance Arbitrator or the Commissioner had jurisdiction to hear the merits of the dispute,

but only whether a dispute that was clearly arbitrable was no longer within his jurisdiction

because the CBA had expired. Equally unavailing is the NBPA's reliance on <u>In re John Starks</u>,

No. 00-01 (Mar. 6, 2000), a case in which the CBA's System Arbitrator – whose jurisdiction to

determine arbitrability is not subject to the prohibition in Article XXXI, Section 5(b) applicable

to the Grievance Arbitrator – determined a question of whether a particular dispute was

arbitrable.

---

[21]    <u>See also</u> <u>Merrill Lynch, Pierce, Fenner & Smith Inc. v. Noonan</u>, No. 92 Civ. 3770 (SWK), 1992
WL 196741, at *4-8 (S.D.N.Y. Aug. 3, 1992) (differentiating between matters that are
appropriately resolved by courts and those reserved for arbitrators by deciding which among three
potential arbitrators had jurisdiction to hear the dispute, but deferring to that arbitrator a
procedural question concerning the timeliness of the arbitration filing); <u>Avis Rent A Car Sys.,
Inc. v. Garage Employees Union, Local 272</u>, 791 F.2d 22, 25-26 (2d Cir. 1986) (interpreting
arbitration agreements and determining that selected arbitrator was improper); <u>Cargill Rice, Inc.
v. Empresa Nicaraguense Dealimentos Basicos</u>, 25 F.3d 223, 225-26 (4th Cir. 1994) (finding that
bar on arbitrators determining "their own jurisdiction" precluded arbitrators from participating in
selection process); <u>Hooters of America, Inc. v. Phillips</u>, 39 F. Supp. 2d 582, 619 (D.S.C. 1998)
("[T]he rule is well-established that it is the court's responsibility to interpret an arbitration
agreement's language regarding arbitrator selection."), <u>aff'd</u>, 173 F.3d 933 (4th Cir. 1999).

Accordingly, the Grievance Arbitrator had no authority to determine his own jurisdiction and, therefore, the question of the arbitrability of the Commissioner's suspensions is subject to a fully independent, *de novo* review by this court. See First Options, 514 U.S. at 943-45; Katz, 290 F.3d at 97. Under a *de novo* review, the question of arbitrability is considered anew and without deference to any prior decision. See Zervos v. Verizon New York, Inc., 252 F.3d 163, 168 (2d Cir. 2001); Greene v. WCI Holdings Corp., 956 F. Supp. 509, 514 (S.D.N.Y. 1997) ("The term '*de novo* determination' has 'an accepted meaning in the law. It means an independent determination of a controversy that accords no deference to any prior resolution of the same controversy.'") (citation omitted), aff'd, 136 F.3d 313 (2d Cir. 1998).

Under that standard, the Grievance Arbitrator's conclusion that this dispute is arbitrable is entitled to no deference whatever, and cannot be relied upon by this Court in any way in its determination of whether the arbitration award should be vacated.

## CONCLUSION

For the foregoing reasons, the NBA's motion to vacate the arbitration award should be

granted, and the NBPA's motion to confirm that award should be denied.

Dated:      December 29, 2004
            New York, New York

                              Respectfully submitted,

                              SKADDEN, ARPS, SLATE,
                                MEAGHER & FLOM LLP
                              Jeffrey A. Mishkin (JM 8380)
                              Douglas B. Adler (DA 6013)
                              Anthony J. Dreyer (AD 3571)
                              Four Times Square
                              New York, New York  10036
                              Tel:  (212) 735-3000


                              By:  _____
                                   Jeffrey A. Mishkin

                              Attorneys for Plaintiff


                              PROSKAUER ROSE LLP
                              Howard L. Ganz (HG 8644)
                              Daniel R. Halem (DH 3035)
                              1585 Broadway
                              New York, New York  10036
                              Tel:  (212) 969-3035

                              Attorneys for Plaintiff