SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP
Jeffrey A. Mishkin (JM 8380)
Douglas B. Adler (DA 6013)
Anthony J. Dreyer (AD 3097)
Four Times Square
New York, New York  10036
Tel:  (212) 735-3000

PROSKAUER ROSE LLP
Howard L. Ganz (HG 8644)
Daniel R. Halem (DH 3035)
1585 Broadway
New York, New York  10036
Tel:  (212) 969-3035

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

NATIONAL BASKETBALL ASSOCIATION,

                Plaintiff,

– against –

NATIONAL BASKETBALL PLAYERS ASSOCIATION,
RON ARTEST, STEPHEN JACKSON, ANTHONY
JOHNSON, and JERMAINE O'NEAL,

                Defendants.

04-Civ.-09528 (GBD)

---

### SUPPLEMENTAL AFFIDAVIT OF RICHARD W. BUCHANAN
### IN SUPPORT OF MOTION TO VACATE ARBITRATION AWARD,
### AND IN OPPOSITION TO DEFENDANTS' MOTION TO CONFIRM

       I, RICHARD W. BUCHANAN being first duly sworn upon oath, state as follows:

1.      I have previously submitted an Affidavit in Opposition to Defendants' Motion to Confirm Arbitration Award and for Injunctive Relief, dated December 22, 2004.  I submit this Supplemental Affidavit in support of the motion of the National Basketball Association ("NBA")

to vacate the arbitration award issued on December 21, 2004, and in further opposition defendants' motion to confirm that arbitration award. I have personal knowledge of the facts set forth herein.

### The Playing Floor and the Apron

2. In support of its motion to confirm the arbitration award, the NBPA has argued that the "playing court" is limited only to the ninety-four feet long by fifty-feet wide in-bounds area. There can be no doubt, however, that, at the absolute minimum, the playing court includes the out-of-bounds "apron" that surrounds the in-bounds area and that protrudes at least five feet from the sidelines and at least eight feet from the endlines.

3. Under NBA rules, important portions of NBA games occur on the apron. After each basket and following the stoppage of play, the ball is put back "in play" from the apron. If a player fails to inbound the ball from the apron within five seconds, a "five second violation," and hence a turnover, occurs. In addition personal fouls can be called for conduct on the apron, including for contact between players that frequently occurs there. In fact, NBA officials spend a significant portion of an NBA game refereeing from the apron.

4. Other aspects of an NBA game also occur on the apron. Because a player is not out-of-bounds until he hits the floor of the apron, NBA players routinely dive or jump for loose balls over the apron and pass, "save," and even shoot the ball from this area. NBA players also refer to the sidelines and endlines where the apron begins as "an extra defender," because a defending player can force an offensive player towards those lines – out-of-bounds – and cause a turnover.

5. Finally, a significant amount of in-game administration occurs on the apron and in the bench areas of the teams. Prior to entering a game, a substituting NBA player must check in at the official scorer's table and wait in the substitution box, both of which are located on the apron.

The game is, obviously, coached by coaches located in the bench area, and referees often assess technical fouls for unsportsmanlike conduct engaged in by coaches and players in the bench area.

### The NBPA's Challenge to Ron Artest's Previous Suspension

6.     The Players Association points to its challenge to the NBA's previous suspension of defendant Ron Artest for throwing a camera while in the exit tunnel as "proof" that it has not consistently agreed that "conduct on the playing court" means conduct at or during an NBA game. As the Players Association well knows, the NBA disputed the NBPA's assertion that Mr. Artest's conduct was not on the playing court, and the Players Association never pursued this matter before the Grievance Arbitrator. Moreover, as with the Rasheed Wallace example upon which the Players Association also relies, the Artest matter was settled by a letter agreement in which it was acknowledged that the player had been suspended for on-the-court conduct. See Exhibit 54 attached. Thus, by reason of these acknowledgements, the Artest example, like the Wallace example, supports the NBA's position that misconduct at or during a game constitutes "conduct on the playing court," and thus is within the Commissioner's exclusive jurisdiction pursuant to Article XXXI, Section 8 of the CBA.

7.     Indeed, although the NBA has imposed discipline pursuant to Article 35(d) on almost 250 separate occasions since the commencement of the 1999 CBA alone (and many multiples of that number since the "conduct on the playing court" language first was included in the parties' labor contract in 1972), in none of these 250 instances did the NBPA pursue a challenge before the Grievance Arbitrator. By contrast, 78 of these 250 instances of 35(d) discipline were appealed to the Commissioner.

### The Players Association's Erroneous Claim that the Grievance Arbitrator Lacked Jurisdiction To Hear Challenges to Discipline Prior to the 1995 CBA

8.  In an attempt to avoid the plain result mandated by Barkley, and to obfuscate the fact that the NBPA appealed to the Commissioner the discipline imposed on Vernon Maxwell for attacking a fan in the stands and on Jo Jo English for fighting in the stands, the Players Association contends that a different result would have been reached in light of changes to the 1995 CBA concerning the Grievance Arbitrator's jurisdiction. The premise of the NBPA's argument is fallacious.

9.  The Commissioner has never – either before 1995 or afterward – had exclusive jurisdiction over all types of player misconduct. In other words, there have always been certain acts of player misconduct (e.g., misconduct that neither occurred on the playing court or involved the "integrity of the game"), and consequent discipline, that the NBPA could ask the Grievance Arbitrator to review.

10. This is made clear by numerous provisions in Article XXXI that evidence the Grievance Arbitrator's general authority over player discipline matters – provisions that have been contained in the parties' CBA since at least 1980. These provisions include Section 14(c), which provides that, in certain "Grievances involving discipline," the issue to be resolved is whether "there has been just cause for the penalty imposed"; Section 14(d), which allows the Grievance Arbitrator to provide a "make whole" remedy to a player who is improperly disciplined; and Section 14(e), which provides that the Grievance Arbitrator's authority shall not be deemed to "limit or impair" the NBA's right to "impose discipline" on a player. The identical provisions are contained in the 1995 CBA (see Ex.19, Section 14(c)-(e)), the 1988 CBA (see Ex. 18, Section 3(d)-(f)), and the 1980 CBA (see Ex. 17, Section 3(d)-(f)), among others. If the Players Association were correct, and all challenges to player discipline were required to be heard by the

4

Commissioner prior to 1995, then there would have been no purpose whatsoever for these provisions in the parties' prior agreements.

11. In truth, the NBPA could have argued that the conduct of Barkley, Maxwell, and English – which occurred in the spectator stands and outside "the flow of the game" – did not constitute "conduct on the playing court" or raise "integrity" concerns. This latter argument would have been entirely consistent with the NBPA's position at the time – which was asserted strenuously during the 1998 hearing in Sprewell – that the "integrity of the game" provision only applied to "gambling by players, the use of performance enhancing drugs, agreements not to win games in order to affect draft pick positions, or other conduct regarding whether the basketball games themselves are being decided other than on the merits." See NBPA Sprewell Post-Hearing Br., at 25, attached as Exhibit 55.

I declare under penalty of perjury that the foregoing is true and correct.

Dated:   December 29, 2004
         New York, New York

_____
Richard W. Buchanan

Sworn to before me
this 28 day of December, 2004

_____
Notary Public

My commission expires:

18 August 2007

DWAYNE DeFREITAS
NOTARY PUBLIC, State of New York
No. 01DE6097123
Qualified in Kings County
Commission Expires Aug. 18, 2007

Exhibit 54



# National Basketball Association

Stu Jackson
Senior Vice President
Basketball Operations

<u>VIA FEDERAL EXPRESS</u>

January 4, 2003

Ron Artest
Indiana Pacers
One Conseco Court
125 S. Pennsylvania
Indianapolis, IN 46204

                          Re:    Indiana Pacers @ New York Knicks
                                    <u>January 3, 2003</u>

Dear Ron:

It has been brought to my attention that, at the conclusion of the above-referenced game, you threw a television monitor to the floor and then took a camera away from a camera-person and threw it to the floor.

For your actions, which violate Article 35(d) of the NBA Constitution, you are hereby fined $35,000 and suspended without pay for the following games:

    Saturday, January 4, 2003          Indiana @ Washington
    Monday, January 6, 2003            Indiana @ Philadelphia
    Wednesday, January 8, 2003      New York @ Indiana

Please remit the sum of $35,000, payable to the National Basketball Association, before Friday, January 24, 2003.

Sincerely,

Stu Jackson

SWJ/rg

cc:    Donnie Walsh
        Doug McKee
        G. William Hunter
        Bob Criqui

Olympic Tower • 645 Fifth Avenue • New York NY 10022 • Main: (212) 407-8000 • Direct: (212) 407-8230 • Fax: (212) 980-6935 • Internet: sjackson@nba.com



NATIONAL BASKETBALL PLAYERS ASSOCIATION

January 7, 2003

<u>BY FAX AND MAIL</u>

Richard W. Buchanan, Esq.
Senior Vice President & General Counsel
National Basketball Association
645 Fifth Avenue
New York, NY 10022

        Re:   <u>Ron Artest</u>

Dear Rick:

      Please be advised that pursuant to Article XXXI of the Collective Bargaining Agreement, the National Basketball Players Association and Ron Artest hereby file this Grievance challenging the three-game suspension and $35,000 fine imposed by the NBA on Mr. Artest for breaking electronic equipment at Madison Square Garden on January 3, 2003. Please note that we do not believe this dispute falls within the parameters of Article XXXI, Section 8 of the CBA, and accordingly will request that the Grievance be heard and resolved by the Grievance Arbitrator. We will contact you in the near future to propose a hearing date.

      In accordance with the terms of Article XXXI, Section 9 of the CBA, we request that all salary withheld be deposited in the interest-bearing escrow account maintained and administered by the NBA and the Players Association.

                                           Sincerely yours,

                                           Ronald Klempner
                                           Associate Counsel

cc:   Ron Artest
       Mark Bartelstein
       Donnie Walsh



# National Basketball Association

Richard W. Buchanan
Senior Vice President &
General Counsel

January 10, 2003

<u>By Fax and Regular Mail</u>

Ronald Klempner
Associate Counsel
National Basketball Players Association
Two Penn Plaza, Suite 2430
New York, NY 10121

      Re:   <u>Ron Artest</u>

Dear Ron:

      In response to your letter of January 7, 2003, please be advised that the NBA disagrees with your contention that the Grievance Arbitrator has jurisdiction to consider a challenge to the NBA's recent fine and suspension of Ron Artest.

      Sincerely,

      Richard W. Buchanan

Olympic Tower · 645 Fifth Avenue · New York NY 10022 · Main: (212) 407-8000 · Direct: (212) 407-8013 · Fax: (212) 888-7931 · rbuchanan@nba.com



# National Basketball Association

Richard W. Buchanan
Senior Vice President &
General Counsel

January 16, 2004

**By Fax and Regular Mail**

Ron Klempner
Associate Counsel
National Basketball Players Association
Two Penn Plaza, Suite 2430
New York, NY 10121

      Re:    **Settlement of On-Court Appeals**

Dear Ron:

      This is to confirm the agreements we have reached concerning the settlement of appeals of on-court discipline filed by players during the 2002-03 season. As we discussed, the following appeals will be dropped, without opportunity to re-file, based on the following overall settlement:

| | |
|---|---|
| Ron Artest | Two games (of the eleven-game) suspension amount will be returned to the player after the All-Star break if he remains on good behavior through February 12, and two games (of the eleven-game) suspension amount will be returned to the player following the conclusion of the 2003-04 season if he remains on good behavior through the conclusion of that season (including the playoffs); remainder of escrow account will be retained by NBA for 50/50 charity split with NBPA. |

Olympic Tower · 645 Fifth Avenue · New York NY 10022 · Main: (212) 407-8000 · Direct: (212) 407-8013 · Fax: (212) 888-7931 · Internet: rbuchanan@nba.com

Ron Klempner
January 16, 2004
Page 2

| | |
|---|---|
| Tony Battie | Escrow account will be retained by NBA for 50/50 charity split with NBPA. |
| Raja Bell | 1/2 of fine amount will be returned to player; remainder of escrow account will be retained by NBA for 50/50 charity split with NBPA. |
| Troy Murphy | 1/3 of suspension amount will be returned to player; remainder of escrow account will be retained by NBA for 50/50 charity split with NBPA. |
| Eduardo Najera | Escrow account will be retained by NBA for 50/50 charity split with NBPA. |
| Greg Ostertag | Escrow account will be retained by NBA for 50/50 charity split with NBPA. |
| Clarence Weatherspoon | Escrow account will be retained by NBA for 50/50 charity split with NBPA. |
| Bonzi Wells | Escrow account will be retained by NBA for 50/50 charity split with NBPA. |
| Kevin Willis | Escrow account will be retained by NBA for 50/50 charity split with NBPA. |

As to Ron Artest, the interpretation of the phrase "remains on good behavior" will be in the sole discretion of the NBA.

Please note that in cases where a suspension-related salary amount is being returned to a player, the money will be returned to the player's team for payment via payroll check (less appropriate withholdings).

In addition, all amounts returned to players will include a pro-rata share of interest from the grievance/escrow account.

Ron Klempner
January 16, 2004
Page 3


If the foregoing does not coincide with your understanding of our agreement, please contact me immediately.

Sincerely,

Richard W. Buchanan

cc:    Bob Criqui

# Exhibit 55

BEFORE THE GRIEVANCE ARBITRATOR

- - - - - - - - - - - - - - - - - - - - - - - - - - - x

In re National Basketball Players  
   Association and Latrell Sprewell

      and

Warriors Basketball Club and  
National Basketball Association.

- - - - - - - - - - - - - - - - - - - - - - - - - - - x

## POST-HEARING BRIEF OF THE NATIONAL BASKETBALL PLAYERS ASSOCIATION AND LATRELL SPREWELL

Robert J. Lanza  
Ronald Klempner  
Hal Biagas  
  Of Counsel

G. William Hunter, Esq.  
National Basketball Players Association  
1700 Broadway, Suite 1400  
New York, New York 10019

Jeffrey L. Kessler  
David G. Feher  
Weil, Gotshal & Manges LLP  
767 Fifth Avenue  
New York, New York 10153

Joseph J. Kaplon  
Jeffrey L. Cutler  
Elizabeth Rosenfeld  
Wohlner Kaplon Phillips Young & Barsh  
15760 Ventura Boulevard, Suite 1510  
Encino, California 91436

Counsel For National Basketball Players Association  
and Latrell Sprewell

February 13, 1998

II. **BOTH THE SUSPENSION OF MR. SPREWELL BY THE NBA FOR ONE YEAR, AND THE DISCIPLINARY TERMINATION OF HIS PLAYER CONTRACT BY THE TEAM, VIOLATED THE JUST CAUSE DISCIPLINARY STANDARD OF THE CBA AND APPLICABLE PRINCIPLES OF LABOR LAW**

A. <u>The Applicable Disciplinary Standard and Burden of Proof</u>

As discussed in our Pre-hearing Brief, the "just cause" standard applies on appeal to the league's one year suspension of Mr. Sprewell, without any arbitrary and capricious standard of appellate review, because this case does <u>not</u> concern the "integrity" of "the game" of basketball -- as would discipline concerning gambling by players, the use of performance enhancing drugs, agreements not to win games in order to affect draft pick positions, or other conduct regarding whether the basketball games themselves are being decided other than on the merits. <u>See</u> CBA Article XXXI, Section 5(c); Pre-hearing Br. at 41-43. This distinction is recognized in Article 35(d) of the NBA Constitution which provides for Commissioner authority to suspend players for actions at or during a game that has been "prejudicial to or against the best interests of the Association <u>or</u> the game of basketball" (emphasis added), while Article 35(e), relied on to suspend Mr. Sprewell here, only refers to conduct that is "prejudicial or detrimental to the Association" and certain other acts, without any mention of the type of conduct that is prejudicial to "the game" (which is covered in other subsections of Article 35 that relate to such things as gambling. <u>See</u> NBA Constitution, ¶ 35(c), (d), (g)). This distinction is also recognized in the