4cnrnatm.txt

1

```
 1   UNITED STATES DISTRICT COURT
     SOUTHERN DISTRICT OF NEW YORK
 2   ----------------------------x
     NATIONAL BASKETBALL ASSOCIATION,
 3
                     Plaintiff,
 4           v.                          04 Civ. 9528 (GBD)

 5   NATIONAL BASKET BALL PLAYERS         TRO
     ASSOCIATION, RON ARTEST,
 6   STEPHEN JACKSON, ANTHONY
     JOHNSON, and JERMAINE O'NEAL,
 7
                     Defendants.
 8   ----------------------------x
                                         New York, N.Y.
 9                                       December 23, 2004
                                         10:00 a.m.
10   Before:

11           HON. GEORGE B. DANIELS
                                         District Judge
12
             APPEARANCES
13
     SKADDEN, ARPS, MEAGHER & FLOM LLP
14   Attorneys for Plaintiff
          Four Times Square
15        New York, New York  10036
          (212) 735-3000
16   BY:  JEFFREY A. MISHKIN, ESQ.
          ANTHONY J. DREYER, ESQ.
17        CHARLES S. LENT, ESQ.

18   PROSKAUER ROSE LLP
     Attorneys for Plaintiff
19        1585 Broadway
          New York, New York  10036
20        (212) 969-3000
     BY:  HOWARD L. GANZ, ESQ.
21
     DEWEY BALLANTINE LLP
22   Attorneys for Defendants
          1301 Avenue of the Americas
23        New York, NY 10019
          (212) 259-6333
24   BY:  JEFFREY L. KESSLER, ESQ.
          DAVID FEHER, ESQ.
25        JEFFREY S. RUGG, ESQ.
```

2

```
 1           (Case called)

 2           THE COURT:  Good morning, gentlemen.  I guess I should

 3   hear you first, Mr. Kessler, with regard to this application.

 4   It is an application for a temporary restraining order and/or
```

Page 1

Dockets.Justia.com

4cnrnatm.txt

5  preliminary injunction.  I would like to get a feel from you
6  exactly what you say the status of this case is and what you
7  say is the appropriate relief at this stage of the proceeding.
8          MR. KESSLER:  Very good, your Honor.
9          THE COURT:  If you would use the podium, it might be
10  easier for the court reporter.
11          MR. KESSLER:  Today, your Honor, we filed an answer
12  and counterclaim in this case asking that the arbitration award
13  issued yesterday by Roger Kaplan in this matter be confirmed
14  and seeking preliminary and permanent injunctive relief not
15  only to confirm but to require the NBA to comply with that
16  arbitration award, because the NBA has made it very clear that
17  they will not so comply absent a court order.
18          We believe, your Honor, it is appropriate and
19  compelling that in these very special circumstances a temporary
20  restraining order be issued immediately by the Court today to
21  allow Mr. O'Neal, who is the one player immediately affected,
22  to begin playing games in the NBA as the arbitrator has so
23  ordered in reducing his suspension.
24          The reason we believe that type of extraordinary
25  relief is required is because this is a classic case, your

                                                    3

1  Honor, where all the circumstances for a temporary restraining
2  order are present.  First of all, your Honor, to address the
3  requirement of irreparable harm, there can be no question, and
4  the case law is very clear on this, that when you take a
5  professional athlete of Mr. O'Neal's caliber and you require
6  him to miss games, that is not something he can be compensated
7  for by saying we will give you your back pay or we will give
8  you your monetary damages at some later time.
9          Mr. O'Neal, and this in the arbitration decision is

                          Page 2

4cnrnatm.txt

10    not disputed, is one of the top players in the NBA.  His

11    absence has an immediate and continuing effect on his team, who

12    may not make the playoffs this year despite the fact that they

13    were one of the favorite teams this year.  Losing that type of

14    an opportunity or having a lower seed in the playoffs, any of

15    those losses are not compensable in the short career of an NBA

16    player.

17            This could be Mr. O'Neal's last year of playing.  You

18    have no way of knowing with a professional athlete.  Making the

19    playoffs or not could be something you could never give back to

20    him or his fans.  So we believe the injury is clearly

21    irreparable from the standpoint of Mr. O'Neal.

22            THE COURT:  Let me ask you a question.  The NBA argues

23    that, first of all, it can be compensated in dollars, that this

24    is basically an argument that could be made any time a player

25    is suspended, and in fact this is something that has been

                                                              4

1    contemplated by both parties and is specifically addressed in

2    the contract and the agreement, that it has always been

3    contemplated, and there has never been a situation where the

4    Players Association has either won an argument or even argued

5    that a player should not immediately be suspended pending a

6    final decision on that suspension or final appeal of that

7    suspension because the player cannot be compensated in dollars.

8            MR. KESSLER:  There is a critical distinction, your

9    Honor.  This is an unprecedented situation.  In the history of

10    the National Basketball Association collective bargaining, and

11    I believe there have been collective bargaining agreements

12    going back to sometime in the late 1960s, there has never been

13    a single time in which the NBA and its teams have ever refused

14    to comply with an arbitration decision, period.  The issue has

15    never come up.

                              Page 3

4cnrnatm.txt

16          We are in a vastly different situation, vastly

17   different, because of the enormously strong federal policy in

18   favor of arbitration, enormously different situation, where an

19   arbitrator has ruled, gone through the process, the arbitrator

20   which both parties have selected has ruled, has decided this,

21   and the NBA is simply saying we won't comply.

22          THE COURT:  That doesn't change the irreparable harm

23   and doesn't change whether or not a person could be compensated

24   in dollars for that.

25          MR. KESSLER:  I will get to the irreparable harm.   I
                                                                5

1    was responding to the point that it has never happened before,

2    that an injunction has been granted pending a suspension.  On

3    likelihood of success --

4          THE COURT:  I wasn't addressing likelihood of success.

5    My question only went to irreparable injury.

6          MR. KESSLER:  On irreparable harm directly -- and I

7    will come back to the other issue -- we have cited case after

8    case, including the Silverman case in the Second Circuit, that

9    establishes that professional athletes are special in terms of

10   what it means to them to miss games.  There is huge competitive

11   significance.

12          If Mr. O'Neal gets one dollar more of salary one day

13   or not, that is not the injury that he suffers.  It is nice

14   that he gets his salary, I am not begrudging it.  But the

15   injury he suffers is the fact that if his team doesn't make the

16   playoffs by one game, he never gets back that year.  If his

17   team makes the playoffs but makes it at a lower seed so they

18   end up losing because they don't have home court advantage, he

19   never gets back that opportunity again.

20          That type of irreparable harm has been recognized in

Page 4

4cnrnatm.txt

21  case after case where leagues have said we are not going to

22  allow a player to play, we are not going to do this, over and

23  over again.  In fact, I am not aware of any case in the country

24  where the irreparable harm has even been questioned in a case

25  where we have likelihood of success.

                                                              6

1         The reason I mention that is the only reason why

2   parties have not sought stays of suspensions pending

3   arbitrations in the NBA, which is what they are arguing, has

4   all to do with the likelihood of success.  In other words, you

5   have no idea.  Until the arbitrator rules, it is very hard to

6   say you have a likelihood of success.  So nobody has ever gone

7   into court saying it is so likely the arbitrator is going to

8   rule in their favor that you should stay the suspension.

9         That is a very different situation, on the likelihood,

10  than respect to the irreparable harm issue, where the judicial

11  precedents are clear.

12        Your Honor, look at the flip side of this.  I think

13  this is very important on looking at this analysis in terms of

14  the balance of harms.  From the NBA standpoint, if we are wrong

15  and you issue a TRO and next week you decide in a preliminary

16  injunction hearing or later on that Mr. O'Neal should have

17  served, he can be suspended and serve the games then.

18        In other words, there is no harm to the NBA.  There is

19  no magic from their standpoint whether he misses a game this

20  weekend or whether he misses a game a month from now in the

21  season if that were to be reversed.  There is zero harm to

22  them.  There is enormous irreparable harm to him.

23        Again, looking at the policy in the Federal

24  Arbitration Act, in the National Labor Relations Act with

25  respect to the importance of arbitration, what we bargained for

                                                              7

4cnrnatm.txt

1   here was expedited resolution in arbitration.  That is the

2   provision of the CBA that was invoked.

3          From a union standpoint, if any time a party wants to

4   defeat that expedition they can simply say, well, I'm

5   contesting jurisdiction and therefore you don't have

6   irreparable harm, just wait, knowing we can never get that

7   back, then you defeat the purpose.

8          This is only going to come up once in a blue moon.  We

9   have a lot of stars aligned here on this Christmas Eve that we

10  are approaching.  The situation here, again, is the first time

11  that I am aware of in the history of the NBA where they refused

12  to follow an arbitration decision where the decision has an

13  immediate effect, because the suspension just ended last night

14  according to the arbitrator, where the arbitrator has said

15  "forthwith."

16         There is a reason why the arbitrator said "forthwith,"

17  and that is because he understood the urgency of getting those

18  games back to the players in order to play, and the fact that

19  there is absolutely no harm to them if we are wrong.  There is

20  no harm to them at all.

21         They say they are harmed in the brief, which I read

22  very quickly, because I just got it, by the fact that the

23  commissioner's institutional authority is undermined.  Well, if

24  ultimately you decide the arbitrator was wrong, he will get

25  back his institutional authority.  That is not irreparable

                                                        8

1   injury.

2          The only issue we are talking about for this TRO is

3   whether O'Neal plays or he doesn't play between now and when we

4   decide this issue.

5          The other thing I mention here, and this is very

4cnrnatm.txt

6    important because of the arbitration, the Second Circuit has

7    made it clear that when you are moving to confirm an

8    arbitration award, which is what effect the underlying relief

9    is here, what is contemplated here, what is contemplated, is

10   summary proceedings by the court.  In other words, when parties

11   try to come in, and I am reading now from the Pickholz case in

12   the Second Circuit, it says, "The confirmation of arbitration

13   award is a summary proceeding that merely makes what is already

14   a final arbitration award a judgment of the court."

15          The whole point here is speed, is resolution.

16   Frankly, in any other case I have done I never have this much

17   authority:  A number of Supreme Court/Second Circuit cases that

18   talk about the deference to arbitration, the need to allow that

19   process to get what the parties bargained for, the importance

20   of not depriving the parties of that process, for judges to

21   facilitate the process going forward.  That is what all these

22   cases are about.

23          It is not about long judicial proceedings or delays or

24   putting things off, which is what they are asking for relief

25   for, where at the end of the day all Mr. O'Neal can get back is

                                                                  9

1    money.  The Players Association gets back nothing.  They have

2    lost their expedition for their players.  The fans, if they

3    should have played, get back nothing, and the team gets back

4    nothing.  All that irreparable harm happens.

5          On the other hand, if you grant the injunction -- and

6    you have to show likelihood of success, we will get to that --

7    but assuming we are going to convince you we have shown not

8    only substantial questions but likelihood of success, in that

9    case the need for temporary relief is compelling, I would

10   submit, in this particular case in terms of that.

11          THE COURT:  Isn't it somewhat of a concession by the

                              Page 7

4cnrnatm.txt

12    Players Association that this can be compensated in dollars

13    because that is exactly what the Players Association agreed to

14    in the collective bargaining agreement?

15         MR. KESSLER:  No.

16         THE COURT:  Isn't that what the collective bargaining

17    agreement says?  It says that during the period of time the

18    suspension should go forward, and if it is determined that the

19    suspension should not have gone forward, then the player should

20    be compensated in dollars.  Isn't that specifically addressed

21    almost word for word that way in the collective bargaining

22    agreement?

23         MR. KESSLER:  Not exactly that way, your Honor.  I

24    will explain what that is.

25         THE COURT:  I have the language here, if I can find it
                                                              10

1    in the pages I have read.

2         MR. MISHKIN:  Your Honor, it is paragraph 14(d) of

3    Article XXXI of the collective bargaining agreement, page 223

4    of the CBA.

5         THE COURT:  I think you have cited it either in Mr.

6    Buchanan's affidavit or in your brief.

7         MR. KESSLER:  Yes.  Let me explain.

8         THE COURT:  Do you remember where that was?

9         MR. MISHKIN:  Yes.  Page 24, your Honor, of Mr.

10    Buchanan's affidavit.

11         THE COURT:  All right.  The language says, "Nothing

12    contained herein shall excuse a player from prompt compliance

13    with any discipline imposed upon him.  If discipline imposed

14    upon a player is determined to be improper by final disposition

15    under this Article XXXI, the player shall promptly be made

16    whole."  I believe there is further language indicating that

Page 8

4cnrnatm.txt

17    the player should receive compensation for that period of time.

18        That is at least some evidence that the Players

19    Association agreed that, in the usual circumstances rather than

20    the unusual circumstance. there isn't a general argument that a

21    player cannot be compensated monetarily.

22        MR. KESSLER:  With all due respect, your Honor, I

23    think what this indicates is the following.  It has nothing to

24    do with whether the harm is irreparable or not.  It simply has

25    to do with the fact that prior to the issue being resolved by

                                                        11

1    the arbitrator, which is what this refers to, prior to it being

2    resolved, in that case they are saying the player cannot, prior

3    to it being resolved, refuse to comply.  He has to comply with

4    the suspension while it is being appealed.  And if he wins,

5    obviously, since he has complied, he will be made whole in some

6    way.

7        THE COURT:  How do you make him whole?

8        MR. KESSLER:  Let me explain how that works.  Let's

9    say there is a 20-game suspension and there is an appeal and it

10    is decided at the 10th game to overturn the appeal and reduce

11    it.  Let's say it is undisputed, there is no dispute over

12    jurisdiction and that is decided.  Sprewell, for example, was

13    overturned by the grievance arbitrator to reduce it.

14        The moment that he would be eligible to play at that

15    time, he gets to play.  And if there were prior games which he

16    should not have been suspended for, he would get back the pay.

17    That is what it means.

18        But that doesn't mean he didn't suffer irreparable

19    harm earlier.  That is my only point.  That is simply a

20    bargained-for agreement for what happens prior to the ruling by

21    the arbitrator.

22        Look at what the last sentence says.  It says, "If
                            Page 9

4cnrnatm.txt

23    discipline imposed upon a player is determined to be improper
24    by a final disposition under this Article XXXI" -- that is what
25    happened here, that is what happened here, we have a final
                                                                12

1     disposition under Article XXXI -- "the player shall promptly,"
2     not at some future time, promptly, "be made whole."
3              The way to make this player whole now, it doesn't say
4     through monetary damages, it doesn't say the player shall be
5     given money, it doesn't say you do the best you can in the
6     circumstances at that point.  But once you get this final
7     disposition -- this language actually supports us -- once you
8     get this disposition which we have from the arbitrator, that is
9     why it is different, then what the CBA says is the player shall
10    be made promptly whole.  It doesn't say give him money.  You do
11    what you can at that point.
12             If the suspension is reduced -- and there have been
13    times that Commissioner Stern, when he has been the arbitrator,
14    has reduced the suspension -- he doesn't just give the player
15    money and say the suspension takes effect.  What he does then
16    is he lets the player immediately play the future games and he
17    gives him money if he can't do anything else at that point.
18             But that is not a concession or agreement that they
19    haven't suffered irreparable injury, which is the issue now
20    before you for which the Linsman case, the Silverman case, the
21    Jackson case, the O'Neal case, the various cases we cited --
22             THE COURT:  All the cases you cite are cases where
23    there was a final determination of those issues.
24             MR. KESSLER:  No, sir.
25             THE COURT:  There is still a dispute.  All of those
                                                                13

1     cases, by the time that the final decision was made to either

Page 10

4cnrnatm.txt

2    enforce the suspension or change the suspension, both sides

3    were in a position to accept the final determination that had

4    been made.  There were no further reviews that were to be made

5    in any of those cases.

6          MR. KESSLER:  Actually, your Honor, that is not

7    correct.  The cases that I am citing now in the irreparable

8    injury section of our brief are cases that had nothing to do

9    with suspensions by discipline or final review.  Those are

10   cases where a league was not letting a player play for some

11   reason.

12         For example, in the Jackson case they were not letting

13   the people play in the NFL because of some rules regarding free

14   agency.  In the O'Neal case it was because he was a one-eyed

15   hockey player.  In the Silverman case it was because there was

16   a lockout going on.  None of those had final rulings.

17         Each of those cases were cases on preliminary

18   injunction or TRO requests, just like here, where the party

19   came in and simply said there is a likelihood of success on the

20   merits and the court said since there is a likelihood of

21   success ultimately that they should allow you to play, we turn

22   to the irreparable harm factor and on the irreparable harm

23   factor we find a player's career is incredibly short and

24   precarious and therefore losing any games cannot be made whole

25   in monetary damages.  That is what every single case that we

                                                            14

1    have cited says, and there is no case to the contrary.

2          THE COURT:  You just excluded all of the cases of

3    discipline, and that is what this case is, a case of

4    discipline.  My understanding of every single one of those

5    cases of discipline that you are referring to is that the time

6    that the decision was made to make the player whole was a time

7    when there was a final disposition, there was no further

                          Page 11

4cnrnatm.txt

8   dispute, all appeals having been exhausted.  All court cases,
9   if there were any, had been exhausted, and both sides had
10  agreed that was going to be a final decision and that was it.
11  That is not the status that we have here.
12         MR. KESSLER:  Your Honor, again, in all due respect --
13         THE COURT:  The discipline cases.
14         MR. KESSLER:  I am talking now about a discipline
15  case.  We don't have a precedent the case where the NBA has
16  refused to comply, so I don't have a case going to court.  But
17  what I can say is the language of the CBA is unequivocal in
18  14(c) that when there is a final disposition under this Article
19  XXXI, which is defined as grievance arbitration, final
20  disposition is defined in section 1.
21         I will read to you from section 5 of Article XXXI.
22  This is saying the award, the arbitrator's award, "shall
23  constitute full, final, and complete disposition of the
24  grievance and shall be binding upon the players, the teams
25  involved, and the parties to this agreement."

                                                        15

1          Once we get that award in section 5, which is full,
2   final, and dispositive, and we get to the language in 14(d),
3   which they cited you to, which says when you get the final
4   disposition you shall promptly be made whole, you put those two
5   together, that is what we have.
6          Now, it is true here that they dispute the
7   jurisdiction of the arbitrator.  That is the likelihood of
8   success argument.
9          THE COURT:  That is what I was going to ask you about.
10  This is an unusual circumstance, that is the way I will
11  characterize it, to talk about a full, final, and dispositive
12  decision when the NBA doesn't acknowledge the jurisdiction of

4cnrnatm.txt

13  the arbitrator, didn't participate in the arbitration, and now

14  there is still a question being raised by them as to whether or

15  not the arbitrator had jurisdiction to decide this case and

16  whether it was properly decided.

17      MR. KESSLER: While it is unusual in the NBA, it is

18  not unusual for the federal courts to deal with this issue or

19  even arbitrations to deal with this issue. In fact, the

20  American Arbitration Association rules, which the arbitrator

21  noted are what applies by the terms of the agreement,

22  specifically provide for cases where one party refused to show

23  up in the arbitration. This happens from time to time, and it

24  directs the arbitrator to complete the arbitration, take the

25  evidence, do justice.

16

1       In other words, what the federal courts say here, and

2  this is all the Supreme Court authority, which is over and over

3  again the Second Circuit, if there is an agreement to

4  arbitrate, the presumption in favor of that, the deference to

5  that, is enormous. It is one of the strongest doctrines in the

6  federal jurisprudence.

7       The Federal Arbitration Act has mandatory terms for

8  the court. If something is supposed to be in arbitration, the

9  court has no discretion, it must go to arbitration. If

10  something could even possibly be subject to arbitration, the

11  cases say it must go there.

12      If this were not true, this would gut that federal

13  policy. Put it aside from the NBA, because this is really not

14  an NBA issue. If someone has an agreement to arbitrate that

15  says full, final, binding arbitration, and they say, I don't

16  like it, there is no jurisdiction, I won't comply, that's all

17  right unless --

18          They can contest that. There are ways to do it. They

Page 13

4cnrnatm.txt

19    can make a motion to set aside the arbitration.  They could

20    oppose confirmation.

21        -- except where there is a likelihood of success on

22    the merits that there is jurisdiction or there are substantial

23    questions going to that issue and the balance of hardships tip

24    decidedly in favor of the movants.  In other words, you are now

25    back to your normal application of TRO standards.

                                                              17


1        Courts are wrestling with this.  What I urge your

2    Honor is don't think of this as a sports case.  Think of this

3    as a case --

4        THE COURT:  This was a collective bargaining case.

5        MR. KESSLER:  That's correct.

6        THE COURT:  This is not a sports case.

7        MR. KESSLER:  That's correct.  For unions in

8    arbitrations, when we look at it this way, outside of the

9    context, it is very, very clear this was done.  Let's say this

10   was a steel workers case and let's say a steel worker was

11   suspended and his family couldn't pay their mortgage because he

12   wasn't getting paid, and the full, final, binding decision of

13   the arbitrator was he should be immediately reinstated and he

14   had irreparable harm, your Honor, because he was to lose his

15   house if he didn't get that done.

16       Your Honor would find that is a different reason for

17   irreparable harm.  He is not a player.  He doesn't care about

18   winning or losing championships.  He would have irreparable

19   harm if you found the likelihood of jurisdiction, so that was

20   full and final, what you would do is you would say he has

21   irreparable harm, there is a likelihood of success on the

22   merits that they were going to be able to confirm this award,

23   there is a balance of hardships in his favor because there is

4cnrnatm.txt

24    no real harm to the employer -- if it is wrong they always can

25    lay him off again later -- and then you would grant a temporary

18

1    restraining order.

2           You have to look at it in the context of an ordinary

3    union here, particularly where it is a labor CBA, because the

4    Supreme Court cases talk about labor CBAs, because of the

5    National Labor Relations Act, are particularly favored with

6    respect to this process.

7           I need now to turn to likelihood of success,

8    obviously.  But if I convince you, and think I will, that there

9    is a likelihood of success that we are going to be able to

10    confirm this award for jurisdiction, let alone substantial

11    questions -- which would also be enough under the TRO standards

12    in this circuit if the balance of hardships tips in our favor,

13    and I think it decisively does, decisively does.

14           By the way, interestingly on these grounds, the NBA

15    cites the decision in the Ewing transcript, which was a denial

16    of TRO.  I commend your Honor to read the portion of that

17    decision on irreparable harm.  There Judge Rakoff found

18    unequivocally we satisfied the irreparable harm test if those

19    Knicks had missed just that one game.  He found unequivocally

20    on the irreparable harm for that one game.  We won that part of

21    it.

22           What we lost on was on likelihood of success and

23    substantial questions going to the merits, which I think is

24    very, very different here from what we had there.  And I will

25    talk about that case.  But I commend you to read Judge Rakoff

19

1    on the irreparable harm because he was correct that it would be

2    irreparable harm for a player to lose that, and this is exactly

3    the same situation with respect to that issue.

Page 15

4cnrnatm.txt

4      THE COURT:  As you move into your position with regard

5  to likelihood success, let me first have a discussion to set

6  the parameters of what needs to be decided today.

7      MR. KESSLER:  Yes, your Honor.

8      THE COURT:  Starting out, it seems to me what today's

9  application is not about.  It seems to me that it is not about

10  the discipline of suspensions that were meted out by the

11  commissioner with regard to Mr. Artest, Mr. Johnson, and Mr.

12  Jackson.

13      MR. KESSLER:  Correct.

14      THE COURT:  However they want to characterize it and

15  you want to characterize it, the arbitrator agreed that that

16  was an appropriate discipline and that there was just cause for

17  that discipline.

18      MR. KESSLER:  And we are not challenging that aspect

19  of the award.

20      THE COURT:  So I don't need to hear argument about

21  whether or not at this point it needs to be confirmed or not

22  confirmed.  That can be resolved another day, if it is even not

23  moot at this point with regard to whether or not a court needs

24  to make a determination on that.

25      MR. KESSLER:  We could probably agree to that by

20

1  stipulation on the other players.

2      THE COURT:  At this point I need to hear from you what

3  you say the likelihood of success on the merits is and what it

4  is that you say the arbitrator found and concluded and why the

5  arbitrator concluded that way with regard to Mr. O'Neal.  That

6  is where I want to focus, because that is the important issue

7  to be resolved.

8      MR. KESSLER:  I agree, your Honor.  I am just going to

Page 16

4cnrnatm.txt

9    make your job half as difficult on this issue.  The only issue

10   you need to decide on likelihood of success with regard to just

11   Mr. O'Neal is whether we are likely to show the arbitrator had

12   jurisdiction.

13          It is very well established, and the NBA's papers

14   don't challenge this.  They are not trying to reargue the

15   merits of the suspension.  Federal courts do not do that.  They

16   are not arguing that the arbitrator was corrupt or some other

17   very narrow ground for overturning the arbitration.  They have

18   one argument.  Their one argument, which is the basis of their

19   complaint and it is the basis of their defense, is that it was

20   not within his jurisdiction.

21          So the only issue we have to address now is

22   jurisdiction.  If there is a likelihood he had jurisdiction, we

23   are done on likelihood of success.  In other words, it is not

24   your role, and this is what the parties bargained for, to

25   decide whether the discipline was fair or unfair or just cause

                                                             21

1    or unjust cause.  That is all behind us in terms of the

2    arbitrator.  The arbitrator either had the jurisdiction or he

3    didn't.  If he did, it is over.  That is the issue I am going

4    to focus on.

5          THE COURT:  Do you think the issue is any broader than

6    whether or not the issue of jurisdiction is determined by

7    section 8 of I believe Article XXXI, which says that the

8    commissioner has the authority to impose on-the-court

9    discipline and has the sole authority to do that?  Do you agree

10   or disagree that the issue here is whether or not the activity

11   of Mr. O'Neal falls within that section as being defined as

12   on-the-court activity or falls outside that section?

13         MR. KESSLER:  I think that is one of the two issues

14   that are very relevant here.

                         Page 17

4cnrnatm.txt

15    THE COURT:  What do you say is the second?

16    MR. KESSLER:  There are two bases, two bases, on which

17   Arbitrator Kaplan found jurisdiction here, two bases.

18    I want to say something first about your standard of

19   reviewing what he did so that we have that as well.  The

20   Supreme Court in a series of recent cases -- and the cases

21   specifically, your Honor, which we cite are the Housan case,

22   which is a 2002 Supreme Court case; Greentree Financial Corp.,

23   which is a 2003 Supreme Court case and citing back to John

24   Wiley & Sons, which is an older Supreme Court case -- has made

25   it clear that there is a difference between substantive

22

1   arbitrability and procedural arbitrability.  That I think is

2   very, very important to your review standard.  That is what

3   this goes to, which is the following.

4    Substantive arbitrability, as made clear in these

5   cases, is whether there is an agreement to arbitrate that

6   subject matter at all or whether it belongs in the courts.  In

7   other words, if the NBA came in and said to you, I think Mr.

8   O'Neal and the union should have filed a court action to

9   challenge directly the discipline on the merits because there

10   is no agreement to arbitrate that, that would be an issue of

11   substantive arbitrability, whether there is an agreement to

12   arbitrate over the subject at all.  That is de novo review.  So

13   when you would be looking at likelihood of success, you would

14   be looking at it there through a de novo framework.  That is

15   one possibility.

16    The other possibility, as the Supreme Court noted, is

17   procedural arbitrability.  Procedural arbitrability is that

18   both parties agree the issue doesn't belong in the courts, the

19   issue should be decided by some arbitrator if it is going to be

4cnrnatm.txt

20  decided.  There are conditions to that arbitration.  In other

21  words, it has to be perhaps above a certain amount of money.

22          For example, one of the things we are going to talk

23  about here is that we have to have $25,000 in injury in order

24  to get a grievance arbitrator as opposed to the commissioner.

25  That is a classic procedural arbitration issue.  Is it above

                                                                23

1   $25,000 or not?  It can be arbitrated, but the question is, is

2   it $25,000?  That is a condition precedent to the arbitration

3   that is procedural.

4           Which arbitrator should it be?  Should it be

5   Commissioner Stern or should it be the grievance arbitrator?

6   This is very important.  Your Honor characterized section 8 of

7   Article XXXI as saying that Commissioner Stern has sole

8   authority in this area.  That is not what it says.  That is

9   what the NBA says it says.

10          The NBA says a lot of things, and Mr. Mishkin will say

11  a lot of things and their briefs say a lot of things.  I urge

12  you please looking carefully at the words of the CBA, because

13  it ain't what they say it says.  That is the point here.

14          The CBA says in Article XXXI -- and the entire section

15  is called "Grievance and Arbitration Procedure," the entire

16  section -- it says that any dispute involving --

17          First of all, let's look at section 5(c) before we get

18  to section 8.  It says, "In any grievance that involves an

19  action taken by the commissioner or his designee concerning the

20  preservation of the integrity of or the maintenance of the

21  public confidence in the game of basketball and a fine or

22  suspension that results in a financial impact to the player of

23  more than 25,000, the grievance arbitrator shall apply an

24  arbitrary and capricious standard of review."

25          This is confirmed by section 13, which says on the one

Page 19

4cnrnatm.txt

24

1   hand a fine or suspension imposed by the commissioner, imposed

2   by the commissioner, shall be appealable to the grievance

3   arbitrator only if it results in financial impact on the player

4   more than 25,000.

5          So the first issue here is, is this something which is

6   a fine or suspension by the commissioner that involves the

7   preservation of the integrity of the maintenance of public

8   confidence in the game of basketball, that it causes injury of

9   more than $25,000?  Then the agreement says that goes to the

10  grievance arbitrator.  That is one possible arbitration.  That

11  is a procedural decision to decide whether the prerequisites

12  are met for that arbitrator or the other arbitrator.

13         THE COURT:  But that is not the dispute.

14         MR. KESSLER:  Right.

15         THE COURT:  As you say, it is not a case of my

16  listening to what the other side is characterizing.  I have

17  read the agreement.  I don't think that you dispute that the

18  commissioner has sole authority to discipline and review

19  appeals of conduct on the playing court.  Do you disagree or

20  agree with that?

21         MR. KESSLER:  I would change one word:  To discipline

22  and to serve as the arbitrator for appeal.

23         THE COURT:  The sole arbitrator?

24         MR. KESSLER:  The sole arbitrator.  It is always only

25  one.  It is either the grievance arbitrator or him.  It is one

25

1   arbitrator or the other.

2          My point is if you look at section 8, and that is why

3   I wanted to compare it, it is an arbitration procedure when it

4   goes to the commissioner.  It talks about written decisions,

Page 20

4cnrnatm.txt

5  hearing dates, full and final binding disposition.  This is

6  exactly the situation we are picking between arbitrators.

7          The Bettman decision we cited is very much on point in

8  this case.  It was a decision rendered by Magistrate Dolinger

9  that was affirmed by Judge Wood.  In that case the NHL, very

10  similar type system, has the commissioner, called the president

11  there.  The commissioner decides in final, binding ways

12  disputes between players and clubs in certain defined

13  categories of circumstances, including their team discipline,

14  by the way.

15          Even though they didn't use the word he is an

16  arbitrator, what the Southern District found is that he was

17  serving as an arbitrator.  And even though, by the way, he is

18  not exactly neutral.

19          The issue there was that we argued he shouldn't be

20  able to serve as the arbitrator.  I represented the hockey

21  players in that case.  We argued he shouldn't be able to serve

22  as an arbitrator because he was biased.  The court said you

23  bargained for a biased arbitrator, but he is the arbitrator.

24  That is what happened in that case essentially, in the Bettman

25  case.

                                                        26

1          The point here is, and this is the only reason for

2  this, the decision of which arbitrator, the commissioner or the

3  grievance arbitrator, Arbitrator Kaplan found is a decision, a

4  decision, that is procedural.  It is not a question that this

5  is going to a court.  It is a question does it meet the

6  requirements of the commissioner or does it meet theirs.

7          This is all in the arbitrator's decision, which again

8  we believe should be in deferential review because it is

9  procedural.  The other part of the Supreme Court cases is that

10  when it is a procedural arbitrability decision, it is

4cnrnatm.txt

11  deferential review to the arbitrator, not de novo review.  That

12  is important.

13         THE COURT:  It seems to me, in reviewing the decision

14  and reviewing all the papers, that this is not a helpful

15  analysis to proceed in this order.  I am not interested right

16  now in whether or not the arbitrator had the authority to

17  determine whether it was substantive or procedural.

18         It seems to me that if I were to go straight to the

19  heart of this issue, whether or not it is conduct that is

20  solely within the purview of the commissioner or conduct that

21  is an arbitrable issue as defined by the collective bargaining

22  agreement, then that in and of itself determines the issue.  It

23  wouldn't depend on any analysis as to whether or not the

24  arbitrator should have or shouldn't have determined whether it

25  was procedural or substantive.

27

1         If it is determined that the collective bargaining

2  agreement says that this issue falls within the language that

3  this issue should go to the arbitrator, then the arbitrator did

4  the right thing.  If it says that this is an issue that falls

5  within the language which says that it is exclusively the

6  commissioner's decision, then the arbitrator did the wrong

7  thing, and I don't have to first analyze whether it is

8  substantive or procedural.

9         MR. KESSLER:  I agree with you 100 percent with

10  respect to the issue of whether the arbitrator has to have the

11  authority to decide.  You don't have to decide that for just

12  the reasons you explained.

13         However, the issue of whether this jurisdictional

14  issue is a procedural or substantive one has meaning for one

15  additional reason that the Supreme Court said, which is that

Page 22

4crnatm.txt

16  whether he had the authority to do it or not, because he has
17  done it, because he has done it, if it is procedural, you
18  should look at what he has done with deference; if it is
19  substantive, you should look it de novo.  So there is a
20  different layer of significance to that procedural/substantive
21  distinction according to the Supreme Court.
22          THE COURT:  The deference or de novo review goes to
23  the substance of what the decision is.  So the reality is
24  practically -- and I don't know if the other side is arguing
25  that, but I have yet to hear an argument that the union is

                                                           28

1  saying that if the arbitrator had the authority to decide this,
2  we think that it was wrongly decided to the extent that a court
3  can step in and overturn this decision.  I haven't heard that
4  argument yet.  Maybe they do intend to make that argument -- it
5  seems to me so far whether or not there is a de novo review or
6  deference doesn't make a big difference here.
7          MR. KESSLER:  The reason I don't think it makes a big
8  difference is because I think we have likelihood of success
9  under either standard.  Maybe I should just go to the heart of
10  it.  Whether you conclude de novo or deference, I think you
11  could come to the same conclusion, and the conclusion is the
12  following.
13          In 1995 -- and the arbitrator went through this and we
14  put this in independently through Mr. Klepman's affidavit -- a
15  major change was made in the NBA.  Prior to 1995 it said all
16  arbitrable appeals went to the commissioner for discipline if
17  it involved either conduct on the playing court or conduct for
18  the integrity and preservation of confidence in the game, which
19  is at Article XXXV(d) of the NBA constitution.  That was the
20  rule.  So prior to 1995 it was the commissioner.
21          In 1995, as a huge concession in bargaining -- this
                              Page 23

4cnrnatm.txt

22  was a dramatic and major change -- all these changes took place
23  which we detailed in our affidavit and submission.  Those
24  changes were designed to indicate that only for conduct on the
25  playing court or for conduct of less than $25,000 impact on the

29

1  player, so two categories, only those two things would the
2  arbitration just go to the commissioner.  Otherwise, the
3  grievance arbitrator is unequivocally given jurisdiction, he
4  applies a just cause standard under section 14.  Under section
5  5 he has standards.  It couldn't be clearer that is the case.
6          What the issue becomes here is, is this an Article
7  XXXV(d) integrity of the game suspension, number one?  We
8  believe, as the arbitrator found, it unequivocally is.  But if
9  there is any doubt, the commissioner wrote that it is.  The
10  discipline notices that were sent out to the players said
11  Article XXXV(d) of the constitution of the NBA.  Match that up
12  with integrity and confidence of the game, that is what article
13  XXXV(d) says.  So they can't dispute it is an Article XXXV(d)
14  and they don't dispute that.
15          What they do say is that even if it is Article
16  XXXV(d) -- they don't dispute it is Article XXXV(d) -- and even
17  though it is public confidence, they say they still should get
18  out of it because it is conduct on the playing court.
19          We have two responses to that.  One, if it is Article
20  XXXV(d), it doesn't go out even if it is conduct in the playing
21  court.  But you don't have to reach that.  That is one grounds.
22  The reason for that is sections 5, 13, and 14(c) make it clear
23  if it is Article XXXV(d), confidence of the game, there is
24  grievance arbitrator jurisdiction.
25          As the Supreme Court has said repeatedly, if there is

30

4cnrnatm.txt

1  any possibility that that is where it goes, that is where it

2  goes.  In other words, that is the standard you have to apply;

3  whether it is deference or de novo, that is the standard you

4  have to apply.

5        Second, I don't press that argument, because we win on

6  conduct on the playing court.  The issue of conduct on the

7  playing court is best illustrated, if I may start, your Honor,

8  with looking at what the district attorney did in this case.

9  It has to do with the difference between the events that

10  happened outside of the game.

11        I don't know how familiar your Honor is with the

12  incident.  But it is not the first part, when Mr. Wallace and

13  the Pistons was pushing and shoving the players and they are

14  milling around.  In fact, it was quite violent, what he was

15  doing.  It is the separate set of events that occurred when the

16  fan hits Mr. Artest with the cup and he runs into the stands

17  and basically a riot breaks out in the stands and then onto the

18  court and everything else.

19        That second set of conduct is not conduct on the

20  playing court as those terms are understood and as the

21  arbitrator found.  That is not conduct within the confines of

22  the game.  It is not a hard foul.  It is not a flagrant foul.

23  It is not leaving the bench during a game.  It is none of those

24  things.

25        It is very much like what happened with Mr. Sprewell
                                                      31

1  and his coach, which went to the grievance arbitrator

2  unopposed.  That was on the playing court.  It happened to be

3  during practice, but it was on the playing court.

4        The whole point here is the distinction.  The DA filed

5  charges for conduct against players and fans there.  The DA

6  didn't file charges against Mr. Wallace.  Why not?  Because,

4cnrnatm.txt

7   and this is well established and other people recognize, things
8   that are happening in the game itself are things that
9   traditionally fall within league jurisdiction:  Pushing a
10  referee in a game, things like that.  We don't contest that.
11  We didn't appeal any of those suspensions.  So that is a
12  distinction here.
13          THE COURT:  The awkward part of that argument, the
14  difficulty that I have just factually, as we just discussed,
15  the issue is not the conduct of Johnson, Artest, or Jackson.
16  All of those arguments have to do with their conduct.  It is
17  unclear to me in your papers whether or not you are talking
18  about that Mr. O'Neal's conduct.  And that is what is at issue,
19  Mr. O'Neal's conduct.
20          MR. KESSLER:  Yes.
21          THE COURT:  Mr. O'Neal was not in the stands.
22          MR. KESSLER:  Yes.
23          THE COURT:  So the question is solely, as to O'Neal's
24  suspension, whether Mr. O'Neal's conduct was on or off the
25  court.  What is your position?

                                                          32

1           MR. KESSLER:  It was off the playing court.  The
2   reason for that is his conduct happened four or five minutes
3   after.  The arbitrator saw all this on the tape.  The game had
4   been brought to a complete halt.  In fact, Mr. O'Neal wasn't
5   even in the game at the time.  He was on the bench.
6           Four or five minutes later, fans were running on the
7   sides of the court in a riot situation, threatening one of the
8   players, threatening one of the players, and Mr. O'Neal got
9   into an altercation with that fan when he was trying to protect
10  the player.
11          THE COURT:  On the court?

Page 26

4cnrnatm.txt

12        MR. KESSLER:  Not on the playing court.  It was off on

13    the side.  The playing court concept, as the arbitrator

14    found -- and this is why deference makes a point.  He

15    understands the agreement of the shop, the arbitrator here.

16    What the "playing court" meant and has to mean is in the

17    context of a game.

18        THE COURT:  Wait a minute.  I want to separate the two

19    practical elements that you say constitute that definition.

20    You are saying that it has to be on the court during the game.

21        MR. KESSLER:  It has to be part of the game.  It has

22    to be in the flow of the game.

23        THE COURT:  You are saying it has to be on the court

24    during the flow of the game.

25        MR. KESSLER:  That's right.

                                                          33

1         THE COURT:  You do not dispute that his conduct was on

2    the court?

3         MR. KESSLER:  I do dispute that, your Honor.

4         THE COURT:  You dispute that he was physically on the

5    court when he struck this player?

6         MR. KESSLER:  Yes.  Actually, he was off the

7    sidelines.  He was off the court.  In fact, your Honor,

8    paragraph 19 of uniform playing contract is very important

9    here, because I think your Honor is thinking of this as if

10    different words were used.  Let me point this out.

11        In paragraph of 9 of the uniform player contract, when

12    the parties wanted to talk about behavior on the court,

13    adjacent to the court, otherwise in the arena, they knew how to

14    do so.  This is on page A16 to A17 of the collective bargaining

15    agreement, which is there.  This was a release for fighting.

16        What it said here is that the player releases claims

17    for fighting, and specifically under number 2, "any fighting or

Page 27

4cnrnatm.txt

18  other form of violent or unsportsmanlike conduct occurring

19  during the course of any practice and/or any competition,

20  regular season or playoff game, on or adjacent to the playing

21  floor or in or adjacent to any facility used for practices or

22  games."

23          In other words, when the parties wanted to talk about

24  the sidelines, the stands, the fans, the entryways, other

25  things that weren't there, they knew exactly what language to

                                                              34

1   use.  The NBA and we drafted this language very carefully.

2           The playing concept, which goes back to the seventies

3   at least in the CBA, was the concept of sports commissioner

4   jurisdiction.  This is what the arbitrator found and this is

5   why it is important.  He understand the law of the shop.  He

6   has been there for six years.  He is the one who the courts

7   look to on these issues.  He said what this meant, what this

8   concept meant, was a commissioner's jurisdiction for things

9   like hard fouls, pushing a referee, a player going off --

10          THE COURT:  I don't see that language in his opinion.

11  I see the distinction he draws is in the stands or not in the

12  stands.  That is the only distinction.  I see no finding by the

13  arbitrator that Mr. O'Neal's conduct was not on the floor.  And

14  I have looked at it very, very carefully.  He makes the

15  distinction between those people, the conduct that occurred in

16  the stands.

17          MR. KESSLER:  He clearly found that he had

18  jurisdiction over Mr. O'Neal's suspension, and he reduced it.

19  He obviously found that it wasn't on the playing floor.

20          THE COURT:  You say obvious.  There is nothing

21  obvious.  The language is not there.  It does not say that.

22          MR. KESSLER:  Here it is.

Page 28

4cnrnatm.txt

23        THE COURT:  Which page?

24        MR. KESSLER:  Page 16.

25        THE COURT:  Page 16.  Just a second.  All right.

        35

1        MR. KESSLER:  "The confrontation between players and

2  fans, spectators, and even arena personnel is distinctly

3  different from the on-court or in-the-game conduct such as

4  flagrant fouls, fight between players, hard picks, elbows, and

5  confronting referees.  It is clear that the genesis of the

6  confrontation occurred when a spectator threw a cup of liquid

7  on Artest when he was lying on the table."

8        THE COURT:  Right.  He says Artest and Jackson entered

9  the stands.  He doesn't mention at all in that paragraph

10  O'Neal.  As a matter of fact, I can tell you exactly what he

11  says with regard to O'Neal.  On page 25 he says at the top,

12  "O'Neal left the bench and attempted to enter the stands."  He

13  says in the next paragraph, "O'Neal was attempting to enter the

14  stands."

15        He says in the paragraph where he has O'Neal's

16  quotation, "O'Neal attempted to assist his teammate Johnson on

17  the floor.  He punched a spectator."  And O'Neal is quoted as

18  saying, "When you start to see fans come onto the court, let

19  alone in the stands hitting players, when they come onto the

20  court, then it becomes a scary situation."

21        Then the arbitrator says, "O'Neal did not enter the

22  stands.  He was trying to protect his teammate Johnson, who was

23  on the floor with a broken hand during this confrontation."

24        Then, in the next-to-last paragraph before the

25  conclusion, the sentence says, "The NBA cannot tolerate such

        36

1  conduct.  My decision is based on the totality of his actions,

2  including his failure to enter the stands."  There is no

4cnrnatm.txt

3   language as to Mr. O'Neal that says his activity took place in
4   the stands or his activities took place somewhere else other
5   than on the floor.

6         You legitimately can argue that that doesn't
7   necessarily mean that it happened on the playing court during
8   the game, as you argue that that definition is to be
9   interpreted and as you argue that that is the way the
10  arbitrator interpreted it.  But there is no finding here that
11  Mr. O'Neal's activity did not take place on the court.

12        MR. KESSLER:  Let me read to your Honor one thing on
13  page 18.  He says, "Based on the reasons set forth above, I
14  find the suspension of Artest, Jackson, Johnson, and O'Neal
15  were not for 'conduct on the playing court' as set forth in
16  Article XXXI section 8."  So he unequivocally made a finding as
17  those terms are meant.

18        I would suggest to your Honor that what he did is he
19  concluded that once the altercation began, the location --
20  actually, if you look at the videotape, your Honor, which we
21  are happy to give you, where the altercation took place was
22  actually off, behind the out-of-bounds line.  But that
23  shouldn't make a different.

24        THE COURT:  Maybe I ought to look at it again.  My
25  recollection is when the punch was thrown, I'm not sure
                                                          37

1   that that is where Mr. O'Neal was located.
2         MR. KESSLER:  Your Honor, let me give you an example
3   which I think illustrates why the arbitrator is right about
4   this.  Let's say four hours before the game started a player
5   was alone practicing on the court at the Conseco Arena and a
6   fan, for some reason, got through security, ran out when a
7   player is shooting by himself, and got into a fight with that

Page 30

4cnrnatm.txt

8  player.  It was literally on the playing court, just like Mr.

9  Sprewell's altercation with his coach was literally on the

10  playing court.  It happened to be during practice.  It was on

11  the playing court.

12        There is no way that that is what is meant by these

13  terms and that the union gave up the right, because that

14  altercation with the fan could have happened on the court

15  physically, it could have happened in the hallways, it could

16  have happened walking into the arena.  So the parties would

17  not --

18        THE COURT:  The NBA is arguing that the game had not

19  been called at that point.  Is that a factual dispute?  Are you

20  claiming that there is evidence that the game had been called

21  other than that there was a fight, there had been technicals

22  called, that they tried to stop the fight?  You are not saying

23  that time had expired and the game was over, and you are not

24  saying that officially by this time the referees had called

25  this game?  Are you saying that that is factually correct?

38

1        MR. KESSLER:  I don't know that anybody knows when the

2  game was called.

3        THE COURT:  That is what I am trying to figure out.

4        MR. KESSLER:  It never resumed.

5        THE COURT:  You don't say that it was necessarily

6  over, had been called?

7        MR. KESSLER:  It doesn't matter to our argument.  What

8  I am saying, your Honor, is the following.

9        THE COURT:  But it does matter to your argument.  Is

10  your argument that this fight had taken place and then order

11  had been restored and then the technicals were shot and the

12  last 45 seconds was played?  Are you saying that if a fan had

13  been on the court and had been punched by a player, that would

Page 31

4cnrnatm.txt

14  not fall within the definition that you have given me of what

15  conduct on the court is supposed to be?

16      MR. KESSLER:  That would not be on the playing court

17  as I have given that to you, that's correct.  The reason is

18  what you have to do, your Honor, and frankly --

19      THE COURT:  Because it is in the middle of a timeout,

20  it is not on the playing court?  I am not quite sure what

21  definition you are using.

22      MR. KESSLER:  Here is what I am saying, your Honor.

23  This is why labor arbitrators get deference.  This is not the

24  tax code.  These are vague terms that have been in the league

25  for decades.

                                                39

1       THE COURT:  I am just trying to understand how you say

2   those terms should be defined.

3       MR. KESSLER:  What I am saying is that the term "on

4   the playing court," the only way to make it make sense,

5   particularly in light of the change in 1995 when the players

6   got the right to arbitration, it can't turn upon, for example,

7   whether the referee called the game five seconds before Mr.

8   O'Neal got into the struggle with a fan or five seconds after.

9   That would be completely arbitrary.  That can't be the

10  difference.  It can't turn upon whether the fight started on

11  this side of the end line and then they got pushed over the end

12  line and then it becomes on the playing court.  That would be

13  an irrational agreement.  The parties wouldn't make that

14  agreement.

15      THE COURT:  Isn't that what you are urging?

16      MR. KESSLER:  No.

17      THE COURT:  You are saying if it wasn't on the floor

18  while they were playing basketball, shooting the ball, and the

Page 32

4cnrnatm.txt

19  clock was running, then it is not on the playing floor.  Isn't

20  that the fine distinction you are drawing?

21        MR. KESSLER:  No.  What I am arguing is it is the type

22  of conduct, which the arbitrator well understood and the DA

23  understood, that things that come out of the flow of the

24  game --

25        THE COURT:  The DA's determination is irrelevant.

                                                        40

1        MR. KESSLER:  I would say, for example, any time a fan

2  is involved, that is not what was contemplated here.  This

3  contemplated things involving two players, a player and a

4  referee, the participants in the game.  The reason the

5  commissioner has this is he is protecting the rules of the

6  game.

7        It is a very violent game.  All sports are.  He says

8  deciding how much violence is allowed in the confines of the

9  game, how much could you talk back to the referee, those

10  things.  That is what gets appealed to him.  It is about the

11  sport.  Nothing about this riot is about the sport.

12        THE COURT:  I want to make sure I understand your

13  argument.  You are arguing that even if this took place on the

14  playing court during the game where a fan ran out on the court,

15  tried to stop a player from making a shot, if that player

16  pummeled that fan in the middle of the game, that is in the

17  within the commissioner's jurisdiction?

18        MR. KESSLER:  I think it would be an independent fact

19  determination.  It is possible that for the hypothetical you

20  gave would be so -- the fan just runs out, gets the player

21  while he is shooting, he is immediately escorted off, the game

22  continues -- an arbitrator who understands the concepts that

23  are applied in the first instance, which is why it is

24  deferential, might determine that that does qualify as on the

Page 33

4cnrnatm.txt

25    playing court.  Maybe it doesn't.  You look at a lot of facts
                                                                    41

1    to determine that issue.

2            THE COURT:  When you said that it depends on whether

3    it is a fan or a player, that is not the argument that you

4    really mean to make?

5            MR. KESSLER:  I am saying a fan makes it a very

6    different situation.  Whether that fact alone will control a

7    hundred percent of the time, I don't ever want to give you a

8    hypothetical, because there could be cases where it would.

9            THE COURT:  But that is what you were saying to me.

10           MR. KESSLER:  What I think is important here in this

11   case is that there were two different events, very clear on the

12   tape.  There is the fight between Wallace and the other players

13   which goes on for four minutes.  Nothing is happening.  Mr.

14   O'Neal is on the bench.  The game never resumes again from that

15   time standpoint ever again.  Four minutes, they all clear, it

16   is not done.

17           Then an entirely different situation develops that at

18   that point, as I said, could have happened outside of the

19   arena, it could have happened in the stands, it could have

20   happened on the sidelines:  A riot breaks out.  In those

21   situations the union didn't bargain for the right that, for

22   example -- let's say in Mr. Artest's case, for example, he has

23   been suspended for life.  They didn't bargain away the right

24   that if it didn't have to do with something that directly

25   involved the regulation of the game -- that is why they put in
                                                                    42

1    only a $25,000 limit.  What they wanted is fair process.  This

2    is about due process.

3            By the way, we lost on three of the suspensions.  We

Page 34

4cnrnatm.txt

4   respect that.  We are talking about the process, the fairness

5   and integrity of the process that was agreed to in 1995.  The

6   only way you should interpret this with a deferential review is

7   that the arbitrator was correct in understanding the meaning of

8   this concept of on the playing court.  That is the important

9   thing.

10          It was not designed to be as rigid, because then you

11  would be setting up a rule that would make no sense.  As I

12  said, if you go over the line one way or the other -- this

13  particular one, if you look at the individual, I think when it

14  started he was on the sidelines.  Maybe he slid over, for all I

15  know.  That can't be the issue.  The arbitrator didn't consider

16  that the issue.  He considered the issue that this was a riot.

17  That had no context to the game.  In that thing it is an

18  integrity suspension.

19          This is a suspension under XXXV(d).  Remember my first

20  argument.  We have unequivocal language that says if it is a

21  suspension for integrity of the game, that is more than $25,000

22  in impact, it goes to the grievance arbitrator.  That is the

23  change.  That is what this was designed to get at, these types

24  of suspensions.  If not these types, what type?  It's got to be

25  a Sprewell type and this type.  There aren't that many where we

                                                            43

1   can do this.

2          I want to say something before I conclude on this,

3   because I know that an Arbitrator Kaplan found that a riot

4   broke out that had its genesis in the stands and spilled out

5   onto the floor.  That is what he found.  It is a different

6   event.  The genesis is in the standards, spilled out onto the

7   floor.  That is why this wasn't the type of discipline that is

8   exclusively --

9          THE COURT:  Are you saying that the genesis of the
                        Page 35

4cnrnatm.txt

10  fight that makes it impossible to be an on-the-court incident

11  after that?

12      MR. KESSLER:  What I am saying is all of these facts

13  which the arbitrator found, which he looked at, that he had

14  knowledge of the shop, that he understood the way sports work,

15  the way these things are interpreted, all of these facts

16  together were taken into account in concluding this, and all

17  you are looking at now, because of the balance of hardships, is

18  whether we have substantial questions going to the merits of

19  our position, combined with the presumption of arbitrability

20  and deferential standard.

21      What I am saying here, there is more than enough for

22  there to be substantial questions going to the merits, combined

23  with the deferential standard, combined with the presumption of

24  arbitrability and the balance of hardships tipping decidedly in

25  our favor.  The Supreme Court says if it is ambiguous, it is

                                                        44

1  arbitrable by him.

2      I do want to make two points that they made in their

3  brief before I conclude, which I didn't address.  One point is

4  they cited a case called Katz v. Feinberg by the Second

5  Circuit, which they say says that it is not procedural on that

6  issue and no deference if it is between two arbitrators.

7      Your Honor, that is not what that case says.  That is

8  the case that they primarily rely upon.  That was a case which

9  had nothing to do with the procedural/substantive thing.  It

10  doesn't cite the Supreme Court authority.  It doesn't even look

11  at it.

12      The issue there was whether or not the arbitration

13  clause covered at all or whether it was something that should

14  go to an accountant who was not an arbitrator.  That is how the

4cnrnatm.txt

15  decision reads.  It is fact-specific.  I don't think it at all

16  stands for any proportion in this.

17      Your Honor should just look at that, because it

18  doesn't say quite what they say in the brief, and it doesn't

19  discuss this issue of review of procedural versus substantive.

20  It doesn't even cite the Supreme Court cases.  There is just no

21  discussion of it.

22      Second, they make the argument of what they call prior

23  history of the parties, which you are going to hear about,

24  which the arbitrator rejected.  That is important to begin

25  with.  But let me say something about that.  They cite a few

                                                    45

1   things as prior history, and I just want to respond why it is

2   not prior history.

3       This is an issue, in effect, of first impression,

4   which is what the arbitrator said.  Their prior history was,

5   one, Mr. Charles Barclay.  That was before 1995.  We had no

6   right to appeal integrity of the game suspensions, completely

7   different CBA.  It could have no meaning in terms of that.  So

8   that is out of the box, doesn't apply.

9       The second one they cite is Judge Rakoff's TRO denial

10  on likelihood of success.  I said I would mention that.  That

11  ruling from the bench, your Honor, which I suspect we might get

12  something like here, that ruling from the bench doesn't at all

13  say what they say it says.  We didn't argue on-the-court/off-

14  the-court there.  We didn't argue anything about this.

15      What we said is the NBA had a rule about leaving the

16  bench, and we said they have no authority to issue the rule, it

17  was collusion.  There a collusion provision in the CBA.  The

18  judge said we have not established a likelihood of success that

19  we would prevail that it was collusion for the NBA to have this

20  rule passed.  That is what the holding was on likelihood.

                            Page 37

4cnrnatm.txt

21      He simply notes that he particularly finds it
22  shouldn't be eligible for collusion when there is this other
23  provision about appealing suspensions.  He mentions the section
24  8, and he accurately quotes section 8 about the commissioner's
25  authority.  There was no ruling about that section.  No one
                                                              46

1  argued that section applied.  That wasn't the issue.  He just
2  noted that section.

3      No one was arguing on or off the court.  There,
4  frankly, we would not argue off the court.  What happened there
5  is during the course of the game, players ran out into the
6  court in the middle of a game as part of the game, and the
7  referees had to get rid of them and restrain them.  That is not
8  an issue and he didn't rule upon it and it wasn't decided.  So
9  that precedent doesn't work.

10      Finally, everything else they cite in the Buchanan
11  affidavit is, as the arbitrator found, we contest the
12  jurisdiction.  We said grievance, they said commissioner.  That
13  is Mr. Rodman's past discipline and Mr. Wallace's past
14  discipline.  That doesn't decide anything.  Or they cite a
15  variety of things which either were on the playing court, like
16  someone leaving a bench during the course of the game, nothing
17  to do with anything, it was normal thing.  So we don't contest
18  that.  Or it was less than $25,000 injury, so there we have to
19  go to the commissioner, because if they fine him $10,000 or
20  something we don't have any right to go there.

21      They don't have any case where certainly the union was
22  agreeing that something that we are saying here -- a fight with
23  fans that happened in an altercation outside of the game,
24  having nothing to do with the game -- there is nothing like
25  that where the union has ever agreed to take a position.
                                                              47
                        Page 38

4cnrnatm.txt

1       This is an issue of first impression which the
2  arbitrator correctly decided.  All your decision is, on the TRO
3  motion anyway, assuming we have shown balance of hardships
4  tipping decidedly in our favor, is are there substantial
5  questions sufficient to prevent this irreparable harm from
6  happening, particularly because they won't suffer any
7  irreparable harm the other way?  Or, if you find the balance is
8  more equal, have we shown a likelihood of success?
9       waiver, by the way, the law is crystal clear and
10 unequivocal.  They can't argue we have waived our rights or
11 anything like that.
12      This is an unusual case.  I suspect you may be on the
13 bench a long time before you get a case quite like this again.
14 But I would urge your Honor that this is a case where there is
15 tremendous irreparable harm to the union and the player, and
16 there is no harm to them at all because the player can be
17 suspended later if we are wrong.  If you balance of hardships
18 our way, irreparable harm.
19      At the very least, the very least, there are
20 substantial questions here, particularly in light of deference.
21 We don't have to show we are certainly going to win.  We only
22 have to show either substantial questions or, at worst,
23 likelihood.  It is not that we are definitely going to win.
24      That is the whole purpose of interim release.  They
25 will get their chance later.  If we turn out to be wrong, he
                                                          48

1  will serve the rest of his suspension, there will be no harm to
2  them.  But if we are right, and I think we have shown we are
3  going to be right, we can never again make up this harm to the
4  player or the union.
5       THE COURT:  Thank you.
                         Page 39

4cnrnatm.txt

6          MR. KESSLER:  Thank you, your Honor.

7          THE COURT:  Let me give my court reporter a break for

8    a second, Mr. Mishkin, and then we will continue with you.  We

9    will take five.

10         (Recess)

11         THE COURT:  Mr. Mishkin.

12         MR. MISHKIN:  Good morning, Judge Daniels.  Not

13   surprisingly, I don't agree with Mr. Kessler that this case is

14   terribly complicated.  The principal matter that you have to

15   decide today, the likelihood of success matter, is whether or

16   not the conduct of Mr. O'Neal took place on the playing court,

17   as that phrase is used in section 8 of Article XXXI of the CBA.

18         Although I will try to be very brief in my oral

19   argument, I do have a witness and we do have some video.  I

20   think we can quickly move through some of the things.  In light

21   of the arguments that Mr. Kessler made, we really ought to take

22   a look at some of the video, and we will do that very quickly

23   after I am done.

24         The first point I would like to make is because we are

25   here on the type of injunction that is not usually asked for,

                                                                    49

1    sometimes it is but it is being asked for here, and that is a

2    mandatory injunction.  The application to you is to alter the

3    status quo.  In this circuit, when you seek to reinstate an

4    employee who has been suspended or discharged, that

5    reinstatement is always viewed as changing the status quo.

6          It is a mandatory injunction, and there is an even

7    higher standard that has to be met in order to get any sort of

8    TRO or preliminary relief.  We cite the cases that tell you

9    that.  So it isn't simply a matter of fair grounds for

10   litigation.  What Mr. Kessler is going to have to show here is

                              Page 40

4cnrnatm.txt

11  the clearest, clearest demonstration that he will win or is

12  very likely to win on the question of whether or not Mr. O'Neal

13  was off the court within the meaning of section 8.  And even if

14  he can show that, which I don't think for a minute he can show,

15  he is going to have to show the kind of irreparable harm that

16  is very palpable and immediate and obvious in its

17  irreparableness.

18          On that point, let me quickly go to where Mr. Kessler

19  started, and that is, is there irreparable harm here?  He said

20  we shouldn't look at this as a sports case, and I agree with

21  him.  We should look at it as a collective bargaining case, an

22  employment case.

23          In the Second Circuit, an employee who has to serve a

24  discharge or suspension while he is waiting for a decision on

25  the merits has been found over and over again not to be

                                                            50

1  suffering irreparable harm.  Back pay and other remedies can

2  make an employee whole if it turns out that they have

3  improperly served a suspension that was later overturned.

4          THE COURT:  In your argument with regard to the harm

5  you say will be done to the league, you put this in a different

6  context than a factory worker who shows up to work and gets a

7  paycheck.

8          MR. MISHKIN:  We do, your Honor.  Our players get paid

9  a lot more.

10          THE COURT:  And their showing up for work, as you

11  said, or not showing up for work has a significantly greater

12  effect on the league and on that player's status.

13          MR. MISHKIN:  As it is supposed to.  The reason for

14  imposing suspensions when serious misconduct has occurred is

15  because it is a serious matter to take a player off the court.

16  But that doesn't mean that within the standards of a

                        Page 41

4cnrnatm.txt

17    preliminary injunction it is irreparable.  It is certainly
18    intended to be serious, but it is not irreparable.  At least it
19    is not irreparable in the NBA.
20          Other sports handle it differently.  In baseball, your
21    Honor may know that the practice is that the player who is
22    suspended does not begin serving his suspension until there has
23    been a final review as to whether or not he should serve it.
24    The practice is completely opposite in the NBA.
25          If we can look at 14(d).  I would like to put that up

                                                            51

1     on the screen.  One historical fact, your Honor, and I will
2     explain in a minute.  In the history of the NBA, no NBA
3     suspension for discipline has ever, ever been enjoined or
4     stayed or made subject to a TRO.  It has never happened.
5           THE COURT:  We are in a situation that has never
6     happened?
7           MR. MISHKIN:  With respect to this, I think it is so.
8     Mr. O'Neal was suspended a long time.  25 games puts him in the
9     hit parade of top suspensions, that is true.  But even Mr.
10    Kaplan found that 15 of them, which have now been served, were
11    not of any harm to him, that is what he deserved.  We are only
12    talking now about the remaining number of games.  I think
13    that that situation has occurred many, many times in the NBA,
14    that some finite number of games has been served.
15          As 14(d) says, "Nothing contained herein shall excuse
16    a player from prompt compliance with any discipline imposed
17    upon him.  If discipline imposed upon a player is determined to
18    be improper by a final disposition under this Article XXXI, the
19    player shall promptly be made whole."
20          Mr. Kessler says is that has nothing to do with
21    irreparable harm.  I think it has to do with irreparable harm.

                              Page 42

4cnrnatm.txt

22  It is a recognition in the collective agreement between us and
23  the union that players can be made whole.  That language, that
24  phrasing, of course relates to preliminary injunction
25  standards:  Can you be made whole or not?

52

1          If you can be made whole, then the injury you are
2   suffering -- and of course you are suffering some injury.
3   Again, that is the point of the suspension.  But if you can be
4   made whole for it, as we say you can, then that injury is not
5   irreparable and certainly not of the type of irreparable harm
6   that has to be shown on a mandatory injunction to alter the
7   status quo and put someone back on the court, in particular the
8   games we are talking about,
9          As your Honor may or may not know, the next game that
10  Mr. O'Neal is being asked to play in is Christmas Day.  It is a
11  rematch, if I can use that word, between the Pacers and the
12  Pistons.  Part of the suspensions here clearly was to make sure
13  that that date had come and gone before we were putting someone
14  back.
15          THE COURT:  I am not sure on what basis you make that
16  argument.  I don't see any place in this record where that was
17  ever a consideration or a motivation for the number of
18  suspensions or any individual suspension.
19          MR. MISHKIN:  Your Honor, as you know, we have made no
20  record.  The minute that Mr. Kessler tried to bring this before
21  the grievance arbitrator, we told them, and you will see all
22  the correspondence, that we would not participate, that this
23  arbitrator had no jurisdiction at all, this was all conduct on
24  the playing court within the meaning of Article VIII.  So we
25  have yet to make any of our record.

53

1          THE COURT:  But there is nothing you have submitted in
Page 43

4cnrnatm.txt

2  the record before me for me to make a termination that the
3  reason that this suspension was structured the way it was is so
4  that the players could avoid the next Detroit game.

5      MR. MISHKIN:  That is correct, your Honor.  We have
6  not put anything in the record.  But I think that the fact
7  that that is the game and the attention that is going to be
8  paid to that game and the security that is going to be involved
9  in that game at least is a factor.

10     THE COURT:  I would assume that both the commission
11 and the league, given what occurred in the last game, have
12 taken what they believe will be appropriate steps to ensure
13 that this kind of thing doesn't happen again, whether he is on
14 the court or off the court.

15     MR. MISHKIN:  I assure you they will try, and very
16 hard.

17     THE COURT:  I want to make sure I clearly understand
18 your argument.  Are you arguing that there is a likelihood of
19 irreparable injury to the league because there is a greater
20 chance that there is going to be further violence if he plays
21 in this game?

22     MR. MISHKIN:  Yes, I am, your Honor.  That goes more
23 to the balance of the hardships.  I really focus now on the
24 question of lack of irreparable harm, because we have agreed
25 that it can be remediated by a back pay award.

                                                54

1      The last thing I will say on this point is Dean
2  Feerick, when he was the arbitrator, decided a case involving
3  Isaiah Rider, this exact issue.  An application was made to
4  Dean Feerick to stay the suspension while he was deciding the
5  merits of the dispute.  It was before the arbitrator.  This was
6  not on-the-court conduct.  Dean Feerick, said I cannot issue a

                          Page 44

4cnrnatm.txt

7   stay.  A stay that is being requested of you here is
8   unprecedented.

9        THE COURT:  All of those other circumstances were
10  circumstances that were while the arbitrator was considering
11  the issue.  They were not circumstances in which the arbitrator
12  had already decided the issue.  So the argument is a little
13  different.

14       Their argument is that, look, this is not the same.
15  The plaintiffs in this case may be absolutely right if we were
16  asking for a stay or asking for any kind of injunctive relief
17  while the arbitrator was making its decision, but the
18  arbitrator has made his decision.  They are saying, look, we
19  have a decision, and what is going to happen is either the
20  court is going to uphold that decision or the court is going to
21  set aside that decision.

22       The presumption is that the court is going to uphold
23  an arbitrator's decision unless there is some evidence to
24  believe that there has been some other determination, so the
25  posture of the case is significantly different from all of the

55

1   other situations we have addressed in the past.

2        MR. MISHKIN:  Of course you are right, your Honor.
3   But what makes it different is that the NBA has asserted that
4   there was no jurisdiction.  In every other one of those
5   arbitrations, we recognized and participated in those
6   arbitrations.

7        This is the first one where we have said this
8   obviously does not go to the arbitrator, it goes to the
9   commissioner, we are going to treat it as a nullity and we are
10  not going to participate.  So for us there is yet to be a
11  determination as to whether we are right that this matter
12  should not have been heard by the arbitrator.  We say it is not

Page 45

4cnrnatm.txt

13   arbitrable.

14        I don't think that that distinction really undermines

15   very much the history that there has never been, while a merits

16   issue was still to be resolved, an NBA player put back on the

17   court before serving the suspension that the commissioner had

18   imposed on him.  It just has never happened.  Again, I think it

19   just goes to irreparable harm.

20        THE COURT:  You say that the player could be made

21   whole.

22        MR. MISHKIN:  Yes.

23        THE COURT:  I assume that your argument is no more or

24   no less than if he has to sit out 10 more games and it is

25   determined that he shouldn't have sat out those 10 games, that

                                                                56

1    we will just pay him for it.  Is there any other argument that

2    you are making that he can be made whole in any other way?

3         MR. MISHKIN:  Yes.  Dean Feerick went into several.

4    He said of course the basic point is to make him whole, to pay

5    him, but with a public statement that he was not --

6         THE COURT:  Give him a nice letter saying we're sorry?

7    How is that going to make him whole?

8         MR. MISHKIN:  This isn't me.  This is Dean Feerick.

9         THE COURT:  I am asking you.  I know Dean Feerick.

10        MR. MISHKIN:  Judge, I don't want to quibble about it.

11   Of course money is the principal way that you make someone

12   whole.

13        THE COURT:  I am just trying to understand what other

14   way you are saying he could be made whole.

15        MR. MISHKIN:  It may not be perfect, but if it is a

16   way of substantially making somebody whole -- again, you will,

17   I am sure, read the employment cases that we cite.  Back pay

4cnrnatm.txt

18    has been found over and over again -- in this circuit it is

19    pretty close to a rigid rule that there is no irreparable harm.

20    You do not grant mandatory injunctions putting people back to

21    work where they can get back pay.  That is what I want to say

22    right now on irreparable harm.

23            THE COURT:  At this point I am not making a judgment

24    about it.  I am just trying to figure out whether you are

25    arguing that if the player has to sit out 10 games that it is

                                                              57

1    determined that he should not have sat out.

2            MR. MISHKIN:  Yes.

3            THE COURT:  You are not making any other argument to

4    me at this point that the league intends to make him whole

5    other than paying him for those games?

6            MR. MISHKIN:  There isn't much the league itself can

7    do to make him whole beyond being paid for those games.

8            THE COURT:  So there is nothing else that I should

9    consider with regard to whether or not that is going to be

10    adequate to make him whole if he has to sit out 10 games that

11    he should not have sat out?

12            MR. MISHKIN:  I think, your Honor, you should consider

13    that there is only a monetary remedy.  But I think you should

14    also consider paragraph 14(d) in which the parties agreed a

15    player could be made whole.  They didn't just say and we will

16    pay him.  The parties went further, which is why that 14(d) is

17    very much an indication of how the parties view irreparable

18    harm.  It is reinforcing to the NBA anyway -- other sports are

19    different -- that you serve your suspension in the NBA, and

20    then if it is wrong, you get back pay.  That is how you are

21    made whole.

22            That was a deliberate choice of words.  That is how we

23    want it in the NBA, and that is how it has always been.  I

                                Page 47

4cnrnatm.txt

24  understand the differences in this case.  But the fact remains

25  that were an injunction to issue ordering a player back on the

58

1  court where there were still 10 days left in the commissioner's

2  suspension, that would be the first time in the history of the

3  NBA that had ever happened.

4          THE COURT:  As we all understand, this is a very

5  unique circumstance, because that language was in contemplation

6  that that would be the case until an ultimate decision was made

7  either by the arbitrator or the commissioner with regard to

8  whether or not the discipline or action was appropriate.

9          MR. MISHKIN:  Or a court, if there is a dispute about

10  whether the arbitrator had jurisdiction.

11          THE COURT:  That may apply to that.  I am not sure

12  that is what the parties had in mind, that we would end up in

13  this circumstance, when they wrote that article.

14          MR. MISHKIN:  No, we did not have the Detroit incident

15  in mind when we wrote those words.  But we did write

16  "determined to be improper."  We didn't confine it to the

17  commissioner or an arbitrator.

18          Cases can come up in different ways.  This case has

19  come up in its own way.  But there has not yet been a final

20  determination.  So this would be, again, the first time that

21  has ever happened.  For all these reasons, Judge, I don't think

22  they can make out the kind of irreparable harm you have to make

23  out on a mandatory injunction.

24          THE COURT:  Let's talk briefly about the balance of

25  hardships.  In this case you have made several arguments in

59

1  your papers and here today with regard to the effect of having

2  him serve this 10-game suspension until this dispute is

Page 48