4cnrnatm.txt

3   resolved or having it be stayed.  You say there is going to be

4   another Detroit-Indiana game on Saturday, on Christmas Day.

5   But there is always going to be another Detroit-Indiana game.

6   That is not the only Detroit-Indiana game.

7        And this issue that you think you want to avoid on

8   Christmas is an issue that the league and the players and

9   everyone else and the fans are going to have to appropriately

10  address sometime in the future, maybe even sometime in the near

11  future.  I have the schedule.  I could look and see when their

12  next game is, but I don't think it is that far off either.

13        Also, you made arguments in the papers that putting

14  him back in the game at this point even affects the balance of

15  teams and the circumstances that currently exist.

16        MR. MISHKIN:  Sure.

17        THE COURT:  That is going to be true no matter when he

18  serves that suspension.  There are games all the way through

19  the end of April.  There are teams or games that he can not

20  play this season even if he plays games right up through the

21  end of March.  I know those are the dates, because I have

22  counted them.  There are at least 10 games in April.

23        So aren't you really just talking about the timing of

24  when these suspensions are going to be served rather than

25  arguing that there is going to be some real hardship?  If he is

                                                              60

1   going to have to be suspended, quite frankly, I am not sure

2   that the player would rather be suspended at the end of the

3   season than take his 10 games now.

4        Honestly, I understand the argument that you are

5   making with regard to their burden with regard to irreparable

6   injury.  But in terms of the balance of hardships, we are not

7   talking about ultimately making a decision as to whether or not

8   he is going to ever serve the suspension.  We are talking about

                        Page 49

Dockets.Justia.com

4cnrnatm.txt

9  the player saying, I think that ultimately I am not going to

10  have to serve these further 10 games, and if I have to serve

11  them, you can't give me that play back.  But if I ultimately

12  have to serve them, then it can happen in January, when that

13  decision is made, it can happen in February, it can happen in

14  March, it can happen in April.  I may even have to sit out the

15  playoffs if the team is in the playoffs, or even I may have to

16  not play next season or at some other time.

17       Why is the balance of hardships in the league's favor?

18  What does the league lose other than its argument that this is

19  the commissioner's decision, he has a right to make that

20  decision, he has made the decision, we want it done now?

21       MR. MISHKIN:  Your Honor, there are a number of cases

22  that we have cited that say that a party who is forced to

23  arbitrate or is affected by an arbitration that it turns out

24  they did not agree to, they have been irreparably harmed.  The

25  NBA operates in a very public way.  We are trying very hard to

                                                              61

1  attract fans, sponsors, attention in the press.  How we

2  operate, how we conduct ourselves, the confidence people can

3  have in the NBA is very important.

4       This area of conduct on the playing court, which,

5  again, I haven't gotten to the merits of, the reason for that

6  going only to the commissioner is because that is the public

7  presentation of our product, our core product.  What happens at

8  a game that people see, that the television audience sees, that

9  affects the NBA and its business in a huge, in a huge way.

10       Part of the confidence we have to impart to the world

11  to be a successful competitor with all that is out there is

12  that we have our house in order that we try very hard to make

13  coming to a game a good experience and we want you to come

Page 50

4cnrnatm.txt

14  back.  If things happen during that presentation, that question

15  whether or not this is a good experience or if anybody wants to

16  be connected with this organization, that is serious to us.

17        So it is not a minor matter, serve the 10 here, serve

18  the 10 there.  The NBA commissioner, who is given sole

19  responsibility to decide when misconduct occurs in that public

20  presentation, has decided that Mr. O'Neal should serve 25

21  games.

22        If someone else says, as an arbitrator already has,

23  no, no, my judgment is that is too long, 15, and a court says,

24  oh, I don't know, I haven't decided yet whether that

25  arbitration even had jurisdiction but I'm going to go with it

                                                              62

1   and put him back, well, the NBA then has had its disciplinary

2   structure pretty well undermined before anybody has decided

3   that it ought to be undermined.

4         THE COURT:  But somebody has already decided that it

5   ought to be undermined.

6         MR. MISHKIN:  Right.  And I am here asking you to

7   correct that.

8         THE COURT:  In essence, the arbitrator has already

9   made that determination.  So the question is not whether or not

10  there is some question about the commissioner's decision.

11  There is some question about the commissioner's decision.

12  There is an arbitrator who disagrees with it.  Whether the

13  arbitrator has the authority to disagree with it is another

14  question.  But clearly that is an issue.

15        Obviously, his decision to suspend was appropriate,

16  and in most respects the arbitrator agreed that it was

17  appropriate, in all respects as to three individuals and in one

18  respect as to the fact that the commissioner took discipline.

19  But the arbitrator disagreed as to the amount of discipline.

                           Page 51

4cnrnatm.txt

20        If you are right, I have a good idea what the
21  commissioner did, how to follow through on that discipline.  If
22  you are right, then there are 10 games that this player is not
23  going to be able to play, period.  That is that is the crux of
24  this.  That is not all of it, you're right, because it has to
25  do with the commissioner's authority, it has to do with the
                                                                63

1   timing.  The commissioner makes the decision as to the timing.
2   But the reality is I know that if you are right, this player
3   will be further punished, this player will have to sit out 10
4   games.
5        But if you are wrong and I make the player sit out the
6   10 games even though an arbitrator says that we don't think
7   that he has to, and it is ultimately decided that the
8   arbitrator was right, then he sat out 10 games that even the
9   league would say that no player should have to sit out games
10  that he shouldn't have to, and that it even adversely affects
11  the league when a player is not playing when that player should
12  be playing.
13        MR. MISHKIN:  Your Honor, I understand that instinct
14  very, very well and the logic of what you have just said.  I
15  think it is affected, which you haven't heard yet, by the
16  likelihood that there is any chance, any chance in the world,
17  let alone the heightened standard they have to meet, that Mr.
18  O'Neal's conduct did not occur literally on the playing floor.
19  But we will come back to that.  I understand the dilemma.
20        Again, the NBA has dealt with that.  They want it a
21  certain way.  Again, I don't want to repeat.  Read 14(d).  Read
22  Dean Feerick on Isaiah Rider.
23        One more point before I go quickly to the merits.
24  This question of de novo review doesn't depend on whether it is

4cnrnatm.txt
25    de novo or deferential, because I think the issue here is so
64

1    clear.  But the points you were making before, I have an
2    arbitrator who has said something already.  He has found
3    something in Katz v. Feinberg.  This is the case that is not
4    cited by the players.
5            This is the case by the Second Circuit two years ago
6    that tells us as clearly as we can be told that Arbitrator
7    Kaplan made a serious mistake by deciding his own authority
8    here.  He never should have decided that.
9            The reason is, under the Katz case, if you have an
10   agreement -- collective bargaining agreement in our case,
11   purchase and sale agreement in that case -- where there is a
12   broad arbitration clause and then there is also in that
13   agreement another dispute resolution mechanism, you have two of
14   them, just like we have here, and it is not clear, it could go
15   to one, it could go to the other, the Second Circuit said as a
16   matter of law neither one of them gets to decide who it is.
17           You are not going to have dueling.  The commissioner,
18   just as well as Mr. Kaplan, could have said, I don't know what
19   he is talking about, I have jurisdiction.  That doesn't happen.
20   The Second Circuit says when you have the situation we have
21   here, as a matter of law it is for the court to decide.
22           You don't have to even consider whether it is
23   procedural or substantive.  Obviously, substantive
24   arbitrability means who gets to decide the substance of the
25   arbitration.  So where deciding between two possible
65

1    arbitrators, you are inevitably deciding substantive
2    arbitrability.
3            It is a short case and I commend it to you.  Katz v.
4    Feinberg is just so clear here that this is for the court de
Page 53

4cnrnatm.txt

5    novo.

6            THE COURT:  The issue, then, for me now is not whether

7    or not the arbitrator should have decided it; the question for

8    me now is, de novo, did the arbitrator properly decide it?

9            MR. MISHKIN:  No.  De novo means you have to take the

10   arbitrator's decision, put it under the -- it didn't happen.

11   The cases say, and we have cited them to you, if we are right

12   about Katz v. Feinberg, and we are, you cannot say, well,

13   arbitrator, huh-uh.  It is de novo.  They have to come in here

14   from the ground up and prove to you, with this heightened

15   standard of a mandatory injunction, that they will clearly,

16   clearly succeed on the merits.  They cannot bootstrap.

17           THE COURT:  Let me ask you this.  That is why I had

18   part of that discussion with Mr. Kessler.  Is your position

19   anything more than the arbitrator should not have decided it?

20   If I determine de novo that this is a case for the arbitrator,

21   what is it that you say the arbitrator -- how did the

22   arbitrator err?  Is there any other review that you have?  Do

23   you have any other attack on the process that was decided?

24           MR. MISHKIN:  Your Honor, whether it is de novo or

25   deferential, you have the problem.  You have to decide whether

                                                              66

1    or not this was on-the-court behavior and therefore arbitrable

2    before the commissioner or not.

3            THE COURT:  Right.  But if I decide that this was not

4    on-the-court behavior, doesn't that resolve the issue?

5            MR. MISHKIN:  Yes.

6            THE COURT:  Isn't it clear that --

7            MR. MISHKIN:  Yes.

8            THE COURT:  -- the substance of the arbitrator's

9    decision is appropriate?  You are not saying that there is any

                              Page 54

4cnrnatm.txt

10  other analysis or any other review that I have?  Obviously,

11  once the arbitrator gets it, there is great deference that I

12  should give to the arbitrator's decision.

13          MR. MISHKIN:  Right.

14          THE COURT:  So you are not attacking the decision,

15  saying, Judge, even if the arbitrator had the right to decide

16  it, the commissioner said it should be 25, the arbitrator said

17  it should be 15, I disagree with the arbitrator so I think it

18  should be 17?  You are not saying that?

19          MR. MISHKIN:  Absolutely not.

20          THE COURT:  You are saying if I find de novo that this

21  is an issue that should be arbitrated by the arbitrator, then

22  you are just going to have to live with the arbitrator's

23  decision pretty much?

24          MR. MISHKIN:  That's right, your Honor.

25          THE COURT:  OK.

                                                    67

1          MR. MISHKIN:  But in deciding whether or not there is

2  a likelihood of your finding that, under Katz v. Feinberg you

3  have to approach that de novo, which means you can't give any

4  weight or deference to what the arbitrator did.  That is my

5  point.

6          Judge, a quick few points on the --

7          THE COURT:  Don't rush it.  You say you want to call

8  Mr. Buchanan, but I'm not sure I need to hear from Mr.

9  Buchanan.  I have an affidavit from him.  Is there anything

10  further that he needs to say that isn't in his affidavit?  I

11  have read his affidavit thoroughly.

12          MR. MISHKIN:  I don't want to impose if your Honor

13  doesn't need it.  But I would like to at least show the clips

14  of Mr. O'Neal.

15          THE COURT:  That's fine, because I think there is a
                              Page 55

4cnrnatm.txt

16  factual dispute with regard to my recollection of what the clip

17  has and Mr. Kessler's recollection and what you say you have in

18  the tapes.

19      MR. MISHKIN:  We will look at the tape and all make

20  our own conclusions.

21      As to the question of the meaning of the phrase

22  "conduct on the playing court," the players and the arbitrator

23  now said that that means literally, literally, on the playing

24  floor and in this concept flow of the game.  We have never

25  heard that before, never.  It does not appear in any NBA rules,

                                                      68

1  not in the collective bargaining agreement, not in the player

2  contract, not in any publications the NBA ever issues.  It is

3  not a phrase that is used in any way in the NBA.

4      But as we understand their use of it, that can't be

5  the meaning of what these parties have intended for more than

6  30 years.  The phrase "conduct on the playing court" within

7  section 8 giving the commissioner exclusive appeal authority

8  has been there since 1972, and that has been unchanged.

9      There are two cases that if you have the time I do

10  want you to look at.  The decision by Arbitrator Collins in

11  Barclay said on the playing court.  There was no dispute that

12  what Barclay did was on the playing court.  What did Mr.

13  Barclay do?

14      THE COURT:  When you say there is no dispute, that is

15  accurate.  But you can't say that the parties, both sides,

16  affirmatively said that this is the definition.  They didn't

17  dispute it.

18      MR. MISHKIN:  Yes, you're right.

19      THE COURT:  It went through its course, but no one in

20  that case defined or acknowledged one way or the other any

                              Page 56

4cnrnatm.txt
21  parameters with regard to that.

22      MR. MISHKIN:  Right.  But the point I am making, and

23  that is absolutely correct, is that the test they have given

24  now could well have been used there to bring it to the

25  grievance arbitrator.  But the grievance arbitrator said this
                                                          69

1   is conduct on the playing court, I find the issue to be can I

2   hear this conduct on the playing court case, and the answer is

3   I can't.

4       Again, Barclay -- and if you know the facts, I am not

5   going to trouble you with them -- walks out of bounds, play has

6   stopped, he has a bump with his teammate, he walks right to the

7   first row, the game is stopped, he is not in the game, he is

8   off the playing floor, and he spits.  That is not on the

9   playing floor.  That is not the flow of the game.

10      Yet those facts have led to a crystal clear

11  arbitration decision that that is on-the-court conduct and it

12  only goes to the commissioner.  For whatever weight you want to

13  give it, it does seem to me very, very telling.

14      THE COURT:  What definition do you say I am supposed

15  to use?  I can very clearly see the distinction that everyone

16  has drawn and agreed upon between what happens in the stands

17  and what happens on the floor.  That is not the whole

18  definition, but certain things happen in the stands, certain

19  things happen on the floor.  We draw that line.  Certain things

20  happen on the floor, certain things happen in bounds, certain

21  things happen out of bounds.

22      I am not quite sure in terms of at least the two

23  elements the way they articulate it.  They say it has to be on

24  the floor and it has to be during the course of the game.  Do

25  you disagree that it has to be on the floor?
                                                          70

Page 57

4cnrnatm.txt

1       MR. MISHKIN: Yes, I disagree that it has to be on the

2   floor. Again, I distinguish the phrase "playing floor," which

3   we understand to mean the 94-by-50-foot rectangle in-bounds

4   playing surface. That is the floor. We can quibble about

5   whether the apron is part of the floor, because parts of the

6   game do occur on the apron and out of bounds.

7       THE COURT: What do you say "on the floor" means?

8       MR. MISHKIN: On the court. On the floor. This is a

9   very important question, and we have an answer.

10      Could you put up, please, Article XXXV(d) of the

11  constitution.

12      XXXV(d) of the constitution has been there forever in

13  the NBA and it is, under the collective bargaining agreement,

14  made part of every player's contract. So every player has

15  agreed to this.

16      It says, "If in the opinion of the commissioner any

17  other act or conduct of a player at or during" that is the

18  critical language, "at or during an exhibition, regular season

19  or playoff game has been prejudicial to or against the best

20  interests of the association." So it doesn't have to be the

21  integrity of the game at all, but this is the authority given

22  to the commissioner to issue fines and suspensions for conduct

23  at or during an NBA game.

24      Now, section 8 is not a grant of authority. Section

25  8, as we have all understood it, means this. If the

                                                        71

1   commissioner has issued discipline under XXXV(d) at or during a

2   game, that discipline is not reviewable under 8. We have

3   always equated, we have equated, at or during the game with

4   conduct on the basketball court.

5       Judge, I don't want you to take it just from me. In

Page 58

4cnrnatm.txt

6  other moments Mr. Kessler and all of us in the NBA have made

7  the point that XXXV means on the court.  I would like to put up

8  two statements that Mr. Kessler has made in prior proceedings

9  where he will agree with me entirely on this point.

10      I believe this is in the Sprewell opening statement.

11  It doesn't really matter.  I refer you to page A19 to give you

12  an example from the NBA constitution excerpt which is attached

13  to the player contract.

14      "If you would look, for example, in XXXV(d), the

15  section we just looked at, when they are talking about this is

16  the commissioner's ability to discipline for conduct of a

17  player at or during," at or during, "an exhibition, regular

18  season, or playoff game.  So this is on-court behavior as we

19  colloquially use that phrase.  It is more colloquial.  But we

20  all equate conduct on the playing court at or during an NBA

21  game."

22      That is not the only time Mr. Kessler has agreed with

23  us on that.  May I have the second.  Mr. Kessler also said,

24  "Because if you look at Article XXXV of the NBA constitution,

25  which both parties cite, which is attached to the uniform

                                                      72

1  player contract, it goes through different reasons for

2  suspending.  You could be suspended for drugs and you could be

3  suspended for gambling and you could be suspended for crimes,

4  and in a separate section, Article XXXV, you can be suspended

5  for on-court behavior."

6      These were not a coincidence.  This is how we have

7  always understood it, and it makes perfect sense, because the

8  purpose of section 8 is to give the commissioner authority when

9  we are presenting our game.  It is irrelevant whether your toe

10  is over the in-bounds line or not or you are two feet in the

11  stands or you are in the exit tunnel or you are even in the

Page 59

4cnrnatm.txt

12   locker room.

13        I am not going to go through all those examples, but

14   you have all those examples, where the players even in the

15   locker room have appealed only to the commissioner, having

16   nothing to do with the flow of the game.  You have examples of

17   Shaquille O'Neal cursing after a game is over appealed to the

18   commissioner.  That is not in the flow of the game.  It has

19   nothing to do with the game.

20        We have Tim Hardaway, after being ejected, walk over

21   to the scorer's table minutes after he has been ejected,

22   complete separation from the court, picking up a television

23   monitor, throwing it on the court.  It has nothing to do with

24   the flow of the game.  It has nothing to do with literally on

25   the playing floor.  Appealed to the commissioner.  After 1995.
                                                            73

1    Cost him much more than $25,000.  Over and over again this is

2    how we have all understood it.

3         Now, we offer those examples to you not because the

4    Players Association has never said, well, maybe we are going to

5    argue -- they have on a couple of occasions:  Barclay for one,

6    Ewing for another.  Those are the only two they actually

7    pursued, and they lost.  Both Judge Rakoff and Arbitrator

8    Collins said this is for the commissioner, only for the

9    commissioner.

10        The other times they have raised the issue:  Dennis

11   Rodman, when he kicked the cameraman just a few feet off the

12   court; Rashid Wallace confronted a referee right outside the

13   arena after a game; and Mr. Artest, I think he threw a camera

14   in the exit tunnel.  In those three cases they filed

15   grievances.  We said, you've got to be kidding that this is

16   only on-the-court behavior, it happened during the game.  And

4cnrnatm.txt

17  all of them went away.  They did not press any of them, not any

18  of them.

19          Judge, perhaps the most telling point on the merits

20  here that I can give you as to the meaning of on-the-court

21  conduct is there has never in the history of the NBA ever been

22  an arbitrator who reviewed the merits of an Article XXXV(d)

23  suspension, never, never, ever until Roger Kaplan did it

24  yesterday.  Never.

25          Why is that?  Because we have all understood up till

74

1  this point that an Article XXXV suspension for conduct at or

2  during a game is the same thing as conduct on the playing court

3  and therefore solely within the commissioner's authority under

4  8.  It has been a totally consistent practice.

5          That is not quite all.  At the beginning of each

6  season the NBA distributes memoranda to each player and to the

7  Players Association explaining our conduct, rulings and our

8  procedures about conduct.  I would like to put one of them up

9  for you now.  This is the most recent conduct memo.  These go

10  at the beginning of every year.  They are very similar, been

11  there for the last six, seven years.  Quite verbatim they have

12  gone out to all the players and the Players Association.

13          Let's focus on this one.  Under the heading "Violence

14  on the Court," we tell the players, "any player who

15  deliberately enters the spectator stands during a game will be

16  automatically ejected and subject to a fine and/or a

17  suspension."  That is the type of violence on the court that

18  the NBA will not tolerate.

19          Now, that is our position.  That is what we have said.

20  But we have given this memo to the Players Association every

21  year since 1999.  Year after year after year they have said

22  precisely nothing.  They haven't said, what do you mean on the

Page 61

4cnrnatm.txt

23  court?  That is not on the court, that's in the stands, that is

24  not in the flow of the game.  Nothing.  We have never heard

25  anything like that from them.

                                                    75

1       And we have been on record for years telling them that

2  is what we believed, that on-the-court conduct included going

3  into the spectator stands.  Silence.  You will see the cases

4  that say when a party to a contract, at least one of them,

5  makes it clear how they view a particular provision and the

6  other party remains silent, you can draw at least some

7  inference that both parties agree that that is the right way to

8  interpret the contract.

9       THE COURT:  That is not determinative, that language.

10      MR. MISHKIN:  No.

11      THE COURT:  Is your argument that the language

12  highlighted is violence or is it on the court?

13      MR. MISHKIN:  I believe it would be violence on the

14  court, entering the spectator stands.

15      THE COURT:  Are you saying that because that is under

16  the heading of "Violence on the Court," it necessarily means

17  that it is on the court.  Well, it doesn't necessarily mean it

18  is violence.

19      MR. MISHKIN:  You're right, Judge.

20      THE COURT:  That doesn't necessarily follow.  A person

21  could be disciplined for going in the stands even if he commits

22  no violence.  So the fact that it is entitled "Violence on the

23  Court" is not as strong an argument as you want to present.

24      MR. MISHKIN:  Some of my arguments are stronger than

25  others.  This one only goes to the point, Judge, that we have

                                                    76

1  equated the words "on the court" with going into the stands.

                    Page 62

4cnrnatm.txt

2    And the arbitrator, without citing this --

3            THE COURT:  You have equated the word "violence" with

4    going in the stands.

5            MR. MISHKIN:  Yes.  The next sentence suggests that we

6    were distinguishing and that the first sentence, we would

7    really view that as violence.  The second sentence says if you

8    just go in there chasing a ball, that is OK.  So I do think

9    that we are certainly warning players that what we would regard

10   as on-the-court behavior that we will not tolerate is going

11   into the stands.

12           I don't see how you read that without at least

13   concluding that that is what the NBA is trying to convey, that

14   somehow it is on the court, going into the stands.  That is

15   part of our presentation of the game.  That is part of

16   on-the-court conduct within the meaning of section 8.

17           Judge, we have given you lots of paper, and I should

18   have at the very outset made an application to file an

19   oversized brief.  I do apologize.

20           THE COURT:  That's all right.

21           MR. MISHKIN:  I think now I would like to get Mr.

22   Buchanan to take us through the very short videos of Mr. O'Neal

23   so we can all resolve this disagreement about exactly where it

24   happened.

25           MR. KESSLER:  Your Honor, if there is going to be an

                                                                77

1    evidentiary presentation with a witness, I would like to first

2    reply to the argument.  I think that would be the appropriate

3    order.

4            THE COURT:  Quite frankly, I am only interested in

5    seeing the video.  If you want to comment on the video --

6            MR. KESSLER:  If he just wants to show the video, that

7    is fine.  I don't think we need Mr. Buchanan on and then I have

                              Page 63

4cnrnatm.txt

8  to cross-examine him.

9          THE COURT:  I have seen portions if not all of the

10  video.  But if you want to show me the video and tell me what

11  portion you believe is at issue and how it is determinative of

12  that fact, then I will hear from both sides as to whether or

13  not your arguments are consistent with what I see.

14          MR. MISHKIN:  Your Honor, we will show you just the

15  clips of Mr. O'Neal.  I do want to say, though, that our

16  objection to the award, and of course we will be cross-moving

17  to vacate the award, goes beyond simply -- the ultimate results

18  we may not quibble with, but the two steps that got the

19  arbitrator there with respect to the other three are something

20  that we very much oppose and will continue to contest.  For

21  today's purposes, because we are only talking about likelihood

22  of success with respect to Mr. O'Neal, we will limit it to Mr.

23  O'Neal, but we would at a broader proceeding say more.

24          THE COURT:  Surely.

25          MR. MISHKIN:  With that, let's play the O'Neal clips.
                                                            78

1          THE COURT:  Before you play that, I am going to give

2  you a laser pointer, so if you wish to point something out

3  while it is playing --

4          MR. MISHKIN:  You are not giving it to the precisely

5  right person.  We have a monitor here that would be of even

6  higher resolution.

7          THE COURT:  It is up to you.  I am not sure how clear

8  your pictures are.

9          MR. KESSLER:  Your Honor, you are a model for the

10  associates I work with that you had the laser pointer.  I

11  commend you for that.

12          (Videotape shown)

                        Page 64

4cnrnatm.txt

13          MR. MISHKIN:  We have Mr. O'Neal with the arrow there.

14    He was standing right on the apron.  This is security personnel

15    that pushes over the apron, the scorer's table.  That is the

16    first clip.  The punch is coming.  Do you want to see that

17    again, Judge?

18          THE COURT:  No.  That's fine.

19          MR. MISHKIN:  You will see there.  Stop it.  Mr.

20    O'Neal has come from 10 or 15 feet away, on the court, on the

21    playing floor, on the playing floor, has run across and punched

22    that fan.  They were both clearly, clearly within the confines

23    of the playing floor.  There is just no definition of playing

24    floor, playing court, any definition that would describe where

25    basketball is played that would not fit where he was.

                                                            79

1          Can we see the next one.  That's it for O'Neal?  OK.

2    Just that one once more.  You see him, he is on the wood, on

3    the white wood.  Comes running over, still on the floor.  OK.

4          THE COURT:  What is your position as to what the

5    status of the game was at that point in time?

6          MR. MISHKIN:  The game was still in progress.  The

7    officials did not call it.  They didn't call it until well

8    after that occurred, your Honor.  We have a clip which we can

9    show you that it was not called.  The officials were debating

10    what to do, but well after that they called the game.  The game

11    was still in progress when Mr. O'Neal committed this

12    misconduct.

13          THE COURT:  Is it your position that the clock had

14    stopped at this point?

15          MR. MISHKIN:  Definitely.

16          THE COURT:  The clock was still running?  How much

17    time?

18          MR. MISHKIN:  There was I think 45.9 seconds when the

Page 65

4cnrnatm.txt

19  foul was committed by Artest on Wallace.

20       THE COURT:  And the clock was stopped at that point?

21       MR. MISHKIN:  It was stopped at that point, but there

22  were still 45.9 seconds left in the game.  So the game was

23  continuing until the referees decided that they would call the

24  game, which they did after the events you have just seen

25  regarding Mr. O'Neal.

                                                              80

1        THE COURT:  How much longer after this event was the

2   game called?

3        MR. MISHKIN:  Probably a matter of minutes.  Yes, a

4   matter of minutes, Judge.

5        THE COURT:  Thank you.

6        MR. MISHKIN:  Thank you very much.

7        THE COURT:  Mr. Kessler.

8        MR. KESSLER:  Thank you, your Honor.  Your Honor, the

9   first and most important point I want to make, which is very

10  clear here, shows you life isn't very simple.  Neither side is

11  saying to you that the test is to literally read "on the

12  playing court," those words, to mean simply look at if you are

13  on the end line or not.

14       THE COURT:  I assume in light of that video it is not

15  your position that he wasn't physically on the playing floor.

16       MR. KESSLER:  Actually, your Honor, in the first

17  incident --

18       THE COURT:  No.  I am saying he struck the player,

19  which seems to be what primarily the discipline was for.

20       MR. KESSLER:  No, your Honor.  The discipline by the

21  commissioner, by Mr. Jackson's letter, which is Exhibit 5 to

22  Mr. Klepman's affidavit, makes it clear that he was suspended

23  for 25 games for both incidents.  They talk about it included

                            Page 66

4cnrnatm.txt

24    striking a spectator and an arena employee.

25         The first one was the pushing of the arena employee,
81

1    which was clearly off the court.  The second one was the punch

2    which physically this shows you why that can't be the test.

3         In fact, it is interesting that what the arbitrator

4    did here, if you look at his ruling, he primarily reduced Mr.

5    O'Neal's discipline because he found the first off-the-court

6    incident, with the pushing of the employee, the first one they

7    showed you, was not disciplinable at all because he was grabbed

8    behind the neck by someone who was unidentified and he said it

9    was reasonable to push someone off from your neck and the guy

10    happened to go there.  That was all clearly off the playing

11    court even by a strict physical definition.  That was almost at

12    the table right by the stands.

13         But this just goes to show, your Honor, if it were a

14    strict physical test, the arbitrator reviewed that one and that

15    is why he overturned the discipline, primarily for that first

16    incident.  It was both.

17         THE COURT:  The argument that I would have to accept,

18    then, is that if there was on-the-court activity and

19    off-the-court activity, the commissioner didn't have the

20    authority to discipline him for the on-the-court activity and

21    not make that --

22         MR. KESSLER:  Your Honor, he has the authority to

23    discipline him.  But there is an appeal.  I want to make that

24    distinction.  XXXV(d) --

25         THE COURT:  I understand that.
82

1         MR. KESSLER:  -- which they show --

2         THE COURT:  But the appeal is that if he is

3    disciplined for on-the-court activity, the appeal goes to the
Page 67

4cnrnatm.txt

4  commissioner.

5          MR. KESSLER:  If it is on the playing court as that

6  term is used there.  But the point I am making to you, and this

7  goes to why we defer to arbitrators in collective bargaining,

8  neither party in this agreement, who have been there for 30

9  years, agreed to the physical distinction that you are talking

10  about between the stands or the line or that.  They want to

11  argue, they showed you that memo --

12          THE COURT:  What are you arguing is the distinction?

13          MR. KESSLER:  I am arguing the distinction is that "on

14  the playing court" has to do with conduct in the context of the

15  flow of the game.

16          THE COURT:  That is not my question.  My question is

17  where do you say physically is on the court?

18          MR. KESSLER:  Physically on the court ends with the

19  end line, it would be my view.  When it is out of bounds, it is

20  off the court.  But I don't think that is the test.  What I am

21  saying is that both of us are saying that is not the test.

22          THE COURT:  I agree with that.  Both of you still

23  disagree as to whether or not that part of the test which is

24  supposed to be physically defined as whether or not it is on

25  the court or off the court --

                                                            83

1          MR. KESSLER:  Both of us agree that is not part of the

2  test, because Mr. Mishkin argues going into the stands.  That

3  is what he was alluding to when he said he is actually going to

4  move, to make this very clear, to upset the arbitration

5  decisions regarding Mr. Artest and the others even though they

6  have been sustained, because he thinks going into the stands is

7  on the playing court.  He can say that.

8          I am saying that it doesn't make sense to say Mr.

Page 68

4cnrnatm.txt

9  Jackson, who was in the stands, and Mr. Artest were subject to

10  independent arbitrator review and the person on the floor, Mr.

11  Johnson, for example, who was sliding on the floor, is subject

12  to appeal to the commissioner.

13      What the parties understood by these phrases and by

14  using the different language was that this is something where

15  you have to look at all the facts together, make a decision

16  what the parties meant for the kind of things that had to do

17  with the commissioner having this authority.

18      And it doesn't have to do with integrity of the game.

19  Mr. Mishkin said, well, because the commissioner has such a

20  desire for the integrity of the game, it is the product.  We

21  went through the fact he ignores that in 1995 integrity of the

22  game was specifically given to the grievance arbitrator if it

23  is more than 25,000.  The very thing that is dearest and

24  closest to the commissioner's heart, that is the unequivocal

25  language of the CBA in section 5, in section 13, in section

84

1  14(c).

2      THE COURT:  But the integrity of the game is supposed

3  to mean something different than on-the-court violence.  It

4  means something different.  I am not sure I can accept your

5  argument that because everything goes to the integrity of the

6  game, on-the-court violence always goes to the integrity of the

7  game.

8      MR. KESSLER:  I agree.

9      THE COURT:  So it cannot be that simply because you

10  can define it as if there is a riot on the court, that goes to

11  the integrity of the game.

12      MR. KESSLER:  I agree, your Honor.

13      THE COURT:  I want to make sure I understand your

14  argument.  Are you arguing that even though that falls within

Page 69

4cnrnatm.txt

15  your definition of being on-the-court activity, simply because
16  it is characterized as going to the integrity of the game makes
17  the appeal arbitrable by an arbitrator?
18          MR. KESSLER:  The way I believe --
19          THE COURT:  Is that yes or no?
20          MR. KESSLER:  No.  The reason is because the way we
21  interpret "on the playing court," they are two different
22  things.  Even though you could argue that "on the playing
23  court" is something that has to do, as I said -- well, I will
24  say it is the operation of the game itself.  Regulating player
25  and referee behavior is part of the game.

                                                        85

1           Integrity of the game generally in XXXV(d) is Mr.
2   Sprewell attacking his coach, it is Mr. O'Neal getting into it
3   with a fan in the middle of a riot, it is Mr. Artest and
4   Jackson getting into the fans in a riot.  That is integrity of
5   the game.  It has nothing to do with the game.
6           You have to ask yourself if this behavior could take
7   place anywhere.  It could happen any time, before the game even
8   started.  Both of us agree to this, and this is why we look at
9   arbitrators.  Both parties would agree.  They argue in the
10  stands it is still commissioner exclusive arbitration even
11  though it is physically clearly off the court.  We argue even
12  though in that second incident Mr. O'Neal slid across into the
13  playing surface, there is no game going on there.
14          By the way, we said the clock stopped.  It is over 7
15  minutes since the clock stopped.
16          THE COURT:  That doesn't matter.  If the game had
17  continued, it doesn't matter how long the clock had stopped,
18  whether it is a 20-second timeout or 7 minutes.
19          MR. KESSLER:  It doesn't matter whether the game

                          Page 70

4cnrnatm.txt

20    continues or not, that is my point.

21            THE COURT:  It matters whether the game has ended.

22            MR. KESSLER:  I don't think so, your Honor, not for

23    this purpose.  Think of the following.  Let's say there were

24    two results.  Let's say that a moment before Mr. O'Neal's

25    slide, a moment before that, the referees in the corner had

                                                            86

1     said they are calling the game.  They are not looking at Mr.

2     O'Neal.  A moment before it.  Or they do it afterwards.  Could

3     that possibly make a difference as to who gets the discipline?

4     No.  In other words, the whole point is you can't have these

5     rigid tests.  That is why the arbitrator has to looked these

6     and decide these things.

7             THE COURT:  You have to have some test, because there

8     is a test that must be applied before the arbitrator looks at

9     it, and that test is whether or not this falls within the

10    definition of on-the-court activity or whether it falls outside

11    the definition of on-the-court activity.  That is a decision

12    that has to be made.

13            If it falls, as you acknowledge, within the

14    definition, your definition, of on-the-court activity, the

15    arbitrator has no role.  You agree with that, don't you?  If it

16    is determined that it falls within your definition of on-the-

17    court activity, the arbitrator has no role?

18            MR. KESSLER:  Yes.  But the way it works is first the

19    CBA gives the arbitrator broad jurisdiction over integrity of

20    the game, and then it takes away and gives to the commissioner

21    the right to be the arbitrator if it fits in on the playing

22    court as the parties meant those terms to be understood, which

23    neither one intends it to be literally understood.

24            Both of us look at a set of factors.  No one has a

25    bright line.  It is just like other areas of things.  There are

                                Page 71

4cnrnatm.txt

87

1    a lot of laws, as you know, the antitrust laws and others,
2    where you look at a whole variety of factors to make a
3    decision.  This is what we do here.  No one wants a bright
4    line.
5           THE COURT:  It is not determinative, but I am still
6    not sure what you claim are the physical confines of
7    on-the-court activity.  Are you saying it has to be in the
8    stadium?  I still don't understand.
9           MR. KESSLER:  If you ask me how to physically define
10   the court, it is the out-of-bounds lines.  But I don't believe
11   that is the test of what the parties meant.  I don't think they
12   meant it to be a physical test.
13          THE COURT:  So you believe that on-the-court activity
14   can be in-the-stands activity?
15          MR. KESSLER:  That's right.  In the stands is clearly
16   not on the playing court.  That is correct.  They are clearly
17   wrong about that anyway.
18          THE COURT:  That is what I am saying.  You do put that
19   limitation on it.  You say on-the-court activity physically
20   cannot occur off the hardwood, is that what you are saying?
21   I'm asking.  They say it can occur in the locker room.  Are you
22   saying it cannot occur in the locker room?
23          MR. KESSLER:  It can put occur in the locker room
24   having nothing to do with the game.  To me, the words "playing
25   court," "playing," to me the playing part had to do with the
88

1    conduct of the game.  That is what made sense.  It is the
2    playing part of it.  If there is no playing, if it is not part
3    of what is going on with referees, that wasn't meant.
4           That is why it makes no sense in this situation for

Page 72

4cnrnatm.txt

5    you to rule that Mr. Jackson's and Mr. Artest's discipline was

6    subject to arbitrable review because that was all in the stands

7    and to argue that Mr. O'Neal, that part of his discipline is

8    subject to arbitrable review, the first part of it, but the

9    second part is not arbitrable because he physically slid on the

10   court.  That can't be it.  It was all part of one riot incident

11   that was not part of the game.  It was part of the playing.

12         If you were going to come at it a different way, my

13   argument would be that the arbitrator's decision has to be

14   sustained, because the first incident, the one that the

15   arbitrator reversed on -- if you read his opinion, he reversed

16   clearly on the first incident, and he imposed 25 games for

17   both -- the first incident clearly was physically outside of

18   the playing court.  It was almost on the scorer's table.

19         What was happening there was Mr. O'Neal was going

20   towards the stands and an arena employee grabbed him around the

21   neck and he didn't know who it was and he pushed him away.

22   That was the first incident he disciplined him for.  That was

23   clearly outside of the physical defines.  That is what this

24   arbitrator reversed.  If you are going to make that physical

25   distinction, which am not asking you to do, then you still have

                                                              89

1    to sustain the arbitrator's jurisdiction.

2          THE COURT:  Ultimately, the question is what is

3    intended here?  What is it intended that the commissioner

4    should have sole authority and responsibility over?  They say

5    what is practical in the sense that it is intended that if they

6    misbehave in the stadium when they show up for a game, that is

7    within the commissioner's sole authority to discipline and

8    review.  You say that that is not the test.

9          MR. KESSLER:  That can't be the test.

10         THE COURT:  What do you say is the test?

                           Page 73

4cnrnatm.txt

11          MR. KESSLER:  The test is that if, after consideration

12    of all facts and evidence by the arbitrator, he finds --

13          THE COURT:  That is kind of fluid, isn't it?

14          MR. KESSLER:  Well, I will come to an end point.

15          -- that the conduct involved was something that was in

16    the context of the regulation of the game by the participants,

17    such as, to use the arbitrator's language, flagrant fouls,

18    fight between players, hard picks, elbows, confronting

19    referees, that is how he was talking about it.  That clearly

20    makes the most sense.

21          THE COURT:  But not striking fans who run out on the

22    court in the middle of a game?

23          MR. KESSLER:  As I said, if it was regulating the

24    behavior while the game is going on, yes, maybe.  In other

25    words, what I am trying to do is say you have to look -- these

                                                          90

1     are not easy issues.

2           THE COURT:  They say they are very easy issues.  There

3     is something that the parties meant by this collective

4     bargaining agreement and they meant something reasonable.  They

5     didn't mean something depending on the circumstances.  They

6     meant that there is a test that we both understand here.

7           I am just trying to figure out the limits of your

8     argument.  Are you saying if this happened, I am asking, during

9     a 20-second timeout, that is on the court?

10          MR. KESSLER:  It could be.  It depends what happens.

11          THE COURT:  What does it depend on?  That is what I am

12    trying to understand.

13          MR. KESSLER:  What the conduct is.

14          THE COURT:  If a fan runs out during a 20-second

15    timeout, I'm getting ready to walk off the court and I strike

                              Page 74

4cnrnatm.txt

16    the fan in the middle of the court?

17         MR. KESSLER:  If those are the only facts, that might

18    be part of the game at that point.

19         THE COURT:  What is the distinction?  That is what I

20    am trying to understand.

21         MR. KESSLER:  Because, Judge, for the same reason the

22    DA did not file charges against Ben Wallace.

23         THE COURT:  The DA had no consideration of whether

24    this was on the court or off the court.

25         MR. KESSLER:  Yes, he did.

                                                            91

1          THE COURT:  That is not the definition of the criminal

2     offense with which these individuals were charged.

3          MR. KESSLER:  What I am saying is that the distinction

4     that is recognized in the criminal law in many states,

5     including Michigan, between, for example, conduct that comes up

6     in the context of a violent activity sport --

7          THE COURT:  This wasn't a prize fight, if that is what

8     you are talking about.

9          MR. KESSLER:  I would say the fan running onto the

10    court and the player reacting may or may not be there.  You

11    would have to look at the other facts and the context of the

12    game.

13         THE COURT:  What other facts determine it?  That is

14    what I am asking.

15         MR. KESSLER:  Did it go off into the stands or stay on

16    the court?  Did the game immediately continue or in effect did

17    the game end?  Was it the type of behavior that was sort of

18    ancillary to the game, the participation in it?  Again, it is

19    hard, without looking, to say that.  That might be on the

20    playing court, what you stated.  In other words, I can't give

21    you that.

                              Page 75

4cnrnatm.txt

22        What they say the test is, they say everything at an

23  arena basically.  They say look at XXXV, it says during or at a

24  game.  If we wanted to say during or at a game, which is what

25  XXXV(d) says, we would have written "during or at a game."  If

92

1  we wanted to say adjacent to the court or in the arena, which

2  is what paragraph 19 of the uniform players contract says for

3  something else, we would have said "adjacent to the Court or

4  there."

5        What is troubling us all here -- and this is just a

6  reality, it doesn't make it easy -- is that until 1995 this

7  issue was irrelevant.  From 1972, when this language found its

8  way into the CBA, until 1995, it goes on for decades, the

9  Players Association can't appeal anything on the court, off the

10  court, $25,000, above, below.  If it involves the integrity of

11  the game, which all these suspensions do, you couldn't appeal,

12  period.

13        By the way, that is why it is ridiculous when he said

14  look at Barclay.  We couldn't appeal Barclay.  That couldn't

15  have any relevance, whether it was on the court.  It wasn't the

16  issue.  We had nothing to do with Barclay.  It was before we

17  had a right to appeal.

18        Since '95, for better or worse, this ambiguous term

19  that was there for two decades has only come up in the context

20  of Mr. Sprewell's arbitration and three arbitrations where the

21  parties disagreed:  Rodman, Wallace, Isaiah Rider, and Artest,

22  the previous one with Artest.  By the way, they go, well, we

23  didn't press it.  We settled them, excuse me.

24        We wrote, and it is in the record, four letters saying

25  it goes to the grievance arbitrator.  They said in each case,

93

Page 76

4cnrnatm.txt

1   by the way, it was reduced and settled.  We can put that in.  I

2   don't know shat kind of inference he is trying to draw that

3   somehow we didn't follow up that.  That happens to most

4   grievances, by the way, your Honor.  They get settled, just

5   like many cases get settled.

6          Let me go to something else, the other thing he

7   mentioned, because I want to address this.  He went through my

8   previous statements.  He should be my biographer.  He did a

9   great job going through these things.  Thank you, Jeffrey, I'm

10  glad the associates spent all night looking for those comments.

11         MR. MISHKIN:  And found them.

12         MR. KESSLER:  If your Honor were interested in those,

13  neither one had anything to do with arguing this issue.  They

14  were in the context.  For example, one was Sprewell where they

15  did not contest jurisdiction, and the Sprewell arbitration went

16  on for 14 days or something like that, until 11 o'clock at

17  night.  The idea that I was somehow opining on making an

18  argument for an issue that wasn't before the arbitrator there.

19  It is nice work for an associate, but it means nothing.

20         The other one was the argument before Judge Rakoff

21  where the issue was collusion.  So, please, reading Judge

22  Rakoff's transcript, there was no argument there.  We didn't

23  argue on the court or off the court.  In that case, by the way,

24  it would have been on the court.  It was players in the middle

25  of the game running out on the court and a fight broke out

                                                              94

1   between players.

2          Actually, that was I think Jeff Van Gundy on that and

3   somebody's leg, if I remember correctly as well.  That was

4   something we don't contest is the kind of things that are there

5   for this.

6          I want to come back and end with the following, unless

                         Page 77

4cnrnatm.txt

7   you have further questions.

8           THE COURT: I have one further question. Is it
9   accurate to say that your argument is that this is not on-the-
10  court activity despite the fact that the game had yet to be
11  called and despite the fact that O'Neal clearly punched this
12  fan on the playing floor, for two reasons: One, because it
13  wasn't during the course of playing the game, and, two, because
14  part of his activity began off the court? Is that an accurate
15  or inaccurate characterization?

16          MR. KESSLER: It is accurate. And I would add three
17  and four. Three, because the first incident wasn't physically
18  on the court at all, which is part of the discipline for which
19  he is punished, so it didn't begin on the court and never got
20  onto the court. It was by the scorer's table, and that was in
21  fact what was reversed here.

22          And four, because the entire incident had to do with a
23  riot that emanated from the stands, which makes it a very
24  different kind of incident. Looking at the difference between
25  what was supposed to be integrity of the game to the grievance
                                                              95

1   arbitrator and what was supposed to be the types of things,
2   flagrant fouls, other things, that would go to the
3   commissioner. It is not a fine, rigid line. No one argues
4   that.

5           THE COURT: I assume the arbitrator makes the
6   distinction between Mr. O'Neal's activity and the activity of
7   the other three.

8           MR. KESSLER: On reversing the suspensions, he did.
9   Otherwise, he does not.

10          THE COURT: He does more than just a reversal of the
11  suspension. One of the reasons, if not the primary reason, he

Page 78

4cnrnatm.txt

12    gives is because of the nature of the activity and where that

13    activity did take place as opposed to the other.

14          MR. KESSLER:  That is only one of the factors in

15    reducing the suspension.  He also ruled, as I indicated, on

16    page 18 he clearly said all the players were not on the playing

17    court as he interprets those terms, including Mr. O'Neal.

18          The last point I wanted to make, your Honor, because I

19    think it is important -- well, two points.  One is it is very,

20    very clear if you look at Judge Jones's decision, which I think

21    is relevant here, and if you look at the Supreme Court in AT&T

22    Technologies.  If there is any possible rational way of looking

23    at this, it is that if this goes to arbitration, even if it is

24    de novo review, you are supposed to apply that presumption.  In

25    fact, this is important.

96

1           They say de novo is throwing away the arbitration

2     decision.  No.  Your Honor, you know what de novo review is.  I

3     assume you have decisions that go up to the Court of Appeals

4     and they get to de novo review your legal decision.  They don't

5     throw it away.

6           They look at it and they say, even under de novo, does

7     that make sense to me.  They may be influenced.  They do not

8     burn it up.  So I know you understand what de novo means.  It

9     does not mean you thrown it away, it is over.  It means you can

10    defer.

11          We think you do have to defer to it because, for all

12    of these things that we have been going through, this is again

13    procedural arbitrability.  The Supreme Court has said these are

14    the kinds of predicate authorities, on and off the playing

15    court, that are predicates to arbitrability.

16          The Supreme Court says arbitrators know best.  Why?

17    Because these things are messy.  These things depend on the law

4cnrnatm.txt

18    of the shop.  He will listen to Mr. Mishkin's argument someday

19    about in the stands or not and he will listen to mine and he

20    will make case-by-case decisions that become precedent and law

21    of the shop.  That is why we defer to this.

22          If all we mean to do now is to show you substantial

23    questions on the merits -- Mr. Mishkin is wrong, by the way.

24    He says there is some higher standard for reinstating

25    employees.  When you have an arbitration decision, which are

                                                                97

1    not those cases that are already in effect -- your Honor drew

2    the right distinction -- it is a very different decision than

3    whether or not you are just seeking to reinstate someone

4    pending those issues.

5          Second of all, it does make a difference here that

6    they are athletes, as your Honor pointed out.  If Mr. O'Neal

7    doesn't win a championship this year or even make the playoffs,

8    he will get the nice letter, but the nice letter is not going

9    to help him.  It is not going to make him whole.

10          The making-whole language, this is my final point, on

11    14(d) that they cite, they said after a final disposition under

12    Article XXXI.  Section 5 of XXXI says what final disposition

13    is.  Final disposition is the grievance arbitrator's ruling.

14    So after final disposition, XXXI, which is the grievance

15    arbitrator's ruling, not the court's ruling, he shall promptly,

16    in the CBA, be made whole.

17          What happens is two things.  You get reinstated for

18    whatever games are left and you can't do anything more than

19    money, as they pointed out, so you do that.  That is not an

20    admission you don't do that here.  You do the best you can

21    here.

22          I would also point out that the choice is not between

                                    Page 80

4cnrnatm.txt

23  court and arbitrator here, it is just between which arbitrator.

24  The case they cited is not on point in that.  I am very happy

25  for you to read a decision they cite, the Feinberg case.  That

98

1  was a case of whether the arbitrator had the ability to decide

2  jurisdiction at all.  You have correctly noted that is not even

3  a relevant issue for you anymore.

4          Number two, as Judge Jones found in this case, still

5  applicable, these CBA provisions do let the arbitrator decide,

6  that is what she ruled here, decide jurisdiction.  That is

7  exactly the point before Judge Jones, and those broad

8  arbitration clauses have not changed with respect to the broad

9  arbitration clauses for the arbitrator to decide.  So those in

10  fact are exactly the same.

11          Finally, your Honor, and again they do not have any

12  answer, there is no harm to the NBA, you are quite right.  If

13  you grant this relief today and we think it is right, that we

14  think we have substantial questions, you will prevent grave

15  irreparable harm, there will be a fair hearing.

16          It won't be just Commissioner Stern saying because

17  that is what I decided, no one can question it.  That is not

18  what the CBA provides for.  It is the just cause standard that

19  is there.  This is an issue of fairness and integrity of the

20  process, not the result.

21          In the end, if they convince you of something else and

22  we are wrong, then Mr. O'Neal will serve those games later.  If

23  it is during the playoffs, it may be worse for him.  But he is

24  willing to take that risk because we believe so strongly that

25  we have a basis where the arbitrator's decision is going to be

99

1  enforced and will not be set aside under the strict standards.

2  So we are asking you please to consider that request for

Page 81

4cnrnatm.txt

3   relief.

4          If you have any other questions, I will answer them.

5          Once you decide that is, by the way, a procedural

6   arbitrability question where there is deference, if you do

7   that, that should be the end of it.  If it is substantive

8   arbitrability and it is de rovo, you still should find that

9   based on this record and those facts there are at least

10  substantial questions going to the merits and the balance of

11  hardships in our favor.

12         Thank you, your Honor.

13         THE COURT:  I want to look back at a couple of the

14  cases that you have cited today over lunch.  I want to give you

15  a decision about 3 o'clock.  So I am going to ask the parties

16  to take some lunch.  We will reconvene here at 3 o'clock, and

17  then I will be prepared to give you a decision.

18         (Recess)

19         (3:00 p.m.)

20         I am ready to render a decision.  The decision is as

21  follows.

22         On November 21, 2004, NBA commissioner David Stern

23  announced the suspensions of several NBA players, including Ron

24  Artest, Stephen Jackson, Anthony Johnson, and Jermaine O'Neal,

25  for their actions during the Indianapolis Pacers-Detroit

                                                            100

1   Pistons basketball game on November 19, 2004.

2          On November 22, 2004, the National Basketball Players

3   Association filed a grievance on behalf of those players,

4   claiming that the discipline imposed by Commissioner Stern was

5   inconsistent with the terms of the collective bargaining

6   agreement and applicable law and without just cause.  The union

7   requested a hearing before the grievance arbitrator.  The NBA

4cnrnatm.txt

8   responded by asserting that only Commissioner Stern had

9   authority to review the suspensions issued by him.

10          The grievance arbitrator went on to determine that he

11  had jurisdiction to decide the arbitrability issue presented in

12  this dispute, and he further determined that he had authority

13  to review the decision of commissioner David Stern in

14  suspending those four NBA players.  A hearing was scheduled in

15  which the NBA decided not to participate in order to preserve

16  their position that the grievance arbitrator had no such

17  authority.

18          On December 22, 2004, grievance arbitrator Roger P.

19  Kaplan issued an opinion and award concluding that the

20  suspensions by Commissioner Stern of NBA players Ron Artest,

21  that suspension being for the remainder of the season; Stephen

22  Jackson, a 30-game suspension; and Anthony Johnson, a 25-game

23  suspension -- that all three of those suspensions were

24  reasonable and for just cause.

25          With respect to Jermaine O'Neal, the grievance

                                                        101

1   arbitrator found that his suspension for 25 games was excessive

2   and not in accordance with the fundamental tenets of just

3   cause.  He thereby reduced O'Neal's suspension to 15 games.

4   That reduction in penalty, if proper, would mean that O'Neal

5   had served his period of suspension and would be eligible to

6   play the next scheduled NBA game, which was again between the

7   Indiana Pacers and the Detroit Pistons, on Saturday, December

8   25, 2004, Christmas Day.

9           The ultimate decision to be determined by this Court

10  is basically twofold:  whether the grievance arbitrator had

11  jurisdiction to decide the arbitrability of this issue in

12  dispute and, two, did the grievance arbitrator have the

13  authority to review the suspension of the four players?

4cnrnatm.txt

14          Today the union seeks injunctive relief in the form of
15   a temporary restraining order preventing the NBA and
16   Commissioner Stern from enforcing any further period of
17   suspension of Jermaine O'Neal until it is determined if the
18   decision of the grievance arbitrator was properly decided and
19   should be confirmed.

20          A temporary restraining order, like a preliminary
21   injunction, is an extraordinary remedy that would not be
22   granted lightly.  In the Second Circuit the standard for a
23   temporary restraining order is the same for a preliminary
24   injunction.

25          A preliminary injunction may be granted only upon the
                                                              102

1    demonstration of irreparable harm and either a likelihood of
2    success on the merits of the case or sufficiently serious
3    questions going to the merits to make them a fair ground for
4    litigation, and a balance of hardships tipping decidedly in
5    favor of the moving party.

6          When there is a mandatory injunction, which plaintiffs
7    in this case argue that the request here is, there is a higher
8    standard required of the movant where an injunction would alter
9    rather than maintain the status quo or an injunction would
10   provide the movant with substantially all of the relief sought
11   and that relief cannot be undone even if the other party
12   prevails at the trial of the merits.

13         The typical preliminary injunction is prohibitory and
14   generally seeks only to maintain the status quo pending a trial
15   on the merits.  A mandatory injunction, in contrast, is said to
16   alter the status quo by commanding this positive act.  A
17   mandatory injunction should issue only upon a clear showing
18   that the moving party is entitled to the relief requested or

4cnrnatm.txt

19   where extreme, very serious damage will result from a denial of

20   preliminary relief.

21        In this case the question of whether the parties have

22   submitted a particular dispute to arbitration, i.e., the

23   question of arbitrability, is a question for judicial

24   determination unless the parties clearly and unmistakably

25   provide otherwise.  In the Gateway dispute about whether the
                                                            103

1    parties are bound by a given arbitration clause raises the

2    question of arbitrability for the Court to decide.

3         Similarly, a disagreement about whether an arbitration

4    clause in a concededly binding contract applies to a particular

5    type of controversy is for the Court.  Procedural questions

6    which grow out of the dispute on its final disposition are

7    presumptively not for the judge but for an arbitrator to

8    decide.  The presumption is that the arbitrator decides such

9    issues of allegations of waiver, of delay, or like defenses to

10   arbitrability.

11        In reviewing an arbitrator's decision, with regard to

12   factual findings there shall be a presumption, rebuttable only

13   by a clear preponderance of the evidence, that the findings of

14   fact made by the arbitrator are correct when ultimately

15   deciding whether to confirm an arbitration award.  District

16   courts are not authorized to second-guess arbitrators'

17   decisions if those decisions are properly within the

18   arbitrator's jurisdiction and within their power and authority.

19        One basis for setting aside an arbitrator's award is

20   the nonstatutory ground of manifest disregard of the law.  This

21   ground presupposes something beyond and different from a mere

22   error in the law or failure on the part of the arbitrator to

23   understand or apply the law.

24        In this case it has not been argued at this stage of
                              Page 85

4cnrnatm.txt

25    the proceedings that if the arbitrator had the authority to

104

1    decide this case, the arbitrator committed any error or

2    disregard of the applicable law other than its initial findings

3    that the arbitrator had the authority to determine

4    arbitrability and that the arbitrator had authority over this

5    issue.

6            I find that a temporary restraining order, at least

7    for some period of time so that this case can be resolved, is

8    appropriate.  I am going to grant the relief requested by the

9    Players Association.

10           In this case I believe that the Players Association

11    has raised sufficiently serious questions going to the merits

12    to make them a fair ground for litigation and the balance of

13    hardships tip in favor of the movants in this case.

14           As to whether irreparable harm or injury is likely to

15    occur if Jermaine O'Neal is forced to continue a period of

16    suspension, and I believe that sufficient evidence has put in

17    serious question going to the merits of the case that may make

18    it possible and likely that if the decision of the arbitrator

19    that the arbitrator had authority to arbitrate this dispute is

20    upheld, having the player serve a 10-game suspension in and of

21    itself under these circumstances -- and I want to emphasize I

22    am limiting it to these circumstances, because these are unique

23    circumstances, other than the standard case, and circumstances

24    that neither the league nor the players have confronted in the

25    past, different from any circumstance that they have confronted

105

1    in the past -- having him serve a 10-game period of suspension

2    in light of what we have now as an outstanding decision by the

3    arbitrator that he should not serve such a period demonstrates

Page 86

4cnrnatm.txt

4  irreparable harm which cannot be undone.

5      More specifically, although, as the parties have

6  argued, this is a collective bargaining case, not a basketball

7  case, both sides recognize that the nature of this business

8  involves other factors not involved in cases outside of the

9  area in which this business is conducted.

10     With regard to O'Neal personally, he was drafted in

11 the 1996 draft by the Portland Trail Blazers and has played in

12 the NBA for approximately 7 years.  Jermaine O'Neal is

13 co-captain of the Indiana Pacers.  He has made the NBA All-Star

14 Team, as indicated in the arbitrator's decision and, relevant

15 to the arbitrator's decision, has made the NBA All-Star Team in

16 the last three years as well as being named All-NBA in the last

17 three years.  Last year he was voted to the Second Team All

18 NBA.

19     I find, as I indicated, that irreparable injury is

20 foreseeable if he is required to continue his period of

21 suspension and if it is later determined that the arbitrator's

22 decision reducing that suspension must be upheld.  I do not

23 find compelling the NBA's argument that under such

24 circumstances, if he serves further suspension that is not

25 required, he can later be made whole by monetary compensation.

                                                    106

1      In this unique set of circumstances, not playing the

2  next 10 games may have irreversible consequences for the

3  player, the team, the player's future, and the league itself

4  beyond those consequences contemplated by the ordinary

5  suspension of a player in having that suspension go forward

6  while awaiting an appeal.

7      This case is in a different posture.  This case has

8  already been appealed.  The only question is the validity of

9  that decision and whether it will be confirmed.  As I said,

                        Page 87

4cnrnatm.txt

10  furthermore, the balance of hardships decidedly tip in the
11  player's favor.  If the arbitration award is set aside, he must
12  still serve the balance of his suspension.  If it is confirmed
13  and he has already served an additional 10-game suspension,
14  cash cannot make a player whole for the games lost under these
15  circumstances.

16          I find that there are sufficiently serious questions
17  going to the merits.  As I said, it may be fair ground for
18  litigation.  This situation is unique.  I emphasize it is
19  limited to the particular facts and circumstances of this case.

20          What is solely determinative of this case is whether
21  the grievance arbitrability is appropriate or whether the
22  appeal lies solely to the commissioner.  That issue is
23  significantly tied to the question of whether Jermaine O'Neal's
24  actions involved conduct on the playing court.  That issue is
25  in significant dispute and merits both further argument and

                                                              107

1   probably further discovery.

2           With regard to a mandatory injunction, it is debatable
3   whether the status quo is being changed.  The status quo is no
4   longer that there is an order of suspension which is merely
5   continuing.  The status quo is now there is an order of
6   suspension which has been reduced by an arbitrator's decision.
7   Applying either standard, I find that the appropriate thing is
8   to not have the player serve any further period of suspension
9   which might possibly be determined to have not been a valid
10  period of suspension.

11          This temporary order, I want to make clear, is not
12  intended to nor does it undermine the commissioner's authority
13  to discipline and sanction players for their misconduct.  There
14  is no dispute that, pursuant to the collective bargaining

Page 88

4cnrnatm.txt

15  agreement, that is a primary function and role and the primary

16  authority is in the commissioner, and that authority should not

17  be undermined.

18      I do not feel that a temporary stay of any further

19  suspension, given the orders in this case and particularly only

20  then to Jermaine O'Neal, will in any way undermine that

21  authority.  However, I do find that it would be simply unfair

22  to continue the suspension once it has been modified on appeal

23  to simply await a judicial determination as to its validity or

24  as to whether or not that decision should, once again, be

25  overturned.

                                                            108

1       That being the status of this case, I believe, as I

2   indicated, it is appropriate and the balance of hardships in

3   this case tip clearly in favor of the player, given the serious

4   issues raised by this case and given the fact that a suspension

5   of this player every game he is suspended beyond which he

6   should be suspended will have consequences that cannot be

7   compensated in dollars and may have other consequences that

8   cannot be articulated or anticipated at this time.

9       Based on those reasons and the applicable law that I

10  have reviewed with regard to the standards and with regard to

11  other situations of discipline as handled and how the parties

12  have dealt with the issue of discipline on the court, I find

13  that it is appropriate to issue such a temporary restraining

14  order.

15      I will keep that order only in place as long as it is

16  necessary for the parties to feel that they wish to put this

17  issue before the Court fully with regard to whether or not this

18  arbitration award should be confirmed or set aside.  I will

19  move on a schedule that is as quick as the parties feel that

20  they are in a position to be heard on that issue and have the

4cnrnatm.txt

21  Court decide that issue or, if necessary, if there is a longer

22  period of time that the parties want than that to consider

23  whether or not this restraining order should simply be

24  converted to a preliminary injunction until this issue is

25  decided.

109

1       That is the decision of the Court.

2       I turn to the plaintiffs. Mr. Mishkin, how do you

3  want to proceed at this point in terms of moving forward with

4  the case?

5       MR. MISHKIN: We are prepared to proceed, your Honor,

6  immediately, and I think we should. We will bring on our

7  motion to vacate. We can proceed next week at the earliest

8  date you have.

9       THE COURT: What do you anticipate you will want to do

10  in preparation for that, and how soon do you want to be heard

11  and be back before the Court to resolve that issue?

12       MR. MISHKIN: I don't think we need any discovery. I

13  think we are ready to proceed on the merits literally

14  immediately.

15       THE COURT: How quickly do you think you can file your

16  papers?

17       MR. MISHKIN: We have filed a substantial amount of

18  them. I think we need to file a motion to vacate. I haven't

19  seen it yet, but there was a counterclaim filed today to

20  confirm. So we will immediately file our motion to vacate. I

21  think it is just a matter of when your Honor can hear us.

22       THE COURT: Let me turn to Mr. Kessler. What is your

23  schedule?

24       MR. KESSLER: Your Honor, I think we probably should

25  agree on a briefing schedule to make parallel motions. We will

110

Page 90

4cnrnatm.txt

1  make a motion to confirm, they will make a motion to vacate,

2  then we can be on a similar briefing schedule for that.

3          THE COURT:  How much time do you want to do that?

4          MR. KESSLER:  What I would like, if possible, is to

5  have some very limited discovery concerning some of the points

6  that are in the Buchanan affidavit which they intend apparently

7  to rely upon that are creating some factual issues about all of

8  this.  What I was going to suggest is that we file cross-

9  motions, if you will, maybe at the end of the third week in

10  January, something like that, and between now and then we do

11  some document discovery.

12          I don't know if it will be necessary to do

13  depositions.  I think there will be some documents we are going

14  to want to get, possibly some depositions.  This will be a

15  final decision on the merits, so I think we are entitled to

16  something here.

17          We could have cross-motions filed near the end of

18  January, a few weeks for opposition briefs, and then have a

19  hearing, your Honor, sometime in February to finally decide

20  this.  That will be an awfully rapid pace to get to the final

21  decision, but we have no problem in trying to meet that kind of

22  schedule.

23          THE COURT:  Mr. Mishkin?

24          MR. MISHKIN:  Your Honor, Mr. Kessler has already

25  tried this case fully on the merits.  I have no idea what he

                                                            111

1  needs to do in addition to the trial he has already conducted.

2  We would like to proceed next week.

3          THE COURT:  This is what I am going to do.  File your

4  papers by the end of the day on the 28th.  I don't see any

5  reason you can't file your papers by then.  I think any

                          Page 91

4cnrnatm.txt

6    response to those papers at this point should come in no later
7    than the 31st, Friday.

8            If you believe that there is discovery that should be
9    taken, then you should notify the other side as to discovery
10   that you think is appropriate by Monday the 27th.  Unless the
11   extent of the discovery or the nature of the discovery is an
12   unreasonable request, you should be prepared -- and I think you
13   can sort of anticipate at this point that you should speak with
14   each other as soon as you leave court today -- you should be
15   prepared to make that discovery available or make parties
16   available for depositions next week.

17           I am not sure that any extensive depositions or
18   extensive document production is necessary, since you basically
19   know who the relevant parties are that you are relying upon and
20   the other side is relying upon, and most of the documents are
21   in the possession of both parties.

22           If there are specific documents that you think you
23   need that you believe that you are not currently in possession
24   of that you think are relevant, ask for those specific
25   documents.  But a general, broad sweeping document request is

                                                             112

1    not what is going to be appropriate.

2            I am not going to delay this schedule for that kind of
3    discovery unless the parties tell me that they both agree that
4    more discovery or the time period needs to be pushed back or
5    that one side can justify the need to have further discovery
6    and that it is going to take longer than being produced next
7    week, given a request by Monday.

8            If that is all done, I am going to put this down for
9    January 3rd, Monday.

10           MR. KESSLER:  Could I raise a point about that?

                            Page 92

4cnrnatm.txt

11          THE COURT:  Yes.

12          MR. KESSLER:  I rarely do this, your Honor.

13     Unfortunately, I have planned for the 3rd to the 10th to be out

14     of the country on one of these things where I have all the

15     members of my family planned for six months and locked in.  I

16     really hesitate to mention that, but I'm afraid -- if you order

17     me, it is going to cause some irreparable harm with many

18     members of my family, if we have to do it that way.  I can do

19     it the day we get back, the 11th, or any date thereafter.  But

20     if there is any way we could avoid that one week, your Honor, I

21     would be most grateful as a personal matter about that.

22          THE COURT:  Mr. Mishkin?

23          MR. MISHKIN:  I hesitate to cause any irreparable harm

24     to Mr. Kessler's family.

25          MR. KESSLER:  Again, I am sort of throwing myself on
                                                         113

1     the mercy of the Court.  I think at this point, frankly, given

2     the TRO, the difference to any interest the NBA has, your

3     Honor, between having it decided shortly after the 3rd or

4     shortly after the 11th is not going to be material.

5          As we said, if the player has to serve those games, he

6     can serve those games later.  If we are right, then it doesn't

7     matter, and I can't imagine that it makes any material

8     difference at this point.  Again, I am at the Court's mercy on

9     this issue.

10          THE COURT:  I am going to put this on as quick a

11     schedule as the NBA wants and can accommodate.  If it has to go

12     beyond that, I am going to consider whether or not I am going

13     to keep the temporary restraining order in place.  I think

14     that that is the only appropriate way to approach it.

15          MR. KESSLER:  I understand, your Honor.

16          THE COURT:  This is equitable relief.  This is very
                              Page 93

4cnrnatm.txt

17  serious equitable relief.  I think that the NBA is entitled to

18  a very swift resolution of this issue.  If you and Mr. Mishkin

19  can agree to some other appropriate schedule, I will

20  accommodate that.  Otherwise --

21        MR. KESSLER:  Your Honor, let me make the following

22  suggestion.  This might accommodate Mr. Mishkin as well.

23  Instead of filing our papers on the 31st, why don't we file

24  them on the 30th and then have the argument on the 31st, in

25  other words, the next day, and do it then.  That way Mr.

                                                        114

1  Mishkin gets a little bit more speed and I get relief on my

2  end.  I'm certainly willing to do that if that would suit the

3  Court, since we are moving so quickly anyway.

4        THE COURT:  Unfortunately, the court is closed on the

5  31st.

6        MR. KESSLER:  Oh, I'm sorry, your Honor.

7        THE COURT:  I can accommodate you on the 30th late in

8  the day if you want to work on that schedule.

9        MR. KESSLER:  That would be fine.  We can get our

10  papers in first thing in the morning.  As your Honor has

11  probably deduced, Mr. Mishkin and I are relatively familiar

12  with these arguments.  Whether Mr. Buchanan testifies or

13  someone else, I don't think we are looking at, even on the

14  merits, a great deal of factual development beyond what your

15  Honor already understands.  So the ultimate merits will be very

16  close to the issues we have already presented.

17        THE COURT:  That is what I am assuming.  I am

18  preparing myself in anticipation of the fact that there is

19  probably not a lot more that you haven't already given me or I

20  haven't already looked at beyond that that I would anticipate

21  on these issues.

                        Page 94

4cnrnatm.txt

22          MR. KESSLER:  If he would agree, we could turn in our

23   papers first thing in the morning on the 30th and then have the

24   hearing in the afternoon, at your Honor's convenience, and then

25   have this decided.

                                                          115

1           THE COURT:  I am willing to accommodate you.

2           MR. MISHKIN:  I am willing to do that, your Honor.

3           THE COURT:  What I will do is schedule it for 2

4    o'clock.

5           MR. MISHKIN:  2 o'clock on Friday the 30th?

6           THE COURT:  Thursday the 30th, 2 o'clock.  I will

7    inspect the papers.  The earlier you can get them to me the

8    better.  I will expect the papers no later than 9:00 a.m. that

9    morning.  If you can get it at some time between 8:00 and 9:00

10   to me, that would be helpful.

11          MR. MISHKIN:  The first brief is due the 28th?

12          THE COURT:  Yes.

13          MR. KESSLER:  What time on the 28th do you want to

14   exchange?

15          MR. MISHKIN:  The 28th is Tuesday.

16          MR. KESSLER:  12 o'clock?  Earlier?

17          MR. MISHKIN:  5 o'clock.

18          MR. KESSLER:  5 o'clock the 28th, that's fine.

19          THE COURT:  I will start preparing myself now for

20   that.  I will see all the parties at 2 o'clock.  I will issue a

21   written order staying the further suspension.  If anything

22   changes, notify me right away and we will make an adjustment.

23   I will be prepared to hear you on the 30th and try and resolve

24   this issue on that day.

25          MR. KESSLER:  I will assume, just so we don't confuse

                                                          116

1    you about this issue, that we will both stick to the normal

                                Page 95

4cnrnatm.txt

2   page limits on this.

3           THE COURT:  At this point I don't see any need to go

4   beyond the normal page limits.

5           MR. KESSLER:  That will prevent mutually assured

6   destruction by both sides.  I think that is a good policy.

7           THE COURT:  Also meaning I can concentrate on the

8   issues, I don't have to wade through the papers.

9           MR. KESSLER:  Your Honor, I think on behalf of both

10  sides we really do appreciate on this holiday schedule your

11  devoting this time to this case.  It is obviously very

12  important to both sides.  We really do appreciate that.

13          MR. MISHKIN:  Your Honor, we will get in our motion to

14  vacate.  I assume that the hearing that we are having at 2

15  o'clock on the 30th is a hearing on the merits of the cross-

16  motions.

17          THE COURT:  Yes.  I will make it a full hearing on the

18  merits.  Thank you.

19          (Adjourned)

20

21

22

23

24

25