National Basketball Association v. National Basketball Players Association et al
Case 1:04-cv-09528-GBD   Document 11-4   Filed 12/29/2004   Page 1 of 5
Doc. 11 Att. 3

Re: John Starks

BEFORE THE SYSTEM ARBITRATOR

----------------------------------------x

In the Matter of

NATIONAL BASKETBALL PLAYERS
ASSOCIATION

and

NATIONAL BASKETBALL ASSOCIATION

No. 00-01 Re: John Starks

----------------------------------------x

Opinion of the System Arbitrator:

An initial hearing with respect to this arbitration was held on March 1, 2000, and a hearing on the merits was held on March 3. Because of the urgency of the matter, the hearings were held by telephone conference call and there was no briefing in the normal manner; rather the parties faxed letters setting forth their position on March 3 prior to that day's hearing. No transcript was made of the two hearings.

Because of the need for expedition and with the agreement of the parties, I gave the parties my oral decision on March 3 after the hearing with the understanding that this opinion would follow within a week.

On February 16 John Starks was traded to the Chicago Bulls by the Golden State Warriors. On Friday, February 25, the Bulls telephoned the National Basketball Association ("NBA") to seek approval for a mutual agreement between the Bulls and Starks under which Starks' contract would be terminated and the Bulls would not be required to pay Starks compensation for the balance of the 1999-2000 season. The NBA advised the Bulls that while a termination under the terms of Article II:3(n) of the Collective Bargaining Agreement ("CBA") was possible, the Bulls would not be relieved from their obligation to continue Starks' salary. The NBA relied on the provisions of paragraph 16 of the Uniform Player Contract ("UPC") governing "Termination" and specifically subparagraph (a)(iii)(y) stating that "the Player shall be entitled to receive his full Compensation for said Season" for any termination from January 10 onward.

Some discussion at the initial hearing dealt with whether the NBA advised the National Basketball Players Association ("NBPA" or "Players Association") as early as the CBA requires but, in any event, by Tuesday evening the NBPA had been in telephonic contact with the NBA to contest the NBA advice. The initial hearing in this arbitration followed the next day, March 1.

1

Re: John Starks

The date March 1 has special significance because that is the date specified in NBA By-Law 6.04 as the last day on which a player for whom a request for waiver is made (the procedure envisaged by Article II:3(n)) would be eligible to participate in Playoff Games for the current season. Just as the Bulls did not wish to have to pay Starks' remaining salary, so Starks wanted to be able to participate in the Playoff Games with another team after being terminated by the Bulls. The proximity of the events outlined above to the March 1 date was the reason for the expedition in this proceeding and also played a role in the NBPA claim that the NBA had circumvented the intention of the parties to the CBA. See Article XIII on "Circumvention."

The reason that the Players Association relied on Article XIII rather than arguing that the NBA had wrongly interpreted Article II:3(n) and the UPC was twofold: First, the division of responsibility between the System Arbitrator and the Grievance Arbitrator is such that the System Arbitrator has, under Article XXXII, no jurisdiction with regard to Article II but does have jurisdiction under the circumvention provision, Article XIII. Second, the Grievance Arbitrator, who would have such jurisdiction under Article II, did not provide as attractive a forum for the NBPA because under the provisions governing grievance arbitration a hearing could not be held immediately and the remedial power of the Grievance Arbitrator was more circumscribed than that of the System Arbitrator. Thus, for reasons of timing and remedy the NBPA perforce presented the case as one of Circumvention under Article XIII.

What constitutes Circumvention is nonetheless not easy to define. To be sure, Article XIII has something of a definition, albeit an indirect one. Section 1(a) states that the parties intended that the CBA provisions, "including, without limitation, those relating to the Salary Cap, the Exceptions to the Salary Cap, the scope of Basketball Related Income (or Core Basketball Revenues), the Escrow System, the Rookie Scale, the Right of First Refusal, the Maximum Player Salary, and free agency, be interpreted so as to preserve the essential benefits achieved by both parties to this Agreement." Moreover, it makes clear that neither party may, among other things, "undertake any action...designed to serve the purpose of defeating or circumventing the intention of the parties as reflected by all of the provisions of this Agreement." (Emphasis supplied) Although there was considerable discussion of just what "all" means in the context of this dispute, there was also agreement that mere error by the NBA in interpreting Article II and its relation to the UPC could not in itself constitute Circumvention. The reason flows from the commonsense meaning of the word "circumvention," but more particularly because such an interpretation would undermine the distinction between the jurisdiction of the System Arbitrator and the Grievance Arbitrator. Nearly any conceivable dispute over the meaning of the CBA would otherwise be an issue for the System Arbitrator.

So much was common ground, but the difficulty in this arbitration arose in determining how much more than mere error would be required for Circumvention. The Players Association argued that the "essential benefits" of "free agency" were involved. Although "free agency" is not a defined term, I assume without deciding that the Starks-Bulls agreement would facilitate Starks

2.

free agency; however, exactly how it would benefit Starks in that regard cannot be exactly spelled out in view of the fact that the waiver process that Article II mandates leaves some uncertainty as to what would happen to Starks if the Starks-Bulls agreement were approved. The reason I need not decide that collateral point is twofold: on the one hand, the subjects such as free agency that are listed are "without limitation" and, on the other hand, the Circumvention provision was surely not intended to provide an alternative standard for every provision touching in any way on the subjects listed in the first sentence of Article XIII:1(a).

I have concluded therefore that where we have a provision such as Article II:3(n) and the question of its relation to the UPC (where neither the Article nor the UPC are themselves within the System Arbitrator's Article XXXII jurisdiction), not every issue of interpretation raises an issue of Circumvention. On the other hand, it would be going too far in an arbitration, especially one on an expedited schedule, to require an affirmative showing of improper subjective intent as a condition of a finding of Circumvention. Therefore, I have concluded that it would be sufficient to show that the party charged with Circumvention acted unreasonably. Here there are two aspects of the unreasonableness standard. First, was the NBA's interpretation of the CBA provisions in question unreasonable? Second, did the NBA act unreasonably by failing to agree to some arrangement for what I shall call "stopping the clock" with respect to the March 1 date so that the Grievance Arbitrator could deal fully with the dispute and its ramifications for all parties concerned, particularly Starks and the Bulls?

With regard to the first question, both sides offered powerful and rather complex arguments supporting their positions on interpretation of Article II:3(n) and the UPC and finding exceptions within the CBA to generalizations offered by the other side concerning interpretation. The CBA is a complicated document running to hundreds of pages, and as it has grown, the complexities have not gone away. Article II:3(n), at least in its present form and reach, is new in the 1999 CBA. What it means in the context of this dispute can only be determined by a close inspection not only of its terms but in comparison with the drafting of the other terms of Article II as a whole and by parsing it together with paragraph 16 of the UPC. Since the Integration Clause forbids inquiry into the negotiation of the CBA's provisions, the agreement necessarily turns on the CBA language itself.

I shall not review the arguments of both sides on the interpretation issues, in part because a proceeding has been commenced before the Grievance Arbitrator who does have jurisdiction to resolve those issues. It is sufficient for the purposes of a Circumvention decision for me to conclude that the issues of interpretation are complex and detailed and that the arguments on interpretation of the two sides were closely balanced in cogency and persuasiveness. In those circumstances, I am unable to find that the NBA's interpretation is unreasonable.

The NBPA argues, however, that even if the NBPA's interpretation was not unreasonable, that does not end the Circumvention inquiry. The argument begins with the observation that the March 1 date was the NBA's choice, not a

3

Re: John Starks

collectively bargained date. The essence of the Players Association argument is that the NBA was acting arbitrarily and unreasonably in refusing to agree to special arrangements that would allow a Grievance Arbitrator's decision siding with the Players Association's interpretation of Article II:3(n) to become effective in permitting the result that Starks and the Bulls sought (namely, that Starks could play for a team in the Playoff Games and the Bulls would not have to pay the remainder of Starks' salary). Since the parties did not argue from the text of the CBA exactly what provisions of the CBA would have to be waived or otherwise dealt with in order to bring about that result in the context of a grievance arbitration, I shall not attempt to offer an analysis of those provisions – which after all are more in the province of the Grievance Arbitrator than that of the System Arbitrator. It suffices to say that the NBA chose not to express any detailed position on the grievance arbitration timing and the Grievance Arbitrator's authority to give remedial relief authority but the Players Association asserted, while reserving their rights in any grievance arbitration, that there was uncertainty on these grievance arbitration timing and remedy issues.

The question thus becomes whether the NBA was required to make special arrangements on pain of being found to have engaged in Circumvention. Although it might appear at first blush somewhat odd to argue that the NBA must waive CBA provisions in order to avoid circumventing the "essential benefits" of the CBA, it is of course true that the whole point about Circumvention is that it is sometimes the case that one can circumvent the intentions of the parties while adhering to the literal terms of an agreement. That is indeed the central meaning of the concept of circumvention. However, under the circumstances presented here, I do not find the NBPA arguments persuasive.

First of all, the March 1 date has a reasoned basis in the sense that there has to be some date after which players who change teams cannot play in the Playoff Games; at minimum, the NBA was acting rationally in believing that the bulk of the membership of teams in the Playoff Games should be the same as their membership in the Regular Season and that a cut-off date facilitates that result. March 1 is a reasonable date. Could it be, say, March 10? Perhaps, but March 1 is a reasonable date. And while the Players Association correctly points out that it had nothing to do with choosing March 1, it also refrained from arguing that the unilateral choice of that date by the NBA was improper.

Second, the only reason that the March 1 date became such a problem was that the Bulls did not approach the NBA until February 25, a Friday preceding a weekend, and therefore just a few working days before the March 1 deadline passed. That the Bulls probably could not have come to the NBA a great deal earlier can be inferred from the fact that Starks was not traded to the Bulls until February 16, but the fact remains that the time crunch was not manufactured by the NBA. In any event, there is little reason to think that this time crunch problem will arise often. On the other hand, there is little reason to believe that a later date – say March 10 – would not be equally likely to create a similar crunch.

4

Re: John Starks

Third, it was not so much the March 1 date as the limitations on grievance arbitrations that created the problem asserted here. From the arguments it appears that the time crunch arose primarily out of the grievance arbitration provisions on timing and remedy. I express no opinion on those provisions, especially because they may well be central to the grievance arbitration that has already been begun. In particular, I do not believe that it is appropriate for the System Arbitrator to require procedures with regard to grievance arbitrations that he finds fair and equitable in the absence of some independent violation of CBA provisions over which he does have jurisdiction. And I conclude that it would be wrong for the System Arbitrator to reach that result indirectly by basing a finding of Circumvention on the refusal of the NBA to waive rights that it may have with regard to grievance arbitrations.

Oral Determination as of March 3, 2000
Opinion dated this 6th day of March, 2000:

Kenneth W. Dam
System Arbitrator