```
 1    UNITED STATES DISTRICT COURT
      SOUTHERN DISTRICT OF NEW YORK
 2    ------------------------------x

 3    PATRICK EWING, ALLAN HOUSTON,
      LARRY JOHNSON, JOHN STARKS,
 4    AND NATIONAL BASKETBALL PLAYERS
      ASSOCIATION,
 5
                    Plaintiffs,
 6
                v.                          97 Civ. 3578 (JSR)
 7
      DAVID STERN, ROD THORN,
 8    AND NATIONAL BASKETBALL
      ASSOCIATION,
 9
                    Defendants.
10
      ------------------------------x
11
                                       May 16, 1997
12                                     1:20 p.m.

13    Before:

14                    HON. JED S. RAKOFF,

15                                      District Judge

16                         APPEARANCES

17    WEIL GOTSHAL & MANGES
           Attorneys for Plaintiffs
18    JEFFREY L. KESSLER
           -and-
19    RONALD KLEMPNER
      HAL BIAGAS
20    WILLIAM HUNTER
           Assistant General Counsel, N.B.A. Players Association
21
      PROSKAUER ROSE GOETZ & MENDELSOHN, LLP
22         Attorneys for Defendants
      HOWARD L. GANZ
23    NEIL HOWARD ABRAMSON

24    ALSO PRESENT:
      JEFFREY MISHKIN, National Basketball Association
25    MARTIN FLUMENBAUM, Attorney for Miami Heat
```

1          (In open court)

2                THE DEPUTY CLERK:  The matter of Patrick Ewing,

3    Allan Houston, Larry Johnson, John Starks and N.B.A. Players

4    Association v. David Stern, Rod Thorn and the N.B.A.

5                Counsel, please state your name for the record.

6                MR. KESSLER:  Jeffrey Kessler, your Honor, for

7    the players and the Players Association.

8                MR. GANZ:  Howard Ganz, your Honor, representing

9    the defendants.

10               THE COURT:  I have received your papers and

11   reviewed them as best I could after the short time frame and

12   I am ready to hear oral argument on this application for a

13   temporary restraining order and preliminary injunction.

14               Let me hear first from the moving party.

15               MR. KESSLER:  Very good, your Honor.

16               May it please the Court, my name is Jeffrey

17   Kessler and I am counsel for the four individual players and

18   the N.B.A. Players Association who has brought this action.

19               Your Honor, I think having quickly read the

20   N.B.A. papers it perhaps would be helpful to try to focus

21   what this motion is about and what it is not about.

22               This is an action seeking, very simply, an

23   injunction in aid of arbitration.  Last night --

24               THE COURT:  I take it that is the grounds on

25   which you say that it does not fall within the purview of

SOUTHERN DISTRICT REPORTERS (212) 805-0300

NBPA000125

1    the anti-injunction statute.

2          MR. KESSLER:  That is correct, your Honor.  This

3    is a boy's market injunction case and all of the case law

4    they cite is simply inapplicable on that basis.

5          THE COURT:  If it is under that provision, I take

6    it your challenge is not to this rule simply as applied to

7    these particular individual plaintiffs, but rather across

8    the board, as I read your papers here, on collusion grounds

9    or otherwise.

10          MR. KESSLER:  Your Honor, it is both.  We filed

11    two separate arbitrations this morning, at approximately

12    9:30 this morning.  The suspensions were at 5 p.m. last

13    night.

14          THE COURT:  Actually, in that regard I wanted to

15    inquire of this:  There is some hearing going on before one

16    of the arbitrators today, you say in your papers?

17          MR. KESSLER:  No.

18          In fact, we wanted to proceed with that

19    arbitration hearing immediately, and the N.B.A. had

20    suggested, and we agreed, to have a scheduling call at 8

21    a.m. this morning.  When I got on the phone call, for some

22    reason counsel for the N.B.A. said they no longer saw any

23    purpose to having the call with the arbitrator until after

24    we came to the Court today to see what your Honor would do.

25          We stand ready to have both of these arbitrations

NBPA000126

1    in a very expeditious fashion.  We think they could be done

2    within a week to ten days, both of them, in terms of going

3    forward.

4            THE COURT:  I take it the ball is in my court

5    then.

6            MR. KESSLER:  That is correct.  The bouncing

7    ball.

8            THE COURT:  Very good.

9            MR. KESSLER:  Let me say, your Honor, this is a

10   boy's market injunction -- we are considering basically

11   traditional standards of injunctive relief because, when you

12   cut through all the cases, essentially what they say -- and

13   we have discussed this in our brief -- is that you apply

14   traditional, equitable principles with a little wrinkle.

15   Then when you get to the question of substance, questions

16   going to the merits, you have to look at that in the context

17   of the arbitration.

18           THE COURT:  I agree with that.

19           Let me just ask you in that regard something that

20   comes up sort of at the tail end of your adversary's papers.

21   On the question of the balance of hardships, they assert, as

22   I understand it, that there is a very considerable hardship

23   in not allowing the Commissioner and the League to take

24   prompt and serious action when a violation of a rule that

25   has as at least its partial, if not primary purpose the

SOUTHERN DISTRICT REPORTERS (212) 805-0300

NBPA000127

1    prevention of violence and the prevention of injury on the

2    court, the basketball court.  Why isn't that a very serious

3    hardship to them?.

4              MR. KESSLER:  Your Honor, I don't think the

5    balance of hardships is even close.  I will explain why.

6              To begin with, from their standpoint their

7    interest is if they have properly applied the rules to have

8    these players suspended for a game.  If we are wrong, if we

9    lose both arbitrations within a week, these players will be

10   suspended probably from a play-off game.  It will have

11   exactly the same effect from their standpoint.  They can be

12   made whole in that sense.

13             THE COURT:  Is that right, or is it a question of

14   that their interest -- and I may be reading more into their

15   papers than they were suggesting, but I thought they were

16   suggesting that the nature of this kind of rule and the

17   nature of this kind of alleged violation requires swift

18   punishment and that it is a happenstance -- not of their

19   doing -- that it occurred in the context of the play-offs,

20   but that it would be equally important to have it be swift

21   if it occurred in the middle of the season, and that

22   therefore deferring it, say, to next year does not have the

23   same attention to the purpose of their rule as having

24   immediate relief.

25             MR. KESSLER:  First, your Honor, we are not

1    suggesting that it be deferred to next year.  We are

2    suggesting that it be deferred until an arbitrator, both

3    arbitrators, can decide if the rule at stake here is a

4    violation of the collective bargaining agreement.  If in

5    fact it is -- and we believe it is, and I would be happy to

6    discuss that point -- then they have no interest in

7    punishing these players.

8            THE COURT:  Yes, but that is confusing the two

9    different standards.  You are talking now about the prong of

10   the standard that goes to whether there are serious

11   questions going to the merits, but we have to look at the

12   balance of hardships separate.

13           MR. KESSLER:  On the balance, on the one hand we

14   have, to begin with, four players who if they miss this game

15   at this point in the season will never be able to be made

16   whole by any arbitrator.  This is not a question of them

17   getting back a monetary payment, a salary for a game.  That

18   is not what this is about.

19           I was on the phone last night with these players,

20   and the pain in their voice for what this means to their

21   team and how far they have come, there is no way to make

22   them whole.  I submit that is irrefutable.  There is no way

23   to make the fans whole.  There is no way to make the team

24   organization whole if the players are right.

25           On the other hand, can they be punished if we're

SOUTHERN DISTRICT REPORTERS (212) 805-0300

NBPA000129

1    wrong, if the arbitrator comes out the other way?

2    Absolutely.  Is there some marginal interest that maybe it

3    is more severe punishment for it to happen the next game

4    than a game a week later if we're wrong?  I don't know.

5            If it is a week later, this team might be in the

6    N.B.A. finals on the next round and it could be worse to

7    have the suspension at that point.  I don't know which is a

8    greater punishment.

9            What is clear is when you are balancing these

10   hardships the League's interest is if it is a proper rule to

11   have the player punished.

12           You were correct when you said it was pure

13   happenstance that this turned out to be the sixth game and

14   the seventh game of this play-off series.  The rule doesn't

15   provide for that.  The rule doesn't say the punishment is

16   you will miss a play-off game or series.  Not at all.

17           If this had been the last play-off game of the

18   season, if this had been the championship game, the last

19   game, then their punishment would have been to miss the

20   first regular season game of the next season.  All that is

21   is pure happenstance as to when it came in.  That is not an

22   interest that could be matched against the interest of these

23   players.

24           THE COURT:  This rule, as I understand it, was

25   invoked on numerous occasions over the past year and the

NBPA000130

1    Players Association raised none of the challenges that you

2    are raising now, is that right?

3            MR. KESSLER:  That is completely untrue, your

4    Honor.  They did fax us an affidavit --

5            THE COURT:  They only got your papers a few hours

6    ago.

7            MR. KESSLER:  I will tell you, it was very

8    interesting.  They talk about this applying to, I think it

9    is 22 players or something like that over this two-year

10   period.  Well, one of them was apparently an incident that

11   happened over two years ago involving 16 players in one shot

12   which, to our knowledge, was completely resolved to the

13   satisfaction of those players and no one knew exactly how

14   the rule was being applied.  That was 16 of them.  The other

15   five are in this case.  So apparently there is one other

16   player floating around, who we may not even know about, who

17   apparently they applied the rule to.

18           THE COURT:  Let me make sure whether or not it is

19   true that although the Players Association knew of this rule

20   they did not, prior to this motion that you brought this

21   morning, raise the legal objections to that rule that you

22   now seek to arbitrate, is that right?

23           MR. KESSLER:  That is not exactly right either.

24           What happened is these rules are not shown to us

25   as a matter of course.  They are not part of the collective

NBPA000131

1    bargaining agreement.

2         THE COURT:  There is an allegation in their

3    memorandum, although without support in the affidavit unless

4    I missed it, that it is mailed to each player -- forget

5    about the rules as a whole -- this rule.  I did not see an

6    allegation in your papers, unless, again, I may have missed

7    it because I have only had a short time to read it, that the

8    Players Association or even these individual players were

9    unaware of this rule.

10         MR. KESSLER:  We don't know to what degree they

11    distribute it to players.  Certainly not all the players

12    seem to recall this rule, but clearly they give it to the

13    teams.  I suppose they ask the teams to talk to the players

14    about it.  We are not disputing that point.

15         THE COURT:  And no one brought a challenge up

16    until now.

17         MR. KESSLER:  Let me explain.  Up until this

18    incident last night, we never realized that in the

19    application of this so-called "rule" -- which was never

20    bargained for and it is not included -- their position is,

21    literally, as we found out for the first time, that if you

22    walk 3 feet away from the bench you engage in no hostile

23    conduct, you do not go near anyone, you do not push anyone,

24    you do not look angrily at anyone, if you come from here to

25    here, as Patrick Ewing did, you are suspended.

NBPA000132

1     THE COURT:  If the question is that you quarrel

2 now with a particular interpretation of the rule, then under

3 that provision it refers that kind of thing to the

4 Commissioner.  That is not an arbitral matter.

5     MR. KESSLER:  No.  Let me explain.

6     We had believed that this was not a rule that had

7 been promulgated and given to the teams as being in force.

8 We had thought -- the one time we became aware of it about

9 two years ago with this one incident -- that it was, in

10 effect, a factor that the Commissioner was looking at in his

11 consideration because, for example, we have no problem in

12 case-by-case determinations by the Commissioner.

13     Mr. Ward was suspended for fighting in the

14 incident two nights ago.  Mr. Brown was suspended for

15 fighting two nights ago.  We have no problem with that.  If

16 leaving the bench is a factor, we would have no problem with

17 that.

18     What we painfully learned last night after

19 talking to Mr. Ewing and Mr. Houston is that players who did

20 nothing that any rational person would construe as being

21 hostile, as being detrimental to the interest of basketball,

22 were being suspended because the rule now is being

23 announced, we believe for the first time, as a rigid rule,

24 that if you walk a few feet from that box after an

25 altercation -- and in Mr. Ewing's case it was after he

SOUTHERN DISTRICT REPORTERS (212) 805-0300

NBPA000133

75ghew11

1    thought the altercation was over -- then you are suspended.

2          When we found out about that last night, we

3    brought the case this morning.  I don't know how much

4    swifter we could have acted in that regard.

5          THE COURT:  The rule as a whole was not, unless

6    again I missed it in your papers and, again, unless I have

7    missed it in their papers, was not perhaps in total context.

8          Maybe some other point may lead to something else

9    that is in these papers that will fill out the context, but

10   what I have is in the Thorn declaration in their papers, it

11   states, "Among the official rules of the N.B.A. is the

12   well-established rule set forth in Rule 12, Section 9,

13   subsection C" -- I would have like to have had, and maybe I

14   do and have not noticed it, all of Rule 12; just reading

15   that makes me think that it is fortunate that both the

16   players and management are represented by lawyers --

17   "providing that players who leave the bench during an

18   altercation will be suspended."

19          What is being quoted now, I take it, is mostly in

20   Section 9, subsection C, and what this quote states is as

21   follows:

22          "During an altercation all players not

23   participating in the game must remain in the immediate

24   vicinity of their bench."

25          That does not sound to me like it is a factor to

NBPA000134

1    be considered.  It seems like a flat, unequivocal statement.

2    The only question is perhaps what is meant by "immediate."

3    Anyway, the quote continues:

4              "Violators will be suspended without pay for a

5    minimum of one game and fined up to $20,000.  The

6    suspensions will commence prior to the start of the next

7    game."

8              Then it goes on with what to do if the

9    suspensions involve more than four players.

10             MR. KESSLER:  The reason that rule was not

11   attached to our papers is because I didn't have it.  What I

12   had was the N.B.A.'s press release stating that such a rule

13   existed and that, therefore, these players were suspended.

14             What you are reading, I quite agree, is a certain

15   rule.  So we were correct in what their position was, this

16   is apparently how they are applying it, and we brought the

17   proceeding.

18             THE COURT:  This document that they refer to as

19   the "Official Rules of the N.B.A.," is that a document you

20   are saying that the Players Association does not have?

21             MR. KESSLER:  I have not done a file search of

22   the Players Association.

23             I can tell you that as a routine matter this what

24   is called, I think, the Basic Operating Rules, or whatever

25   that is called, that document as a whole has never been

NBPA000135

1    shared with the Players Association.  It is not something

2    that the League -- it is not part of our collective

3    bargaining relationship.

4            This is very important because I want to focus

5    the Court's attention on the anti-collusion provisions of

6    this agreement and why this is so significant.

7            We carefully bargained for anti-collusion

8    provisions that are unique in sports.  It is not the same

9    provisions as in baseball or football.  They are rather

10   unique.  What these provisions did is a variety of things.

11   One of the things it did is it said to the N.B.A. and its

12   teams, You can't have any agreements concerning the terms or

13   conditions of employment offered to any veteran or rookie

14   that is not part of his deal.

15           Now they say, Well, this couldn't possibly mean

16   suspensions, it couldn't mean a rule about that; it must

17   mean a rule about money or meals or something else.

18           Well, we know what it refers to.  How do we know?

19   They don't even discuss this in their brief.  They had time

20   to look at my brief.

21           In Section 2 the parties said that despite the

22   fact that we are having this incredibly broad definition of

23   collusion, there are some things we are going to take out of

24   the collusion.  It says that the following conduct shall not

25   be a violation of Section 1, and this is on Article 14,

SOUTHERN DISTRICT REPORTERS (212) 805-0300

NBPA000136

1    Section 1 and 2 of the CBA.

2                Now the reason it says some conduct is not a

3    violation is because otherwise it would be.

4                What we do find is in Section 2, No. E, which is

5    one of the exclusions from collusion, and what is excluded

6    is "Any action taken by the N.B.A. League office to exclude

7    from the League, suspend or discipline any player for

8    reasons involving gambling, drugs or the commission of a

9    crime."

10               Now what is significant about that?  We did not

11   agree to exclude from collusion any rules they were going to

12   promulgate about suspending players not for gambling, drugs

13   or the commission of a crime, but for on-court behavior.

14               Are we sure the parties thought of this?  We can

15   be very sure.  Because if you look at Article 35 of the

16   N.B.A. Constitution, which both parties cite, which is

17   attached to the Uniform Player Contract, it goes through

18   different reasons for suspending.  You could be suspended

19   for drugs and you could be suspended for gambling and you

20   could be suspended for crimes, and in a separate section, in

21   Article 35, you can be suspended for on-court behavior.

22               Now the only inference we believe can be drawn is

23   that the parties intended to keep rules about this, not

24   individual proceedings about looking at the facts of a case

25   and deciding whether or not this was conduct detrimental to

NBPA000137

1  basketball -- we don't have a problem with that -- but rules

2  that were not part of the anti-collusion provisions.  Why?

3  Because the players wanted to be able to monitor and agree

4  to any rules so that they wouldn't promulgate a rule like

5  this one which says that if you walk 3 feet from a bench you

6  are suspended when that conduct has no rational relationship

7  to being against the interest of the N.B.A.

8        These players are the test.  This is what we are

9  going to show the arbitrators, because the players here, one

10  of them, almost when the altercation was over, basically did

11  nothing except call the players to come back to the bench,

12  and the other one tried to be a peacemaker, and the third

13  one tried to pull one of his own players off of another

14  player.  Those are the hostile acts against the interests of

15  the game that were punished here.

16        Now what we are entitled to is to present this to

17  the arbitrator charged with interpreting the collusion

18  provisions.  We could do that within the next week or so.

19  If I am right, this is collusion, it is not right, and this

20  rule cannot be applied.  It has to be case by case.  If I am

21  wrong, then a week from now we will get a different result.

22        That balance of hardships with this serious

23  issue, I think a likelihood of success, frankly, on the

24  collusion point points to not suspending these players, to

25  breaking players' hearts, to breaking fans' hearts because

NBPA000138

1    what's really happened here is the N.B.A. has decided that

2    they are going to get tough and they are going to take a

3    stand for whatever reason, no matter how irrational, because

4    that's how they are.

5          THE COURT:  I think I need to bring you back to

6    the fact that we are in a court of law.  Your legal points

7    are well taken.  I will be interested to hear the responses

8    of your adversary.

9          MR. KESSLER:  I apologize, your Honor, if I got

10   carried away.

11         THE COURT:  I do not know that a jury speech is

12   really appropriate to this.

13         MR. KESSLER:  I am sorry, your Honor.  I get

14   carried away because of the emotional nature of the issue.

15         Let me go back to a legal point.

16         THE COURT:  Just to pick up on that, basketball

17   games, any professional sports, obviously excite tremendous

18   albeit perhaps short-term emotions on the part of fans, on

19   the part of players.  It is inherent in the situation.  It

20   is part of the, if you will, pleasure of the situation.  But

21   it follows from, one might think, that there has to be

22   pretty strict regulation of anything that threatens to let

23   those emotions get out of hand, because the potential for

24   brawls on the court spreading to brawls in the stands, etc.,

25   etc., is always present.  One can think of the experiences

NBPA000139

1    they have had in soccer games in Europe and things like that

2    where fights in the field have led to deaths in the stands

3    to know that this is a serious matter both ways.

4              MR. KESSLER:  Your Honor, we could have an

5    interesting, philosophical debate about what are the

6    appropriate rules for the N.B.A., but the issue here is, are

7    there issues that they have given up in collective

8    bargaining the ability to do certain things without the

9    Players Association?

10             THE COURT:  I agree with you that that is the

11   kind of issue we ought to focus on, but the relevance of the

12   point I was just making is that even if you meet the grounds

13   of sufficiently serious questions going to the merits to

14   make a fair ground for litigation -- which I won't attempt

15   to say ten times fast, but it is standard -- you also have

16   to meet a balance of hardships tipping decidedly towards the

17   party requesting the preliminary relief.  At least one

18   question that I am, I guess, raising in my mind -- I have no

19   doubt that there is hardship here to the petitioners.  I am

20   wondering still whether there is not still some hardship in

21   not permitting the League to properly enforce a rule that

22   upon its face calls for prompt enforcement.

23             MR. KESSLER:  Again, your Honor, if there is some

24   hardship, it is a tiny amount of hardship.  Because if

25   they're right, in a week we are going to know and every

NBPA000140

1    player in the League is going to know the League is right,

2    this is the rule, and it is now enforced.  These players

3    will be punished, if the League is right.  There is no

4    material hardship there.  There is no undermining of their

5    basic enforcement policy.

6           The only hardship they will really suffer is that

7    if they are wrong then they will suffer the hardship which

8    they should suffer, which is that their authority will be

9    reigned in by the proper arbitrators under the collective

10   bargaining agreement which, by the way, they even have a

11   right of appeal there under the collusion proceedings before

12   the system arbitrator.  We even set up a private three judge

13   appellate panel.

14          The parties negotiated this deal so that there

15   were neutral individuals who could determine these very,

16   very important issues based on an understanding of the

17   industry which they get by being the arbitrators in this

18   situation and which they can apply on an expedited basis.

19   We specifically provided for these proceedings to be held.

20   As I said, we were ready this morning to have the first

21   arbitration this afternoon, and the N.B.A. wasn't

22   interested, for whatever reason they decided.  We are

23   willing to do both of these.

24          That hardship of us being wrong for a week and

25   then it being established that they are right on the rule

SOUTHERN DISTRICT REPORTERS (212) 805-0300

NBPA000141

1    and the players being suspended a week from now cannot

2    measure up to what will be lost if they are opposed tonight.

3             THE COURT:  Where do you derive that estimate of

4    a week from?

5             MR. KESSLER:  Based on our prior history when we

6    want to move, when both parties want to move -- in fact,

7    frankly, your Honor, I would be willing to stipulate as part

8    of this that we are ready to have that proceeding on any day

9    convenient to both arbitrators -- two days, within the next

10   week.

11            Obviously if there are player witnesses, we want

12   to do it on an off day for the players, not during a game or

13   when they are practicing just before a game.  I see no

14   problem in doing that.  I cannot tell you the arbitrators'

15   availability because they didn't want to make the phone call

16   this morning.

17            There is no reason why we can't do this.  In

18   fact, your Honor, we only get a TRO for ten days.  So if you

19   give me a TRO, my mission is to get this all resolved within

20   those ten days because, if I come back to you in ten days

21   and say it hasn't be resolved, I need it flipped over and

22   they say, Well, if Mr. Kessler and his players had not been

23   diligent in some way or it hasn't been possible, I don't

24   think you're going to give me the extension at that point.

25            What I need is simply the ability to get these

NBPA000142

1    neutrals to do their job.  That is why I said it is a

2    classic injunction in aid of arbitration.

3            If the suspensions happen today and a week from

4    now it is found that Patrick Ewing should have played and

5    Allan Houston should have played tonight and the Knicks lose

6    the game and lose the series and the course of history is

7    changed, nobody can give that back to them.  You can't.  You

8    can't give it back.  That hardship outweighs the sweetened

9    delay for them.  They have their rules.

10            By the way, there is one last point I want to

11    make.  They talk about a rule that they have established

12    that if you punch somebody you are suspended.  It is silly.

13    No one is going to object to the Commissioner finding, yes,

14    that is a dispositive fact, you shouldn't punch anybody.

15    The problem with this rule, and precisely why we wanted this

16    collusion provision -- or why we wouldn't agree to it --

17    there is not necessarily any rational relationship.  That is

18    why the players wouldn't agree to it, between this and doing

19    something detrimental to the League.

20            Now, if they brought a proceeding that these

21    players engaged in a fight, pushed people, did something,

22    that might be proper grounds.  We are not contesting that

23    and we are not contesting the Commissioner's authority to do

24    that case by case.

25            THE COURT:  I think at the risk of interrupting

SOUTHERN DISTRICT REPORTERS (212) 805-0300

NBPA000143

1   the course of history, I think I need to hear a little bit

2   from your adversary and then we will come back to you in a

3   few minutes.

4              MR. KESSLER:  Thank you, your Honor.

5              MR. GANZ:  Good afternoon, your Honor.  My name

6   is Howard Ganz.

7              THE COURT:  In terms of your argument about the

8   anti-injunction statute, why doesn't this fall within the

9   recognized exception for an injunction in aid of

10  arbitration?

11             MR. GANZ:  Because, your Honor, it is not in aid

12  of any arbitration to which these players and this union are

13  entitled.

14             The clear and explicit language of the collective

15  bargaining agreement says that disputes about discipline

16  imposed by the Commissioner or his designee with respect to

17  on-court conduct are to be resolved exclusively in the ways

18  set forth and resolved exclusively by appeal to the

19  Commissioner.

20             The provisions go on to say that that is the

21  final binding, conclusive result -- binding on the players

22  involved, the teams involved, and the parties to the

23  agreement, the N.B.A. and the Players Association.  That is

24  the explicit language of this collective bargaining

25  agreement.

NBPA000144

1          Your Honor, in our papers -- and we may not have

2     gotten them to you in order for you to have seen this -- the

3     claim that someone else, someone other than the Commissioner

4     had jurisdiction or authority to adjudicate a dispute

5     concerning the imposition of discipline for on-court

6     misconduct, that dispute is one that we have already had --

7     "we" meaning the union and the N.B.A. -- we have already had

8     that and adjudicated it.  It was decided under the prior

9     collective bargaining agreement where the language of the

10    process is either identical or substantially identical to

11    what it is now, meaning simply that disputes about player

12    discipline for on-court conduct went under the old

13    agreement -- exclusively, the Commissioner.

14         There was an incident, and your Honor may recall

15    or have read about it, where a player, who shall go

16    nameless, but I am sure people may recall the incident, was

17    alleged to have spat upon a fan.  He was disciplined for

18    that conduct.  The Players Association sought to have that

19    matter arbitrated before the grievance arbitrator.

20         One of the two arbitrators, they say, should

21    adjudicate this dispute here.

22         The arbitrator at that time, a Professor Collins

23    at NYU Law School -- he has been a long-time professional

24    arbitrator and teacher at NYU -- ruled very explicitly, and

25    I think we have attached the opinion and award to our

SOUTHERN DISTRICT REPORTERS (212) 805-0300

1    papers, that under the language of the agreement disputes

2    about the imposition of discipline for on-court misconduct

3    were exclusively for the Commissioner.  That is what the

4    parties had agreed to.

5            So to go back to your question, the precondition

6    for the --

7            THE COURT:  This particular rule which, again, I

8    do not have, as far as I know, the entirety of -- that is to

9    say, Rule 12 -- but only the portion that you have quoted,

10   what is the rule more generally to it?

11           MR. GANZ:  Pardon me?

12           THE COURT:  Do you have the whole rule?

13           MR. GANZ:  I do not have the entire rule with me,

14   your Honor.  It is a multi-page tiny print.  I have a

15   portion of it.  I will be happy to hand it up to the Court.

16           Rule 12 covers a variety of things.  The

17   subsection 9 that we had cited I think is headed "fines"

18   and it goes through the different aspects of conduct that is

19   subject to discipline.

20           THE COURT:  When new rules are promulgated within

21   this document they are not shown to the players?

22           MR. GANZ:  I think Mr. Thorn's declaration makes

23   clear -- it is unclear whether he sends them to the players

24   or he informs the players of them.  Let me just address that

25   point, your Honor.

NBPA000146

75ghewin

1              These rules are published in a paperback

2    publication called the *N.B.A. Guide*.  That is a publication

3    that is published by the sporting news.  You can buy it on

4    your newsstand.  The N.B.A. distributes, I would exaggerate,

5    probably 50,000 copies across the world, not only to people

6    involved in the N.B.A., but even to its lawyers.  It has

7    pictures of the players and their statistics.  At the end,

8    it has the official rules of the N.B.A.

9              Beyond that, your Honor, with all due respect, I

10   think it is outrageous to suggest that the Players

11   Association never knew that there was a rule that says if

12   you leave the bench during an altercation you are suspended.

13   Even the players, your Honor -- we didn't bother to bring

14   newspaper articles or other things -- even the players

15   involved in these matters were aware of that.  The Miami

16   players didn't leave the bench, so they had to be aware of

17   something.  Most of the Knicks, a majority of the Knicks,

18   didn't leave the bench.

19             I submit, your Honor, it is just absurd to

20   suggest that the union -- Mr. Hunter, Mr. Klempner -- didn't

21   know that there was such a rule.  Maybe Mr. Kessler does not

22   know these rules, maybe he does not get a copy of the *N.B.A.*

23   *Guide*.  I will make sure he is on the mailing list next

24   year.  These are public, official rules that are available

25   to anybody.  Their existence is known.  This rule itself,

SOUTHERN DISTRICT REPORTERS (212) 805-0300

NBPA000147

1    your Honor, has been applied several times since it was

2    promulgated.

3         THE COURT:  Assuming they were on notice of the

4    rules, it certainly does not follow necessarily that they

5    could be held to have waived any objections.  Part of his

6    point, as I understand it, is they had bargained for the

7    right to effect review of these rules but for the ones

8    dealing with gambling, etc.  Maybe I am misunderstanding the

9    situation.

10        MR. GANZ:  I think Mr. Kessler said something, or

11   at least I understood him to be saying something otherwise.

12        What he said, at least in part -- I don't know if

13   this is the point your Honor is going to -- is that we can

14   understand the union says a case-by-case adjudication by the

15   Commissioner or his designee of on-court misconduct, so the

16   union does not come here saying we want to upset the

17   suspensions of P.J. Brown and Charlie Ward -- Mr. Brown

18   playing for Miami; Ward for the Knicks -- who were the

19   original combatants in this altercation, because in their

20   view that was a case-by-case adjudication.  They are

21   perfectly entitled to pursue a case-by-case adjudication of

22   the suspensions imposed upon the four other players.  That

23   is what the Commissioner would entertain at a hearing.

24        Mr. Kessler, the union, the players, want to

25   advance whatever arguments, whatever factual assertions,

NBPA000148

1    whatever evidence they can muster to persuade the

2    Commissioner that the suspension should be reduced,

3    eliminated, deferred.  They are fully entitled to do that.

4    That is the procedure that everyone bought into by virtue of

5    this collective bargaining agreement, and, indeed, your

6    Honor, that has been the procedure with respect to on-court

7    discipline for 50 years.  Certainly through half the time

8    there's been a union, 30 years.

9              Your Honor, with respect to the incidents where

10   players have been suspended for leaving the vicinity of the

11   bench when there is an altercation on the floor, in several

12   instances the players have invoked the Commissioner's

13   procedure and have filed an appeal and come to a hearing

14   with the Commissioner.

15             THE COURT:  Maybe I just missed the point, and it

16   wouldn't be the first time, but I thought I saw in his

17   papers and I thought he was making the argument now that

18   while the players had agreed to and bargained for, if you

19   will, a case-by-case all-factors-considered decision vested

20   with the Commissioner for on-court problems, they had not

21   agreed to and they had under their unique, as he puts it,

22   anti-collusion rules not given up the right to bargain for

23   or have input with respect to specific per se rules that

24   would be invoked, and that in this case what was being

25   invoked was not a case-by-case all-facts-considered type of

SOUTHERN DISTRICT REPORTERS (212) 805-0300

1    decision -- because, indeed, by their view if that had been

2    done they would not have suffered this penalty -- but rather

3    was a strict and literal enforcement of a draconian and

4    unyielding rule that they would never have agreed to.  I am

5    not saying that is right or wrong, but I thought that was

6    his point.

7            MR. GANZ:  Let's assume that is, let me respond

8    to it, your Honor.

9            First, your Honor, I believe the language of the

10   agreement, the collective bargaining agreement, must

11   control.  I understand what Mr. Kessler says about

12   collusion, but if you look at the language with respect to

13   collusion and try to force fit it into a phrase about an

14   employment term or condition, this whole notion of you can

15   get suspended if you leave the bench, I see the argument, I

16   think it is imaginative and creative, but it doesn't work.

17   Because if you go to the provisions that deal with how

18   disputes about the imposition of discipline for on-court

19   misconduct are to be handled, whatever it may say about

20   collusion, it says very specifically and precisely that

21   precise dispute is resolved exclusively by the Commissioner.

22   I think, your Honor, that is the absolute, plain, clear

23   language.

24           THE COURT:  Assuming arguendo that there was a

25   reasonable question as to whether there were conflicting

SOUTHERN DISTRICT REPORTERS (212) 805-0300

NBPA000150

1    provisions of the CBA that left open whether the no

2    collusion provision relating to terms or conditions of

3    employment was applicable here or not -- and I know you say

4    there is no issue there -- assuming that, is the

5    determination of whether there is a conflict and therefore

6    whether it is ultimately covered or not covered by what is

7    subject to arbitration, is that for the arbitrator or the

8    court?

9            MR. GANZ:  The question, your Honor, as to

10   whether -- I would interpret what you have just posed as

11   positing the issue as to whether there is an agreement to

12   arbitrate.  That is really at a party's instance, either for

13   the Court, if you are inclined -- and you can refuse to

14   arbitrate saying there isn't any agreement to arbitrate, or

15   you can without prejudice go before the arbitrator and say

16   you decide.  It is my position you have no jurisdiction.  We

17   have not agreed to arbitrate, but you may decide it.  A

18   party has a right -- a party can't be ordered to arbitrate

19   unless a court decides that there is an agreement.

20           Here I say there is no agreement to have either

21   the system arbitrator or the grievance arbitrator involved

22   in player discipline matters, your Honor.

23           For the purposes of this proceeding, let me

24   remind myself of where we are.  We are here at 2:30, 2:15

25   when there is a game at 8:00 this evening where the most

NBPA000151

1    extraordinary kind of temporary relief is being sought.

2         There is, and I will be happy to go through it,

3    great prospect of hardship to the National Basketball

4    Association.  There is exceedingly persuasive reasons for

5    this rule.  Though Mr. Kessler can't understand its

6    rationality, we will be happy to display to the Court

7    videotapes that trace a history of on-court altercations and

8    players streaming from the bench, which indeed led to this

9    rule.

10         The point is, your Honor, that on this

11   application the plaintiffs here have to demonstrate that

12   there is a likelihood of success on the merits that the

13   arbitrators -- grievance and system -- will decide that they

14   have jurisdiction.

15         THE COURT:  That is one of the branches they

16   could pursue, but there is an alternative branch.  The basic

17   standard which I thought was pretty well the opinion of both

18   parties here is that in order to obtain this relief they

19   have to show A, irreparable harm, and, B, either likelihood

20   of success on the merits or sufficiently serious questions

21   going to the merits to make a fair ground for litigation and

22   a balance of hardships tipping decidedly towards the party

23   requesting the preliminary relief.

24         MR. GANZ:  I didn't mean to leave out the

25   sufficiently serious question.

SOUTHERN DISTRICT REPORTERS (212) 805-0300

1          I think in your appraisal of those factors, I

2    would submit that you should and must consider, one, the

3    language, which I am not going to repeat what it says, and,

4    two, the prior precedent with respect to this very dispute.

5          A decision rendered by the very kind of

6    arbitrator that Mr. Kessler says should now decide this

7    issue, putting aside whether the suspensions are right or

8    wrong or otherwise, just on the question of jurisdiction,

9    fashioned on the language of this agreement and that

10   precedent and fashioned just to the collusion part, with an

11   open and notorious application, whether you want to call it

12   a rule or a fortuitous circumstance, that every time since

13   1994 a player left the bench and went on the court in the

14   middle of an altercation, he got suspended.  Maybe I was

15   purely fortuitous, but I think not.  There was never a

16   protest as to the application of that rule or the invocation

17   of that fortuitous circumstance, and players went to the

18   Commissioner to say, you shouldn't have done it to me

19   because I was going to be a peacemaker.

20          If I may just speak to that point, your Honor.

21   Your Honor was correct, and I don't mean to curry favor, but

22   sporting events, particularly at play-off time, arouse

23   enormous emotions on the part of players and fans, and

24   conduct on the playing court of the kind that occurred in

25   Miami a couple of nights ago obviously threatens enormous

SOUTHERN DISTRICT REPORTERS (212) 805-0300

NBPA000153