1    injury to the players who are involved.  This is a

2    pro-player rule.  This is not an anti-player rule.  This is

3    for the players, for very large, strong, powerful men who

4    can do significant injury to one another, this is to prevent

5    them from doing that and certainly to prevent their

6    altercations from spilling out in the crowd.

7          THE COURT:  His argument, as I understand it, is

8    as follows:  It is not like they are going to be regularly

9    challenging or seeking an arbitration every time because

10   their challenge is essentially, at least under the collusion

11   prong, to the very existence of this per se rule in its

12   form.  So the hardship that the League would suffer under

13   their analysis is that on this one occasion instead of being

14   able to invoke the rule immediately, they would have to wait

15   a week, and that could not be said to meaningfully undercut

16   the force of the rule if in fact it turns out the rule is

17   correct and is non-collusive and is proper in all respects.

18   What will follow then is that forever after it will be

19   enforced by its terms immediately, but the hardship that the

20   League will suffer on this occasion if a TRO is granted and

21   the League ultimately prevails will be on this one occasion

22   it had to wait a week to enforce the rule.

23          MR. GANZ:  May I respond?

24          THE COURT:  Yes.  When I recapitulate one side's

25   arguments or another it does not mean I necessarily agree or

SOUTHERN DISTRICT REPORTERS (212) 805-0300

NBPA000154

Dockets.Justia.com

1    disagree.  I am just trying to clarify it in my mind.

2             MR. GANZ:  I will respond to that with three

3    points.  First, your Honor, the bargain struck here between

4    this union, the players and the N.B.A., the bargain struck

5    here is that the suspension goes ahead and the adjudication

6    of its propriety follows that the employer acts, the

7    employee grieves, and that is the standard in

8    labor-management contracts.  It is very clear from the

9    language of at least two provisions in the collective

10   bargaining agreement.  If I may just call your attention to

11   one which regrettably is not referred to in our brief.

12            THE COURT:  I assume that is the norm, but of

13   course there he is saying that from there the very reason

14   they are here for a TRO is because of the highly unusual

15   circumstances that creates an unusual hardship for them.

16            MR. GANZ:  May I respond to that, your Honor?

17            THE COURT:  Yes.

18            MR. GANZ:  I don't doubt that game six of this

19   series is very important, but I don't know whether a game on

20   March 10 that determined who was going to make the play-offs

21   was just as important to the players involved or a game at

22   the end of the season as to who was going to get home

23   court --

24            THE COURT:  I wonder how far that cuts.  I agree

25   with you there is a continuum, but, for example, if someone

NBPA000155

1   were disciplined and were told you cannot participate in the

2   final Olympic contest of a particular sport because we have

3   a rule that says discipline first, grievance later, and

4   tomorrow is your Olympic contest, to argue back and say,

5   well, of course before that Olympic gold medal contest there

6   was 14 qualifying rounds and that if the person had missed

7   any of the qualifying rounds they also might have missed the

8   whole thing I think is a spurious argument.  There is a

9   difference between those two situations.

10          MR. GANZ:  I am not arguing that point, your

11  Honor.  We have a contract that says nothing contained in

12  this agreement shall excuse a player from prompt compliance

13  with any discipline imposed upon him.  That is point one.

14          Point two, we have an agreement that says the

15  Commissioner or his designee can suspend you for on-court

16  misconduct, and then within 20 days if you appeal he has to

17  have a hearing and then he has to make a decision ten days

18  later and the suspensions proceed.

19          Mr. Kessler made a point in the collusion area to

20  saying the deal in basketball is different than that in

21  baseball.  It is different in this respect too, your Honor.

22  In baseball, if your Honor recalls the incident with Roberto

23  Alomar, the baseball players have, as I understand it, a

24  provision in their agreement that says you don't have to

25  serve your suspension until the hearing is held.  The N.B.A.

SOUTHERN DISTRICT REPORTERS (212) 805-0300

NBPA000156

1    contract is just the reverse.  You serve your suspension and

2    then the hearing is held.

3          Frankly, without criticizing baseball by any

4    means, the N.B.A. believes that is a fundamentally important

5    right that it obtained in this agreement for the very

6    reasons -- pointing specifically to the Roberto Alomar

7    incident and the tremendous outcry of protest about not only

8    what Mr. Alomar was accused of doing or did, but about

9    baseball's inability to take seize of it and control it

10   immediately.

11         It is the swift discipline, the swift punishment

12   that is absolutely essential not only to prevent players

13   tomorrow night from engaging in the same kind of conduct,

14   but to preserve really the essence and integrity of the

15   game, to assure the fans that this game is going to be

16   played according to a set of rules.

17         The last point I would make in response to your

18   question, your Honor, is it is easy for Mr. Kessler to say

19   that we will do it next week.  The suspensions here may or

20   may not -- only history will tell -- have a significant or

21   insignificant or a non-competitive effect, and if a

22   temporary restraining order is issued and the players to be

23   suspended tonight and or on Sunday are returned and

24   ultimately it is concluded that they should have been

25   properly suspended, the N.B.A. is in a pretty big pickle.

SOUTHERN DISTRICT REPORTERS (212) 805-0300

NBPA000157

1     Is tonight's winner still the winner?  Is Sunday's loser

2     still the loser?  Do we replay the games?  What is the

3     N.B.A. supposed to do in those circumstances?

4              THE COURT:  In your analogy or your distinction

5     between baseball, I would have guessed from what you told me

6     about the baseball situation that that comes up all the

7     time -- and I would suspect that that is not before me --

8     and the result stands even if the grievance is ultimately

9     overturned, so I wonder whether that is really quite as

10    major a problem as you are positing.  If I understand the

11    point you were making about baseball, it ought to be an

12    issue there all the time, at least potentially, and seems

13    not to have prevented the sport from surviving.

14             MR. GANZ:  Your Honor, all I can respond to is

15    that these are issues that someone has to decide.

16             Mr. Kessler has no problem with a rule as to

17    throwing a punch.  I don't know if that is a good rule or a

18    bad rule or a sensible rule or not.  If you throw a punch

19    and it is clear you never would have hit the guy, is that a

20    punishable offense?  I think in the N.B.A. it is.

21             Someone has to make that judgment.  These are not

22    easy judgments.  Believe me, the N.B.A. takes no pleasure --

23    this is a self-inflicted wound.  The N.B.A. takes no

24    pleasure in having had to come to the conclusion it came to

25    yesterday, but someone has to decide.

NBPA000158

1        This really is the bottom line point which I

2   think cuts across all of the arguments we have made and

3   Mr. Kessler made.  The agreement that we have reached with

4   the players, for good or for ill, is that it is up to the

5   Commissioner.  It is not, with all due respect, your Honor,

6   you, it is not the system arbitrator.

7        THE COURT:  Thank you for small favors.

8        MR. GANZ:  You are quite welcome.

9        If I may, your Honor.  We have talked about this

10  rule -- and I don't want to pick up Mr. Kessler's lingo --

11  this "blanket rule" as being the generator for why we're

12  here, but Mr. Thorn's declaration that is before you makes

13  very clear at the end of it that with or without any rule he

14  would have come to the same determination.

15       Without reading extensively, what he says is that

16  the N.B.A. has learned by experience -- and, frankly, we

17  wouldn't be happy to display these videotapes, but we are

18  prepared to show you the sort of legislative history or the

19  basis for the enactment of the rule, and including the one

20  clip that stands out in my mind, your Honor.  Maybe here

21  people will recall the Kermit Washington, Rudy Tomjanovich

22  thing that happened about 20 years ago when Tomjanovich was

23  running down the court to be a peacemaker, and I don't think

24  anyone ever doubted that, no one except apparently Kermit

25  Washington who broke his jaw and cheek and everything else

1    in 16 places.  So Mr. Washington didn't appreciate

2    Mr. Tomjanovich' intent.

3            That is why there is this rule.  What the

4    N.B.A.'s experience has shown is that a player who leaves

5    the bench during an altercation, his entry onto the court

6    creates an incendiary situation that simply escalates to

7    conflict or can be perceived as intended that way.  The

8    opposing player can't know whether his adversary who is

9    marching on the court to be Ralph Bunch --

10           THE COURT:  I understand that point, and it is a

11   fair response to some of the points that were made by your

12   adversary, but to my mind it is tangential just as his

13   claims that their hearts were pure is tangential.

14           The real question -- not the only question -- is

15   whether the rule to deal with that, assuming it was invoked,

16   is a rule that can be challenged before an arbitrator

17   regardless of whether the rule is a good rule or bad rule.

18           You have pointed out reasons why it is a sensible

19   rule, and that may be relevant on the hardship point, but in

20   theory you could come up, if it were otherwise lawful, with

21   a completely unsensible rule and you would still have the

22   right to deprive this court of jurisdiction if there was any

23   rule that fell within the exception to the anti-injunction

24   statute.

25           MR. GANZ:  What we have here, your Honor, is a

NBPA000160

1    sensible rule.

2              THE COURT:  I am not at all suggesting that is

3    not true.  I am just saying I think it is not the heart of

4    the controversy.

5              MR. GANZ:  Whether it is or it isn't, I agree, it

6    is not the heart of the controversy.  Whether it is sensible

7    or not sensible, whether its application here is appropriate

8    or inappropriate, those are issues not foreclosed.  Those

9    are issues that the parties have agreed to adjudicate in a

10   particular way.  That is the basic point.

11             That is the reason, your Honor, why Norris

12   LaGuardia applies, if you are talking about any other

13   arbitral forum, because there is no agreement to arbitrate

14   in such other forums.  So this litigation cannot be in aid

15   of arbitration.  It is indeed, your Honor, a way to avoid

16   the very process that the parties agreed would be the way in

17   which these matters would be resolved.

18             Thank you, your Honor.

19             THE COURT:  Let me hear from petitioner's

20   counsel.

21             MR. FLUMENBAUM:  Your Honor, may I speak on

22   behalf of the Miami Heat?

23             THE COURT:  Mr. Flumenbaum, despite my tremendous

24   respect for you, I do not think they are a party to this

25   proceeding and I am going to reluctantly decline to give you

SOUTHERN DISTRICT REPORTERS (212) 805-0300

NBPA000161

1    that opportunity.

2              MR. FLUMENBAUM:  I understand that they are not a

3    party, however, they do have an interest and they do have an

4    objection to the Players Association --

5              THE COURT:  I think it is not properly before me,

6    but it is a pleasure to have you in my courtroom.

7              MR. FLUMENBAUM:  Thank you.

8              MR. KESSLER:  Your Honor, let me begin by

9    agreeing with your Honor that the issue is what did the

10   parties agree to here -- that is the core issue -- and would

11   there be arbitration of these issues.

12             I submit that Mr. Ganz has not done anything to

13   question or detract from our collusion arguments because his

14   position that the collusion provisions could not apply to

15   something like a suspension would render nugatory the need

16   for Section 2 which says, but remember collusion doesn't

17   apply to suspensions for drugs, crime and gambling.  It just

18   makes utterly no sense.  You can't reconcile those two

19   things.

20             THE COURT:  The question of those conflicting

21   interpretations is -- I would be interested if you

22   disagree -- I think he is right that that is a question for

23   the Court.  That is presumably the threshold question or one

24   of the threshold questions I have to reach.

25             MR. KESSLER:  If I understand correctly, I don't

SOUTHERN DISTRICT REPORTERS (212) 805-0300

NBPA000162

1    think so, your Honor.

2              THE COURT:  The determination of whether there

3    has been consent to arbitration is a question of law for the

4    Court, yes?

5              MR. KESSLER:  Yes, but I think the way you

6    approach that issue is as follows:

7              Clearly both sides agree there has been consent

8    to arbitrate what is a violation of the collusion

9    provisions.  There is no dispute on that.  Mr. Ganz and I

10   don't dispute that.  We agree there is an agreement on that

11   issue.  The next issue becomes is a particular type of

12   agreement between the N.B.A. and its teams collusion, which

13   is what our argument is.

14             THE COURT:  You have also agreed, have you not,

15   not to arbitrate certain other types of activities.  If the

16   question therefore is you could escape the effect of that

17   other clause by simply any time you wanted to recast it as

18   to fall within the first clause, it cannot be that that

19   issue gets determined by an arbitrator.  It seems to me that

20   is an issue for the Court.

21             MR. KESSLER:  I understand what you are saying.

22   Yes, you have to interpret what is the scope of the

23   arbitration with respect to the collusion or what is the

24   scope of the arbitration for suspension.  I submit, though,

25   it is very clear that if you look at the actual language of

1    Section 8 of the grievance procedures, which Mr. Ganz is

2    referring to, it is clear you are talking about case-by-case

3    commissioner adjudication of individual facts.  There is no

4    mention of an ability of the NFL to promulgate any rules --

5    the N.B.A.  I am sorry.

6             If Mr. Ganz were right, it would say, And the

7    Commissioner may promulgate rules, policies, presumptions

8    about discipline which shall also only be arbitral this way.

9    In fact, it is very easy to see why his argument can't be

10   correct.

11            Under his argument you could suspend a player,

12   for example, and say the Commissioner decides the

13   appropriate punishment in this case is going to be to not

14   only punish the player but require the team to give up

15   salary cap room -- and your Honor may be familiar that we

16   have a salary cap in the N.B.A. -- well, that would directly

17   violate another provision of the CBA which sets the salary

18   cap.  And we would bring an arbitration again before this

19   same system arbitrator saying, Mr. Commissioner, you cannot

20   in the guise of discipline violate something else you have

21   given up, and that arbitrator determines that.  This is what

22   we're saying here.  In the guise of case-by-case discipline

23   you cannot promulgate the terms and conditions of employment

24   which the collusion provisions say you cannot do.

25             Now, if they have terms to propose, we could

NBPA000164

75ghewin

1    agree with them on it.  We are not unreasonable people on

2    the players' side.  We are willing to debate with them and

3    come up with reasonable rules, but these rules were never

4    offered and shown.

5            In that regard, with respect to the *Barkley* case

6    that they cited, the *Barkley* case, of course, is completely

7    off point.  Number one, it had nothing to do with collusion.

8    In fact, the arbitrator who decided that would have no

9    authority to consider it collusion.  So there was no

10   collusion idea in that case.

11           Number two, there was no uniform policy.  It was

12   a case-by-case adjudication.  The argument there was, did

13   the imposition of the penalty somehow take that out of the

14   case-by-case adjudication.  Completely different argument.

15   Nothing to do with this at all.

16           Again, this goes to the hardship point.  Your

17   Honor's at least formulation of my position was exactly

18   correct.  What we're saying is in the small amount of time

19   that it will take to determine whether the Commissioner has

20   the authority or not to promulgate these type of rules

21   without the Players Association there will be very little,

22   if any, damage done to their discipline powers, to their

23   authority unless we're right.  If we're right, then it is

24   not cognizable injury, it is simply the fact that it is the

25   deal they gave up.

SOUTHERN DISTRICT REPORTERS (212) 805-0300

1          Someone might think that there should be $10
2    million in fines imposed on players who get into fights.
3    Maybe that will deter all fighting.  I suspect it would.
4    The Commissioner could not do that.  There is a maximum fine
5    set in the agreement.  So all of this is about what has been
6    agreed to and how do you review that in the context of
7    arbitration.

8          THE COURT:  Is there any other place -- and,
9    again, I do not have these full documents before me; I have
10   little snippets -- is there any other place in these
11   documents as a whole where the terms and conditions of
12   employment is referred to in a way to make it unmistakable
13   that it includes discipline?

14          MR. KESSLER:  I have not reviewed it for that
15   point, your Honor, but I would say nothing could be clearer
16   than Section 2 of this very article because that is the
17   context in which it is raised.  Again, there would be no
18   reason to exclude discipline for drugs and crime if it
19   wasn't included.

20          THE COURT:  I understand that argument from
21   before and it is important.

22          MR. KESSLER:  It certainly is not a defined term.
23   It is a fairly broad term.  I know label laws are generally
24   terms and conditions of employment -- not taking it out of
25   the CBA -- and generally refers to almost any aspect under

SOUTHERN DISTRICT REPORTERS (212) 805-0300

1   the terms under which the employer deals with the employee.

2   It is an extremely broad concept.

3          Again, singling the fact that the players deal

4   here, the bargain they achieve was if you want to change our

5   terms and conditions of employment, do it with us, because

6   as you know on the label laws employers can sometimes impose

7   terms.  What we did was bargain that away during the term of

8   the CBA.  During the term of the CBA, they have imposed

9   terms upon themselves, have committed collusion.  That is

10  why we are entitled to have arbitration.

11         Mr. Ganz went through this argument about

12  baseball and, after all, we didn't have this provision

13  specifically allowing for injunctions.  Well, Mr. Ganz and

14  his firm are extraordinarily knowledgeable label lawyers.

15  They knew of the boy's market exception.  They knew that in

16  an appropriate case an injunction in aid of arbitration

17  would be available.  That is the deal we made.  We didn't

18  prohibit it.  We didn't specifically provide for it.  Both

19  of us being knowledgeable lawyers put ourselves in the state

20  of the law about which we were very familiar.  This is the

21  case.

22         Again, we have not had many cases under the CBA.

23  As your Honor pointed out, it is the extraordinary

24  circumstances of this particular situation where we need the

25  injunction.  Frequently when we have disputes with the

NBPA000167

1  N.B.A., if it takes weeks to resolve or a month to resolve

2  no one particularly gets upset about that because we could

3  work that out.  This is one where we believe the

4  consequences will be severe.

5         Finally, your Honor, just to close, all we're

6  seeking to do is to preserve the status quo for the next ten

7  days or shorter.  We are willing to stipulate to a shorter

8  time to have this hearing if the N.B.A. is.  That is all we

9  are doing.

10        The pickle Mr. Ganz referred to is a pickle that

11 won't go away no matter which way you turn the pickle jar,

12 because if you don't grant this TRO and the players don't

13 play and the team loses and a week later we get a

14 determination they should have been able to play, you have

15 the same pickle that Mr. Ganz referred to.

16        This won't go away one way or the other.  The

17 point is, shouldn't the arbitrators be permitted to do their

18 job?  As your Honor said, no one gave the Court the job --

19 not that your Honor may not want it; maybe you want it,

20 maybe you don't --

21        THE COURT:  I am much too short for any of the

22 jobs that seem to be available.

23        MR. KESSLER:  Our arbitrators are not terribly

24 tall.  The point is the parties selected the arbitrators.

25 All we are seeking is an ability to let them render their

NBPA000168

1    relief in a context where the parties will preserve their

2    rights until that happens.

3            Thank you, your Honor.

4            THE COURT:  All right.  Mr. Ganz, I do not know

5    if there was anything further you wanted to add, but I will

6    give you that opportunity if you want it.

7            MR. GANZ:  Thank you, your Honor.

8            First, your Honor, I would with respect to this

9    argument about collusion invite the Court -- if I may hand

10   up a complete copy of the collective bargaining agreement.

11           THE COURT:  All right.

12           MR. GANZ:  Your Honor, I am not going to parse

13   the language, but if I could just call your attention to the

14   anti-collusion provisions, they start at page 117.  I think

15   if you read them, you will come to the correct conclusion

16   that they have absolutely nothing to do with what is before

17   you today.  These are, as the language indicates, provisions

18   designed to prevent teams from colluding so as to refuse to

19   negotiate with players, not offering player contracts, and

20   depriving them of compensation and other rights by some

21   conspiracy.

22           This is clearly not that, I would submit, and I

23   think the language would support that, your Honor.

24           THE COURT:  I have looked at that.  I noticed

25   that in the copy you have given me it goes from page 112 to

1   115 and then to 116 and then it doubles back to 113 and 114,

2   but that is not a unique problem for federal courts to deal

3   with.  I manage to parse through.

4          MR. KESSLER:  We have an extra that your Honor

5   may have.

6          THE COURT:  Thank you.

7          MR. GANZ:  You will note, your Honor, this is

8   jointly produced.

9          THE COURT:  To my mind it has the clear

10  indications of the handiwork of lawyers.

11         MR. GANZ:  Your Honor, two other points.  One,

12  Mr. Kessler says that we are both pretty good lawyers and

13  yet he can't understand how I could never have expected to

14  be here today under the circumstances.  With respect to

15  that, on this issue of on-the-court player discipline, the

16  reason why I could never have anticipated, or one of the

17  reasons, one of the principal reasons I could never have

18  anticipated being here is reflected again in the language of

19  the agreement.

20         I call your attention here again to Article 31,

21  Section 8, which sets forth this procedure before the

22  Commissioner and obviously contemplates the service of the

23  suspension before its adjudication, as well as Article 31,

24  Section 14D, which makes clear that the player must comply

25  promptly with the discipline imposed upon him.

NBPA000170

1          Finally, your Honor, whether this is a pickle jar

2    or whichever way it works, I think it goes back to something

3    I said earlier.  Someone has to make a decision.  The

4    parties, I submit, have agreed as to who that someone is

5    supposed to be.  Judgments like that, what is best for the

6    game of basketball, what is best for the N.B.A., both the

7    players and teams, are the kind of judgments, it seems to

8    me, your Honor, that ought to be made by the Commissioner of

9    the National Basketball Association, especially where there

10   is powerful language suggesting that that is his

11   entitlement.

12          Thank you, your Honor.

13          MR. KESSLER:  Your Honor, if I could just answer

14   one question you asked.  I found another answer.  It is on

15   the same page.  I apologize for being slow.

16          You asked is there any other meaning of the word

17   "terms and conditions of employment."  In that Section 2 of

18   Article 14, again I now look -- this is again what is not

19   included in collusion -- I find in No. A the formulation,

20   negotiation of collective bargaining proposals.  Of course

21   that is exactly our point.  It says we exempted them from

22   formulating and proposing it to us.  So if they propose to

23   us that there will be a rule like this, collective

24   bargaining is clearly the broad meaning of terms and

25   conditions, that is not collusion.  If they implemented the

NBPA000171

1    proposals to have a rule like this, then in fact it is not

2    exempt and it becomes subject to collusion.

3                Thank you, your Honor.

4                THE COURT:  Thank you.

5                Let's talk about timing that will both

6    accommodate your needs and give me a chance to look more

7    deeply at some of the materials you furnished me with.

8                What I would propose, unless you tell me it does

9    not meet the sensible way of handling this time-wise, is

10   that we reconvene at 4:30 and I will render my decision at

11   that time.  I would think that since the game does not start

12   until 8:00 that even, assuming arguendo, I would grant the

13   TRO that that would be sufficient time.

14               Is that true or not?

15               MR. KESSLER:  Given the time constraints your

16   Honor is under, I think we would find that very reasonable.

17               THE COURT:  I will look forward to seeing you all

18   then at 4:30.

19               (Recess)

20

21

22

23

24

25

NBPA000172

1          (Resumed)

2              THE DEPUTY CLERK:  Court is now in session in the

3    matter of Patrick Ewing, Allan Houston, Larry Johnson, John

4    Starks and N.B.A. Players Association v. David Stern, Rod

5    Thorn and the N.B.A.

6              THE COURT:  I have reached a decision.  I have

7    made some rough notes.  I will try as best I can based on

8    those notes to articulate not only my decision but also the

9    reasons for it.

10             I do at the outset want to express my

11   appreciation for the excellent advocacy by counsel for both

12   sides, who if they were not already consummate professionals

13   would certainly be appropriate first-round draft picks, and

14   their excellent papers and excellent oral argument on very

15   short notice has tremendously assisted the Court.

16             We are here, as everyone knows, on a request for

17   a temporary restraining order with respect to the discipline

18   imposed on the individual plaintiffs and, in particular,

19   those who are most immediately affected tonight.  Both sides

20   are agreed, as they must be given the Second Circuit law,

21   that the standard in this circuit for the obtaining of a

22   temporary restraining order and preliminary injunction is

23   that the party that is asking for it must demonstrate,

24   first, irreparable harm, and, second, either likelihood of

25   success on the merits or sufficiently serious questions

Decision

1   going to the merits to make a fair ground for litigation and

2   a balance of hardships tipping decidedly toward the party

3   requesting the preliminary relief.

4         The good thing about this complicated standard is

5   that it guarantees that no one but lawyers will fully

6   understand anything else that is said in these proceedings.

7         The Court is therefore required to first address

8   whether there is irreparable harm.

9         In essence, the harm that is being asserted is

10   non-economic in nature, but very immediate in nature.  It is

11   the deprivation of the opportunity of these players to play

12   in a critical play-off game that they realistically and

13   reasonably view as very important in their overall careers

14   and life goals.

15         Were it purely a question of psychological harm,

16   I would be somewhat hesitant to hold this makes out a case

17   of irreparable harm.  One can suppose that some high school

18   seniors who are deprived because of what they view as

19   improper discipline from going to their senior prom -- this

20   shows my age, because I do not even know if there are still

21   senior proms -- that someone in that situation would quite

22   possibly feel very severe psychological harm that I am not

23   sure would give rise to the irreparable harm of the sort

24   required by the standard.  But as I indicated earlier today

25   in the question about the Olympics, there is an objective

NBPA000174

Decision

1   component here as well, and no one can for a moment pretend

2   that this game and games that are coming up in the play-offs

3   are just another game.  It also is apparent to me from

4   reading the parties' papers that the defendants do not make

5   any serious challenge to the claim of irreparable harm.  So

6   I conclude that on the first prong the plaintiffs have made

7   out their demonstration of irreparable harm.

8        So we then come to the multi-bifurcated second

9   prong of showing either a likelihood of success on the

10  merits or the two-part showing that there are sufficiently

11  serious questions going to the merits to make a fair ground

12  for litigation and a balance of hardships tipping decidedly

13  toward the party requesting the preliminary relief.

14       For reasons that I will get to in a minute, I do

15  not think there is a showing of likelihood of success on the

16  merits.  So we turn to the alternative of sufficiently

17  serious questions going to the merits to make a fair ground

18  for litigation and a balance of hardships tipping decidedly

19  toward the party requesting the preliminary relief.

20       Taking up the second part of that initially, the

21  balance of hardships, I find that to be a somewhat close

22  question.  There is no doubt that the defendants will suffer

23  some hardship in not being able to swiftly enforce

24  discipline, pursuant both to their overall arrangements that

25  discipline should be swiftly enforced, particularly for

NBPA000175

75gnewin

Decision

1    on-court infractions, and also more particularly pursuant to

2    the so-called "blanket rule" that is in issue here.

3            Nevertheless, the hardship to the defendants from

4    this particular requested order is not all that severe in

5    terms of those long-term goals because the essence of the

6    challenge goes not to the right to impose discipline or to

7    impose it swiftly, but to the particular viability of this

8    particular rule without the agreement of the players, and if

9    that challenge -- which could be resolved by an arbitrator

10   presumably in a matter of a few days -- were to fail, then

11   forever after that rule would be in place and discipline

12   would be promptly visited for infractions in accordance with

13   the terms of the rule.

14           In other words, nothing about the requested TRO,

15   in the Court's view, would have meaningful long-term

16   implications for the ability of the League to visit

17   punishment swiftly for on-court infractions that indeed, for

18   reasons alluded to earlier in the argument, must in

19   appropriate cases be dealt with swiftly.

20           By contrast, the hardship to the plaintiffs is of

21   more severe consequence because although this Court is

22   sufficiently parochial to wish that the Knicks would be in

23   every play-off game in every level in every season, one

24   cannot assume that that will always be the case.

25           So on balance I find that the plaintiffs have

NBPA000176

1    made out the portion of the prong, the subpart of the text

2    that we are now dealing with, namely, that they have

3    demonstrated that the balance of hardships tips decidedly

4    toward them in requesting the preliminary relief.

5        We reach, therefore, the question of the merits,

6    sort of, in the funny and oblique and indirect way that

7    merits get reached in TRO-type situations.

8        The real question that one has to look at in that

9    regard is whether the challenge to the blanket rule raised

10    here by plaintiffs is something that the parties have agreed

11    to arbitrate or, even more precisely, whether there are

12    sufficiently serious questions about that issue to make it a

13    fair ground for litigation.

14        If it is not a matter open to arbitration, then,

15    number one, an injunction would not issue at all because we

16    would be under the anti-injunction statute rather than under

17    the arbitration exception to it, and, number two, the

18    plaintiffs would not have shown sufficiently serious

19    questions going to the merits to make a fair ground for

20    litigation let alone likelihood of success on the merits.

21        I am mindful, by the way -- as a sidelight

22    here -- that defendants have argued that the blanket rule

23    really was not invoked, that it was a determination case by

24    case on the merits that the blanket rule was only part of;

25    but I think that is itself a little bit in issue.

NBPA000177

75 gnewin

Decision

1   Defendants themselves argued in a different context that the

2   plaintiffs had to be on notice of the so-called blanket

3   rule, because there have been 22 or so cases, they allege,

4   in which the rule has been invoked and in effect followed.

5   I think it is a reasonable inference that plaintiffs could

6   argue that that is all that was involved here.

7          Now I suppose I should pause here and say what

8   the parties are referring to by the "blanket rule." It is a

9   sub, sub, subpart of one of innumerable rules that are part

10  of what are called the "Official Rules of the N.B.A.," and

11  although I have not been furnished by either side with the

12  entirety of those rules, I finally discovered that what

13  defendants had given me as Exhibit C to the affidavit of

14  Jeffrey Mishkin corresponds to what in his affidavit he

15  refers to as Exhibit 3, and that is a portion of the

16  official rules including the blanket rule. It states:

17         "During an altercation all players not

18  participating in the game must remain in the immediate

19  vicinity of their bench. Violators will be suspended

20  without pay for a minimum of one game and fined up to

21  $20,000. The suspensions will commence prior to the start

22  of the next game. The team must have a minimum of eight

23  players dressed and ready to play at every game. If five or

24  more players leave the bench, the players will serve their

25  suspensions alphabetically according to the first letters of

NBPA000178

1    their last name.  If seven players are suspended, assuming

2    the participants are included, four of them will be

3    suspended for the first game following the altercation.  The

4    remaining three will be suspended for the second game

5    following the altercation."

6              Now plaintiffs say that rule is in violation of

7    the anti-collusion provisions of the N.B.A. collective

8    bargaining agreement and that as such it must be subject to

9    arbitration because the anti-collusion provisions, with

10   certain carve outs, are subject to arbitration.  They point

11   in particular to Section 1 of Article 14 of the N.B.A.

12   collective bargaining agreement which, the overall article,

13   is entitled "Anti-collusion provisions."  Section 1 states:

14             "Subject to Section 2 below, no N.B.A. team, its

15   employees or agents will enter into a contract, combination

16   or conspiracy, express or implied, with the N.B.A. or any

17   other N.B.A. team, their employees or agents:

18             (a)  to negotiate or not to negotiate with any

19   veteran or rookie;

20             (b)  to offer or not to offer a player contract

21   to any free agent;

22             (c)  concerning the terms or conditions of

23   employment offered to any veteran or rookie."

24             Now read on its face it seems rather doubtful

25   that this has anything to do with the blanket rule.  First

Decision

1   of all, it is directed not to the Commissioner's office, but

2   to N.B.A. teams, their employees and agents.  It talks in

3   language drawn from antitrust law about contracts,

4   combinations or conspiracies.  It talks about negotiations,

5   offers, things of that sort, conditions of employment.

6       It seems on its face clearly, or at least

7   certainly primarily, directed at collusion in the signing up

8   of players, negotiation of terms with players, things of

9   that kind.  But plaintiffs say, well, one of the carve outs,

10  which is Section 2E, states that any action taken by the

11  N.B.A. League office to exclude from the League, suspend or

12  discipline any player for reasons involving gambling, drugs

13  or the commission of a crime will not be subject to the

14  requirements of the anti-collusion provisions.  They say by

15  negative inference that suggests that any action taken by

16  the N.B.A. League office to discipline any player for other

17  reasons is subject to the anti-collusion provisions.

18      It is a clever argument.  I think one would

19  ultimately find it unpersuasive in that the more natural

20  sense of the carve out is simply to say that if people go

21  around signing up players or negotiating with them, they

22  better not be signing up crooks.  The N.B.A. reserves the

23  right to make sure that that is never done, and the section

24  does not really speak one way or the other to the issue that

25  the plaintiffs are raising.

SOUTHERN DISTRICT REPORTERS (212) 805 ----

NBPA000180

Decision

1          I say, in finding that that argument in and of

2   itself would not be sufficient to show that plaintiffs have

3   established a likelihood of success on the merits, I think

4   if it were all that were involved in this contract perhaps

5   it might arguably make out sufficiently serious questions

6   going to the merits to make a fair ground for litigation,

7   especially since in the context of whether or not something

8   is arbitral the law of the United States has always been,

9   for many years now, to tilt in favor of arbitration wherever

10  it reasonably can be inferred.  But that is not by any means

11  all that is involved in this collective bargaining

12  agreement.

13          We have an article, Article 31, which is the

14  natural place anyone would look to see if something is

15  arbitrable or not, because it is entitled "Grievance and

16  Arbitration Procedure;" and among other pertinent things

17  Section 8 of that article, entitled "Special Procedures with

18  Respect to Player Discipline," states that "Any dispute

19  involving a fine or suspension imposed upon a player by the

20  Commissioner or his designee for conduct on the playing

21  court shall be processed exclusively as follows:"  And then

22  it sets forth provisions that do not include reference to

23  the arbitrators.

24          Plaintiffs argue that this refers to in effect

25  the Commissioner's quasi judicial functions of determining

SOUTHERN DISTRICT REPORTERS (212) 805-0300

NBPA000181

1    on a case-by-case basis with reference to all its

2    particularities whether there has been any

3    on-the-playing-court violation, but does not deal with the

4    question of whether he can propound without compliance with

5    the anti-collusion provisions a blanket rule and then, as

6    they would argue, apply it automatically in the

7    circumstances of this case.  I think that is far too fine

8    spun an argument in the face of language that is so plain,

9    so clear, so unequivocal and so on point to the dispute that

10    underlies this controversy.

11         If there were intended to be the limitation that

12    plaintiffs argue for, it would have been set forth right

13    there in Section 8, one would have supposed.  So if one

14    plays the game of negative inference, which this court

15    believes is in any case not a very solid way of reasoning,

16    it would cut here in defendants' favor just as in the

17    previous section it cut in the plaintiffs' favor.  I think

18    much more to the point is the unequivocal language of this

19    provision.

20         Accordingly, the Court finds that not only have

21    the plaintiffs failed to show a likelihood of success on the

22    merits, they have not even demonstrated against the very,

23    very modest standard required in the arbitration law context

24    that they have sufficiently serious questions going to the

25    merits to make a fair ground for litigation.

NBPA000182

Decision

1          Accordingly, the Court will deny the preliminary

2   injunction.

3          Ladies and gentlemen, I have another matter that

4   is important to the litigants, and it may not matter to

5   anyone else, but I am going to have to take that up.  I ask

6   everyone to clear the court except for the people that

7   should be here.

8                      o0o

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

NBPA000183