National Basketball Association v. National Basketball Players Association et al
Case 1:04-cv-09528-GBD    Document 12    Filed 12/29/2004    Page 1 of 34
Doc. 12

DEWEY BALLANTINE LLP
Jeffrey L Kessler (JK 7891)
David G. Feher (DF 4867)
Allan L. Garcia
Jeffrey S. Rugg
1301 Avenue of the Americas
New York, New York 10019-6092
Tel: (212) 259-8000

NATIONAL BASKETBALL PLAYERS ASSOCIATION
Ronald E. Klempner
Hal Biagas
Two Penn Plaza, Suite 2430
New York, New York 10121

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-----------------------------------------------------------------x
NATIONAL BASKETBALL ASSOCIATION          :
                                         :
                Plaintiff,               :
                                         :
        v.                               :      04 Civ. 09528 (GBD)
                                         :
NATIONAL BASKETBALL PLAYERS              :
ASSOCIATION, RON ARTEST, STEPHEN         :
JACKSON, ANTHONY JOHNSON and             :
JERMAINE O'NEAL                          :
                                         :
                Defendants.              :
-----------------------------------------------------------------x


**MEMORANDUM OF LAW IN SUPPORT OF DEFENDANTS' MOTION TO
CONFIRM ARBITRATION AWARD AND IN OPPOSITION TO PLAINTIFF'S
MOTION TO VACATE**

Dockets.Justia.com

## TABLE OF CONTENTS

**Page**

PRELIMINARY STATEMENT ................................................................ 1

BACKGROUND ................................................................................. 4

    The Agreement To Arbitrate ........................................................ 4

    Arbitrator Kaplan's Industry Experience ....................................... 5

    The Proceedings Before Arbitrator Kaplan .................................... 5

ARGUMENT .................................................................................... 7

I.     THE GRIEVANCE ARBITRATOR'S DETERMINATION OF THE
       PROCEDURAL QUESTION OF WHICH ARBITRATOR SHOULD HEAR
       THE APPEAL OF THE PLAYERS' SUSPENSIONS IS SUBJECT TO
       DEFERENTIAL REVIEW .......................................................... 7

II.    THE GRIEVANCE ARBITRATOR CORRECTLY DECIDED THAT HE
       WAS THE PROPER ARBITRATOR TO DECIDE THE DISCIPLINARY
       APPEAL ............................................................................ 20

      A.    The Grievance Arbitrator Correctly Decided That He Has
           Jurisdiction Under The CBA To Review Commissioner Discipline
           Imposed On A Player To Protect The "Integrity Of The Game,"
           Under Article 35(d) Of The NBA Constitution That Has A Financial
           Impact Greater Than $25,000 ............................................... 20

      B.    The Grievance Arbitrator Correctly Decided He Has Jurisdiction
           Over The Arbitral Appeal Because It Concerned A Riot With Fans
           And Others, Outside Of The Game, And Thus Did Not Involve
           "Conduct On The Playing Court" ........................................... 23

CONCLUSION ................................................................................. 32

## PRELIMINARY STATEMENT

Defendants Jermaine O'Neal and the National Basketball Players Association ("NBPA") (collectively "Defendants") respectfully submit this memorandum of law in support of their motion, pursuant to the Labor Management Relations Act, 29 U.S.C. § 185, and the Federal Arbitration Act, 9 U.S.C. § 9, to confirm the December 21, 2004 Opinion and Award (the "Award") of Grievance Arbitrator Roger P. Kaplan, and in opposition to the cross-motion to vacate the Award by the plaintiff herein, the National Basketball Association ("NBA").[1]

As this Court knows, "the confirmation of an arbitration award is a summary proceeding that merely makes what is already a final arbitration award a judgment of the court." Florasynth, Inc. v. Pickholz, 750 F.2d 171, 176 (2d Cir. 1984). Moreover, "in reviewing an arbitrator's decision, with regard to factual findings there shall be a presumption, rebuttable only by a clear preponderance of the evidence, that the findings of fact made by the arbitrator are correct when ultimately deciding whether to confirm an arbitration award. District courts are not authorized to second-guess arbitrators' decisions if those decisions are properly within the arbitrator's jurisdiction and within their power and authority." Decision Granting TRO in this Action, Transcript of Proceedings ("TRO Tr."), dated December 22, 2004 (SKA-18), at 103.

In these cross-motions, the only issue for the Court to decide is whether the Grievance Arbitrator properly concluded that he had the arbitral authority to hear the appeals of the suspensions reviewed in the Award. In making this determination, the Court should give deference to the findings of the arbitrator, since the issue before him – whether the Grievance Arbitrator or Commissioner Stern had arbitral jurisdiction – is a procedural determination, based upon a finding of the factual predicates for Grievance Arbitrator review set forth in the collective bargaining agreement between the NBA and the NBPA, dated January 20, 1999 ("CBA"). As such, their "final disposition are presumptively not for the judge but for an arbitrator to decide."

---

[1] The Award is attached as Exhibit 10 to the Affirmation of Ronald Klempner, dated December 23, 2004 ("KA-10"), and is also submitted herewith as Exhibit A. The Award is comprised of the Opinion Arbitrator Kaplan issued on December 21 and an earlier decision on his authority to decide the arbitrability issue that was incorporated into the Award by reference in the December 21 Opinion. The Klempner Affirmation was submitted in support of defendants' motion for a TRO, and defendants request that the Klempner Affirmation be included in the record on this motion. Submitted herewith is a Second Affirmation of Ronald Klempner, dated December 29, 2004 ("SKA"), which covers various matters and documents not included in the initial declaration.

TRO Tr. at 103. However, even if this Court were to determine that this is an issue for de novo review by the Court, the presumption of arbitrability would still apply "unless it may be said with positive assurance that the arbitration clause is not susceptible of an interpretation that covers the asserted dispute. Doubts should be resolved in favor of coverage." AT&T Technologies, Inc. v. Communications Workers of Am., 475 U.S. 643, 650 (1986) (citations omitted); NBA v. NBPA, No. 98 Civ. 4912 (BSJ), Transcript dated July 30, 1998, at 54-55 (S.D.N.Y.) (Judge Barbara Jones) (KA-4). As the Supreme Court recently made clear, where, as here, the arbitrability determination turns upon an interpretation of an industry rule, "in the absence of any statement to the contrary in the arbitration agreement," the arbitrability issue is to be determined by the arbitrator who is "comparatively more expert about the meaning" of the rule. Howsam v. Dean Witter Reynolds, Inc., 537 U.S. 79, 85 (2002). Applying these principles, it is clear that the Award should be confirmed.

Specifically, since the CBA was amended in September 1995, the Grievance Arbitrator has clearly had jurisdiction to review any "action taken by the Commissioner (or his designee) concerning (i) the preservation of the integrity of, or the maintenance of public confidence in, the game of basketball, and (ii) a fine and/or suspension that results in a financial impact to the player of more than $25,000." CBA, Article XXXI, §§ 5(c), 8, 13 & 14 (c) (KA-1, at 217, 219-20 & 223). In this case, the Grievance Arbitrator has made factual findings that both of these predicates to his arbitral jurisdiction exists (Award at 14-16) and the Court must give deference to those findings. See Howsam, 537 U.S. at 85; Green Tree Financial Corp. v. Bazzle, 539 U.S. 444, 452-53 (2003).

The only serious argument the NBA advances in opposition to the above conclusion is its claim that the Commissioner has exclusive jurisdiction to hear any appeal of the discipline, pursuant to Article XXXI, Section 8, because the suspensions at issue were for "conduct on the playing court." However, as the Grievance Arbitrator found after a review of the evidence, "the suspensions of Artest, Jackson, Johnson and O'Neal were not for 'conduct on the playing court' as set forth in Article XXXI, Section 8." Award at 18.

Based on his detailed knowledge of the CBA and the industry, the Grievance Arbitrator found that "the confrontation between players and fans, spectators and even arena personnel [which was the subject of the discipline at issue] is distinctly different from the type of 'on court' or 'in the game' conduct such as flagrant fouls, fights between players, hard picks, elbows and confronting referees," which must be appealed to the Commissioner. Award at 16.

Indeed, Arbitrator Kaplan correctly found that when the parties to the CBA wanted to use more expansive language to cover a broader array of player conduct – as they did in Paragraph 19 of the Uniform Player Contract and Article 35(d) of the NBA Constitution – they knew how to do so, but clearly did not do this in Article XXXI, Section 8. Award at 17. This is exactly the type of specialized determination of what was the intent of the parties to an ambiguous CBA that is most appropriate for resolution by the labor arbitrator chosen by the parties and for deferential review by the courts.

In this connection, it is significant that neither party to the CBA is advocating a literal, geographic interpretation of the words "on the playing court." The NBA claims that these words should be interpreted to mean any conduct "at or during an NBA game" and would include, for example, any conduct by a player in the stands, in the locker room, or even in the arena garage – which is not even close to the physical "playing court."[2] This is why the NBA is seeking to vacate even that portion of the Award that sustains the suspensions of Mr. Jackson and Mr. Artest for conduct that was clearly in the stands and far removed from the physical playing court. Defendants, on the other hand, contend that the words "conduct on the playing court" are meant to apply only to conduct which occurs as part of the "playing" of the game (such as flagrant fouls, fights between players, confronting referees, etc.), so that the Commissioner has exclusive, arbitral authority over only that conduct which is part of regulating the playing of the game itself. This is not to say that the Commissioner cannot impose discipline for other player behavior that threatens the integrity of, or maintenance of public confidence in, the game of basketball. He may do so under Article 35 (d) and (e) of the NBA Constitution. However, that discipline is subject to appellate review by the Grievance Arbitrator pursuant to the 1995 amendments to the CBA. It is in precisely this type of case, where neither party is asking for a literal interpretation of the words of a CBA and both sides are arguing for competing industry-specific interpretations, that deference to the findings of the labor arbitrator is mandated. To the extent the parties disagree on the meaning or content of their past industry practices, the Court must defer to the Grievance Arbitrator's findings that the parties' past practice establishes that this is a case of "first

---

[2] Plaintiffs' Memorandum of Law In Opposition To Defendants' Motion To Enjoin The National Basketball Association From Continued Enforcement Of Player Suspensions, dated December 22, 2004 ("NBA TRO Br."), at 21-24.

impression," and that the suspensions at issue were not for conduct "on the playing court," as the parties have used those terms in Article XXXI, Section 8 of the CBA.

In sum, whether a standard of deferential or de novo review is applied, the Award should be confirmed. As the Grievance Arbitrator found, "the genesis of the altercation occurred when a spectator threw a cup of liquid on Artest while he was off the court and lying on a table." Award at 16-17. The entire riot among players, fans, arena personnel and others that subsequently transpired in the stands and elsewhere in the arena thus did not occur as part of the game that had been played, and was not conduct "on the playing court" as those terms are used in the CBA. Instead, this was a classic example of conduct that was disciplined by the Commissioner because it involved "the maintenance of public confidence in the game of basketball" and thus was subject to appeal to the Grievance Arbitrator so long as it had a financial impact on the players of more than $25,000, which it indisputably did here.

## BACKGROUND

### The Agreement To Arbitrate

In 1999, the NBA and the NBPA agreed upon a CBA that will not expire until July 1, 2005. That CBA provides for the appointment of a Grievance Arbitrator, in Article XXXI of the CBA, and includes a provision defining the scope of the Grievance Arbitrator's jurisdiction in extremely broad terms: "Any dispute (such dispute hereinafter being referred to as a 'Grievance') involving the interpretation or application of, or compliance with, the provisions of this Agreement or the provisions of a Player Contract . . . shall be resolved exclusively by the Grievance Arbitrator in accordance with the procedures set forth in this Article . . . ." CBA, Article XXXI, § 1(a) (KA-1, at 213). Moreover, each Uniform Player Contract ("UPC") in the NBA, which is an Appendix to and part of the CBA, also has a very broad arbitration clause which provides that "[i]n the event of any dispute arising between the Player and the Team relating to any matter arising under this Contract, or concerning the performance or interpretation thereof (except for a dispute arising under paragraph 9 hereof [relating to injunctive relief to prevent a player from playing for anyone other than the team]), such dispute shall be resolved in accordance with the Grievance and Arbitration Procedure set forth in the NBA/NBPA Collective Bargaining Agreement." Uniform Player Contract, ¶ 17 (KA-1, at A-16) (emphases added).

4

Further, Sections 5(c), 13 and 14(c) of Article XXXI of the CBA specifically refer to the Grievance Arbitrator's jurisdiction to review player discipline imposed by the Commissioner:

> In any Grievance that involves an action taken by the Commissioner (or his designee) concerning (i) the preservation of the integrity of, or the maintenance of public confidence in, the game of basketball, and (ii) a fine and/or suspension that results in a financial impact to the player of more than $25,000, the Grievance Arbitrator shall apply an "arbitrary and capricious" standard of review.  (Section 5(c))

> A fine or suspension imposed by the Commissioner shall be appealable to the Grievance Arbitrator only if it results in a financial impact on the player of more than $25,000.  (Section 13)

> The parties recognize that a player may be subjected to disciplinary action for just cause by his Team or by the Commissioner (or his designee).  Therefore, in Grievances regarding discipline, the issue to be resolved shall be whether there has been just cause for the penalty imposed.  (Section 14(c))

(KA-1, at 217, 223).

Finally, Paragraph 5(d) of the Uniform Player Contract, attached as an Appendix to the CBA, provides as follows:

> The Player acknowledges that the Commissioner is empowered to impose fines upon and/or suspend the Player for causes and in the manner provided in [Article 35 of the NBA Constitution], provided that such fines and/or suspensions are consistent with the terms of the NBA/NBPA Collective Bargaining Agreement.

(KA-1, at A-4).

## Arbitrator Kaplan's Industry Experience

Arbitrator Roger Kaplan was appointed as Grievance Arbitrator by agreement of the NBA and the NBPA in December 1999.  He has been the only Grievance Arbitrator under the 1999 CBA and has extensive experience in both arbitrating disputes in the NBA and disputes in other professional sports in which he has served as an arbitrator (including the National Football League and Major League Baseball).  KA ¶¶ 6-9.

## The Proceedings Before Arbitrator Kaplan

The arbitration at issue in this case was commenced on November 22, 2004.  The NBA declined to participate in the proceedings with respect to the Grievance Arbitrator's jurisdiction, but submitted various correspondence asserting that the arbitrator did not have jurisdiction over the underlying dispute and did not have jurisdiction to determine whether the Grievance Arbitrator or Commissioner Stern should hear the NBPA's appeal.  The proceedings

before Arbitrator Kaplan are summarized in more detail in the Award. Award at 2-5; see also KA ¶¶ 12-25. On December 3, 2004, Arbitrator Kaplan issued a decision, which held that:

> [I]t is clear that the parties have an arbitration process in place, which must be followed. Without further evidence, I do not believe that the parties intended that if the NBA raised any arbitrability issue challenging the Grievance Arbitrator's right to hear the dispute, this alone, would preclude arbitration. Therefore, under the terms of the CBA, the hearing will either be held before Commissioner Stern or before the Grievance Arbitrator. Notwithstanding the provisions of Article XXXI, Section 5(b), I find that the broad arbitration clauses contained in Article XXXI, Section 1 of the CBA and paragraph 17 of the Uniform Player Contract, warrant a finding that I have jurisdiction to determine whether the arbitrability issue raised by the NBA is meritorious.

KA-7, at 4-5 (emphasis added).

Also, on December 3, 2004, the NBA filed its Complaint in this action, alleging that the Grievance Arbitrator did not have jurisdiction over this dispute. On December 5, in a letter to the Court, the NBA announced that it would not seek a stay of the arbitration proceedings scheduled before the Grievance Arbitrator. On December 6, the NBA advised the Grievance Arbitrator that it would not appear before the Grievance Arbitrator at the hearing and that it would not participate in the Grievance Arbitrator's consideration of his jurisdiction or the merits of the arbitration.

The Grievance Arbitrator conducted the hearing on December 9, 2004, for a full day. Transcript, KA-9. The NBA refused to participate. The Grievance Arbitrator first heard argument concerning the arbitrability of the dispute before him, and then heard argument and testimony regarding the merits of the grievance. The NBPA presented six witnesses and entered 56 items of evidence. Id. The NBPA also presented the Grievance Arbitrator with a 40 page Pre-Hearing Brief. KA ¶ 22. At the hearing, the Grievance Arbitrator took various steps "to ensure that arbitral principles and fairness prevailed" even though the NBA refused to participate. Award at 14.

On December 14, 2004, the Grievants presented the Grievance Arbitrator with a 29 page Post-Hearing Brief. The NBA has been presented with numerous opportunities to participate in the Grievance and to present testimony, evidence and argument to the Grievance Arbitrator. In addition, the NBA has been provided with Grievants' Pre- and Post-Hearing briefs, a copy of all exhibits in the Arbitration, and a copy of the transcript of the December 9, 2004 hearing. KA ¶¶ 23-24.

On December 21, 2004, the Grievance Arbitrator issued the Award, holding that the Grievance Arbitrator, not Commissioner Stern, has arbitral jurisdiction to decide the merits of the appeal and that the NBA lacked just cause to impose its 25 game suspension on Mr. O'Neal. The other three suspensions imposed by the Commissioner, including the rest-of-season and post-season suspension for Mr. Ron Artest, were sustained. The Grievance Arbitrator reduced the suspension of Mr. O'Neal to 15 games and ordered that such relief be "implemented forthwith." Award at 27. The 15th game of Mr. O'Neal's suspension took place on December 22, 2004. However, the NBA refused to comply with the Arbitrator's decision, and the NBPA and Mr. O'Neal were thus forced to file a counterclaim in this action to confirm the Award and seek preliminary and permanent injunctive relief requiring the NBA to comply with the terms of the Award. On December 23, 2004, this Court granted Mr. O'Neal and the NBPA the requested Temporary Restraining Order, lifting his suspension. TRO Tr. at 104. The Court then set an expedited schedule for consideration of confirmation of the Award, in support of which this memorandum is submitted.

## ARGUMENT

**I.    THE GRIEVANCE ARBITRATOR'S DETERMINATION OF THE PROCEDURAL QUESTION OF WHICH ARBITRATOR SHOULD HEAR THE APPEAL OF THE PLAYERS' SUSPENSIONS IS SUBJECT TO DEFERENTIAL REVIEW**

It is well established that "courts must grant an arbitration panel's decision great deference. A party petitioning a federal court to vacate an arbitral award bears the heavy burden of showing that the award falls within a very narrow set of circumstances delineated by statute and case law. The [Federal Arbitration Act] sets forth certain grounds upon which a federal court may vacate an arbitral award, but 'all of [these] involve corruption, fraud, or some other impropriety on the part of the arbitrators.'" Wallace v. Buttar, 378 F.3d 182, 189 (2d Cir. 2004) (citations omitted). "[T]he confirmation of an arbitration award is a summary proceeding that merely makes what is already a final arbitration award a judgment of the court." Florasynth, Inc. v. Pickholz, 750 F.2d 171, 176 (2d Cir. 1984).[3]

---

[3] The Second Circuit "recognize[s] only the doctrine of manifest disregard of the law," and "does not recognize manifest disregard of the evidence as proper ground for vacating an arbitrator's award." Wallace, 378 F.3d at 193 (citations omitted); id. at 192 ("if a federal court is convinced that an arbitral panel has reached a merely incorrect legal result -- that is based upon an irrational application of a controlling legal principle – the court should not conduct an independent review ...(continued)

When, as here, an arbitration award has been made pursuant to a collectively bargained for grievance procedure, the Supreme Court has held that "[c]ourts are not to usurp those functions which collective bargaining contracts have properly 'entrusted to the arbitration tribunal, . . . but should defer to the tribunal chosen by the parties finally to settle their disputes." Hines v. Anchor Motor Freight, Inc., 424 U.S. 554, 562-63 (1976). "Courts are not authorized to review the arbitrator's decision on the merits despite allegations that the decision rests on factual errors or misinterprets the parties' agreement." Major League Baseball Players Ass'n v. Garvey, 532 U.S. 504, 509 (2001) (emphasis added; citation omitted).

Moreover, "[t]he labor arbitrator's source of law is not confined to the express provisions of the contract, as the industrial common law – the practices of the industry and the shop – is equally a part of the collective bargaining agreement although not expressed in it. The labor arbitrator is usually chosen because of the parties' confidence in his knowledge of the common law of the shop and their trust in his personal judgment to bring to bear considerations which are not expressed in the contract as criteria for judgment. . . . The ablest judge cannot be expected to bring the same experience and competence to bear upon the determination of a grievance, because he cannot be similarly informed." United Steel Workers of Am. v. Warrior & Gulf Navigation Co., 363 U.S. 574, 581-82 (1960).

In short, since the NBA is not alleging corruption or any of the other extremely narrow statutory grounds for setting aside an arbitration award, the Award must be confirmed unless the NBA can overcome the substantial deference afforded to arbitration awards and convince this Court that the dispute was not within the arbitrator's jurisdiction. The NBA cannot meet this heavy burden.

---

...(continued)
of the factual record presented to the arbitral panel in order to achieve the 'correct' result") (emphasis added). And, "[a]n arbitral award may be vacated for manifest disregard of the law 'only if "a reviewing court . . . finds[s] both that (1) the arbitrators knew of a governing legal principle yet refused to apply it or ignored it altogether, and (2) the law ignored by the arbitrators was well defined, explicit, and clearly applicable to the case."'" Id. at 189. A manifest disregard of the law is a "severely limited" doctrine and is reserved for only "those exceedingly rare instances where some egregious impropriety on the part of the arbitrators is apparent." Id. (citation omitted). A court may not even presume that an arbitrator has any knowledge of the law, or that he or she is "capable of understanding and applying legal principles with the sophistication of a highly skilled attorney." Id. at 190. And, "arbitrators are not required to provide an explanation for their decision." Id. (citation omitted).

The NBA's challenge to the authority of the Grievance Arbitrator to determine whether the issue is arbitrable before him is a replay of the NBA's failed effort before Judge Barbara Jones in 1998 to prevent another labor dispute with the NBPA from being arbitrated. NBA v. NBPA, No. 98 Civ. 4912 (BSJ), Transcript dated July 30, 1998, at 53-54 (S.D.N.Y.) (KA-4). As Judge Jones explained in that case, the provisions of the NBA CBA contain extremely broad arbitration clauses which support a presumption that the arbitrator has the authority to determine his own jurisdiction:

> The players' contracts pursuant to which the arbitration was noticed provide for arbitration of "any dispute arising between a player and the team relating to any matter arising under this contract or concerning the performance or interpretation thereof."
>
> This is the prototypical broad arbitration clause, and I don't think I have to cite to you generally to the authorities [as to the impact of such a clause]. . . .
>
> I do note that the [NBA] made an argument that this broad clause was somehow narrowed by a provision of the CBA – I believe it was Article 31 section 5 (b). I have read that provision. I don't believe that it is relevant, and, moreover, it is not in the scope section with respect to the arbitration, but rather in the decisions and awards section. So I continue to believe, having read the document, this is the broadest possible type of arbitration provision.
>
> As such, there is, of course, a presumption of arbitrability which can only be overcome by clear evidence that the dispute in question falls outside the arbitration clause. . . .

Id. at 54-55 (emphasis added).

The text of the 1999 CBA contains the same broad arbitration clauses that were before Judge Jones. For example, the CBA provision defining the scope of the Grievance Arbitrator's jurisdiction reads as follows: "Any dispute (such dispute hereinafter being referred to as a 'Grievance') involving the interpretation or application of, or compliance with, the provisions of this Agreement or the provisions of a Player Contract . . . shall be resolved exclusively by the Grievance Arbitrator in accordance with the procedures set forth in this Article . . . ." CBA, Article XXXI, § 1(a) (KA-1, at 213). Similarly, the Uniform Player Contract, which is part of the CBA, has a very broad arbitration clause that provides that "in the event of any dispute arising between the Player and the Team relating to any matter arising under this Contract, or concerning the performance or interpretation thereof (except for a dispute arising under paragraph 9 hereof [relating to injunctive relief to prevent a player from playing for anyone other than the team]), such dispute shall be resolved in accordance with the Grievance and Arbitration Procedure set

9

forth in the NBA/NBPA Collective Bargaining Agreement." UPC, ¶ 17 (KA-1, at A-16) (emphases added).

It is well settled that these types of extremely broad arbitration clauses make virtually any action challenging conduct under the CBA arbitrable. See, e.g., Vera v. Saks & Co., 335 F.3d 109, 117 (2d Cir. 2003) ("The language in the CBA, requiring arbitration of '[a]ny dispute, claim, grievance or difference arising out of or relating to this agreement . . .' constitutes a broad arbitration clause."); Ace Capital Re Overseas Ltd. v. Central United Life Ins. Co., 307 F.3d 24, 26 (2d Cir. 2002). "If a court concludes that a clause is a broad one, then it will order arbitration and any subsequent construction of the contract and of the parties' rights and obligations under it are within the jurisdiction of the arbitrator." McDonnell Douglas Fin. Corp. v. Pennsylvania Power & Light Co., 858 F.2d 825, 832 (2d Cir. 1988) (emphasis added). Indeed, the Second Circuit has held that, with such a broad arbitration clause, even if "the dispute is in respect of a matter that, on its face, is clearly collateral to the contract, then a court should test the presumption by reviewing the allegations underlying the dispute and by asking whether the claim alleged implicates issues of contract construction or the parties' rights and obligations under it. If the answer is yes, then the collateral dispute falls within the scope of the arbitration agreement . . . ." Collins & Aikman Prods. Co. v. Bldg. Sys., Inc., 58 F.3d 16, 23 (2d Cir. 1995) (emphasis added).

When a broad arbitration clause exists, any doubts regarding the arbitrability of a dispute must be resolved in favor of arbitration. As the U.S. Supreme Court has stated:

> [I]t has been established that where the contract contains an arbitration clause, there is a presumption of arbitrability in the sense that "[a]n order to arbitrate the particular grievance should not be denied unless it may be said with positive assurance that the arbitration clause is not susceptible of an interpretation that covers the asserted dispute. Doubts should be resolved in favor of coverage." Such a presumption is particularly applicable where the clause is as broad as the one employed in this case, which provides for arbitration of "any differences arising with respect to the interpretation of this contract or the performance of any obligation hereunder."

AT&T Technologies, Inc. v. Communications Workers of Am., 475 U.S. 643, 650 (1986) (citations omitted; emphases added). Indeed, "federal policy 'requires [courts] to construe arbitration clauses as broadly as possible,'" David L. Threlkeld & Co., Inc. v. Metallgesellschaft Ltd. (London), 923 F.2d 245, 250 (2d Cir. 1991) (citations omitted; emphasis added), and "any doubts concerning the scope of arbitrable issues should be resolved in favor of arbitration."

<u>Moses H. Cone Mem'l Hosp.</u> v. <u>Mercury Constr. Corp.</u>, 460 U.S. 1, 24-25 (1983) (emphasis added).

      Where, as here, an arbitration clause is broad, it inherently includes the authority of the arbitrator to rule upon his own jurisdiction:

> The language of the CBA suggests that the present dispute is arbitrable on its face. While establishing separate procedures for the resolution of jurisdictional disputes [regarding which employee group is entitled to do certain work], Article IV makes clear that all grievances or disputes arising "over the interpretation or application of the terms" of the CBA are to be settled under the standard grievance procedures of Article VI. Furthermore, the subcontracting article provides that "[a]ny dispute involving this Article" must be resolved under these grievance procedures. <u>These are broad rather than narrow arbitration provisions.</u> The present dispute comes within both of them . . . . We are presented with a dispute over the interpretation of the CBA's substantive provision, and Article IV subjects such disputes to arbitration. Thus, we cannot say "with positive assurance that the arbitration clause is not susceptible of an interpretation that covers the asserted dispute." Warrior & Gulf Navigation Co., 363 U.S. at 582-83, 80 S.Ct. at 1353. <u>Under the terms of the CBA it was for the arbitrator to decide, in the first instance, whether the parties presented an arbitral contractual dispute or a nonarbitral jurisdictional one.</u>[4]

<u>Southern California Dist. Council of Laborers</u> v. <u>Berry Construction, Inc.</u>, 984 F.2d 340, 344 (9th Cir. 1993); <u>see</u> <u>also</u> <u>Teamsters United Parcel Service Nat'l Negotiating Comm.</u> v. <u>United Parcel Service, Inc.</u>, No. 92 Civ. 5162 (CSH), 1993 WL 277161, at *2-4 (S.D.N.Y. July 21, 1993) (dismissing complaint requesting that "this Court, rather than an arbitrator, should determine the scope of the National Grievance Committee's jurisdiction"); <u>Rochdale Village, Inc.</u> v. <u>Pub. Serv. Employees Union Local No. 80</u>, 605 F.2d 1290, 1295 (2d Cir. 1979) ("If a court finds that the parties have agreed to submit to arbitration disputes 'of any nature or character,' or simply 'any and all disputes,' all questions . . . will be properly consigned to the arbitrator: 'With that finding the court will have exhausted its function, except to order the reluctant party to arbitration.'").

      Moreover, the U.S. Supreme Court has recently made it clear that the arbitrator, not the courts, should determine the arbitrability issue when that determination – as here – depends upon an interpretation of industry rules and where – as here – there is no express "statement to the contrary" in the arbitration agreement. <u>Howsam</u>, 537 U.S. at 85 ("<u>[T]he NASD arbitrators, comparatively more expert about the meaning of their own rule, are comparatively better able to interpret and to apply it.</u> In the absence of any statement to the contrary in the arbitration

---

[4] The reference in the quotation to a "jurisdictional dispute" was not a reference to the jurisdiction of the arbitrator, but to a dispute "between two or more groups of employees over which is entitled to do certain work" for the employer. <u>See</u> 984 F.2d at 342 n.2.

agreement, it is reasonable to infer that the parties intended the agreement to reflect that understanding . . . .") (emphasis added, citation omitted). The Supreme Court explained that "for the law to assume an expectation that aligns (1) decisionmaker with (2) comparative expertise will help better to secure a fair and expeditious resolution of the underlying controversy – a goal of arbitration systems and judicial systems alike." Id. In this case, as in Howsam, that alignment compels the conclusion that the Court should give deference to the Grievance Arbitrator's determination of the arbitrability issue, which was based upon his years of experience interpreting the CBA and the law of the shop in the NBA.

This Court stated, in issuing its TRO, that "[w]hat is solely determinative of this case is whether the grievance arbitrability is appropriate or whether the appeal lies solely to the commissioner. That issue is significantly tied to the question of whether [the players'] actions involved conduct on the playing court." TRO Tr. at 106 (emphasis added); see CBA, Art. XXXI, § 8. This is analogous to the issue addressed by the Supreme Court in Howsam, where the jurisdiction of the arbitrator turned on the meaning of an industry term, and the Court held that such a "procedural gateway" issue was best resolved by the arbitrator, not the courts. See Howsam, 537 U.S. at 86 ("Dean Witter notes the Code's time limit rule uses the word 'eligible.' That word, in Dean Witter's view, indicates the parties' intent for the time limit rule to be resolved by the court prior to arbitration. We do not see how that is so. For the reasons stated in Part II, *supra*, parties to an arbitration contract would normally expect a forum-based decisionmaker to decide forum-specific procedural gateway matters. And any temptation here to place special antiarbitration weight on the appearance of the word 'eligible' in the NASD Code rule is counterbalanced by a different NASD rule; that rule states that 'arbitrators shall be empowered to interpret and determine the applicability of all provisions under this Code.' NASD Code § 10324. Consequently, without the help of a special arbitration-disfavoring presumption, we cannot conclude that the parties intended to have a court, rather than an arbitrator, interpret and apply the NASD time limit rule.").[5]

In an effort to avoid the conclusion that this Court should apply deference in reviewing Arbitrator Kaplan's determination that the appeals of these suspensions should be

---

[5] See also TRO Tr. at 105 ("although, as the parties have argued, this is a collective bargaining case, not a basketball case, both sides recognize that the nature of this business involves other factors not involved in cases outside of the area in which this business is conducted").

before the Grievance Arbitrator as opposed to Commissioner Stern, the NBA claims that the CBA
prevents the Grievance Arbitrator from determining that he has jurisdiction over this grievance,
because it states that: "Nor, in the absence of agreement by the NBA and the Players Association,
shall the Grievance Arbitrator have jurisdiction or authority to resolve questions of substantive
arbitrability." CBA, Article XXXI, § 5. However, this provision supports the authority of the
Grievance Arbitrator to decide the issue before him in this case.

Specifically, this provision indicates that <u>only</u> issues of "substantive arbitrability"
are not within the otherwise extremely broad jurisdiction of the Grievance Arbitrator. Thus, there
can be no doubt that the parties intended all issues of <u>procedural</u> arbitrability, such as the factual
predicates to arbitration before the Grievance Arbitrator (as opposed to Commissioner Stern) to be
within the jurisdiction of the Grievance Arbitrator. <u>See</u>, <u>e.g.</u>, <u>Two Guys From Harrison-N.Y., Inc.</u>
v. <u>S.F.R. Realty Assocs.</u>, 472 N.E.2d 315, 318 (N.Y. 1984) (recognizing and applying doctrine of
<u>inclusio unius est exclusio alterius</u>, <u>i.e.</u>, the inclusion of one is the exclusion of another).

As the Supreme Court has stated:

> Just as the arbitrability of the merits of a dispute depends upon whether the parties agreed
> to arbitrate that dispute, *so the question "who has the primary power to decide
> arbitrability" turns upon what the parties agreed about that* matter. <u>Did the parties agree
> to submit the arbitrability question itself to arbitration?</u>  <u>If so, then the court's standard for
> reviewing the arbitrator's decision about *that* matter should not differ from the standard
> courts apply when they review any other matter that parties have agreed to arbitrate.</u>  <u>That
> is to say, the court should give considerable leeway to the arbitrator, setting aside his or her
> decision only in certain narrow circumstances.</u>

<u>First Options of Chicago, Inc.</u> v. <u>Kaplan</u>, 514 U.S. 938, 943 (1995) (emphasis added; citations
omitted). Given the broad arbitration clause in the CBA, and the very limited exclusion in
Article XXXI, Section 5 of the CBA relating only to "substantive" arbitrability, it must be
concluded that the parties <u>agreed</u> that any issues of procedural arbitrability are to be decided by the
Grievance Arbitrator. As to such issues, "<u>the court should give considerable leeway to the
arbitrator.</u>" 514 U.S. at 943 (emphasis added).

As this Court recognized in its TRO decision, procedural arbitrability issues "are
presumptively not for the judge but for an arbitrator to decide." (TRO Tr. at 103). This rule is
well-established in the case law:

> "[P]rocedural" questions which grow out of the dispute and bear on its final disposition"
> are presumptively *not* for the judge, but for an arbitrator, to decide. <u>John Wiley [& Sons,
> Inc. v. Livingston</u>, 376 U.S. 543, 557 (1964)] (holding that an arbitrator should decide
> whether the first two steps of a grievance procedure were completed, where these steps are

prerequisites to arbitration). So, too, the presumption is that the arbitrator should decide "allegation[s] of waiver, delay, or a like defense to arbitrability." [Moses H. Cone Memorial Hospital v. Mercury Constr. Corp., 460 U.S. 1, 24-25 (1983)]. Indeed, the Revised Uniform Arbitration Act of 2000 (RUAA), seeking to "incorporate the holdings of the vast majority of state courts and the law that has developed under the [Federal Arbitration Act]," states that an "arbitrator shall decide whether a condition precedent to arbitrability has been fulfilled." RUAA § 6(c), and comment 2, 7 U.L.A. 12-13 (Supp. 2002). And the comments add that "in the absence of an agreement to the contrary, issues of substantive arbitrability ... are for a court to decide and issues of procedural arbitrability, *i.e.,* whether prerequisites such as *time limits,* notice, laches, estoppel, and other conditions precedent to an obligation to arbitrate have been met, are for the arbitrators to decide." *Id.,* § 6, comment 2, 7 U.L.A., at 13 (emphasis added).

Howsam, 537 U.S. at 84-85 (underlinings added; italics in original).

     The difference between issues of substantive and procedural arbitrability was recently explained by the Supreme Court in Green Tree Financial Corp. as the difference between the question of "whether the parties wanted a judge or an arbitrator to decide whether they agreed to arbitrate a matter" (an issue of substantive arbitrability that is generally for de novo review by the courts) and the question of "what kind of arbitration proceeding the parties agreed to" (an issue of procedural arbitrability that is generally for the arbitrator to decide). Green Tree Financial Corp., 539 U.S. at 452-53 (emphases added); see also Teamsters United Parcel Service Nat'l Negotiating Comm. v. United Parcel Service, Inc., No. 92 Civ. 5162 (CSH), 1993 WL 277161, at *4 (S.D.N.Y. July 21, 1993) ("As noted in John Wiley & Sons, Inc. v. Livingston, 376 U.S. 543 (1964), '[q]uestions concerning the procedural prerequisites to arbitration do not arise in a vacuum; they develop in the context of an actual dispute about the rights of the parties to the contract or those covered by it.' Id. at 556-57. This dispute clearly does not involve a threshold question of arbitrability. The plaintiff concedes that the underlying dispute is arbitrable.") (emphasis added).

     As Arbitrator Kaplan correctly held, there is no question of "substantive arbitrability" in this case – i.e., whether there is an agreement to arbitrate the issue as opposed to having the discipline appeal heard on the merits by a court. Both the NBPA and the NBA concur that there is an agreement to arbitrate the issue of discipline and that the courts cannot review the merits of the dispute. Instead, the only issue is one of "procedural arbitrability" – i.e., how the arbitration should take place (before the Grievance Arbitrator under Article XXXI, Sections 1, 5(c), 13 and 14 of the CBA and Paragraph 5(d) of the Uniform Player Contract, or before Commissioner Stern under Article XXI, Section 8 of the CBA). See Award at 12 ("I read the

language in Article XXXI to indicate which forum these suspensions must be adjudicated, not whether the parties agreed to arbitrate the matter. Article XXXI, Section 1 sets forth the broad scope of the arbitration procedure. There is no basis to conclude that the parties intended such matters were outside the scope of the arbitration process. Therefore, I believe that the dispute here is a procedural arbitrability issue because arbitration is provided under two (2) separate procedures in the CBA, which both result in the complete disposition of the matter."). Deference should be granted by the Court to the determination of the Grievance Arbitrator that the factual predicates to his hearing the appeal exist. Indeed, it has previously been held – without challenge from the NBA – that an arbitrator under the CBA could determine the prerequisites to his jurisdiction. See, e.g., In re John Starks, Decision No. 00-01, dated March 6, 2000 (SKA-19) (NBA System Arbitrator determined whether he or the Grievance Arbitrator had jurisdiction over dispute concerning NBA playoff eligibility rule). Moreover, in a grievance involving Dennis Rodman, which was settled, the NBA previously agreed that the Grievance Arbitrator should decide whether he, or Commissioner Stern, had jurisdiction to hear Mr. Rodman's appeal of his discipline, where the parties disputed whether the conduct at issue was "on the playing court." SKA ¶ 3 & Exh. 25.

   The NBA erroneously asserts that the Second Circuit held in Katz v. Feinberg, 290 F.3d 95 (2d Cir. 2002), that "the question of which arbitrator should decide the merits of the dispute was a matter only for the court." NBA TRO Br. at 36-37 (emphasis in original). The Second Circuit, however, has done no such thing. The Katz decision did not involve the situation of a procedural choice between two arbitrators, as we have here. Instead, in Katz, the agreement expressly stated that the initial determination (the valuation of the company's shares) was "not subject to any appeal, arbitration, proceeding, adjustment or review of any nature whatsoever." Katz, 290 F.3d at 96. The complaining party in Katz sought two bites of the apple that were not provided for in the agreement, by having the accountant first value the shares and then, after losing, having the AAA arbitration panel review that valuation, even though the parties' agreement expressly stated that the accountant's valuation was "not subject to any appeal, arbitration, proceeding, adjustment or review of any nature whatsoever." Id. at 96; see Katz v. Feinberg, 167 F. Supp. 2d 556, 572 (S.D.N.Y. 2001) (the parties "did not intend to allow for arbitral review of [the accountants'] valuation determination [and] it follows inexorably that the arbitration panel exceeded the scope of its authority by reviewing and re-fashioning that valuation"). The Second Circuit itself has thus characterized Katz as "holding that a panel had

exceeded its authority in modifying the award that another arbitrator had rendered." Hoeft v. MVL Group, Inc., 343 F.3d 57, 65 (2d Cir. 2003). Here, by contrast, where the CBA unequivocally provides for an arbitral appeal of the NBA's initial imposition of discipline, and the only issue is which arbitral appeal process should be used, Katz has no application at all. This is not a case where the players first appealed to Commissioner Stern and then, having lost, tried to invoke a second arbitral appeal to the Grievance Arbitrator.

This Court has previously addressed the situation where there is a choice between two arbitrators, and has determined that the arbitrator with broad interpretive authority over the agreement should determine which arbitrator can resolve the dispute. In Salzarulo v. Thomas S. Brown Assoc., Inc., 654 F. Supp. 151 (S.D.N.Y. 1987), there were two potential arbitral processes to resolve a labor dispute – grievance procedures under a "local agreement" and grievance procedures under a "national agreement." Id. at 154 ("The central question in this case is jurisdictional in nature:  Under which grievance procedures–those provided by the Local Agreement or the National Agreement–ought the dispute between Brown and Local 2 to be arbitrated?").  In this situation of a choice between two arbitrators, the Court held that the National Agreement's arbitrators, with the broader jurisdiction, had the authority to decide which arbitrator should resolve the issue. Id.[6]  There thus can be no doubt that this Court should defer to the Grievance Arbitrator's determination that he – and not Commissioner Stern – should hear the appeal at issue here.

The NBA also wrongly asserts that the Supreme Court's decision in First Options of Chicago held that "an arbitrator is permitted to determine his own authority to hear a dispute only where there is 'clear and unmistakable' evidence that the parties specifically agreed to give that power to the arbitrator." NBA TRO Br. at 33-34 (emphasis in original).  The Second Circuit, however, has squarely held that "We read First Options as a clarification of the type of evidence needed to submit to arbitration a dispute regarding whether parties ever entered into a valid

---

[6] See also United Furn. Workers of Am., AFL-CIO v. Fort Smith Couch & Bedding Co., 214 F. Supp. 164, 172 (W.D. Ark. 1963) ("In the contract before the court the parties have agreed to submit 'any complaints or grievances,' and as heretofore stated, the fact that certain types of grievances are to be submitted to the Commission and another type is required to be submitted to an industrial engineer as arbitrator does not in anywise weaken the force of the total agreement to arbitrate.") (refusing employer's request for the court to determine which arbitrator should hear dispute).

arbitration agreement at all." Abram Landau Real Estate v. Benova, 123 F.3d 69, 73 (2d Cir.
1997) (emphasis added). This aspect of First Options thus has no application to this case, where
the parties clearly have agreed to an arbitration clause, and the only question is which arbitrator
decides. Indeed, the Second Circuit has expressly confirmed that a broad arbitration clause
continues to be sufficient after First Options to empower an arbitrator to rule upon issues of
arbitrability:

> This reading of First Options would require courts to decide all issues of arbitrability,
> absent clear and unmistakable evidence that the parties agreed to submit such a question to
> arbitration. In short, a general arbitration clause covering all issues of interpretation would
> no longer be regarded as sufficiently clear and unmistakable, absent precise language that
> issues of arbitrability should be arbitrated. We do not read First Options so expansively.

Abram Landau Real Estate, 123 F.3d at 73 (emphases added).

      The broad scope of the type of arbitrability issues that qualify as procedural and
therefore are subject to determination by arbitrators, as opposed to the courts, was most recently
emphasized by the Second Circuit in Mulvaney Mechanical, Inc. v. Sheet Metal Workers Int'l
Ass'n, Local 38, 351 F.3d 43 (2d Cir. 2003). In that case, the Second Circuit explained that even
the issue of whether a union repudiated a CBA, thus potentially voiding the authority of the
arbitrator, was the type of procedural arbitrability issue that the Supreme Court in Howsam
determined is for the arbitrator, not the courts, to decide:

> [This repudiation issue] raises questions about the ongoing validity of the underlying
> contract, and therefore presents a substantive challenge to the authority of the arbitrator. It
> also, however, presumes the one-time existence of a valid contract and goes to the
> enforcement of that contract against [the employer]. Upon repudiation, a contract does not
> cease to exist, but merely becomes voidable, and the non-repudiating party may enforce
> the contract or rescind it. The question therefore is not the existence of an agreement, but
> rather the ongoing enforceability of an agreement that the parties unquestionably had
> reached. Because the parties agreed to arbitrate, and because the language of the
> arbitration clause encompasses the union's strike and the consequences thereof, the only
> remaining question is whether the union's subsequent conduct discharges [the employer]'s
> obligation to arbitrate. We are persuaded that, on balance, the issue of repudiation most
> closely resembles the defenses to arbitrability such as waiver, estoppel, or delay that the
> Supreme Court listed [in Howsam] as questions properly decided by arbitrators.

Mulvaney Mechanical, Inc., 351 F.3d at 45-46 (citations omitted). Here too, the question "is not
the existence of an agreement" to arbitrate, but the procedural issue as to whether predicates in the
agreement had been satisfied to support arbitral review by the Grievance Arbitrator, as opposed to
Commissioner Stern. Given the expansive scope of procedural arbitrability recognized in

Mulvaney, there can be no question that the issue presented here – which arbitral process should apply – is a determination about which this Court should defer to the Grievance Arbitrator.

Nor can there be any doubt that the choice between having the appeal of the initial disciplinary determination heard by the Grievance Arbitrator or Commissioner Stern is a choice between two arbitrators. As Arbitrator Kaplan explained (Award at 12), the authority of Commissioner Stern to hear and finally resolve a narrow class of "on the playing court" discipline appeals is set forth in the same article of the CBA – entitled "Grievance And Arbitration Procedure" – that also sets forth the authority of the Grievance Arbitrator. (KA-1, at 213, 219). Moreover, Article XXXI, Section 8 provides that any "appeal" of any "dispute" within its terms shall be "processed" in a "hearing" as set forth in the provision, after which the Commissioner is required to "render a written decision," which written decision is to constitute a "full, final and complete disposition of the dispute" – and the decision of the Commissioner "shall be binding" on the parties. (KA-1, at 219). The arbitral nature of this process is evident from the terms of this provision, which are similar to the terms used to describe a "full, final and complete disposition" before the Grievance Arbitrator. Award at 12.[7]

Further, a decision cited by Arbitrator Kaplan (id. at 13) removes any doubt that a league Commissioner serves as an arbitrator when making appeal determinations of this kind. Specifically, in a case involving the National Hockey League, this Court previously held that the NHL President (also known as the NHL Commissioner) served as an arbitrator of certain disputes involving players under a provision of the NHL CBA similar to the one at issue here, notwithstanding the fact that the Commissioner's position was not 'independent' of the team owners:

---

[7] Under New York law, the question of whether the parties agreed to arbitrate is evidenced by two key factors: (1) that "the award encompasses the entire controversy between the parties" and (2) that the proceeding has an "appropriate degree of formality." Penn Cent. Corp. v. Consol. Rail Corp., 441 N.Y.S.2d 266, 269 (App. Div. 1981) (interpreting contract as containing an arbitration clause even though the contract called for "appraisers"); see also Chris O'Connell, Inc. v. Beacon Looms, Inc., 652 N.Y.S.2d 24, 25 (Sup. Ct., 1st Dep't 1997) ("Although the parties' agreement employs the word 'mediate' rather than 'arbitrate', it does provide that '[t]he proceedings shall be conducted as the mediator directs, with written findings', that 'such findings are agreed to be enforceable in any court with jurisdiction over the [losing] party', and that '[c]osts of mediation shall be borne by the [losing] party'. We agree with the IAS court that such language sufficiently indicates an intention to arbitrate rather than mediate.") (brackets in original).

It is true that the relationship between Bettman and Sather was, in one respect, different from the ordinary arbitrator-party relation. Specifically, Bettman had been hired by and was ultimately answerable to the team owners collectively, and it may be assumed that Sather in effect spoke for the Edmonton team owners. Nonetheless this does not undermine [Commissioner] Bettman's capacity to sit as an arbitrator in these disputes or demonstrate that Sather's telephone call must disqualify Bettman from that role.

Nat'l Hockey League Players' Ass'n v. Bettman, No. 93 Civ. 5769 (KMW), 1994 WL 738835, at *27 (S.D.N.Y. Nov. 9. 1994) (emphasis added) (Dolinger, M.J.), adopted, No 93 Civ. 5769 (KMW) (S.D.N.Y. Dec. 14, 1994). Indeed, the provision of the NHL CBA that Magistrate Judge Dolinger determined authorized Commissioner Bettman to "sit as an arbitrator in these disputes" did not use the word "arbitration" with respect to the Commissioner proceedings, and only used that term with respect to the "independent" arbitrator who would hear the dispute if it was not within the scope of the Commissioner's decision-making authority, just as is the case here. Id. at *7.[8]

        In its opposition to the TRO, the NBA did not mention the Bettman decision at all. Instead, the NBA relied upon a Black's Law Dictionary definition of arbitration as referring to a dispute resolution procedure involving one or more "neutral third parties." NBA TRO Br. at 35-36. However, as the Bettman case held, a Commissioner is not inherently disqualified from serving as a "neutral" arbitrator simply because he is an employee of the team owners. See Bettman, 1994 WL 738835, at *27.

---

[8] The NHL provision in Bettman stated that: "Any dispute involving a player, the Association and/or a Club concerning (i) the severity of discipline or a penalty imposed by a Club or (ii) the interpretation or application of the League Constitution or By-Laws, one of the Approved Standard Form Contracts or a League Rule shall be referred exclusively to the President of the League or his designated representative for final and binding determination subject to any right of appeal provided for in the League Constitution or By-Laws. Such a dispute shall be referred to the President in writing, with a copy of the notice of referral sent to the other party, not later than 60 days after the dispute arose. Disputes concerning the interpretation or application of League Constitutional provisions or By-Laws that are expressly enumerated in Section 7.01(c) and disputes concerning the application or interpretation of the standard players contract as set forth in Section 4.03 may be arbitrated at the request of the Association or the Clubs pursuant to Section 4.05." 1994 WL 738835, at *7 (emphasis added). Magistrate Judge Dolinger, whose opinion was adopted by the court, found that the exceptions in the last sentence of this provision did not apply (Nat'l Hockey Players' Ass'n, 1994 WL 738835, at *8), and ultimately found that Commissioner Bettman was not disabled from "serving as arbitrator" of the particular controversy before him. Id. at *32.

In sum, under applicable Supreme Court authority, the procedural determination by Grievance Arbitrator Kaplan that he was the appropriate arbitrator, as opposed to the Commissioner, is only subject to deferential (not de novo) review by the courts.  See, e.g., Green Tree Financial Corp., 539 U.S. at 452-53 ("Rather the relevant question here is what *kind of arbitration proceeding* the parties agreed to. . . .  Arbitrators are well suited to answer that question.") (emphasis added); Howsam, 537 U.S. at 84 ("for the law to assume an expectation that aligns (1) decisionmaker with (2) comparative expertise will help better to secure a fair and expeditious resolution of the underlying controversy – a goal of arbitration systems and judicial systems alike"); First Options of Chicago, Inc., 514 U.S. at 943 ("Did the parties agree to submit the arbitrability question itself to arbitration?  If so, then the court's standard for reviewing the arbitrator's decision about *that* matter should not differ from the standard courts apply when they review any other matter that parties have agreed to arbitrate.  That is to say, the court should give considerable leeway to the arbitrator, setting aside his or her decision only in certain narrow circumstances.") (emphasis added).

## II. THE GRIEVANCE ARBITRATOR CORRECTLY DECIDED THAT HE WAS THE PROPER ARBITRATOR TO DECIDE THE DISCIPLINARY APPEAL

Applying the deferential review standards that govern procedural arbitrability issues, it is clear beyond peradventure that the Grievance Arbitrator properly concluded that he, and not Commissioner Stern, had the jurisdiction to decide the merits of the disciplinary appeal at issue.  Moreover, the same conclusion would be reached even if the Court applied a de novo standard of review.

### A. The Grievance Arbitrator Correctly Decided That He Has Jurisdiction Under The CBA To Review Commissioner Discipline Imposed On A Player To Protect The "Integrity Of The Game," Under Article 35(d) Of The NBA Constitution, That Has A Financial Impact Greater Than $25,000

As Arbitrator Kaplan found, before September 1995, the previous CBA in the NBA granted the NBA Commissioner exclusive appellate jurisdiction to arbitrate all disputes over League discipline, with no Grievance Arbitrator review of that discipline at all, when the discipline involved either "conduct on the playing court" or the "integrity" of, or "public confidence" in, the game of basketball.  Award at 14-15.  Article XXVIII, Section 2(f) of the 1988 CBA, for example, provided that "all disputes involving a fine or suspension imposed upon a player by the Commissioner (or his designee) for conduct on the playing court, or involving action taken by the Commissioner (or his designee) concerning the preservation of the integrity of, or the

<u>maintenance of public confidence in, the game of basketball</u>, shall be processed exclusively as follows: . . . . [<u>i.e.</u>, specifying arbitral process before the Commissioner]." (KA-3, at 119 (emphasis added)).

Moreover, the UPC in the 1988 CBA attached a copy of Article 35 of the NBA Constitution, which provided in Article 35(d) that the Commissioner "may order for a time the suspension" of a player for any act or conduct "at or during" a game that the Commissioner believed to be "<u>prejudicial to or against the best interests of the [NBA] or the game of basketball</u>." (KA-3, at 155 (emphasis added)); <u>see also</u> Article 35(e) of the NBA Constitution (KA-3, at 156) ("The Commissioner shall have the power to suspend for a definite or indefinite period, or to impose a fine not exceeding $2,000, or inflict both suspension and fine upon any player who, in his opinion, shall have been guilty of conduct prejudicial or detrimental to the [NBA]."). Thus, prior to September 1995, if a player was suspended by the Commissioner for conduct at or during a game, neither the player nor the NBPA could appeal the discipline to the Grievance Arbitrator, or anyone other than the Commissioner, regardless of whether the discipline involved conduct on or off the playing court, if the discipline concerned "the preservation of the integrity of, or the maintenance of public confidence in, the game of basketball." Article 35(d) (KA-3, at 155). The same thing was true of discipline imposed by the Commissioner under Article 35(e). (KA-3, at 156).

However, the scope of the Grievance Arbitrator's authority was radically expanded by the parties as a result of the 1995 CBA, which, for the first time, subjected appeals of Commissioner discipline for conduct not "on the playing court" to arbitral review by the Grievance Arbitrator, as opposed to the Commissioner, so long as the fine or suspension involved a financial impact of more than $10,000, later increased to $25,000 (which is usually the case with a suspension). For example, Article XXXI, Section 13 of the CBA was added to provide that: "A fine or suspension imposed by the Commissioner <u>shall</u> be appealable to the Grievance Arbitrator only if it results in a financial impact on the player of more than $10,000 [the amount was increased to $25,000 in the 1999 CBA]." (KA-2, at 172) (emphasis added). In addition, Article XXXI, Section 8 was amended to make it clear that exclusive Commissioner arbitral jurisdiction was now circumscribed to <u>only</u> those cases involving "conduct on the playing court" or a financial impact on the player of less than $25,000:

> Any dispute involving (i) a fine or suspension imposed upon a player by the Commissioner (or his designee) for conduct on the playing court (regardless of its financial impact on the player), or (ii) action taken by the Commissioner (or his designee)

21

concerning the preservation of the integrity of, or the maintenance of public confidence in, the game of basketball <u>resulting in a financial impact of $25,000 or less</u>, shall be processed exclusively as follows:  [outlining procedures for appeal before Commissioner] . . . .

(KA-2, at 168) (emphasis added).

The parties also added Article XXXI, Section 5(c) of the CBA which provides that "[i]n any Grievance that involves an action taken by the Commissioner (or his designee) concerning (i) the preservation of the integrity of, or the maintenance of public confidence in, the game of basketball, and (ii) <u>a fine and/or suspension that results in a financial impact to the player of more than $25,000</u>, the Grievance Arbitrator shall apply an 'arbitrary and capricious' standard of review."  (KA-2, at 167) (emphasis added); <u>see also</u> 1995 CBA, Article XXXI, § 14(c) ("The parties recognize that a player may be subjected to disciplinary action for <u>just cause</u> by his Team <u>or by the Commissioner (or his designee)</u>.  Therefore, in Grievances regarding discipline, the issue to be resolved shall be whether there has been <u>just cause</u> for the penalty imposed.") (emphases added) (KA-2, at 173).

The new 1995 CBA provisions for the first time subjected Commissioner discipline for "integrity of the game" conduct covered by Articles 35(d) and (e) of the NBA Constitution to arbitral review by the Grievance Arbitrator, where the financial impact was more than the specified amount.  As Arbitrator Kaplan found, those provision make it clear that suspensions under Article 35(d) with a financial impact of more than $25,000 are subject to arbitral review by the Grievance Arbitrator under Article XXXI, Sections 1, 5(c), 13 and 14(c) of the CBA.  Award at 14-16; <u>see also</u> <u>In re NBPA (Latrell Sprewell)</u>, 548 PLI/Pat 429, at 520-21 (1999) (KA-16).  Indeed, the 1999 CBA, in Paragraph 5(d) of the UPC, states that any discipline imposed by the Commissioner under Article 35 of the NBA Constitution must be consistent with the terms of the CBA, which imposes just cause limits upon the imposition of that discipline which is reviewed by the Grievance Arbitrator.  <u>See</u> UPC, ¶ 5(d) ("The Player agrees to be bound by Article 35 of the NBA Constitution, a copy of which, as in effect on the date of this Contract, is attached hereto.  The Player acknowledges that the Commissioner is empowered to impose fines upon and/or suspend the Player for causes and in the manner provided in such Article, <u>provided that such fines and/or suspensions are consistent with the terms of the NBA/NBPA Collective Bargaining Agreement</u>.") (emphasis added) (KA-1, at A-4); <u>see also</u> CBA, Art. XXXI, § 14(c) ("The parties recognize that <u>a player may be subjected to disciplinary action for **just cause** by his Team or by the Commissioner (or his designee)</u>.  Therefore, in Grievances regarding discipline, <u>the issue to be</u>

resolved shall be whether there has been just cause for the penalty imposed.") (emphases added) (KA-1, at 223); CBA, Art. XXXI, Section 13 ( "A fine or suspension imposed by the Commissioner shall be appealable to the Grievance Arbitrator" if it results in a financial impact on the player of more than $25,000.") (emphasis added) (KA-1, at 223).

     The ruling by the Grievance Arbitrator that he had jurisdiction over the suspensions at issue is especially compelling because each of the suspension letters issued by the NBA states that the discipline was being imposed by the Commissioner "pursuant to Article 35(d) of the NBA Constitution." Letters from Stu Jackson, NBA, to Ron Artest, Stephen Jackson, Anthony Johnson, and Jermaine O'Neal, dated November 22, 2004 (KA-5) (emphasis added). It thus cannot be seriously disputed that these suspensions are based on conduct "concerning the preservation of the integrity of, or the maintenance of public confidence in, the game of basketball." Compare CBA, Article XXXI, Section 8 (KA-1, at 219-20) with NBA Constitution, Article 35(d) (KA-1, at A-19). See also In re NBPA (Latrell Sprewell), 548 PLI/Pat 429, at 519-20 (1999) (KA-16) (accepting broad scope of "integrity of the game" discipline advanced by the NBA).

     Having based its imposition of discipline upon the "integrity of the game" provisions of Article 35(d) of the NBA Constitution, the NBA cannot claim that such discipline is not subject to Grievance Arbitrator review, when the financial impact of that discipline exceeds $25,000. As Arbitrator Kaplan properly held, the CBA provides for an appeal to the Grievance Arbitrator in such a case, which is the new independent review of "integrity of the game" Commissioner discipline that the NBPA first secured in the 1995 CBA.

**B.  The Grievance Arbitrator Correctly Decided He Has Jurisdiction Over The Arbitral Appeal Because It Concerned A Riot With Fans And Others, Outside Of The Game, And Thus Did Not Involve "Conduct On The Playing Court"**

     The only serious argument the NBA advances to oppose the jurisdiction of the Grievance Arbitrator is its claim that the suspensions at issue are exclusively within the arbitral jurisdiction of Commissioner Stern under Article XXXI, Section 8 of the CBA (quoted supra pp. 21-22), because the discipline purportedly was imposed by the Commissioner for "conduct on the playing court." CBA, Art. XXXI, § 8 (KA-1, at 219-20). However, as Arbitrator Kaplan correctly held, this provision is inapplicable because the discipline at issue was imposed under Article 35(d) of the NBA Constitution to maintain public confidence in the game of basketball and had a financial impact on the players of more than $25,000 each (which is subject to the jurisdiction of the Grievance Arbitrator under Article XXXI, Sections 5(c), 13, and 14(c) of the CBA, and

Paragraph 5(d) of the UPC) and because the incident at issue did <u>not</u> involve "conduct on the playing court" as those terms are used in the CBA.  Award at 16-18.

At the outset, it is important for the Court to note that neither party to the CBA is advocating a literal, geographic meaning for the terms "on the playing court," so that clearly was <u>not</u> the agreed upon meaning.  The NBA argues that the terms "on the playing court" should be interpreted to cover any conduct "at, during or in connection with an NBA game" – even if it takes place, for example, in the locker room or in the arena parking area after the game is long over.  <u>See</u> Complaint, ¶ 34; Affidavit of Richard Buchanan, dated December 22, 2004 ("BA"), ¶¶ 48(e) & 48(f) (in a "locker room"); <u>id.</u> ¶ 52(a) (in a "hallway underneath the stands"); BA ¶ 52(b) ("outside the locker room following a game"); BA ¶ 54 ("in the parking area after a game").  For this reason, the NBA is challenging the jurisdiction of the Grievance Arbitrator even to affirm the suspensions of Mr. Artest and Mr. Jackson, who were indisputably disciplined for engaging in an altercation with fans in the stands, far removed from the physical playing court.  The NBPA, on the other hand, argues that the actual meaning of the terms at issue is limited to conduct that is part of the playing of the game and thus integral to the Commissioner's establishment of rules for the game (such as what constitutes a flagrant foul, how much a player can argue with officials, etc.).  It is precisely because the intent of the parties must be determined from ambiguous CBA language that it is most appropriate for the Court to defer to the labor arbitrator's interpretation of the "law of the shop."  <u>See</u>, <u>e.g.</u>, <u>Warrior & Gulf Navigation Co.</u>, 363 U.S. at 581-82 ("The ablest judge cannot be expected to bring the same experience and competence to bear upon the determination of a grievance, because he cannot be similarly informed."); <u>Howsam</u>, 537 U.S. at 85 ("[T]he NASD arbitrators, comparatively more expert about the meaning of their own rule, are comparatively better able to interpret and to apply it.")

As found by Arbitrator Kaplan, the confrontation with fans at issue here was very different from typical game-related discipline relating to the "playing" of the game "on the playing court," such as elbows, hard picks, confrontations with referees, or fights between players.  Instead, the incident involved a riot that broke out <u>in the stands, off the playing court, and outside of the game</u> – between players, fans, and other team and arena personnel – after a fan threw a beverage on Indiana Pacers player Ron Artest while Mr. Artest was lying in a horizontal position on a table that also was off the court and not part of the game.  Such conduct – which had nothing to do with the game – does not fall within the Commissioner's exclusive jurisdiction over appeals

of discipline for "conduct on the playing court" under Article XXXI, Section 8.  Award at 16-18.
As Arbitrator Kaplan explained:

> The confrontation between players and fans, spectators and even arena personnel is
> distinctly different from the type of "on court" or "in the game" conduct such a flagrant
> fouls, fights between players, hard picks, elbows and confronting referees.  It is clear that
> the genesis of the altercation occurred when a spectator threw a cup of liquid on Artest
> while he was off the court and lying on a table.  Instantly, Artest rushed into the stands
> creating the subsequent confrontation between players and fans, spectators and arena
> personnel which led to the suspensions in the instant case.  The longest suspensions were
> given to Artest and Jackson for "entering the stands and striking spectators."

Award at 16-17.

    The only specific conduct cited in the discipline letters the League sent to the two
players who were suspended for the longest periods – Mr. Artest and Mr. Stephen Jackson – was
"entering the stands and striking spectators."  Letters from Stu Jackson, NBA, to Ron Artest and
Stephen Jackson, dated November 22, 2004 (emphasis added) (KA-5).  Further, Mr. O'Neal was
specifically suspended, in part, for his conduct in pushing "an arena employee" into the scorer's
table, which conduct the videotape shows did not occur on the physical playing court.  (SKA-20
(videotape)).  Indeed, there is no question that the Grievance Arbitrator reduced Mr. O'Neal's
suspension because he believed that the conduct of Mr. O'Neal (off the physical playing court) in
pushing the arena employee to free himself from an unidentified person who was choking him was
not "just cause."  Award at 25 ("The video tape shows that when O'Neal was attempting to enter
the stands and rescue his teammates, an unidentified person grabbed him around the neck from
behind. . . .  I cannot fault O'Neal for attempting to free himself from an unidentified person
whose hands were around his neck.").

    As both parties have argued, the determination of whether particular conduct comes
within the meaning of the terms "on the playing court," as used in the CBA, is not subject to a
bright-line, geographic test and requires a detailed review of the factual circumstances and
specialized knowledge of the industry.  This is exactly the type of situation in which deference
should be given by the Court to the findings of the Grievance Arbitrator that "the suspensions of
Artest, Jackson, Johnson and O'Neal were not for 'conduct on the playing court' as set forth in
Article XXXI, Section 8."  Award at 18 (emphasis added).

    The Grievance Arbitrator's conclusion that the four suspensions at issue were
subject to his arbitral jurisdiction is also supported by a comparison of the player conduct here to
the conduct at issue in the Latrell Sprewell grievance, where the suspended player, whose

Commissioner-imposed discipline was successfully challenged before the Grievance Arbitrator, engaged in an altercation with his head coach <u>on the court</u> during a team practice.  <u>In re NBPA (Latrell Sprewell)</u>, 548 PLI/Pat 429 (1999) (KA-16).  The fact that Mr. Sprewell's altercation literally took place "on the playing court" did not preclude Grievance Arbitrator review of the discipline imposed on him.  Rather, in that proceeding, as here, the type of conduct at issue did not involve "playing" conduct during the course of a game, among the participants in the game, and thus was not subject to exclusive Commissioner appeal.

The NBA asserts that the words "conduct on the playing court" should be interpreted to mean the same thing as the words "[conduct] at or during" an NBA game used in Article 35(d) of the NBA Constitution.  BA ¶ 34.  However, the exact opposite is true.  The fact that the NBA used different words in Article 35(d) demonstrates that it intended a different meaning in Article XXXI, Section 8.  <u>See</u>, <u>e.g.</u>, <u>Frank B. Hall & Co., Inc.</u> v. <u>Orient Overseas Assocs.</u>, 401 N.E.2d 189, 189 (N.Y. 1979) ("[t]he difference in the language of the two provisions" shows "the parties must be deemed to have intended different meanings").

Similarly, as Arbitrator Kaplan found, the very different and broader language in Paragraph 19 of the Uniform Player Contract proves that the parties knew how to refer to player conduct in the arena as a whole or adjacent to the playing court (rather than just "on the playing court"), when they wanted to do so.  Award at 17.  Paragraph 19 of the UPC provides that "[t]he Player hereby releases and waives every claim he may have against the NBA [and other persons] . . . arising out of or in connection with . . . (ii) any fighting or other form of violent and/or unsportsmanlike conduct occurring during the course of any practice and/or any Exhibition, Regular Season, and/or Playoff game (on <u>or adjacent to</u> the playing floor or <u>in or adjacent to</u> <u>any</u> <u>facility</u> used in practices or games), . . . ."  (KA-1 at A-16-A-17) (emphases added).  No such broad language appears in the "on the playing court" terms of Article XXXI, Section 8.  (<u>See</u> KA-1, at 219-20).  As Arbitrator Kaplan determined, "when the parties wanted to encompass more than the actual game, they knew how to write such language."  Award at 17.  Aware of this determination by the Grievance Arbitrator, the NBA nonetheless has no credible explanation as to why the parties would choose <u>different</u> language in Paragraph 19 of the UPC and Article 35(d) of the NBA Constitution (which is attached to the UPC) to cover conduct adjacent to but not "on" the playing court, if the parties meant to cover the same conduct in Article XXXI, Section 8.  <u>See also</u> <u>In re NBPA, NBA & Boston Celtics (Vin Baker)</u>, Case No. 04-1, at 11 (Mar. 11, 2004) (Kaplan) ("These are sophisticated parties.  Their decision to permit only these exceptions [in the CBA] are

purposeful. <u>It would be inappropriate to expand these exceptions beyond their chosen words.</u>")
(emphasis added) (SKA-21).

Indeed, the NBA's argument – that "conduct on the playing court" encompasses all
of the "integrity of the game" conduct covered by Article 35(d) of the NBA Constitution – is a
transparent attempt to negate the changes to the CBA on this issue that the NBA lost at the
collective bargaining table in 1995. As reviewed above, before then, there was no Grievance
Arbitrator review of either conduct on the playing court discipline or integrity of the game
discipline. During the 1995 negotiations, the NBPA won a substantial change in the CBA,
securing Grievance Arbitrator review for discipline imposed by the Commissioner for "integrity of
the game" misconduct when it has a financial impact on the player above a specified amount (now
$25,000). By asserting that "conduct on the playing court" is synonymous with Article 35(d)
"integrity of the game" misconduct, the NBA improperly is seeking to recover much of what it
gave up in bargaining in 1995 when the change to this language was made. <u>See</u> <u>J.C. Penney Co.,
Inc.</u> v. <u>1700 Broadway Co.</u>, 429 N.Y.S.2d 369, 373-74 (N.Y. Sup. Ct. 1980) ("In urging the Court
to adopt its 'substantial completion' interpretation [when the contract uses the term 'completion of
the building'], Penney is in effect, asking for reformation of the tax escalation clause. . . .") (citing
<u>Frank B. Hall & Co.</u>, <u>supra</u>).

There is also no truth to the NBA's claim that both the NBA and the NBPA have
had a "consistent past practice and mutual understanding" that accords with the NBA's view of
Commissioner jurisdiction. Complaint ¶ 34.[9] While the NBA has asserted that "on numerous
occasions, the Players Association has confirmed this mutual understanding by 'appealing' to the
Commissioner under Article XXXI, Section 8 (or its predecessors), suspensions imposed for
misconduct outside the confines of the playing floor, including suspensions for entering the
spectator stands and attacking a fan; walking off the court and spitting on a fan; verbally
confronting a spectator in the stands from an out-of-bounds position; fighting in the locker room;
and misconduct in the exit tunnels leading to the locker rooms" (Complaint, ¶ 34), Arbitrator
Kaplan correctly found that this was not accurate and that the "on the playing court" issue was one

---

[9] <u>Id.</u> ("The consistent past practice and mutual understanding of the parties to the CBA is, and for
many years has been, that conduct 'on the playing court' includes and encompasses any conduct of
the player at, during, or in connection with an NBA game, whether or not all or any part of the
conduct in question occurred literally on the 94 by 50 foot wooden rectangular surface known as
the playing 'floor.'").

of "first impression" Award at 17. This factual finding by the Grievance Arbitrator was well-grounded and must be accepted, and given deference, by the Court. See TRO Tr. at 103 (factual findings of arbitrator presumed to be correct absent clear preponderance of the evidence to the contrary).

Specifically, prior to the instant proceeding, the only previous incident of League discipline that involved an NBA player engaging in a physical altercation with a fan in the stands was a fight in February 1995 involving Vernon Maxwell of the Houston Rockets, who was fined $20,000 and suspended for ten games by the NBA "for entering the stands and striking a fan" during the third quarter of a game. Memo from Rod Thorn to Bob Weinhauer, dated February 8, 1995 (KA-11). However, as Arbitrator Kaplan found, "[i]n Maxwell's case, the Association only had the right to appeal to Commissioner Stern and not to the Grievance Arbitrator. Since the provisions of the 1988 CBA were different than they are now, I find that Maxwell's appeal has no relevance to the jurisdictional issue before me in this matter." Award at 17-18 (emphasis added). These factual findings by the Grievance Arbitrator must be given deference by this Court. In fact, as Arbitrator Kaplan further found, since the CBA was amended in September 1995 to grant the Grievance Arbitrator authority to hear appeals for "integrity" of the "game of basketball" fines or suspensions in excess of $25,000, the NBPA has repeatedly challenged assertions by the NBA that discipline for player conduct outside of the context of the game is within the Commissioner's exclusive appeal jurisdiction. Award at 17 (discussing NBPA appeals to Grievance Arbitrator in Rodman and Wallace cases).[10]

In opposing the TRO, the NBA placed great weight on the Barkley and Ewing cases, arguing that these "rulings" are "directly on point" and "govern" the outcome in this case. NBA TRO Br. at 2-3. This is nonsense. As to Barkley – in which the player was disciplined for

---

[10] For example, in the Rodman appeal, the NBPA advised the NBA that "[t]he Players Association indeed believes that the dispute over the discipline imposed last week by the NBA on Dennis Rodman is to be resolved by the Grievance Arbitrator in accordance with the terms of Article XXXI of the Collective Bargaining Agreement, and is not appealable to the Commissioner under Section 8 of that Article. If you wish to challenge the Grievance Arbitrator's jurisdiction, we will be glad to respond to such a challenge before the Arbitrator." Letter from Ronald Klempner to Joel Litvin, General Counsel, NBA, dated January 21, 1997 (emphasis added) (KA 13). The NBA did not challenge the NBPA's position before the Grievance Arbitrator, and the grievance instead was settled. See also KA ¶¶ 36-38 (discussing NBPA appeals to Grievance Arbitrator in Rodman, Wallace and prior Artest disciplinary cases); SKA ¶¶ 5, 7, 10 (discussing NBPA appeals to Grievance Arbitrator in second Wallace case, and in Mercer, Trent, and Shaquille O'Neal cases)

spitting on a fan and other conduct during a game – this 1992 case is irrelevant for purposes of determining what is or is not "conduct on the playing court" for exactly the same reason as the Maxwell case and all other instances of Commissioner discipline before the 1995 CBA. SKA ¶¶ 30-35. Before then, the CBA provisions were fundamentally different and the NBPA "only had the right to appeal to Commissioner Stern and not to the Grievance Arbitrator." Award at 17.[11] It thus would have made no difference whether the conduct was or was not conduct "on the playing court," since the sole appeal would have been to Commissioner Stern. The NBA itself observes that the question of whether the conduct was on the playing court was never raised in the Barkley appeal – "the Players Association made no such argument" (BA ¶ 38) – but totally ignores the fact that because the 1988 CBA was different, the issue was not relevant.[12]

      As to the Ewing case, while that incident arose after the 1995 amendments to the CBA, there was no dispute in that case as to whether the player conduct at issue was "conduct on the playing court." The NBA disingenuously describes that incident as a "player altercation occurring out-of-bounds and in the spectator seats behind the basket during a playoff game" (BA ¶ 44), leaving the impression that fans somehow were involved in the incident. In fact, as the NBA knows, the Ewing case involved a player-to-player fight that erupted during the playing of a playoff game after one player shoved another player on the baseline during the game, which was followed by other players leaving the bench area and going out on to the playing floor. SKA ¶ 7(a). There was no question that this player-to-player altercation was the type of conduct arising from the flow of the game that was considered to be "conduct on the playing court." The only disputed issue in that case was whether a new League rule that any players leaving the bench area during a player fight would be automatically suspended for one game – regardless of the player's intention to join the fight or act as a peacemaker – violated the anti-collusion provisions of the

---

[11] The NBA's assertion that the predecessor provision in the 1988 CBA (Article XXVIII, § 2(f)(i)) and Article XXXI, Section 8 are "substantially identical" (BA ¶ 42) is an inexplicable misstatement.

[12] Instead, the only issue in the Barkley proceeding was whether a suspension without pay, as opposed to a suspension with pay, was within the authority of the Commissioner under the 1988 CBA. NBA & NBPA, Decision No. 92-4, dated July 24, 1992 (KA-12), at 5-6. That issue has absolutely no bearing on this case, since the NBPA and the players do not challenge the authority of the Commissioner to issue suspensions without pay for the November 19 incident at the Auburn Hills Palace.

CBA. That issue had nothing to do with the definition of "conduct on the playing court" and neither Judge Rakoff nor the NBPA addressed that issue during the TRO hearing. SKA-22 (Tr. 12-16, 50-60).[13]

   The NBA has also cited a number of other past incidents of discipline to argue that the NBPA has "recognized" that "conduct on the playing court" should "be broadly interpreted to encompass any player misconduct occurring at an NBA game." BA ¶ 48. However, as found by the Grievance Arbitrator (see Award at 17), and as is clear from the documents and facts reviewed in the First and Second Affirmations of Ronald Klempner, submitted herewith, this is not correct. To the contrary, given the unequivocal objections to Commissioner jurisdiction made by the NBPA in the Rodman, Wallace and the earlier Artest proceedings, as well as in other proceedings, the record is clear that there has been no such "recognition" by the NBPA. See KA ¶¶ 36-38; SKA ¶¶ 3. Moreover, as discussed above, all of the incidents cited by the NBA prior to the 1995 are wholly irrelevant because, before then, the only disciplinary appeal available was before the Commissioner, regardless of whether the conduct was on or off the playing court. See supra pp. 20-23.

   With respect to the post-September 1995 incidents of discipline cited by the NBA, none of them show any agreement by the NBPA that "conduct on the playing court" encompasses anything beyond that found to be covered by Arbitrator Kaplan. SKA ¶ 7. Several of the incidents described by the NBA were player-to-player altercations that stemmed directly from "the flow of the game," regardless of whether some of the activity spilled out of bounds. See, e.g., BA ¶ 48(b) & Exh. 35 (Clarence Weatherspoon/Kevin Willis fight that occurred "during the course of an NBA game"); BA ¶ 48(d) & Exh. 38 (Reggie Miller and Kobe Bryant shoving match that started on the playing court). Those appeals were thus filed by the NBPA pursuant to Article XXXI, Section 8. See id. By contrast, as to the incidents outside of the game, the NBPA has consistently filed appeals to the Grievance Arbitrator, without any reference to Article XXXI,

---

[13] The NBA asserts that outside counsel for the NBPA "agreed" with the NBA's interpretation that Article XXXI, Section 8 has the same scope as Article 35(d) of the NBA Constitution, in oral argument in the Sprewell and Ewing cases. NBA TRO Br. at 20-21. However, as reviewed in the TRO hearing, neither of those cases involved any dispute about the scope of "conduct on the playing court" under Article XXXI, Section 8, and the quoted statements, taken wildly out of context, have no bearing on the issues here, especially in light of the plainly different language in Article XXXI, Section 8 and Article 35(d). See TRO Tr. at 93.

Section 8.  See BA ¶ 48(e) & Exh. 39 ("Ron Mercer and the National Basketball Players Association hereby grieve the actions of the National Basketball Association"); BA ¶ 48(f) & Exh. 40 ("pursuant to Article XXXI of the Collective Bargaining Agreement, the National Basketball Players Association and Gary Trent hereby grieve"); BA ¶ 49(f) & Exh. 44 ("pursuant to Article XXXI of the Collective Bargaining Agreement, the National Basketball Players Association and Shaquille O'Neal hereby appeal").  The NBPA has never agreed with the NBA's assertions, after the September 1995 CBA was put into effect, that "conduct on the playing court" extended to player actions outside of the game.  Instead, all of these discipline disputes – except Sprewell – were settled, and there was never any resolution of the parties' disagreement over which arbitrator should hear these appeals.  SKA ¶¶ 2-11.  That is why the Grievance Arbitrator properly concluded that this was an issue of "first impression."  Award at 17.[14]

Finally, the NBA's claim that the NBPA's "silence" in response to being "notified" of the NBA's interpretation of the "on the playing court" issue, through NBA memoranda, is simply absurd.  NBA TRO Br. at 24.  The grounds for the NBA's claim of notice – various "headings" under which different types of player conduct are listed – says nothing about which arbitrator would hear any appeals of discipline for such conduct.  These memos do not evidence any NBPA agreement on the issue.

In sum, there is no past practice of the NBPA that is in any way inconsistent with the procedural jurisdiction determination of the Grievance Arbitrator here, and certainly no basis for this Court to second-guess the Arbitrator's finding that the conduct involved was not "on the playing court" as those terms are used in Article XXXI, Section 8 of the CBA.  Indeed, the only relevant past practice in which an appeal hearing took place was in the Sprewell case, where the NBA did not challenge the authority of the Grievance Arbitrator to review the discipline imposed on Mr. Sprewell for conduct physically on the playing court during practice.  See In re NBPA (Latrell Sprewell), 548 PLI/Pat 429 (1999) (KA-16).  Even under a de novo standard of review, there would thus be no basis for this Court to disagree with the Grievance Arbitrator's determination that he, not Commissioner Stern, was the proper arbitrator to hear these appeals.

---

[14] The fact that the NBPA decided not to appeal certain impositions of discipline at all (see BA ¶ 52) has no bearing on the issue before the Court.  Since the NBPA decided not to contest these impositions of discipline, the NBPA never expressed a view on whether any appeal of them would be before the Grievance Arbitrator or the Commissioner.

This conclusion is even more compelling because the issue is one of procedural arbitrability, based on factual determinations by the arbitrator and his understanding of the industry and the law of the shop, which the Supreme Court has made clear is subject to highly deferential judicial review.

## CONCLUSION

For all of the foregoing reasons, defendants respectfully request that this Court confirm the Award, deny the NBA's cross-motion to vacate, and issue a permanent injunction requiring the NBA to comply with the Award.

Dated: December 29, 2004
     New York New York

Respectfully submitted,

Jeffrey L. Kessler (JK 7891)
David G. Feher (DF 4867)
Allan L. Garcia
Jeffrey S. Rugg
DEWEY BALLANTINE LLP
1301 Avenue of the Americas
New York, New York 10019

NATIONAL BASKETBALL
    PLAYERS ASSOCIATION
Ronald E. Klempner
Hal Biagas
2 Penn Plaza, Suite 2430
New York, New York 10121
(212) 655-0880

Attorneys for Defendants
National Basketball Players Association, Ron Artest,
Stephen Jackson, Anthony Johnson and Jermaine
O'Neal

NY1 902941v2