SENT BY: NBA UNION ST.; National Basketball Players Association et al DEC-22-04 11:15AM; PAGE 2
Case 1:04-cv-09528-GBD    Document 12-2    Filed 12/29/2004    Page 1 of 33
Doc. 12 Att. 1

**********************************************

| | |
|---|---|
| In The Matter of Arbitration Between | * |
| | * |
| NATIONAL BASKETBALL PLAYERS | * |
| ASSOCIATION | * Grievants: Ron Artest, |
| | * Stephen Jackson, |
| and | * Anthony Johnson, |
| | * Jermaine O'Neal |
| NATIONAL BASKETBALL ASSOCIATION | * |
| | * Case No. 04-3 |
| | * |
| | * |

**********************************************

**********************************

## OPINION AND AWARD OF

## ROGER P. KAPLAN, ESQ., ARBITRATOR

**********************************

APPEARANCES:

For National Basketball Association:          No Appearance


For National Basketball Players
Association:                                  Jeffrey L. Kessler, Esq.
                                              David G. Feher, Esq.
                                              Allan L. Garcia, Esq.
                                              Jeffrey Rugg, Esq.

                                              DEWEY BALLANTINE LLP

                                              Ron Klempner, Esq.
                                              Hal Biagas, Esq.

Dockets.Justia.com

## STATEMENT OF THE CASE

On December 13, 1999, the National Basketball Association (NBA) and the National Basketball Players Association (Union or Association) appointed the undersigned as the Grievance Arbitrator for disputes arising under the 1999 Collective Bargaining Agreement (CBA).

On November 21, 2004, NBA Commissioner David Stern announced the suspensions of several NBA players, including Ron Artest, Stephen Jackson, Anthony Johnson and Jermaine O'Neal for their actions during the Indiana Pacers/Detroit Pistons basketball game on November 19, 2004.[1] On November 22, 2004, the NBA sent letters to these players setting forth the following suspensions:

| | |
|---|---|
| Ron Artest: | remainder of the 2004-2005 NBA season, including playoffs; |
| Stephen Jackson: | 30 games; |
| Anthony Johnson: | 5 games; |
| Jermaine O'Neal: | 25 games. |

On November 22, 2004, the Union filed a grievance under Article XXXI of the CBA on behalf of each of the above-mentioned players. It claimed that the discipline imposed by Commissioner Stern was "inconsistent with the terms of the CBA and applicable law, and without just cause". On November 23, 2004, the Union requested a hearing on the suspensions in accordance with Article XXXI, Section 3(b) of the CBA. On November 26, 2004, the NBA responded by stating that I did not have jurisdiction to consider whether this dispute is arbitrable. The NBA asserted that under Article XXXI,

---

[1] Commissioner Stern also suspended NBA players Ben Wallace, Elden Campbell, Derrick Coleman, Chauncey Billups and Reggie Miller. In its letter dated November 30, 2004, the Association stated that it was not appealing the suspensions of players "for the on-the-court altercation between players during the game and for the players who were suspended solely for leaving the bench during that altercation". Thus, the Union did not appeal the suspensions of NBA players Wallace, Campbell, Coleman, Billups or Miller.

2

Section 8 of the CBA, only Commissioner Stern had authority to review the suspensions issued by him. Additionally, the NBA stated that it would not participate in any proceeding before me concerning the merits of the dispute and my authority to determine jurisdiction.

On November 30, 2004, the Union submitted an extensive letter, with exhibits, setting forth its position on the issues. After receiving the Union's letter, the NBA indicated in a letter dated December 2, 2004, reiterating its position that I lacked jurisdiction to decide whether the matter is arbitrable. The NBA repeated its position that it would be risking their right to seek de novo judicial review by making further assertions and arguments.

On December 3, 2004, I issued a decision, holding that I had jurisdiction to determine the arbitrability dispute in this matter.[2] In my decision, I scheduled a hearing on the remaining issues "of the arbitrability of the Union's attempt to challenge Commissioner Stern's decision and, if arbitrable, whether there was just cause for the suspensions imposed". On the same day, I held a conference call between the parties. During that telephone call, I ruled that I would not bifurcate the hearing, but rather hold a hearing initially to hear arguments on the arbitrability question and then hear the merits of the dispute, immediately thereafter. The NBA indicated in the conference call that it would not participate in the arbitrability portion of the hearing, but would participate in the hearing regarding the merits of the dispute. I scheduled a hearing in New York for Thursday, December 9, 2004.

On December 3, 2004, the NBA filed a Complaint in the United States District Court for the Southern District of New York challenging the appeal of the suspensions to the Grievance Arbitrator. On December 5, 2004, the NBA informed United States District Judge George B. Daniels that it had "decided not to seek a stay of the arbitration proceeding now scheduled for Thursday, December 9", but would wait

---

[2] My decision of December 3, 2004, is hereby incorporated by reference into this Opinion and Award.

until after the arbitration hearing to decide whether to proceed further.

  In a letter dated December 6, 2004, the NBA informed me that it "had decided not to appear for any portion of the hearing scheduled for December 9; thus, we will not participate in either your consideration of the arbitrability issue or the merits".[3]

  On December 7, 2004, I wrote a letter to the parties requesting that they both participate in the hearing, so that a "full, informed and appropriate decision" could be made. Prior to the hearing, the Union requested that the NBA make Dr. Yolanda Brooks and Commissioner Stern available to testify at the December 9, 2004 hearing. Additionally, it requested that the NBA provide a copy of its investigative file in this matter as well as video tapes of previous incidents in accordance with their obligations under the CBA. On December 8, 2004, the NBA responded by stating that it had no obligation under the CBA or applicable law to provide discovery materials or produce witnesses in this case. On December 8, 2004, the NBA reiterated its position to me that it would not participate at the arbitration hearing on December 9th with regard to the arbitrability issue and/or the merits of the dispute.

  On Thursday, December 9, 2004, I conducted a hearing in New York, New York in the above-captioned case. The NBA did not appear and/or participate in the arbitration hearing. At the commencement of the hearing, the Union submitted a pre-hearing brief. A verbatim transcript was made of the hearing. At the hearing, the Union called six (6) witnesses who testified under oath; and submitted 56 exhibits, which I accepted into evidence.[4] The Union submitted a post-hearing brief, which I received on approximately December 14, 2004. On December 13, 2004, I called NBA Counsel and asked whether a post-hearing brief would be submitted on its behalf. The NBA informed me that same day that no post-hearing brief would be submitted.

---

[3] Prior to the receipt of this letter, the NBA informed me in the December 3rd conference call that it would not participate in the arbitrability issue at the December 9, 2004 hearing, but that it would appear and present arguments on its behalf regarding the merits of this dispute.

[4] At the arbitration, I requested that the Association prepare a document regarding Artest's suspensions while he has an NBA player. I received that exhibit on December 14, 2004.

## ISSUES

I find the issues to be as follows:

1.     Whether the Grievance Arbitrator has jurisdiction to decide the arbitrability issue in this dispute?

2.     If so, does the Grievance Arbitrator have authority to review the suspensions of the four (4) NBA players?

3.     If so, did Commissioner Stern have just cause under the CBA to suspend NBA players Ron Artest, Stephen Jackson, Anthony Johnson and Jermaine O'Neal?

4.     If not, what shall be the remedy?

## PERTINENT PROVISIONS OF THE COLLECTIVE BARGAINING AGREEMENT BETWEEN THE NATIONAL BASKETBALL ASSOCIATION AND THE NATIONAL BASKETBALL PLAYERS ASSOCIATION JANUARY 1999

### ARTICLE VI  PLAYER CONDUCT

Section 8.  On-Court Conduct

In addition to its authority under paragraph 5 of the Uniform Player Contract, the NBA is entitled to promulgate and enforce reasonable rules governing the conduct of players on the playing court that do not violate the provisions of this Agreement. Prior to the date on which any new rule promulgated by the NBA becomes effective, the NBA shall provide notice of such new rule to the Players Association and consult with the Players Association with respect thereto.

### ARTICLE XXXI  GRIEVANCE AND ARBITRATION PROCEDURE

Section 1.    Scope

(a)    Any dispute (such dispute hereinafter being referred to as a "Grievance") involving the interpretation or application of, or compliance with, the provisions

of this Agreement or the provisions of a Player Contract (except as provided in paragraph 9 of a Uniform Player Contract), including a dispute concerning the validity of a Player Contract, shall be resolved exclusively by the Grievance Arbitrator in accordance with the procedures set forth in this Article;...

Section 3.      Hearings.

(h) ...All such hearings shall be conducted in accordance with the Labor Arbitration Rules of the American Arbitration Association.

Section 5.      Arbitrator's Decision and Award.

(b)     The Grievance Arbitrator shall have jurisdiction and authority only to:
(i)      interpret, apply, or determine compliance with the provisions of this Agreement: (ii) interpret, apply or determine compliance with the provisions of Players Contract;...

The Grievance Arbitrator shall not have jurisdiction or authority to add to, detract from, or alter in any way the provisions of this Agreement (including the provisions of this subsection) or any Player Contract. Nor, in the absence of agreement by the NBA and the Players Association, shall the Grievance Arbitrator have jurisdiction or authority to resolve questions of substantive arbitrability.

(c)     In any Grievance that involves an action taken by the Commissioner (or his designee) concerning (i) the preservation of the integrity of, or the maintenance of public confidence in, the game of basketball, and (ii) a fine and/or suspension that results in a financial impact to the player of more than $25,000, the Grievance Arbitrator shall apply an "arbitrary and capricious" standard of review.

Section 8.      Special Procedure with Respect to Player Discipline

(a) Any dispute involving (i) a fine or suspension imposed upon a player by the Commissioner (or his designee) for conduct on the playing Court (regardless or its financial impact on the player) or (ii) action taken by the Commissioner (or his designee) concerning the preservation of the integrity of, or the maintenance of pubic confidence in, the game of basketball resulting in a financial impact to the player of $25,000 or less,

shall be processed exclusively as follows:

(i)    Within twenty (20) days following written notification of the action taken by the Commissioner (or his designee), a player affected thereby may appeal in writing to the Commissioner.

(ii)    Upon the written request of the Players Association, the Commissioner shall designate a time and place for hearing as soon as is reasonably practicable following his receipt of the notice of appeal.

(iii)    As soon as reasonably practicable, but not later than twenty (20) days, following the conclusion of such hearing, the Commissioner shall render a written decision, which decision shall constitute full, final and complete disposition of the dispute, and shall be binding upon the players(s) and Teams(s) involved and the parties to this Agreement.

Section 13.    Threshold Amounts for Certain Grievances.

A fine or suspension imposed by a Team shall be appealable to the Grievance Arbitrator only if it results in a financial impact on the player of more than $2,000. A fine or suspension imposed by the Commissioner shall be appealable to the Grievance Arbitrator only if it results in a financial impact on the player of more than $25,000.

Section 14.    Miscellaneous.

(c)    The parties recognize that player may be subjected to disciplinary action for just cause by his Team or by the Commissioner (or his designee). Therefore, in Grievances regarding discipline, the issue to be resolved shall be whether there had been just cause for the penalty imposed.

Exhibit A    National Basketball Uniform Player Contract

19.    Release.

7

The Player hereby releases and waives every claim he may have against the NBA and its related entities and every member of the NBA...arising out of or in connection with (i) any injury that is subject to the provisions of paragraph 7, (ii) any fighting or other form or violent and/or unsportsmanlike conduct occurring during the course of any practice and/or Exhibition, Regular Season, and/or Playoff game (on or adjacent to the playing floor or in or adjacent to any facility used for practices for games),

## NBA CONSTITUTION    MISCONDUCT

35.    The provisions of this Article 35 shall govern all Players in the Association, hereinafter referred to as "Players."

(d)    If in the opinion of the Commissioner any act or conduct of a Player at or during an Exhibition, Regular Season, or Playoff game has been prejudicial to or against the best interests of the Association or the game of Basketball, the Commissioner shall impose upon such Player a fine not exceeding $35,000, or may order for a time the suspension of any such Player from any connection or duties with Exhibition, Regular Season or Playoff games or he may order both such fine and suspension.

## PERTINENT RULES OF THE NBA    October 18, 2004

...The NBA will take immediate action against any player who engages in violent actions during a game, including ejection and appropriate fines and/or a suspension.

Also, any player who deliberately enters the spectator stands during a game will be automatically ejected and subject to a fine and/or a suspension...The first row of seats is considered the stands. Entering the spectator stands after a game is also prohibited, and appropriate fines and/or a suspension will be imposed.

## PERTINENT RULES AND PROCEDURES OF THE AMERICAN ARBITRATION ASSOCIATION (Labor Arbitration Rules) Amended and Effective May 1, 2004

27.    Arbitration in the Absence of a Party or Representation

Unless the law provides to the contrary, the arbitration may proceed in the absence of any party or representative who, after due notice, fails to obtain a postponement. An award shall not be made solely on the default of a party. The arbitrator shall

8

require the other party to submit such evidence as may be required for the making of an award.

## FACTS

This grievance protests the decision made by NBA Commissioner Stern on November 21, 2004, suspending NBA players Artest, Jackson, Johnson and O'Neal. The suspensions resulted from the actions of these players near the conclusion of a regular season NBA game between the Indiana Pacers and the Detroit Pistons on November 19, 2004. The NBA suspended Artest and Jackson for actions which included "entering the stands and striking spectators". The NBA suspended Johnson for actions "which included striking a spectator". The NBA suspended O'Neal for actions which included "striking a spectator and an arena employee".

The Union submitted into evidence Commissioner Stern's remarks from his press conference on November 21, 2004. In announcing the suspensions, Commissioner Stern stated that the penalties meted out by the NBA focused only on "player misconduct."[5]

Artest is a professional basketball player, who is currently in his sixth season in the NBA. He played collegiate basketball at St. Johns University for two (2) years. The Chicago Bulls drafted him in 1999; he played two and a half years with the Bulls. The Bulls traded Artest to the Pacers, where he has played the last few years. Artest was an All-Star last year, making the first team All-Defense and Third Team All-NBA. He was also named the Defensive Player of the Year for the 2003-2004 season and runner-up for that award in the 2002-2003 season.

Artest has had a number of suspensions in his 6 year NBA career. These suspensions are outlined below:

2000-2001:  1 game for altercation with another player during a game;
2002-2003:  8 games for flagrant fouls (which includes confronting an opposing

---

[5]    The actions of the players on November 19th will be discussed in the Discussion and Analysis section of this Opinion and Award.

coach and taunting);
1 game for breaking a photograph in the locker room after
a game (imposed by the team);
3 games for damaging TV equipment in arena tunnel after game;
2003-2004:     1 game for flagrant foul;
1 game for leaving bench area;

Jackson has been an NBA player since 2000. He did not play collegiate basketball. He played his last year of high school basketball at Oak Hill Academy in Virginia. In 1997 the Phoenix Suns drafted him, but he failed to make the roster and was released. In subsequent years he played professional basketball in Australia, the Dominican Republic and Venezuela. Jackson played for the New Jersey Nets during the 2000-2001 season, the San Antonio Spurs during the 2001-2002 and 2002-2003 seasons and the Atlanta Hawks last year. This is his first year with the Pacers. Prior to this incident, Jackson did not have any suspensions during his career in the NBA.

Johnson graduated from the College of Charleston in 1997, where he played collegiate basketball. This is Johnson's second year with the Pacers. He previously played in the NBA with the Sacramento Kings, Atlanta Hawks, Orlando Magic, Cleveland Cavaliers and New Jersey Nets.

Johnson has been suspended for one game in 1999 for a flagrant elbow. He has no other disciplinary suspensions during his career. During the night in question, Johnson was not participating in the game because of a broken right hand. He was sitting on bench in street clothes during the Pacers/Pistons game.

O'Neal, like Jackson, never played collegiate basketball. The Portland Trailblazers drafted him with the 17th pick in the 1996 NBA draft. After playing four (4) years with the Trailblazers, he was traded to the Pacers, where he has played continuously since the 2000-2001 season. He was a member of the Goodwill Games Team for three (3) years and also a member of the USA World Championship Team that qualified for the 2004 Olympics. An injury prevented him from playing in the 2004 Olympics.

O'Neal made the NBA All-Star team the last three (3) years as well as being named All-NBA the last three (3) years. Last year, he was voted to the second team All-

NBA. He is a co-captain of the Pacers.

O'Neal received the NBA Community Assist Award which acknowledged his contributions to charities and his community. In 2004, O'Neal won the Magic Johnson Award, which recognized his play on the court, his cooperation with the media and overall good citizenship. In his nine (9) year career in the NBA, O'Neal was suspended once for an altercation with NBA player Corliss Williamson approximately three (3) years ago.

Based upon the inability of the parties to resolve this matter amicably, it proceeded to arbitration as set forth earlier in this decision.


## DISCUSSION AND ANALYSIS

There are three (3) separate issues for resolution. These issues will be discussed seriatim.


## GRIEVANCE ARBITRATOR'S JURISDICTION TO DECIDE ARBITRABILITY DISPUTE

On December 3, 2004, I issued a decision that I had jurisdiction to decide the arbitrability issue in the present case. Although I found that I did have jurisdiction, I left open the question of whether the arbitrability dispute before me was a substantive or procedural arbitrability dispute. The Union contended that this was a procedural arbitrability question. The NBA argued in its letters dated November 26, 2004 and December 2, 2004 that I lacked jurisdiction to decide the arbitrability issue. Furthermore, the NBA contended that the language in the CBA precluded me from resolving this disagreement, citing the following provision in Article XXXI, Section 5(b) of the CBA which states, "Nor, in the absence of agreement by the NBA and Players Association, shall the Grievance Arbitrator have jurisdiction or authority to resolve questions of

substantive arbitrability".

In my previous decision, I agreed with the rationale of former Grievance Arbitrator John Feerick and District Judge Barbara Jones in holding that arbitrators have jurisdiction to initially determine arbitrability questions. The broad arbitration clauses contained in the CBA and the Uniform Player Contract support that conclusion.

The arbitrability question in the instant dispute centers around which procedure NBA players must use under the CBA when appealing their suspensions. Both procedures are contained in Article XXXI, entitled the "Grievance and Arbitration Procedure". In Section 8 of that Article, the appeal goes to Commissioner Stern. Under Sections 1, 4, 5, 13 and 14 of Article XXXI, the appeal goes to the Grievant Arbitrator.

Article XXXI, Section 8 outlines the procedures for an appeal to Commissioner Stern. It provides for a written appeal to the Commissioner, a hearing within a reasonable period of time and a written decision which constitutes "full, final and complete disposition of the dispute and shall be binding upon the player(s) and Team(s) involved...". The other provisions in Article XXXI, which outline the Grievance Arbitrator's jurisdiction, provide for similar procedures so that a "full, final and complete disposition of the Grievance" can be made.

I read the language in Article XXXI to indicate which forum these suspensions must be adjudicated, not whether the parties agreed to arbitrate the matter. Article XXXI, Section 1 sets forth the broad scope of the arbitration procedure. There is no basis to conclude that the parties intended such matters were outside the scope of the arbitration process. Therefore, I believe that the dispute here is a procedural arbitrability issue because arbitration is provided under two (2) separate procedures in the CBA, which both result in the complete disposition of the matter. The fact that Commissioner Stern acts as the arbitrator in one of those procedures is of no consequence. I find that the parties agreed to arbitrate NBA player discipline cases. The facts relating to the suspensions operate to determine which procedure shall be utilized. I cannot say with

12

positive assurance that the arbitration clause here fails to cover the asserted dispute.

The Supreme Court has held:

> [I]t has been established that where the contract contains an arbitration clause, there is a presumption of arbitrability in the sense that "an order to arbitrate the particular grievance should not be denied unless it may be said with positive assurance that the arbitration clause is not susceptible of an interpretation that covers the asserted dispute. Doubts should be resolved in favor of coverage". Such a presumption is particularly applicable where the clause is as broad as the one employed in this case, which provides for arbitration of "any difference arising with respect to the interpretation of this contract or the performance of any obligation hereunder." AT&T Technologies, Inc. v. Communication Workers of Am., 475 U.S. 643, 650 (1986).

Finally, the Union cited a decision where National Hockey League Commissioner Gary Bettman served as an arbitrator for certain disputes under a collective bargaining agreement regarding a controversy involving players similar to the issue presented here. The union argued that the validity of NHL player offer sheets should have been submitted to the independent arbitrator, rather than NHL Commissioner Bettman.

In that case, the U.S. District Court held as follows:

> It is true that the relationship between Bettman and Sather was, in one respect, different from the ordinary arbitrator-party relation...Nonetheless this does not undermine [Commissioner] Bettman's capacity to sit as an arbitrator in these disputes or demonstrate that Sather's telephone call must disqualify Bettman from that role.

Nat'l Hockey League Players' Ass'n v. Bettman, No. 93 Civ. 5769 (KMW), 1994 WL 738835 at p. 27 (S.D.N.Y. Nov. 9, 1994) (Dolinger,M.J.) adopted, No 93 Civ.5769 (KMW) (S.D.N.Y. Dec. 14, 1994).

For the reasons set forth above and those contained in my December 3, 2004 decision, I find that I have jurisdiction to decide the arbitrability issue presented here.

## AUTHORITY TO REVIEW THE GRIEVANCE OF THE FOUR (4) SUSPENDED NBA PLAYERS

In its November 26th and December 2nd letters to me, the NBA set forth its arguments, in a limited fashion, on my authority to review Commissioner Stern's decision. The NBA stated that "it was clear and unequivocal that the suspensions imposed by the Commissioner are not subject to the jurisdiction of the Grievance Arbitrator". I disagree.

As stated previously, the NBA did not participate at the arbitration hearing.[6] Article XXXI, Section 3 (h) of the CBA requires that all hearings shall be conducted pursuant to the Labor Arbitration Rules of the American Arbitration Association (AAA). The Labor Arbitration Rules state, in pertinent part, "The arbitrator shall require the other party to submit such evidence as may be required for the marking of an award". The NBA brought this provision of the Labor Arbitration Rules to my attention in its December 6, 2004 letter. As to the hearing itself, based on the NBA's failure to participate, I probably asked more questions than I normally would have if both parties had been represented. For example, I asked Artest questions and requested that his past suspensions be made a part of the record. I viewed that my responsibility under the CBA and the Labor Arbitration Rules of the AAA was to establish a full record with probative evidence, to ensure that arbitral principles and fairness prevailed.

The Union asserted three (3) reasons as to why the Grievance Arbitrator has jurisdiction. They will be discussed seriatim.

A.     Authority to review Commissioner Stern's suspensions under Article 35 of the NBA Constitution

Under the 1988 CBA, the Commissioner had authority to administer discipline without review for either "conduct on the playing court" or the "integrity" of, or "public

---

[6]     In no way was the NBA's lack of participation at the arbitration hearing a factor in my rulings on the arbitrability question or the merits of this dispute.

14

confidence" in the game of basketball. Prior to the implementation of the 1995 CBA, a suspended NBA player could appeal only to the Commissioner if the discipline concerned "the preservation of the integrity of, or the maintenance of public confidence in, the game of basketball".

However, the 1995 CBA provided additional jurisdiction for the Grievance Arbitrator. The 1995 CBA provided for the first time that discipline could only be imposed for just cause. Additionally, any suspension resulting in a financial impact of more than $10,000 shall be appealable to the Grievance Arbitrator. This amount was increased to $25,000 pursuant to Article XXXI, Section 13 of the current CBA.

The Union argued that as a result of these changes, "integrity of the game" discipline covered by Articles 35(d) and (e) of the NBA Constitution were subject to review for the first time by the Grievance Arbitrator if the financial impact on the player was more than $25,000. These new provisions provided for arbitral review by the Grievance Arbitrator where "integrity of the game" discipline was covered by Articles 35 (d) and (e) of the NBA Constitution if the financial impact on the NBA player was more than $25,000.

Also under Paragraph 5 (d) of the Uniform Player Contract, the NBA players agreed to be bound by Article 35 of the NBA Constitution, giving the Commissioner the power to suspend. However, this provision provided that the suspension be "consistent with the terms of the NBA/NBPA Collective Bargaining Agreement". Article XXXI, Section 14 (c) of the CBA requires that there must be just cause for the discipline imposed.

The suspension letters issued to Artest, Jackson, Johnson and O'Neal all specify that the penalties were imposed by the Commissioner pursuant to Article 35 (d) of the NBA Constitution, not under Article XXXI, Section 8 of the CBA. It seems apparent that the suspensions were issued by the Commissioner in "the best interests of the [NBA] or the game of basketball". Based upon the provisions of Article XXXI, Sections 1, 5(c), 13 and 14 of the CBA and Paragraph 5 (d) of the NBA Constitution, I find that the grievance filed by the NBA players over their suspensions in this case are appealable to the

15

Grievance Arbitrator.

B.    Whether suspensions of Artest, Jackson, Johnson and O'Neal were for "conduct on the playing court" as set forth in  XXXI, Section 8 of the CBA

The NBA argued in its November 26, 2004 letter that it believed that the suspensions issued by Commissioner Stern were not subject to the jurisdiction of the Grievance Arbitrator. It contended that Article XXXI, Section 8 provides the Commissioner with the sole and exclusive authority to hear the appeals of these suspensions because conduct stems from "on the court" behavior. I disagree.

The disputed provision in the CBA gives Commissioner Stern sole authority to hear appeals of suspensions when it involves "conduct on the playing court". What happened here was conduct that occurred in the stands and not "on the playing court". A literal reading of those words would not encompass any activity which occurred in the stands. In his press conference on November 21, 2004, Commissioner Stern referred to "participants in and around the court", "the bounds of acceptable conduct for fans" and the "egregious behavior by individuals in the stands". Clearly, what occurred in the stands on November 19, 2004 is beyond "conduct on the playing court".

Furthermore, the conduct of the NBA players involved here did not occur "during the playing of the game". The suspensions of NBA players for conduct during the game and on the playing court (i.e., Wallace- 5 game suspension) were not appealed. The Union acknowledged that suspensions during the game were not appealable to the Grievance Arbitrator. This is precisely why no appeal was made for players such as Wallace.  The Union made clear in its presentation before me that what occurred on the playing court during the game was within the sole discretion of Commissioner Stern under Article XXXI, Section 8 of the CBA.

The confrontation between players and fans, spectators and even arena personnel is distinctly different from the type of "on court" or "in the game" conduct such as flagrant fouls, fights between players, hard picks, elbows and confronting referees. It is clear that the genesis of the altercation occurred when a spectator threw a cup of liquid on

16

Artest while he was off the court and lying on a table. Instantly, Artest rushed into the stands creating the subsequent confrontation between players and fans, spectators and arena personnel which led to the suspensions in the instant case. The longest suspensions were given to Artest and Jackson for "entering the stands and striking spectators".

Additionally, Paragraph 19 of the Uniform Player Contract is a release signed by all NBA players. In pertinent part, this provision provides that "The Player hereby releases and waives every claim he may have against the NBA...arising out of or in connection with ...(ii) any fighting or other form of violent and/or unsportsmanlike conduct <u>occurring during the course of any practice and/or any Exhibition, Regular Season, and/or Playoff game (on or adjacent to the playing floor or in or adjacent to any facility used for practices or games,...</u>" (emphasis added).

Thus, when the parties wanted to encompass more that the actual game, they knew how to write such language. If the parties wanted to refer to areas adjacent to the playing court in Article XXXI, Section 8 as they did in Paragraph 19 of the Uniform Player Contract, they could have easily done so. Based on the fact that Article XXXI, Section 8 only refers to "conduct on the playing court", the Union's argument that this provision should be construed narrowly is persuasive.

In reviewing previous disciplinary actions issued by Commissioner Stern against NBA players, it appears that this is a case of first impression involving the interpretation of Article XXXI, Section 8 of the CBA. In suspensions involving Dennis Rodman and Rasheed Wallace for conduct adjacent to the playing court, the Union filed grievances before the Grievance Arbitrator. While the NBA disagreed with the Union's assertion that the Grievance Arbitrator had jurisdiction, these cases were settled without a resolution as to what provision of the CBA would govern.

Finally, the suspension of NBA player Vernon Maxwell in 1995 for entering the stands and striking a spectator was appealed to Commissioner Stern pursuant to Article XXVIII, Section 2 (f) of the 1988 CBA. In Maxwell's case, the Association only had the right to appeal to Commissioner Stern and not to the Grievance Arbitrator. Since the provisions of the 1988 CBA were different than they are now, I find that Maxwell's

17

appeal has no relevance to the jurisdictional issue before me in this matter.

Based upon the reasons set forth above, I find that the suspensions of Artest, Jackson, Johnson and O'Neal were not for "conduct on the playing court" as set forth in Article XXXI, Section 8.


C.    <u>Reasonableness of suspensions under Article VI, Section 8 of the CBA</u>

The Association made an argument that Article VI, Section 8 of the CBA provides an independent review for the Grievance Arbitrator of the NBA's rules. This provision states as follows: "In addition to its authority under paragraph 5 of the Uniform Player Contract, the NBA is entitled to promulgate and enforce reasonable rules governing the conduct of players on the playing court that do not violate the provisions of this Agreement". The Union alleged that this provision was added for the first time to the present CBA.

On October 18, 2004, the NBA issued rules which dealt with violence and the entrance of players into the stands. In pertinent part, the rules stated:

> The NBA will take immediate action against any player who engages in violent actions during a game, including ejection and appropriate fines and or a suspension.

> Also, any player who deliberately enters the spectator stands during a game will be automatically ejected and subject to a fine and/or a suspension...The first row is seats is considered the beginning of the stands. Entering the spectator stands after a game is also prohibited, and appropriate fines and/or a suspension will be imposed.

The Union contended that even if the conduct at issue was considered "on the playing court" under Article XXXI, Section 8, the discipline imposed here would be subject to a review under this provision of the CBA. I disagree.

Under the broad arbitration procedures outlined in Article XXXI, Section 1 of the CBA, I do have jurisdiction regarding the "interpretation or application of, or compliance

18

with, the provisions of this Agreement". However, in the context of these suspensions, such an interpretation cannot override the absolute language of Article XXXI, Section 8, which gives the Commissioner sole authority to review discipline for conduct "on the playing court". Absent suspensions issued by the Commissioner under Article XXXI, Section 8, the Grievance Arbitrator could interpret the reasonableness of NBA rules and their application under Article VI, Section 8. But, if the conduct is determined to be "on the playing court", the Commissioner's authority under Article XXXI, Section 8 must be upheld.

For the reasons set forth above, I find that I do not have authority to rule on the reasonableness of these suspensions under Article VI, Section 8.

## JUST CAUSE TO UPHOLD SUSPENSIONS

Prior to looking at the actions of each suspended NBA player, the Union raised certain procedural and legal arguments during the course of the December 9, 2004 hearing.

The Association claimed that the NBA refused to produce certain documents and witnesses. The NBA argued that it had no obligation under the CBA and/or applicable law to produce witnesses or provide discovery materials. In grievance arbitration hearings under collective bargaining agreements, each party is responsible for producing its own witnesses and documents in support of its position. The Union did not exhaust all avenues to secure documents and the attendance of relevant witnesses, including the request and issuance of subpoenas. Although the Union requested that I make an adverse inference based on the NBA's failure to respond to their request, I reached my decision without drawing any such inference.

The Union also argued that the NBA's lack of security at the Pacers/Pistons game should be considered. It relied upon the testimony of Joseph Smith who is O'Neal's personal security officer. He testified concerning the lack of security practices at the arena that night and the alleged failure of the referees to bring the incident under control. Other witnesses also claimed that the lack of sufficient security at the arena and the

19

referees' failure to take control contributed to the resulting brawl. In my view, even if these assertions could be established, and there is insufficient evidence to do so, I cannot conclude that this somehow excused the behavior of the Grievants.

I now turn to the conduct of the individual NBA players.

## ANTHONY JOHNSON

Johnson testified that the only suspension he received in his seven (7) year NBA career was for a flagrant elbow in 1999. He indicated that he has never been in a basketball fight on or off the court.

Approximately seven (7) weeks ago, Johnson injured his hand in a game, which prevented him from being in uniform in the game against the Pistons. He was dressed in street clothes and watched the game from the bench. After Piston Ben Wallace pushed Artest around the neck, Johnson testified that he remained at the Pacers' bench, observing the commotion and scuffling between the players on the court. Johnson stated that at no time did he enter the stands.

Johnson testified that after Artest came back onto the court after going into the stands, he observed two (2) fans confronting Artest. He testified that he believed that these fans were threatening Artest. After seeing Artest and these fans engage in fisticuffs, he "immediately made [his] way to subdue one of the fans and come to the defense of my teammate".

In response to my questions, Johnston stated that he attempted to give a forearm blow to the fan fighting with Artest, but slipped and wound up on top of the fan. Further, he testified that the allegation by the NBA of him striking a spectator was a "fair assessment of what occurred."

Like the testimony of the rest of his suspended teammates, Johnson was remorseful for what occurred. He claimed that he was only trying to protect his teammate. It is acknowledged that such behavior is to be commended. I note that in his press conference on November 21, 2004, when responding to a question about

suspending a particular player who entered the stands, Commissioner Stern stated as follows: "...we actually had the good news there were players in the stands attempting to act as peacemakers...We encourage players to act as peacemakers".

Johnson admitted that he attempted to hit the spectator. There is no evidence, either in Johnson's testimony or in the video tape that Johnson was acting as a peacemaker. Although, he slipped before he could deliver his forearm blow to the fan engaged in fighting Artest, he intended and, did in fact, strike a spectator.

Although Johnson's altercation with a fan was slight compared to his teammates, he received a minor suspension. There is no evidence that such behavior was in a peacemaking role.

Commissioner Stern's suspension of Johnson for five (5) games was for just cause. The Union's grievance on Johnson's behalf is denied.

## STEPHEN JACKSON

This is Jackson's first year with the Pacers. Prior to the discipline imposed in this case, Jackson has not been suspended during his NBA career. He testified that he has never been in a fight at any level in a basketball game.

Jackson was remorseful for his conduct. He testified that he was disappointed for the NBA, his team and the fans.

Jackson was guarding Ben Wallace, when Artest fouled Wallace. He saw Wallace push Artest and then attempted to stand between them to avoid a fight. Jackson testified that after Artest was hit with a beverage and entered the stands, he followed Artest with the intent to bring him back onto the playing court. When asked whether he had any intent to strike fans and/or confront them in the stands, Jackson responded negatively.

Although Jackson testified that he attempted to "retrieve" his teammate and had no intent to fight any fans in the stands, the video tape does not support his assertion. No fan provoked Jackson to enter the stands. He did so on his own volition. Although Jackson testified that he had sought to bring Artest back to the court, the video tape shows

21

conclusively that he did not try to so initially. He showed no effort to stop the altercation
and end the confrontation. The video tape clearly indicates that when entering the stands,
he attempted to punch and/or strike spectators. He entered the stands swinging his fists at
several fans.

Rather than attempt to bring Artest's altercation to a conclusion, Jackson's
conduct exacerbated the situation. It cannot be said that Jackson acted as any kind of
peacemaker. The throwing of punches by an NBA player, whether those punches
connect, reflects adversely on the NBA, the Pacers and Jackson himself.

There was no justification for Jackson entering the stands unprovoked and
pummeling spectators and fans. That conduct cannot be condoned. Commissioner Stern
had just cause to suspend Jackson for 30 games. The Union's grievance on Jackson's
behalf is denied.


RON ARTEST


Artest testified that he was sorry that he entered the stands. He stated that he has
been seeing an NBA counselor to assist him with these types of situations.

After the altercation with Wallace on the playing court, Artest, in an attempt to
extricate himself from the on-court scuffling, laid down on a table. After a period of time,
Artest was hit with a beverage by a spectator. He entered the stands looking for the
spectator who threw the liquid at him. By entering the stands, Artest precipitated one of
the ugliest brawls in NBA history. It is generally understood and indisputable that the
riot that ensued was one of the worst, if not the worst, in the history of sports since the
advent of collective bargaining.

It is undeniable that punches were exchanged between fans and Artest. After being
hit with the beverage, Artest charged into the stands trampling fans in an effort to find the
perpetrator. It is clear from viewing the video tape that Artest attacked the wrong person.

The Union argued that Commissioner Stern's penalty was excessive in banning
him for the rest of the NBA season. It argued that the penalty is too severe and not in line

22

with offenses in other sports for misconduct. The NBA should not have to justify its decision based upon what commissioners in other sports have done in penalizing their athletes. It is fundamental that previous incidents within your own sport are paramount in determining appropriate penalties.

The Union argued that the Vernon Maxwell suspension in 1995 should act as precedent for the Artest penalty issued here. It is true that Maxwell was suspended for 10 games when he entered the stands and hit a spectator. However, the similarities between the two (2) incidents end there. Apparently, the Maxwell incident ended quickly. No other NBA players and fans were involved in the altercation. In essence, what happened in Maxwell's incident is not nearly as severe and does not come close to the unprecedented brawl between players and fans that occurred in Detroit on November 19, 2004.

The only other disciplinary case of recent vintage in the NBA which somewhat parallels this incident was when Latrell Sprewell attacked and choked his coach on the playing court during a practice session. In that case, Arbitrator Feerick, in addition to ruling on other matters, reduced Sprewell's punishment. Arbitrator Feerick stated, in pertinent part, as follows:

> I find that a penalty of 68 games is commensurate with the severity of the misconduct, addresses the wrong done to the Head Coach, the Grievant's Team, and the NBA and conveys a message that violence in the NBA will be dealt with severely but always with due regard to principles of fairness. I also find that based on other NBA disciplinary actions with respect to violence in the sport, both on and off the court, a greater penalty would be unreasonable and disproportionate to the circumstances involved in this proceeding. As for a penalty of $6.4 million against a history of less penalties for misconduct not involving a Coach, I find it justified by virtue of the singularity of the misconduct and the emphasis placed on combating violence by both the NBA and NBPA...In re NBPA (Latrell Sprewell), 548, PLI/Pat 429 (199), dated March 4, 1998.

Obviously, the penalty in Sprewell was severe. This incident, which Artest precipitated, was violent. Although Artest was provoked by a spectator throwing a

23

cup of liquid on him, it in no way justifies his response. While reasonable people might argue whether Sprewell's misconduct was more egregious than Artest's, both acts of misconduct were substantial and deserving of significant penalties.

Finally, one major factor present here and not in <u>Sprewell</u> was the past suspensions that Artest has received in his six (6) year NBA career. Commissioner Stern referred to that fact in his press conference on November 21st. He stated: "I did not strike from my mind the fact that Ron Artest has been suspended on previous occasions".

While the Union admitted progressive discipline was a component of just cause, it argued that Artest has not incurred a suspension for other than rough play in almost two (2) years. While that might be true, Artest's complete NBA record must be considered. When his past record is closely examined, it shows that Artest has been suspended for 15 games during his career. Aside from flagrant fouls, the other two (2) suspensions dealt with similar problems, anger management.

Commissioner Stern stated in his press conference that "We have to make the point that there are boundaries in our games and that one of those boundaries which has always been, but is hereby announced to be immutable, is the boundary that separates the fans from the court and players cannot lose control and go into the stands".

If this was Artest's first offense, his argument for mitigation of the severity of his penalty might have been more compelling. However, I cannot discount his previous suspensions, which in any light, are serious. Commissioner Stern had just cause to suspend Artest for the remainder of the NBA season. The Union's grievance on his behalf is denied.


## JERMAINE O'NEAL


When the on-court altercation commenced between Wallace and Artest, O'Neal was on the bench. As the confrontation escalated and Artest entered the

24

stands, O'Neal left the bench and attempted to enter the stands. He testified that he wanted to make sure his teammates were okay and bring them back to the court. When O'Neal was asked at hearing whether he wanted to be a peacemaker, he responded "Yes". Other Pacer players who entered the stands and acted as peacemakers were not subjected to any discipline.

The video tape shows that when O'Neal was attempting to enter the stands and rescue his teammates, an unidentified person grabbed him around the neck from behind. O'Neal testified that this person did not identify himself; but it was later revealed that the person was an arena employee. O'Neal's personal security guard attempted to extricate O'Neal from this situation, but was unsuccessful. Eventually, O'Neal got free, but only after pushing the arena employee into the scorer's table. O'Neal testified that it was not his intent to push this person into the scorer's table, but only to free himself.

I cannot fault O'Neal for attempting to free himself from an unidentified person whose hands were around his neck. He described this chaotic situation at that point in time as "crazy" and a "complete riot". When asked whether he attempts to avoid trouble, O'Neal responded that he is a leader and a captain of his team. He stated that it was his concern that his teammates were safe and protected.

Unfortunately, when O'Neal attempted to assist his teammate Johnson on the floor, he punched a spectator. When asked why he hit the spectator, O'Neal answered as follows:

> Because I felt he was threatening Anthony Johnson's livelihood...And that's a question you have to ask yourself, that when you start to see fans come on to the court, let alone in the stands hitting players, when they come on to the court, then it becomes a scary situation...

O'Neal did not enter the stands. He was trying to protect his teammate Johnson who was on the floor, with a broken hand, during this confrontation. It is clear that O'Neal used excessive force when he punched the unknown spectator.

25

O'Neal's previous conduct in the NBA is vastly different from Artest's. His career in the NBA has been a positive one. He is the recipient of a couple of awards, attesting to his character, community involvement and citizenship. His one punch of a spectator, while excessive, was clearly out of character. O'Neal is a leader on the Pacers as evidenced by his captaincy.

On balance, Commissioner Stern's penalty of 25 games for his misconduct is excessive. I reduce O'Neal's penalty to 15 games. This should not be viewed as condoning what O'Neal did. He did punch a fan. The 15 game suspension is a significant penalty. The NBA cannot tolerate such conduct. My decision is based on the totality of his actions, including his failure to enter the stands, his excellent past record, his credible testimony that he intended to act as a peacemaker and his self-defense and restraint in freeing himself from a person who grabbed him around the neck.

Based upon all of the above, Commissioner Stern's suspension of O'Neal for 25 games was not based on just cause. O'Neal's suspension is reduced to 15 games.


CONCLUSION


In disciplinary cases, the burden is on the employer to prove wrongdoing and to show the appropriateness of the penalty. Although the NBA did not participate in the arbitration hearing, I saw video tapes of the alleged wrongdoing. In its arguments, the Union admitted that all four (4) of the Grievants are deserving of some suspension. Therefore, the main thrust of my examination on the merits of this dispute is not whether there was wrongdoing, but whether the suspensions issued by Commissioner Stern are "for just cause" as set forth in Article XXXI, Section 14 of the CBA.

While the deciding official in disciplinary cases is entitled to discretion and deference in promulgating appropriate penalties, that discretion and deference is not unfettered. In the instant case, I find that Commissioner Stern's decision to suspend Artest, Jackson and Johnson for the number of games he did is reasonable and based on

26

just cause. With respect to O'Neal, I find the suspension was excessive and not in
accordance with the fundamental tenets of just cause. I reduce O'Neal's suspension to 15
games.

**************

AWARD

**************

After carefully considering all of the evidence presented at hearing and the
arguments raised in the Union's pre-hearing and post-hearing briefs, as well as the
arguments made by the NBA in its submissions of November 26, 2004 and December 2,
2004, I find that:

1. I have jurisdiction to decide the arbitrability issue presented in this dispute;

2. I have authority to review the decision of Commissioner David Stern in
suspending the four (4) NBA players in this case under Article XXXI,
Sections 1, 5, 13 and 14;

3. Commissioner David Stern had just cause under Article XXXI, Section 14
of the CBA to suspend NBA players Ron Artest, Stephen Jackson and
Anthony Johnson. He did not have just cause to suspend Jermaine O'Neal
for 25 games. O'Neal's suspension is reduced to 15 games and will be
implemented forthwith.

4. The grievance is upheld in part and denied in part.

DATED: **DEC 2 1 2004**

Roger P. Kaplan

Roger P. Kaplan, Esq.
Arbitrator

Alexandria, Virginia

27

**\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*** 　　　　　　　　　 **\***

In The Matter of Arbitration Between 　　　　　　　　　 **\***

NATIONAL BASKETBALL PLAYERS ASSOCIATION 　　 **\***

　　　　　　　　　　　　　　　　　　　　　　　　**\* Pacers/Pistons Grievance**

　　　　　　　　　and 　　　　　　　　　　　　**\***

　　　　　　　　　　　　　　　　　　　　　　　**\* Case No. 04-3**

NATIONAL BASKETBALL ASSOCIATION 　　　　　　**\***

**\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\***

**\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\***

### DECISION OF ROGER P. KAPLAN, ESQ.

### GRIEVANCE ARBITRATOR

**\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\***

## STATEMENT OF THE CASE

On December 13, 1999, the National Basketball Association (NBA) and the
National Basketball Players Association (Union or Association) appointed the
undersigned as the Grievance Arbitrator under their Collective Bargaining Agreement
(CBA). On September 1, 2004, my term as the Grievance Arbitrator was terminated.
However, a successor has not been selected. Under Article XXXI, Section 6 of the CBA,
I continue to serve as the Grievance Arbitrator until the selection of a successor.

On November 22, 2004, the Union filed a grievance under Article XXXI of the
CBA on behalf of each of the players who was disciplined by NBA Commissioner David
Stern for their actions during the Indiana Pacers/Detroit Pistons game on

November 19, 2004. The Union claimed that the discipline imposed by Stern was "inconsistent with the terms of the CBA and applicable law, and without just cause". On November 23, 2004, the Union requested a hearing on this matter in accordance with Article XXXI, Section 3(b) of the CBA. On November 26, 2004, the NBA responded by disagreeing as to the substantive arbitrability of this dispute. It contended that the Association's attempt to appeal Commissioner Stern's decision to the Grievance Arbitrator was improper. In conclusion, the NBA stated as follows:

> We therefore object in the strongest terms to any assertion by the Grievance Arbitrator of jurisdiction over any aspect of this dispute. In order to preserve its right to de novo judicial review on the issue of arbitrability, the NBA must respectfully decline to participate in any proceeding before you concerning either the merits of this dispute or the question of your authority to determine jurisdiction. The NBA reserves all, and waives none, of its rights regarding all the matters raised in Mr. Kessler's letters.

On November 30, 2004, the Association submitted an extensive letter, with exhibits, setting forth its position on the issues. In that letter, the Association stated that it was not appealing the suspensions of players for the "on-the-court altercation", but appealing only the suspensions of Ron Artest, Stephen Jackson, Jermaine O'Neal and Anthony Johnson. On December 2, 2004, the NBA responded to the Association's letter, reiterating its argument that the Grievance Arbitrator does not have jurisdiction to consider this matter. The NBA repeated its position that they would be risking their right to seek de novo judicial review by making further assertions and arguments.

DISCUSSION AND ANALYSIS

I have considered the issues involving my jurisdiction to hear the instant dispute. I find that I have jurisdiction to determine the arbitrability of this grievance. My decision today does not reach the conflict between the parties as to whether Commissioner Stern's

2

decision is reviewable and the propriety of the suspensions issued by him on November
21, 2004. Both of these issues will be heard at a hearing during the week of December 6,
2004. I have tentatively set a date of December 8, 2004 for that hearing. Additionally, my
decision is not in any way based on the Union's argument contained in its November 30,
2004 letter that alleges that Commissioner Stern has expressed a bias in this matter. The
only decision I make is that I have authority to determine the arbitrability of the
underlying dispute.

In reaching this decision, I note that Article XXXI, Section 1 of the CBA provides
for any grievance "involving the interpretation or application of, or compliance with, the
provisions of this Agreement...shall be resolved exclusively by the Grievance Arbitrator
in accordance with the procedures set forth in this Article;"... Additionally, in paragraph
17 of the Uniform Player Contract, it provides for arbitration of "any dispute arising
between the Player and the Team relating to any matter arising under this Contract, or
concerning the performance or interpretation thereof (except for a dispute arising under
paragraph 9 hereof), such dispute shall be resolved in accordance with the Grievance and
Arbitration Procedure set forth in the NBA/NBPA Collective Bargaining Agreement". I
agree with rationale expressed by the previous NBA Grievance Arbitrator John D.
Feerick indicating that these provisions are clearly broad arbitration clauses. These broad
arbitration clauses have been uniformly held by courts to justify a presumption of
arbitrability.[1]

This is not the first time that the NBA has challenged the authority of the
Grievance Arbitrator to decide an arbitrability issue. It challenged the jurisdiction of
Arbitrator Feerick immediately prior to the NBA lockout of its players on
July 1, 1998. After Arbitrator Feerick decided that he had jurisdiction, the NBA sought a
TRO from a New York Federal Court challenging his decision. District Judge Barbara
Jones held in denying the NBA's motion that, "I also note that determining whether there
is jurisdiction is a task that arbitrators routinely perform, subject to de novo review and

---

[1]     See Collins & Aikman Prods. Co v. Building Sys., Inc., 58 F.3d 16, 20 (2nd Cir. 1995); McDonnell Douglas
Fin. Corp. v. Pennsylvania Power & Light Co., 858F.2d 825, 832 (2d Cir. 1998).

3

absent a stay.[2]

One of the court cases cited by Arbitrator Feerick in his decision is instructive here. In <u>National Ass'n of Broadcast Employees & Technicians v. Am. Broad., Co.,</u> 140 F.3d 459, 462-63 (2d Cir. 1998), the Court stated, in pertinent part, as follows:

> We see no reason why arbitrability must be decided by a court before
> an arbitration award can be made...There is, moreover, much to be lost.
> Indeed the proposed rule would frustrate a fundamental goal of arbitration:
> to provide a simple and expeditious alternative to litigation. Under
> [plaintiff]'s view, arbitration proceedings must come to a halt, and the party
> seeking arbitration must bear the burden of obtaining a favorable ruling
> whenever a party disputed arbitrability. If any and all objections to
> arbitrability were enough to halt the process pending a court order
> compelling arbitration, a non-grieving party would have an incentive to
> raise meritless arbitrability issues, particularly where, as here, time is of the
> essence.

> The Union makes another argument, claiming that this matter is not a
> substantive arbitrability determination, but rather a procedural arbitrability dispute.
> It argued that under the CBA, a hearing will either be held before Commissioner
> Stern under Article XXXI, Section 8 or the Grievance Arbitrator under Article
> XXXI, Sections 1 and 13.

> The NBA contended that Article XXXI, Section 5 (b) precludes jurisdiction
> by the Grievant Arbitrator based upon the following language:

> ...The Grievance Arbitrator shall not have jurisdiction or authority
> to add to, detract from, or alter in any way the provisions of
> this Agreement, (including the provisions of this subsection) or any
> Player Contract. Nor, in the absence of agreement by the NBA and
> the Players Association, shall the Grievance Arbitrator have jurisdiction or
> authority to resolve questions of substantive arbitrability.

Without rending a decision at this time, as to whether this is a substantive or procedural arbitrability dispute, it is clear that the parties have an arbitration process in place, which must be followed. Without further evidence, I do not believe that the parties intended that if the NBA raised any arbitrability issue challenging the Grievance

---

[2]  <u>NBA v. NBPA,</u> No. 98 Civ. 4912 (BSJ), Transcript dated July 30, 1998, at 53-54(S.D.N.Y.)

Arbitrator's right to hear the dispute, this alone, would preclude arbitration. Therefore, under the terms of the CBA, the hearing will either be held before Commissioner Stern or before the Grievance Examiner. Notwithstanding the provisions of Article XXXI, Section 5 (b), I find that the broad arbitration clauses contained in Article XXXI, Section 1 of the CBA and paragraph 17 of the Uniform Player Contract, warrant a finding that I have jurisdiction to determine whether the arbitrability issue raised by the NBA is meritorious.

For the reasons enumerated above, I find that I have jurisdiction to decide the arbitrability issue in this dispute. The hearing on the remaining issues of the arbitrability of the Union's attempt to challenge Commissioner Stern's decision and, if arbitrable, whether there was just cause for the suspensions imposed, will be heard on Wednesday, December 8, 2004. I request that the Association and the NBA inform my office of the arrangements for the hearing on that date.

DATED:    DEC 0 3 2004

Roger P. Kaplan, Esq.
Grievance Arbitrator

Alexandria, Virginia

5