National Basketball Association v. National Basketball Players Association et al    Doc. 15

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

———————————————————————

NATIONAL BASKETBALL ASSOCIATION,                    :

                                        :

                            Plaintiff,

                                        :        04-Civ.-09528(GBD)

        - against -

                                        :

NATIONAL BASKETBALL PLAYERS
ASSOCIATION, RONALD ARTEST, STEPHEN       :
JACKSON, ANTHONY JOHNSON, and JERMAINE
O'NEAL,                                   :

                            Defendants.    :

———————————————————————


### PLAINTIFF'S MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANTS' MOTION TO ENJOIN THE NATIONAL BASKETBALL ASSOCIATION FROM CONTINUED ENFORCEMENT OF PLAYER SUSPENSIONS

**SKADDEN, ARPS, SLATE,
MEAGHER & FLOM LLP**
Jeffrey A. Mishkin (JM 8380)
Douglas B. Adler (DA 6013)
Anthony J. Dreyer (AD 3571)
Four Times Square
New York, New York  10036
Tel:  (212) 735-3000

**PROSKAUER ROSE LLP**
Howard L. Ganz (HG 8644)
Daniel R. Halem (DH 3035)
1585 Broadway
New York, New York  10036
Tel:  (212) 969-3035

Dockets.Justia.com

## TABLE OF CONTENTS

Page

PRELIMINARY STATEMENT ............................................................................... 1

    A.   The Altercation During the November 19, 2004 Game Between the Indiana
          Pacers and the Detroit Pistons.................................................................. 4

    B.   The NBA's Regulation of Player Conduct .............................................. 5

    C.   The Limited Jurisdiction of the Grievance Arbitrator ............................. 6

    D.   Imposition of Discipline for the November 19 Altercation ...................... 8

    E.   Proceedings Before the Grievance Arbitrator ......................................... 9

I.    THE NBPA CANNOT SATISFY THE RIGOROUS STANDARDS FOR
     INJUNCTIVE RELIEF............................................................................. 12

II.   THE NBPA HAS NO LIKELIHOOD OF SUCCESS ON THE MERITS OF
     ITS CLAIM THAT THE PURPORTED ARBITRATION AWARD SHOULD
     BE CONFIRMED. ..................................................................................... 13

    A.   Under the Plain Language of CBA Article XXXI, Section 8, the Dispute
          Unquestionably Involves "Conduct on the Playing Court." ..................... 15

    B.   The NBPA's Narrow Interpretation of the CBA Is Foreclosed by Prior
          Arbitral and Judicial Authority. ................................................................ 17

    C.   The Proper Interpretation of "Conduct on the Playing Court" Is at Least as
          Broad as Article 35(d), Which Authorizes the NBA To Impose Discipline
          for Misconduct "At or During" an NBA Game. ...................................... 20

    D.   The Parties' Past Practice Demonstrates That "Conduct on the Playing
          Court" Broadly Encompasses Player Misconduct at NBA Games....................... 21

    E.   The Players Association Was Notified of the NBA's Interpretation of
          "Conduct on the Playing Court" and Never Contested It. .................................... 24

    F.   There Is No Basis for the Players Association's Interpretation of Section 8........ 25

    G.   The "Integrity of The Game" Language In Section 8 Has No Bearing on
          This Case.................................................................................................. 27

    H.   The NBPA Cannot Circumvent the Exclusive Jurisdiction of the
          Commissioner by Mischaracterizing Its Grievance as a Dispute Over the
          "Reasonableness" of an NBA Rule............................................................ 29

    I.    The Question of Arbitrability Is Subject To De Novo Review. ............................ 33

III.  THE NBPA HAS FAILED TO DEMONSTRATE THAT IT WILL SUFFER
     IRREPARABLE HARM IN THE ABSENCE OF THE REQUESTED
     RELIEF..................................................................................................... 38

IV.  THE BALANCE OF HARDSHIPS TIPS DECIDEDLY IN THE NBA'S
     FAVOR. .................................................................................................... 40

CONCLUSION ......................................................................................................... 43

# TABLE OF AUTHORITIES

## CASES

Absolute Recovery Hedge Fund, L.P. v. Gaylord Container Corp., 185 F. Supp. 2d 381 (S.D.N.Y. 2002)..........................................................................41

American Almond Products Co. v. Consolidated Pecan Sales Co., 144 F.2d 448 (2d Cir. 1944)..........................................................................36

AT&T Technologies, Inc. v. Communications Workers, 475 U.S. 643 (1986) ...........................34

Avis Rent A Car System, Inc. v. Garage Employees Union, Local 272, 791 F.2d 22 (2d Cir. 1986)..........................................................................37

Bear Stearns & Co. v. N.H. Karol & Associates, Ltd., 728 F. Supp. 499 (N.D. Ill. 1989) ..........................................................................37

Brown v. New York Cty. Hlth. & Hosp., No. 96-CV-0156, 1996 WL 68558 (E.D.N.Y. Feb. 5, 1996)..........................................................................12, 39

Borey v. National Union Fire Insurance Co., 934 F.3d 30 (2d Cir. 1991) ..............................12, 38

Brewer v. West Irondequoit Central School District, 212 F.3d 738 (2d Cir. 2000)......................12

Buder v. New York Trust Co., 82 F.2d 168 (2d Cir. 1936)..........................................................25

Buffalo Forge Co. v. Ampco-Pittsburgh Corp., 638 F.2d 568 (2d Cir. 1981)............................38

Cargill Rice, Inc. v. Empresa Nicaraguense Dealimentos Basicos, 25 F.3d 223 (4th Cir. 1994)..........................................................................37

Cendant Corp. v. Forbes, 70 F. Supp. 2d 339 (S.D.N.Y. 1999), aff'd mem., 205 F.3d 1322 (2d Cir. 2000)..........................................................................36

In re Chateaugay Corp., 891 F.2d 1034 (2d Cir. 1989) ...............................................................23

Chicago School Reform Board of Trustees v. Diversified Pharmaceutical Services, Inc., 40 F. Supp. 2d 987 (N.D. Ill. 1999) ..........................................................41

Contra Costa Legal Assistance Workers v. Contra Costa Legal Services Foundation, 878 F.2d 329 (9th Cir. 1989) ...................................................................30, 32

Cooper v. TWA Airlines, LLC, 274 F. Supp. 2d 231 (E.D.N.Y. 2003) ........................................39

District 2, Marine Engineers Beneficial Association v. Falcon Carriers, Inc., 374
    F. Supp. 1342 (S.D.N.Y. 1974)..................................................................................35

Ewing v. Stern, No. 97 Civ. 3578 (JSR) (S.D.N.Y. May 16, 1997) .......................................passim

Firemen's Insurance Co. v. Keating, 753 F. Supp. 1146 (S.D.N.Y. 1990) ....................................39

First Options of Chicago, Inc. v. Kaplan, 514 U.S. 938 (1995) ...............................................34, 38

General Drivers Local Union No. 509 v. Ethyl Corp., 68 F.3d 80 (4th Cir. 1995) ......................32

Graphic Communications International Union, Local 735-S v. North American
    Directory Corp. II, 98 F.3d 97 (3d Cir. 1996)..................................................................30

Greene v. WCI Holdings Corp., 956 F. Supp. 509 (S.D.N.Y. 1997), aff'd, 136
    F.3d 313 (2d Cir. 1998)...............................................................................................38

Hooters of America, Inc. v. Phillips, 39 F. Supp. 2d 582 (D.S.C. 1998), aff'd, 173
    F.3d 933 (4th Cir. 1999) .............................................................................................37

Howsam v. Dean Witter Reynolds, Inc., 537 U.S. 79 (2002).......................................................35

International Union, United Plant Guard Workers v. Lockheed Martin Utility
    Services, Inc., No. 97-3495, 1998 WL 416015 (6th Cir. July 8, 1998).............................32

JSG Trading Corp. v. Tray-Wrap Inc., 917 F.2d 75 (2d Cir. 1990) .............................................12

Jessup v. American Kennel Club, Inc., 862 F. Supp. 1122 (S.D.N.Y. 1994).................................38

In re John Starks, No. 00-01 (Mar. 6, 2000) ...............................................................................37

John Wiley & Sons, Inc. v. Livingston, 376 U.S. 543 (1964) ......................................................35

Journal of Commerce v. Employees Association, No. 87 CIV. 6977 (MJL), 1988
    WL 49068 (S.D.N.Y. May 12, 1988) ............................................................................33

Katz v. Feinberg, 290 F.3d 95 (2d Cir. 2002).......................................................................passim

Lazar's Auto Sales, Inc. v. Chrysler Finance Corp., No. 99 CIV. 0213(CM), 1999
    WL 123501 (S.D.N.Y. Mar. 2, 1999) ............................................................................13

Line Communications Corp. v. Reppert, 265 F. Supp. 2d 353 (S.D.N.Y. 2003) ....................13, 38

Local Union No. 787, International Union of Electric, Radio & Machine Workers
    v. Collins Radio Co., 317 F.2d 214 (5th Cir. 1963).........................................................32

Malletier v. Dooney & Bourke, Inc., 340 F. Supp. 2d 415 (S.D.N.Y. 2004) .................................11

Marshall v. National Association of Letter Carriers BR36, No. 03 Civ. 1361
    TSAJP, 2003 WL 22119882 (S.D.N.Y. Sept. 15, 2003) .....................................12

Merrill Lynch, Pierce, Fenner & Smith Inc. v. Noonan, No. 92 Civ. 3770 (SWK),
    1992 WL 196741 (S.D.N.Y. Aug. 3, 1992).........................................................37

Mount Ararat Cemetery v. Cemetery Workers Union, Local 365, 975 F. Supp.
    445 (E.D.N.Y. 1997).............................................................................................41

National Basketball Players Association v. National Basketball Association (In re
    Chicago Bulls), 96-01 (Dam, 1996)..............................................................23, 24

NBPA (Charles Barkley) v. NBA, No. 92-3 (1992) ............................................. passim

NBPA (Isaiah Rider) v. NBA, (Oct. 27, 1997).........................................................40

NBPA (Sprewell) v. NBA, (Jan. 27, 1998)................................................................20

New York News, Inc. v. Newspaper Guild of New York, 927 F.2d 82 (2d Cir.
    1991) .......................................................................................................................32

New York State Teamsters Conference Pension & Retirement Fund v. United
    Parcel Serv., Inc., 198 F. Supp. 2d 188 (N.D.N.Y. 2002), aff'd, 382 F.3d
    272 (2d Cir. 2004)................................................................................................23

Office of Commisioner of Baseball v. World Umpires Association, 242 F. Supp.
    2d 380 (S.D.N.Y. 2003) .......................................................................................32

Paulson, Inc. v. Bromar, Inc., 808 F. Supp. 736 (D. Haw. 1992).........................25

Piercy v. Federal Reserve Bank, No. 02 Civ. 5005 (DC), 2003 WL 115230
    (S.D.N.Y. Jan. 13, 2003)......................................................................................39

Tellium, Inc. v. Corning Inc., No. 03 Civ. 8487 (NRB), 2004 WL 307238
    (S.D.N.Y. Feb. 13, 2004) ................................................................................4, 41

Tradescape.com v. Shivaram, 77 F. Supp. 2d 408 (S.D.N.Y. 1999) .....................41

Transportation-Communication Employees Union v. Union Pacific R.R. Co., 385
    U.S. 157 (1966).....................................................................................................23

United States Postal Service v. American Postal Workers Union, 204 F.3d 523
    (4th Cir. 2000).......................................................................................................32

iv

<u>Vantico Holdings S.A. v. Apollo Management, LP</u>, 247 F. Supp. 2d 437
    (S.D.N.Y. 2003) ...........................................................................................................13

<u>Walsh v. Northrop Grumman Corp.</u>, 871 F. Supp. 1567 (E.D.N.Y. 1994) .............................39, 40

<u>West v. Keane</u>, No. 93 Civ. 6680 (JFK), 1995 WL 434306 (S.D.N.Y. July 24,
    1995) .........................................................................................................................12

<u>Zervos v. Verizon New York, Inc.</u>, 252 F.3d 163 (2d Cir. 2001)....................................................38

## OTHER AUTHORITIES

<u>Black's Law Dictionary</u> 112 (8th ed. 2004) .................................................................................36

Restatement 2d Contracts 202(4)....................................................................................................25

11 Williston on Contracts § 32:14 (4th ed.)...................................................................................25

## PRELIMINARY STATEMENT

This action arises out of one of the most flagrant incidents of violence ever to have occurred in the history of the National Basketball Association ("NBA") – an incident in which certain NBA players engaged in violent physical attacks on spectators and security personnel during an NBA game. The NBA Commissioner, after a thorough investigation, imposed suspensions on the players involved. The National Basketball Players Association ("NBPA" or "Players Association"), the union representing NBA players, took the position that the suspensions were excessive, and persuaded a third-party arbitrator – without the NBA's participation or consent – to issue an "award" purporting to reduce the length of one of the suspensions. That "award," however, has no legal force or effect, as the arbitrator was without authority to issue it.

In the nearly forty-year history of the collective bargaining relationship between the NBA and the Players Association, the authority to discipline players for misconduct committed at or during an NBA game has been reserved solely and exclusively to the Commissioner of the NBA. The Commissioner's exercise of that authority has never been reviewed – let alone overturned – by a third party arbitrator.

Currently, the Commissioner's authority is found in Article 35(d) of the NBA Constitution (which is incorporated explicitly into every player's contract), and Article XXXI, Section 8 of the 1999 collective bargaining agreement between the NBA and the Players Association ("CBA"). Article 35(d) empowers the Commissioner to impose fines and suspensions for any "act or conduct of a player at or during" any NBA game that, "in the opinion of the Commissioner," has been prejudicial to or against the best interests of the NBA. Article XXXI, Section 8 provides that any challenge by a player to a fine or suspension for "conduct on the playing court" is to be resolved exclusively by an appeal to the Commissioner.

1

The phrase "conduct on the playing court" in Section 8 has been consistently interpreted by the NBA to refer to any behavior by a player in connection with the presentation of an NBA game, without regard to whether that behavior occurs literally within the four corners of the playing floor or during game action. In fact, over the past forty years, the NBA has imposed hundreds of fines and suspensions for "conduct on the playing court," notwithstanding that many of those incidents occurred off the basketball floor (including conduct on the apron surrounding the playing floor, on the bench, in the spectator stands, in the tunnels leading to and from the court, and in the locker room), and that many occurred before or after, or during breaks in, a game.

Twice before, the Players Association has unsuccessfully sought to challenge the Commissioner's sole and exclusive authority over "conduct on the playing court." In 1992, the NBPA argued to an arbitrator that the Commissioner lacked the authority to suspend Charles Barkley without pay, after he walked off the basketball floor and spit on a spectator during a break in game action. NBPA (Charles Barkley) v. NBA, No. 92-3 (1992). In 1997, the Players Association argued to this very Court (in the context of a motion for an injunction "in aid of arbitration") that the Commissioner lacked authority to suspend Patrick Ewing (among other players) for leaving the bench area to join in an altercation that took place out-of-bounds and during a stoppage in play. Ewing v. Stern, No. 97 Civ. 3578 (JSR) (S.D.N.Y. May 16, 1997). In both cases, the NBPA's claims were rejected. Both the arbitrator and the judge (Judge Rakoff) concluded that the matters were not arbitrable because the Commissioner has sole and exclusive authority over "conduct on the playing court." These rulings, which are directly on point, govern the outcome of this case.

2

The NBPA's prior actions also make clear that its theory in this case – that player conduct must take place both on the playing floor and within the "flow of the game" in order for it to fall within the Commissioner's exclusive jurisdiction under Section 8 – is nothing but a fiction, devised for the first time ever in this proceeding. The Players Association did not advocate this interpretation in <u>Barkley</u> or <u>Ewing</u>, despite factual circumstances in both cases that would have supported it. Further, over the course of the last ten years, the NBPA has filed numerous appeals to the Commissioner where the discipline imposed by the NBA was for conduct off the playing floor and outside of "the flow of the game." These include, for example, altercations between players in the locker room following a game, detrimental statements by players following a game, and altercations occurring entirely in the spectator stands.

As a result of all of this, there is no likelihood that the NBPA will succeed on the merits of its motion to confirm. The Grievance Arbitrator's assumption of jurisdiction over this matter was precluded by the express and unambiguous terms of Section 8. The NBPA's notion, adopted by the Grievance Arbitrator, that the Commissioner's "on the playing court" authority terminates at the baseline – and thus comprehends a punch thrown by one player at another while both are under the basket, but not a punch thrown by a player at a spectator in the first row – is utterly preposterous. In any event, it cannot reasonably be disputed that a substantial portion of the misconduct for which the individual defendants were suspended occurred on the actual playing floor, and that alone requires a finding that only the Commissioner has authority to review the suspensions. Finally, as the evidence will plainly establish, the consistent past practice and mutual understanding of the parties to the CBA confirms that all the conduct in question constitutes "conduct on the playing court" and therefore was within the sole jurisdiction of the Commissioner and was not arbitrable.

3

Nor can the NBPA show that it will suffer any irreparable injury without the requested relief, or that the balance of the hardships tips in its favor. In the history of the NBA, no player suspension has ever been stayed or enjoined prior to a final determination on the merits. Indeed, the CBA itself expressly recognizes that a suspended player can be made whole by a monetary award after having served his suspensions. Indeed, if the requested preliminary injunction is issued, the true irreparable harm will be that suffered by the NBA, as it will have its bargained-for system of player discipline publicly and utterly dismantled by reason of an arbitration on issues the NBA never agreed to arbitrate. See, e.g., Tellium, Inc. v. Corning Inc., No. 03 Civ. 8487 (NRB), 2004 WL 307238, at *3 (S.D.N.Y. Feb. 13, 2004) ("Compelling arbitration of a matter not properly subject to arbitration constitutes 'per se irreparable harm.'").

Finally, the injunction sought by the Players Association would alter – not preserve – the status quo, by compelling the NBA to reinstate for his next ten games a player who, all agree, has been properly suspended from November 21, 2004 until the current date for flagrant misconduct. Under settled law, the NBPA's burden for such a "mandatory" injunction is "significantly higher" than the already-elevated burden that must be overcome to obtain the extraordinary remedy of a preliminary injunction. The Players Association cannot meet that burden.

## STATEMENT OF FACTS

**A.    The Altercation During the November 19, 2004**
**Game Between the Indiana Pacers and the Detroit Pistons**

The serious and unprecedented event that underlies this proceeding occurred with 45.9 seconds remaining in a November 19, 2004 NBA game between the Indiana Pacers and the Detroit Pistons at The Palace of Auburn Hills (the "Detroit Incident"). (Affidavit of Richard W. Buchanan, ¶ 7 (hereinafter, "Buchanan Aff.").) The Detroit Incident began when an altercation

4

broke out on the playing floor among players for the Pacers and the Pistons, following a foul committed by defendant Artest on an opposing player, Ben Wallace. (Id., ¶ 8.) The altercation escalated to the point where members of the Pacers engaged in physical confrontations with Palace patrons and others on the playing floor and in the stands. (Id.) Each of the individually named defendants was involved in some aspect of the incident. (Id.)

Following his altercation with Wallace, defendant Artest entered the stands to confront a spectator, whom he subsequently pushed to the ground. (Id.) He thereafter returned to the playing floor and struck one spectator in the face, and punched another. (Id.) Defendant Jackson attempted to instigate a fight with several Pistons players on the playing floor, and then followed defendant Artest into the stands, where he struck one spectator in the face and another in the back of the head. (Id.) Jackson also spit at two different fans as he left the basketball floor. (Id.)

After the altercation began, defendant Johnson left the immediate vicinity of his team's bench and confronted a spectator on the playing floor, whom he punched and wrestled to the ground. (Id.) Likewise, defendant O'Neal left the immediate vicinity of his team's bench and attempted to enter the stands, but was restrained by an usher whom O'Neal forcefully shoved over the scorer's table. (Id.) Defendant O'Neal then proceeded to attack a spectator on the playing floor, whom he punched in the face. (Id.)

All of the conduct engaged in by the individual defendants on the playing floor and in the stands occurred prior to the announcement by the officiating crew that the game was over. (Id., ¶ 9.)

## B.    The NBA's Regulation of Player Conduct

The NBA and the NBPA are parties to the CBA, which covers the period from January 20, 1999 through June 30, 2005, and sets forth the employment terms governing NBA players.

5

(Id., ¶ 6.)  Pursuant to the terms of the CBA, each NBA player has entered into a Uniform Player

Contract ("UPC") that contains additional terms and conditions of employment.  (Id., ¶ 10.)

The conduct of NBA players is governed by various provisions of the CBA and the UPC,

and by rules and regulations promulgated by the NBA and its member teams.  (Id., ¶ 11.)  Of

particular relevance here is Article 35 of the NBA Constitution (entitled "Misconduct"), which

empowers the Commissioner to fine and/or suspend an NBA player for the causes set forth

therein.  Article 35(d) of the NBA Constitution provides that:

> If in the opinion of the Commissioner any other act or conduct of a Player at or
> during an Exhibition, Regular Season, or Playoff game has been prejudicial to or
> against the best interests of the Association or the game of basketball, the
> Commissioner shall impose upon such Player a fine not exceeding $35,000, or
> may order for a time the suspension of any such Player from any connection or
> duties with Exhibition, Regular Season, or Playoff games, or he may order both
> such fine and suspension.

(Id., ¶ 12.)

All NBA players and the NBPA are – and have been for many years – expressly advised

in writing at the commencement of each playing season that "violence on the court," including

engaging in "violent acts during a game" and deliberately entering "the spectator stands during a

game," is prohibited.  (Id., ¶ 14.)  Any such conduct may subject a player to ejection from the

game, a fine and/or suspension.   (Id. (attaching Player Conduct Memo of October 18, 2004).)

The players and the NBPA are also advised – and have been for many years – that any player

who leaves his team's bench area during an altercation will be suspended.  (Buchanan Aff. ¶

14(b).)

**C.    The Limited Jurisdiction of the Grievance Arbitrator**

Article XXXI of the CBA sets forth grievance arbitration procedures for the resolution of

disputes that arise between the NBA and/or its member teams and the NBPA and/or individual

NBA players. (Id., ¶ 16.) The Grievance Arbitrator's authority is carefully circumscribed, particularly with respect to disputes involving player discipline.[1]

As an initial matter, the CBA states that a "fine or suspension imposed by the Commissioner shall be appealable to the Grievance Arbitrator only if it results in a financial impact on the player of more than $25,000." CBA Art. XXXI, sec. 13 (emphasis added). Even if this financial threshold is met, however, the Grievance Arbitrator is precluded from hearing a challenge to discipline imposed by the Commissioner for misconduct on the playing court. Article XXXI, Section 1(b) of the CBA states that the Grievance Arbitrator shall have jurisdiction over player discipline only to the extent set forth in Section 8 of the Article XXXI. Section 8 provides, in relevant part, as follows:

> Any dispute involving (i) a fine or suspension imposed upon a player by the Commissioner (or his designee) for conduct on the playing court (regardless of its financial impact on the player) . . . shall be processed exclusively as follows:
>
> (i)      Within twenty (20) days following written notification of the action taken by the Commissioner (or his designee), a player affected thereby or the Players Association may appeal in writing to the Commissioner.
>
> (ii)      Upon the written request of the Players Association, the Commissioner shall designate a time and place for hearing as soon as is reasonably practicable following his receipt of the notice of appeal.
>
> (iii)      As soon as reasonably practicable, but not later than twenty (20) days, following the conclusion of such hearing, the Commissioner shall render a written decision, which decision shall constitute full, final and complete disposition of the dispute, and shall be binding upon the player(s) and Team(s) involved and the parties to this Agreement.

---

[1]      The CBA contains numerous other limitations on the jurisdiction of the Grievance Arbitrator. See, e.g., Article XXXI, Section 1 (providing that certain types of disputes arising under the CBA – including those involving such critical economic issues as the NBA Salary Cap, the NBA Draft, free agency, and the pay scale for Rookie players – are to be heard by the System Arbitrator, not the Grievance Arbitrator); Article XXXI, Section 7(e) (providing that certain injury-related disputes are to be heard by a designated physician, and not the Grievance Arbitrator, if a party to the dispute so elects).

CBA Article XXXI, Section 8 (emphasis added). This exclusive power of the Commissioner over issues of fundamental importance to the NBA is a critical and indispensable pillar of the NBA's bargained-for system of player discipline. (Buchanan Aff. ¶ 18.)

A further limit on the Grievance Arbitrator's authority is that imposed upon his ability to determine whether a dispute is arbitrable. In 1998, a dispute arose between the NBA and the NBPA over whether the Grievance Arbitrator or the courts had jurisdiction to determine questions of arbitrability. (Id., ¶ 20.) Following this dispute, the parties added new and explicit language to the CBA that provides that the Grievance Arbitrator does not have jurisdiction or authority to resolve any disagreements over the arbitrability of the substance of a dispute (i.e., "substantive" arbitrability). (Id.) The new language (underscored below) added to Article XXXI, Section 5(b), provides as follows:

> The Grievance Arbitrator shall not have jurisdiction or authority to add to, detract from, or alter in any way the provisions of this Agreement (including the provisions of this subsection) or any Player Contract. Nor, in the absence of agreement by the NBA and the Players Association, shall the Grievance Arbitrator have jurisdiction or authority to resolve questions of substantive arbitrability.

**D.    Imposition of Discipline for the November 19 Altercation**

On November 20, 2004, the Commissioner, pursuant to his authority under Article 35(d) of the NBA Constitution, suspended defendants Artest, Jackson, and O'Neal indefinitely pending the NBA's investigation of the Detroit Incident. (Buchanan Aff. ¶ 21.) On November 21, 2004, following an investigation by the NBA, the Commissioner (again pursuant to Article 35(d)) suspended defendant Artest for the remainder of the season, defendant Jackson for thirty games, defendant Johnson for five games, and defendant O'Neal for twenty-five games (collectively the "Suspensions"). (Id., ¶ 21.) Five other players involved in the Detroit Incident also were suspended. (Id.)

8

E.    **Proceedings Before the Grievance Arbitrator**

On November 22, 2004, the NBPA purported to challenge the Commissioner's

imposition of discipline before the Grievance Arbitrator. (Id., ¶ 23.)  On November 23, 2004, the

NBPA requested that the Grievance Arbitrator convene an expedited hearing.  (Id.)  On

November 26, 2004, the NBA sent a letter to the Grievance Arbitrator and the NBPA, objecting

– by reason of Sections 5(b) and 8 of the CBA – to the commencement of the purported

arbitration proceedings.  (Id., ¶ 24.)  On November 30, 2004, the NBPA responded by sending a

20-page letter (with more than 150 pages of exhibits) to the Grievance Arbitrator, asking him to

rule, by December 3, 2004, that he has the authority to determine the arbitrability of the NBPA's

claim and that he, rather than the NBA Commissioner, has jurisdiction to resolve it.  (Id., ¶ 25.)[2]

On December 2, 2004, the NBA reiterated its objection to the Grievance Arbitrator's

consideration of the matter, and, in order to preserve its entitlement to de novo review of these

issues in federal court, refused to participate in a hearing before the Grievance Arbitrator or

otherwise to respond substantively to the NBPA's arguments.  (Id., ¶ 26.)

On December 3, 2004, despite the clear language in Section 5(b) that should have

precluded this result, the Grievance Arbitrator issued a "decision" holding that he "has

jurisdiction to determine the arbitrability of this grievance," and setting an expedited hearing to

consider both whether "Commissioner Stern's decision is reviewable and the propriety of the

suspensions issued by him on November 21, 2004."  (Id., ¶ 27.)  Having thus usurped the role of

the Commissioner, the Grievance Arbitrator next refused to grant the NBA's reasonable request

to bifurcate the issues of arbitrability and the propriety of the suspensions, which would have

---

2       In its November 30, 2004 letter, the NBPA stated that it was withdrawing its request for
        arbitration with respect to all players other than defendants Artest, Jackson, Johnson and O'Neal.
        (Id., ¶ 25.)

9

enabled the NBA to secure a judicial determination of the question of arbitrability (assuming the Grievance Arbitrator found the dispute arbitrable) before the commencement of any hearing on the merits. Because the hearing on the merits convened by the Grievance Arbitrator would itself eviscerate the NBA's bargained-for right to have the Commissioner alone decide issues involving discipline for "conduct on the playing court," the NBA declined to participate in the hearing. (Id., ¶ 29.) On December 3, 2004, the NBA initiated this action seeking declarations that: (i) pursuant to the terms of the CBA, the Grievance Arbitrator had no authority to resolve the arbitrability issue; (ii) the dispute the NBPA has attempted to submit to grievance arbitration is not arbitrable and that the Grievance Arbitrator has no jurisdiction over that dispute; and (iii) the NBPA's sole remedy to challenge the Suspensions is an appeal to the Commissioner pursuant to Section 8. (Id., ¶ 30.)

On December 7, the Grievance Arbitrator wrote to the NBA urging it to attend the hearing and announcing the standard of review he intended to apply to his consideration of the proprietary of the Suspensions, even though he had not yet received a single piece of evidence or head any argument on that issue. (Id., ¶ 31.) The NBA responded the next day, informing the Grievance Arbitrator again that it would not participate in the December 9 hearing. (Id.) In the NBA's absence, on December 9, 2004, the Grievance Arbitrator held the hearing. (Id., ¶ 32.) On December 21, 2004, the Grievance Arbitrator issued his arbitration award, holding that (i) he has the authority to determine arbitrability; (ii) the dispute is arbitrable before the Grievance Arbitrator, and is not within the exclusive jurisdiction of the Commissioner, because the conduct in question did not take place "on the playing court" within the meaning of Article XXXI, Section 8 of the CBA; and (iii) the Commissioner had just cause to suspend defendant Artest for the remainder of the season, defendant Jackson for thirty games and defendant Johnson for five

10

games, but that the Commissioner did not have just cause to suspend defendant O'Neal for twenty-five games, and reducing that suspension to fifteen games. The Players Association now moves to confirm the arbitration award and for a preliminary injunction pending its motion to confirm.

We demonstrate below that: (i) under Katz v. Feinberg, 290 F.3d 95 (2d Cir. 2002), and Article XXXI, Paragraph 5(b) of the CBA, the Grievance Arbitrator was, as a matter of law, precluded from determining his own jurisdiction to decide arbitrability and therefore, in considering whether the Players Association has demonstrated a likelihood of success on the question of arbitrability, the NBA is entitled to a fully independent, de novo review by this Court, (see pp. 33-38, below); (ii) the Players Association has no likelihood of success on the merits of its motion to confirm for at least five separate reasons including, without limitation, the prior arbitral decision in Barkley and the prior judicial decision in Ewing (see pp. 17-19, below); and (iii) by reason of Article XXXI, Section 14 (d) of the CBA and the decision of former Grievance Arbitrator John Feerick in NBPA (Isaiah Rider) v. NBA, at 3 (Oct. 27, 1997), both recognizing that players can be made whole by monetary awards after having served their suspensions, and by reason of the fact that never in the history of the NBA has any player suspension been enjoined or stayed prior to a final determination on the merits, the Players Association cannot establish the indispensable element of irreparable harm.

11

## ARGUMENT

I.    **THE NBPA CANNOT SATISFY THE RIGOROUS
      STANDARDS FOR INJUNCTIVE RELIEF.**

Because an interim injunction is "'one of the most drastic tools in the arsenal of judicial

remedies,'" <u>Malletier v. Dooney & Bourke, Inc.</u>, 340 F. Supp. 2d 415, 428 (S.D.N.Y. 2004)

(citation omitted), and affords the moving party "a measure of his final relief <u>in advance</u> of

proving that he is entitled to final relief," <u>Borey v. Nat'l Union Fire Ins. Co.</u>, 934 F.3d 30, 33 (2d

Cir. 1991) (emphasis added), it is to be issued in only the most "extraordinary" circumstances.

<u>JSG Trading Corp. v. Tray-Wrap Inc.</u>, 917 F.2d 75, 80 (2d Cir. 1990).

Under the traditional standards, an interim injunction may issue only upon a showing of:

(i) irreparable harm; and (ii) either (a) a likelihood of success on the merits, or (b) sufficiently

serious questions going to the merits to make them a fair ground for litigation, and that the

balance of hardships tips decidedly in the moving party's favor.  See <u>Brewer v. West Irondequoit</u>

<u>Cent. Sch. Dist.</u>, 212 F.3d 738, 743-44 (2d Cir. 2000).  However, where, as here, a party seeks an

"affirmative" or "mandatory" injunction – one that "'will alter, rather than maintain, the status

quo'" – "a <u>significantly higher</u> standard applies." <u>Brewer</u>, 212 F.3d at 744 (citation omitted,

emphasis added). See <u>Brown v. New York Cty. Hlth. & Hosp.</u>, No. 96-CV-0156, 1996 WL

68558, at *2 (E.D.N.Y. Feb. 5, 1996) (holding expressly that a request for reinstatement is an

application for a mandatory injunction as to which the significantly higher standard must be met.

[3]  To meet that standard, the movant must "make a <u>'clear' or 'substantial'</u> showing of a

likelihood of success" on the merits, <u>id.</u> (emphasis added) – <u>i.e.</u>, that its claim "'is considerably

---

[3]    <u>Accord</u> <u>Marshall v. Nat'l Ass'n of Letter Carriers BR36</u>, No. 03 Civ. 1361 TSAJP, 2003 WL
       22119882, at *2 (S.D.N.Y. Sept. 15, 2003) (plaintiff seeking mandatory injunction must make
       "an even higher showing to obtain a preliminary injunction"); <u>West v. Keane</u>, No. 93 Civ. 6680
       (JFK), 1995 WL 434306, at *1-2 (S.D.N.Y. July 24, 1995) (same).

more likely to succeed than fail.'" Lazar's Auto Sales, Inc. v. Chrysler Fin. Corp., No. 99 CIV.

0213(CM), 1999 WL 123501, at *5 (S.D.N.Y. Mar. 2, 1999) (citation omitted). In such

circumstances, the burden of demonstrating irreparable harm is similarly heightened, and a party

seeking interim injunctive relief must show "that the alleged injury is neither remote nor

speculative, but actual and imminent." Line Communications Corp. v. Reppert, 265 F. Supp. 2d

353, 356 (S.D.N.Y. 2003) (citations and internal quotes omitted).[4]

Here, of course, the status quo is that defendant O'Neal (who is the only subject of the

NBPA's motion for injunctive relief) remains suspended consistent with the terms imposed by

the Commissioner in his November 21, 2004 decision.[5] Accordingly, because the NBPA asks

this Court to direct the NBA to reinstate defendant O'Neal pending resolution of the motion to

confirm, it is attempting to alter the status quo, and its application must be scrutinized under the

"heightened" standards for affirmative injunctions. The NBPA has not satisfied and cannot

satisfy those standards.

## II.     THE NBPA HAS NO LIKELIHOOD OF SUCCESS ON THE MERITS OF ITS CLAIM THAT THE PURPORTED ARBITRATION AWARD SHOULD BE CONFIRMED.

The Players Association cannot establish a "clear" likelihood of success on the merits of

its claim to confirm the purported arbitration award, because the Grievance Arbitrator lacked

jurisdiction to hear this dispute. Under the CBA, challenges by players to discipline imposed for

---

[4]     See, e.g., Vantico Holdings S.A. v. Apollo Mgmt., LP, 247 F. Supp. 2d 437, 451-52 (S.D.N.Y. 2003) (denying injunction where plaintiff did not meet higher "clear showing" standard for mandatory injunctive relief).

[5]     The Players Association, through its motion to confirm, has apparently conceded the propriety of the first fifteen games of defendant O'Neal's twenty-five game suspension (which the Grievance Arbitrator upheld). The fifteenth game of this suspension occurred on Wednesday, December 22, 2004. Accordingly, there is no challenge here to any of the "injury" suffered by Mr. O'Neal to date. The NBPA, too, no longer contests the suspensions of defendants Artest, Jackson and Johnson, all of which were upheld by the Grievance Arbitrator.

"conduct on the playing court" can only be heard and resolved through appeals filed with the Commissioner, and not through grievances tendered to the Grievance Arbitrator. Because this case involves "conduct on the playing court," the Grievance Arbitrator's award is a nullity and cannot be confirmed.

That the conduct of the suspended players was "on the playing court," within the ordinary meaning and the parties' common understanding of that contractual language, is amply supported by the following five independent points:

- the misconduct during the Detroit Incident occurred "on the playing court," within both the literal and sensible meaning of those words;

- prior arbitral and judicial decisions have held, on facts closely analogous to these, that the Commissioner's exclusive authority over "conduct on the playing court" extends beyond the literal meaning of the words to conduct occurring in areas surrounding the basketball floor;

- the Players Association has acknowledged that CBA Article XXXI, Section 8 is synonymous with Article 35(d) of the NBA Constitution, such that "conduct on the playing court" includes, at least, conduct "at or during an Exhibition, Regular Season, or Playoff Game";

- the Players Association has conceded the NBA's broader interpretation of "conduct on the playing court" by filing numerous appeals to the Commissioner for player misconduct similar to that at issue here; and

- the NBA previously put the NBPA on notice that players entering the spectator stands would constitute "on the court" misconduct, and the Players Association never contested that assertion.

In contrast to the foregoing, there is nothing in the language or structure of the CBA, or the parties' prior dealings, to support the Players Association's contention – advanced for the first time ever in this proceeding – that the Commissioner's exclusive jurisdiction over "conduct on the playing court" is limited to conduct occurring "within the flow of an NBA game." Nor is there any basis for the NBPA's alternative argument that the Commissioner's exclusive

14

jurisdiction under Section 8 is somehow undermined by the NBA's authority to adopt reasonable rules governing the conduct of players on the court.

> ### A. Under the Plain Language of CBA Article XXXI, Section 8, the Dispute Unquestionably Involves "Conduct on the Playing Court."

As an initial and entirely dispositive matter, the conduct of the suspended players during the Detroit Incident occurred "on the playing court," within both the literal and sensible meanings of those words. The incident commenced during a game, in the waning seconds of the fourth quarter, with a hard foul and a retaliatory shove between two players on the basketball floor. Other players quickly became involved in the altercation, some as peacemakers and some as escalators, in a confrontation between the two teams that occurred on the basketball floor. Following a thrown object by a spectator, certain players engaged in continued and additional violent misconduct in the spectator stands just adjacent to the basketball floor and then again on the basketball floor itself. In particular, the following occurred:

- Defendant Johnson left the immediate vicinity of his team's bench during the altercation (in violation of NBA rules), and punched a spectator on the basketball floor;

- Defendant O'Neal left the immediate vicinity of his team's bench during the altercation (in violation of NBA rules), shoved an usher who was trying to keep him from leaving the basketball floor and entering the stands, and punched a spectator on the basketball floor;

- Defendant Artest left the basketball floor and deliberately entered the stands to confront and push a spectator, and then returned to the basketball floor to punch one spectator and push another; and

- Defendant Jackson acted as an escalator rather than as a peacemaker on the basketball floor, left the basketball floor and deliberately entered the stands, where he punched one spectator in the face and another in the back of the head. Jackson also spit at two different fans as he left the basketball floor.

(See Buchanan Aff. ¶ 8.)

As the foregoing makes clear, each of the defendants participated in serious misconduct that literally took place "on the playing court." Indeed, all of the misconduct of defendants

15

Johnson and O'Neal occurred "on the playing court," within the plain and ordinary meaning of those words.[6] Some of the misconduct of defendants Artest and Jackson took place, literally, "on the playing court," and some took place in the spectator stands, only a few feet away from the basketball floor. All the misconduct of these two players, however, and the misconduct of the other defendants, took place during an NBA game and resulted from the original foul and altercation that occurred on the playing floor.

On these facts, the only reasonable conclusion is that this conduct, in its totality, occurred "on the playing court" and therefore falls within the exclusive jurisdiction of the Commissioner. This conclusion is literally true for the conduct of defendants O'Neal and Johnson, and it is literally true for much of the conduct of defendants Artest and Jackson. For the remainder of the conduct of defendants Artest and Jackson, it is the only conclusion that makes sense, as any other interpretation would lead to competing claims of jurisdiction between the Commissioner and the Grievance Arbitrator for the same incident, create the potential for inconsistent penalties, and produce potentially absurd results.

An example proves the point. If Player A punches Player B while both are on the playing floor, then the Commissioner would, under the NBPA's theory and the ruling of the Grievance Arbitrator, have the exclusive and unreviewable authority to discipline Player A. But if the punch knocks Player B into the spectator seats and, from there, Player B lands a retaliatory punch on Player A, the NBPA's theory would subject the Commissioner's discipline of Player B to review by the Grievance Arbitrator. Further, if Player A were then to strike Player B while in

---

[6]    While a portion of defendant O'Neal's misconduct occurred in the out-of-bounds (or "apron") area of the playing floor, the Players Association cannot seriously contend that this does not constitute part of the "playing court" within the Commissioner's exclusive jurisdiction. In any case, such an argument is foreclosed by Judge Rakoff's opinion in Ewing v. Stern, No. 97 Civ. 3578 (JSR), Tr. at 58, where he found that player misconduct in the bench area constitutes "conduct on the playing court."

16

the stands, this punch would presumably be reviewable by the Grievance Arbitrator, but Player B's counterpunch – after the players stagger back onto the playing floor -- would not be. The resulting mess – in which both the Commissioner and the Grievance Arbitrator would have jurisdiction over half of each player's actions – is not a sensible method for resolving disciplinary disputes and, thus, is not a proper interpretation of the "on the playing court" language.

### B.    The NBPA's Narrow Interpretation of the CBA Is Foreclosed by Prior Arbitral and Judicial Authority.

The conclusion that the Grievance Arbitrator lacked authority to decide this matter is also compelled by prior arbitral and judicial authority – the only authorities that have previously addressed the issues now before the Court.

In a 1992 arbitration before NYU Law Professor Daniel Collins arising under the 1988 CBA, the NBPA contended that the Commissioner lacked the authority to issue a suspension without pay to a player who had engaged in an altercation with spectators. See NBPA (Charles Barkley) v. NBA, No. 92-3 (1992). In that case, during a stoppage in play, Charles Barkley walked into the out-of-bounds area underneath the basket and verbally abused and spit on spectators in the stands. (Buchanan Aff. ¶ 37.) Under the theory advanced by the NBPA here, one might have expected the Players Association to challenge the Commissioner's jurisdiction on the ground that Barkley's misconduct did not occur "on the playing court," because the player was in the out-of-bounds area and acted outside of the "flow of the game." But the Players Association made no such argument. Instead, the NBPA's only claim was that the Commissioner lacked the authority to order a suspension "without pay."

Arbitrator Collins made short work of the Players Association's attempt to avoid the Commissioner's exclusive authority, holding that the matter was "not within the Impartial

17

Arbitrator's contractual jurisdiction."[7]  Moreover, he, too, agreed that the conduct engaged in by

Barkley was conduct "on the playing court": "The Arbitrator finds the issue to be <u>whether a</u>

<u>dispute concerning a suspension of a Player by the NBA Commissioner or his designee for</u>

<u>conduct on the playing court</u> can only be processed pursuant to the Special Procedure set forth in

Article XXVIII, Section 2(f)(1) of the Collective Bargaining Agreement."  <u>Barkley</u> at 2

(emphasis added).[8]

      Similarly, in a 1997 disciplinary dispute arising under the 1995 CBA, this Court came to

the same conclusion as Arbitrator Collins in <u>Barkley</u>.  <u>See</u> <u>Ewing v. Stern</u>, No. 97 Civ. 3578

(JSR) (S.D.N.Y. May 16, 1997).  In that case, a dispute arose over suspensions imposed by the

NBA for a player altercation occurring out-of-bounds and in the spectator seats behind the basket

during a playoff game. (Buchanan Aff. ¶ 44).)  Here again, the Players Association did not argue

that the misconduct was not "on the playing court," but instead asserted that the rule enforced by

the NBA (prohibiting players from leaving the bench area) was unreasonable.  The NBPA,

purporting to commence a grievance arbitration in support of this position, moved this Court for

a stay of the suspensions pending resolution of the arbitration.  (<u>Id.</u>)  Judge Rakoff rejected the

NBPA's motion, finding that the Players Association could not establish a likelihood of success

---

[7]      "The Impartial Arbitrator believes the language of Article XXVIII, Section 2(f)(1) [now Article XXXI, Section 8] <u>clearly and unambiguously provides that disputes such as those at issue here</u>, i.e., "involving. . . a suspension imposed upon a Player by the Commissioner (or his designee)," <u>are not within the Impartial Arbitrator's contractual jurisdiction</u>.  Thus, he cannot express any opinion as to the merits of such disputes, including whether the Commissioner of his designee is contractually empowered to impose a suspension without pay.  <u>That question can only be addressed under the Agreement by the Commissioner</u>."  <u>Barkley</u> at 7 (emphasis added).  (<u>See</u> Buchanan Aff. ¶ 42 (making clear that the language of Article XXXI, Section 8 of the current CBA is substantially identical to the language of Article XXVIII, Section 2(f)(1) of the 1988 CBA).)

[8]      <u>See also</u> <u>Barkley</u> at 7-8 ("The Impartial Arbitrator for the foregoing reasons finds that a dispute concerning a suspension of a Player by the Commissioner or his designee <u>for conduct on the playing court</u> can only be processed pursuant to the Special Procedure set forth in Article XXVIII, Section 2(f)(1) of the Collective Bargaining Agreement.") (emphasis added).

on the merits because the dispute was not arbitrable, but rather fell within the exclusive

jurisdiction of the Commissioner under Article XXXI, Section 8 of the CBA. Ewing, 97 Civ.

3578, Tr. at 59. As the court observed:

> We have an article, Article 31, which is the natural place anyone would look to see if something is arbitrable or not, because it is entitled "Grievance and Arbitration Procedure;" and among other pertinent things Section 8 of that article, entitled "Special Procedures with Respect to Player Discipline," states that "Any dispute involving a fine or suspension imposed upon a player by the Commissioner or his designee for conduct on the playing court shall be processed exclusively as follows:" And then it sets forth provisions that do not include reference to the arbitrators.

Id. at 58 (emphasis added).

Both Barkley and Ewing involved misconduct by players that, under the theory presented

by the Players Association here, should have been subject to challenge before the Grievance

Arbitrator because it occurred in the spectator stands and outside "the flow of the game." But the

NBPA never even advanced this position, making clear that its current view is not a longstanding

interpretation of the CBA, but merely a convenient fiction concocted by its lawyers here.

Moreover, both Arbitrator Collins and Judge Rakoff independently concluded that the conduct at

issue in those cases occurred "on the playing court," and therefore fell within the

Commissioner's exclusive jurisdiction. These decisions dictate the proper outcome in this case.[9]

---

[9]    The Players Association, in a desperate attempt to distinguish their concession in Barkley and its holding, now contends that the suspension at issue in Barkley was a so-called "integrity of the game" suspension, and not a suspension for "conduct on the playing court." That is yet another fiction, with no factual basis whatsoever. As Arbitrator Collins' opinion makes clear, all parties involved understood that the suspension was imposed by the NBA for "conduct on the playing court." Indeed, the decision will be searched in vain for any reference to "integrity of the game" issues.

19

C.    The Proper Interpretation of "Conduct on the Playing Court"
      Is at Least as Broad as Article 35(d), Which Authorizes the NBA
      To Impose Discipline for Misconduct "At or During" an NBA Game.

The source of the Commissioner's authority to impose fines and suspensions for player

misconduct in connection with NBA games is Article 35(d) of the NBA Constitution.  That

Article empowers the Commissioner to impose discipline for misconduct "at or during an

Exhibition, Regular Season, or Playoff Game," and is directly related to the provisions of Article

XXXI, Section 8 of the CBA, which accords the Commissioner sole, exclusive and final

jurisdiction to hear an appeal regarding "conduct on the playing court."  Article 35(d) provides

the basis for the Commissioner's authority to impose the discipline that Section 8 commits to his

sole and exclusive jurisdiction.

The NBA has always understood Article 35(d) and Section 8 to be synonymous – that

discipline imposed by the Commissioner under Article 35(d) is only appealable to the

Commissioner under Section 8.  Although the Players Association now argues that there is a

significant difference between the two provisions, its counsel has, on two separate occasions

during the course of other proceedings between the parties, candidly acknowledged and agreed

with the NBA's interpretation:

- [I]f you look, for example, in 35D [sic] [of the NBA Constitution], when they are talking
  about this is the commissioner's ability to discipline for conduct of a player at or during
  an exhibition, regular season or playoff game.  So this is on-court behavior as we
  colloquially use that phrase.

Buchanan Aff. ¶ 35, Opening Argument of Jeffrey Kessler in NBPA (Sprewell) v. NBA, at 35

(Jan. 27, 1998) (emphasis added).

- Because if you look at Article 35 of the NBA Constitution, which both parties cite, which
  is attached to the Uniform Player Contract, it goes through different reasons for
  suspending.  You could be suspended for drugs and you could be suspended for gambling
  and you could be suspended for crimes, and in a separate section, in Article 35, you can
  be suspended for on-court behavior.

20

Buchanan Aff. ¶ 35, Oral Argument of Jeffrey Kessler in <u>Ewing v. Stern</u>, No. 97 Civ. 3578

(JSR), at 14 (May 16, 1997) (emphasis added).

There can, of course, be no reasonable dispute that the misconduct at issue in this case

took place "at or during" an NBA game. Nor, if only based on the acknowledgement by the

NBPA's own counsel during the <u>Sprewell</u> and <u>Ewing</u> matters, can there be any legitimate

question that <u>both</u> the NBA <u>and</u> the Players Association have understood the language of Article

35(d) to mean "on the playing court." Accordingly, the Grievance Arbitrator lacked jurisdiction

to hear this dispute, and the relief request by the NBPA should be denied.[10]

### D.    The Parties' Past Practice Demonstrates That "Conduct on the Playing Court" Broadly Encompasses Player Misconduct at NBA Games.

In the twelve-plus years since <u>Barkley</u> was decided, the NBPA has repeatedly recognized

through its actions that "conduct on the playing court" should be broadly interpreted to

encompass any player misconduct occurring at an NBA game. In particular, on numerous prior

occasions, the NBPA has filed appeals with the Commissioner – and not grievances with the

Grievance Arbitrator – when challenging discipline imposed for player misconduct occurring at

or during an NBA game (<u>i.e.</u>, pursuant to Article 35(d)), even where the conduct took place

outside the confines of the playing floor and outside the "flow of the game.") These prior

appeals to the Commissioner reflect the Players Association's acknowledgement and

---

[10]    Citing the grievance arbitration in the <u>Sprewell</u> matter, the NBPA argues that it is "well established that an Article 35(d) suspension by the Commissioner is subject to review by the Grievance Arbitrator." (<u>See</u> Kessler Letter of November 30, 2004, at 7-8.) This argument is insupportable. First, Sprewell was suspended pursuant to Article 35(e) of the NBA Constitution, not 35(d), as his misconduct occurred at a team practice and not "on the playing court." (<u>See</u> Buchanan Aff. ¶ 58.) Accordingly, <u>Sprewell</u> is irrelevant to the question of whether a dispute concerning suspensions imposed under Article 35(d) for conduct at an NBA game is arbitrable. Second, far from being "well established," on the one and only occasion on which an NBA Arbitrator was asked to review an Article 35(d) suspension, he determined that the Arbitrator had <u>no</u> jurisdiction to hear the NBPA's challenge and that it could only be brought as an appeal to the Commissioner. See <u>NBPA (Charles Barkley) v. NBA</u>, No. 92-3 (1992).

21

understanding that "conduct on the playing court" includes conduct occurring in all of the

following off-the-floor locations:

## The Bench Area

In accordance with Judge Rakoff's opinion in the Ewing matter, the Players Association has often appealed to the Commissioner in circumstances where players have been suspended for improperly leaving the bench area. Since 1997, there have been ten such appeals filed by the Players Association. (See Buchanan Aff. ¶ 48(a).)

## The Press Area

In March of 2002, the NBA fined and suspended Denver's Tim Hardaway, who, after he had been ejected from a game, removed a television monitor from the press area and threw it from there onto the playing court. The NBPA appealed to the Commissioner. (See id.,¶ 48(c).)

## The Scorer's Table

In March of 2002, following the conclusion of a game, Indiana's Reggie Miller engaged in a shoving match with Kobe Bryant of the Lakers, which ended up out of bounds when Miller pushed Bryant onto the scorer's table, leading to a suspension and fine for Miller. The NBPA appealed to the Commissioner. (See id.,¶ 48(d).)

## The Spectator Area

Consistent with the decisions in Barkley and Ewing, the NBPA has appealed to the Commissioner in circumstances where players have engaged in misconduct in the spectator stands. For example, in May 1994, Chicago's Jo Jo English was suspended for pushing an opposing player over the first row of spectator stands, starting a melee in the spectator area involving numerous players. The discipline was appealed to the Commissioner. (See id.,¶ 48(i).) In February 1995, Houston's Vernon Maxwell entered the stands and attacked a spectator, leading to a fine and suspension that was appealed to the NBA Commissioner. (See id., ¶ 48(h).) Similarly, the NBPA appealed to the Commissioner the discipline imposed on New York's Clarence Weatherspoon, who, in 2002, threw an opposing player into the spectator area. (See id., ¶ 48(b).)

## The Locker Room

In January 2000, Gary Trent was fined and suspended for entering the visiting team's locker room to confront an opposing player who had been ejected from the game. The NBPA appealed to the Commissioner. (See id.,¶ 48(f)). Similarly, in March 2000, Ron Mercer was also fined and suspended for entering the visiting team's locker room to confront an opposing player at the completion of a game. The NBPA appealed to the Commissioner. (See id. ¶ 48(e).)

The Players Association has also filed appeals to the Commissioner in numerous

instances where the conduct at issue occurred during a stoppage in play or after the game ended,

or where the conduct was committed by players who were on the bench or who had been ejected from the game. These appeals reflect the Players Association's acknowledgement and understanding that "conduct on the playing court" includes conduct occurring outside of "the flow of the game." For example:

- Vernon Maxwell and Patrick Ewing (incidents described above) committed their misconduct after they had been removed from the game and taken their places in the bench area. (See id., ¶ 49(a).)

- Charles Barkley (spitting on fan) committed his misconduct after play had stopped. (See id., ¶ 49(b).)

- Gary Trent (altercation in locker room) committed his misconduct during a game in which he did not play due to injury. (See id., ¶ 49(c).)

- Tim Hardaway (throwing a television monitor) committed his misconduct after he had been ejected from the game. (See id., ¶ 49(d).)

- Ron Mercer (altercation in locker room) and Reggie Miller (shoving Kobe Bryant onto scorer's table) committed their misconduct after the game had ended. (See id., ¶ 49(e).) The same is true of Shaquille O'Neal, who was suspended in 2004 for uttering obscenities in a live television interview after the game had concluded. The NBPA appealed this discipline to the Commissioner. (See id., ¶ 49(f).)

The Players Association's actions are highly relevant in interpreting the "conduct on the playing court" language contained in Section 8. Where there is a question as to the meaning of a collectively bargained provision, a court may look to extrinsic factors such as the parties' past practice to interpret the language in question.[11] The Players Association's actions also put the lie

---

[11]     See, e.g., In re Chateaugay Corp., 891 F.2d 1034, 1038 (2d Cir. 1989); National Basketball Players Association v. National Basketball Association (In re Chicago Bulls), 96-01, at 16 (Dam, 1996) (noting that the NBA and NBPA agreed that past practices may be considered in construing a disputed provision of the CBA); Transportation-Communication Employees Union v. Union Pac. R.R. Co., 385 U.S. 157, 161 (1966) ("In order to interpret [a collective bargaining] agreement it is necessary to consider . . . the practice, usage and custom pertaining to all such agreements."); New York State Teamsters Conference Pension & Retirement Fund v. United Parcel Serv., Inc., 198 F. Supp. 2d 188, 196 (N.D.N.Y. 2002) (for a collective bargaining agreement, "it is well settled that the 'parties' "practice, usage and custom" is of significance in interpreting their agreement.'") (quoting Consol. Rail Corp. v. Ry. Labor Executives' Ass'n, 491 U.S. 299, 311 (1989)), aff'd, 382 F.3d 272 (2nd Cir. 2004).

to the newfound interpretation of Section 8 being advanced here. If, as the NBPA contends, the Commissioner's jurisdiction over "conduct on the playing court" only extends to incidents that take place on the basketball floor and within "the flow of the game," then each of the examples listed above should have been challenged before the Grievance Arbitrator, and not the NBA Commissioner.

### E.    The Players Association Was Notified of the NBA's Interpretation of "Conduct on the Playing Court" and Never Contested It.

Even if the Players Association had not actively conceded the issue by its numerous appeals to the Commissioner, it was repeatedly and consistently notified that the NBA considered "conduct on the playing court" to encompass conduct at or during an NBA game, yet never challenged that interpretation. This is evidenced by "Player Conduct Memos" distributed by the NBA to every player and the NBPA at the start of each of the past six NBA seasons:

- Under the heading "Violence On the Court," the Player Conduct Memo admonishes that "any player who deliberately enters the spectator stands" during or after a game will be subject to suspension. (Buchanan Aff. ¶ 56(a).)

- Under the heading "RULES RELATING TO FIGHTING, FLAGRANT FOULS AND OTHER PLAYING COURT MISCONDUCT," the Player Conduct Memo sets forth prohibitions against fighting, throwing punches, and leaving the bench area during an altercation. (Id., ¶ 56(b).)

- Under the sub-heading "OTHER RULES GOVERNING CONDUCT ON THE PLAYING COURT," the Player Conduct Memo sets forth prohibitions against "stimulating or encouraging crowd disorder." (Id., ¶ 56(c).)

Despite having received a copy of the Player Conduct Memos for the past six years – including, most recently, on October 18, 2004 – the NBPA never once disputed or challenged the NBA's characterization of "conduct on the playing court" as described in those Memos. (Id., ¶ 57.) The NBPA's silence – year after year – on this issue demonstrates its agreement with the NBA that "conduct on the playing court" encompasses far more than conduct on the basketball floor during game play. See Buder v. New York Trust Co., 82 F.2d 168, 171 (2d Cir. 1936)

24

(holding that plaintiff's continued silence regarding defendant's repeated statement of its understanding of a contract provision demonstrated agreement with defendant's construction of contract term).[12]

### F.    There Is No Basis for the Players Association's Interpretation of Section 8.

The Players Association contends that the conduct at issue here does not fall within the Commissioner's exclusive jurisdiction under Section 8 because it did not all occur "on the playing floor" and because it did not occur in "the flow of the game." But the NBPA offers no support of any kind for these asserted limitations. The Players Association can point to no language within Article XXXI, no prior judicial or arbitral decision, and no prior communication to the NBA that states or even discusses such an interpretation. It is, in short, simply made up by the NBPA's lawyers in the context of this case, and – as demonstrated above – is entirely refuted by the language of the applicable CBA provision and the parties' prior course of dealing.

If more were needed, however, to persuade the Court of the fallaciousness of the Players Association's argument, it is supplied by the following compelling fact: in the 30-plus years that the CBA has conferred upon the Commissioner exclusive authority over "conduct on the playing court," the NBPA has never successfully put the merits of an NBA fine or suspension before a neutral arbitrator. Not one single time. And this is so, despite the fact that the NBA regularly disciplines players for conduct at or during NBA games – indeed, the NBA has imposed such

---

[12]    See also Paulson, Inc. v. Bromar, Inc., 808 F. Supp. 736, 745 (D. Haw. 1992) (finding that party's silence could be interpreted to mean that certain products were not covered by parties' agreement); Rest. 2d Contracts § 202(4) ("Where an agreement involves repeated occasions for performance by either party with knowledge of the nature of the performance and opportunity for objection to it by the other, any course of performance accepted or acquiesced in without objection is given great weight in the interpretation of the agreement.") (emphasis added); 11 Williston on Contracts § 32:14 (4th ed.) ("[T]he parties' own practical interpretation of the contract – how they actually acted, thereby giving meaning to their contract during the course of performing it – can be an important aid to the court. Thus, courts give great weight to the parties' practical interpretation.").

discipline on almost 250 separate occasions since the commencement of the 1999 CBA alone,

and many multiples of that number since the "conduct on the playing court" language was first

included in the parties' labor contract in 1972.[13]

    Thus, in addition to the incidents detailed above in which the NBPA affirmatively filed

appeals before the Commissioner for misconduct off the playing floor and outside of the "flow of

the game," the Players Association also declined to seek reductions in discipline before the

Grievance Arbitrator in numerous other similar incidents of misconduct. The accompanying

Buchanan Affidavit contains a list of these situations, which includes, for example, the

following:

- In 2002, Rick Fox, a player for the Los Angeles Lakers, after being ejected from a game against Sacramento, exited the playing floor through the access tunnel, sprinted down a hallway underneath the stands, and attacked Sacramento's Doug Christie in the opposite exit tunnel, thereby instigating an altercation in the tunnel involving numerous players. Notwithstanding a six-game suspension for Fox and other substantial suspensions imposed by the NBA, the Players Association took no action. (See id., ¶ 52(a).)

- Also in 2002, Golden State's Chris Mills attempted to confront and threaten opposing players outside the locker room following a game. Despite a three-game suspension imposed by the NBA, the Players Association took no action. (See id., ¶ 52(b).)

- In 2001, Indiana's Reggie Miller, after exiting the game and sitting on the team bench with 1:58 left in the fourth quarter, threw a piece of gum (from his seated location on the bench) and hit a game official on the other side of the court. Despite a significant suspension and fine imposed by the NBA, the Players Association took no action. (See id., ¶ 52(c).)

- In 1997, Portland's J.R. Rider, during the halftime warm-up period, went into the stands and spit on a spectator in the fourth row. Despite a three-game suspension and a substantial fine imposed by the NBA, the Players Association took no action. (See id., ¶ 52(d).)

---

[13]    In Barkley and Ewing, the Players Association did not seek to argue before the arbitrators that the NBA's discipline was excessive, but rather that the NBA lacked authority to impose a certain type of discipline (Barkley) and that the rule underlying the NBA's discipline was unreasonable (Ewing). That the NBPA was so careful in those cases to avoid arguing the merits of the discipline proves the point: both the NBA and the Players Association fully understood that the Commissioner had exclusive jurisdiction over the players' misconduct.

It is, we submit, incredible to assert – as the Players Association must assert here – that although it has (supposedly) always had the ability to obtain relief from a neutral arbitrator for allegedly excessive discipline imposed by the Commissioner with respect to conduct that took place off the playing floor or outside of the "flow of the game," it has just never before availed itself of that opportunity. The truth, as the Players Association well knows, is that the CBA precludes such relief, and the NBPA, before now, has never had the temerity to assert otherwise.[14]

### G.    The "Integrity of The Game" Language in Section 8 Has No Bearing on This Case.

The Players Association argues that its position is supported by a change in the language of Section 8 that was adopted by the parties in 1995. Prior to that time, Section 8 made clear that the Grievance Arbitrator lacked jurisdiction over both:  (i) disputes involving fines or suspensions for "conduct on the playing court;" and (ii) action taken by the Commissioner "concerning the preservation of the integrity of, or the maintenance of public confidence in, the game of basketball." (Buchanan Aff. ¶ 18, Ex. 19.)  In the 1995 CBA, this latter provision was amended to provide that the Commissioner's exclusive jurisdiction over "integrity" matters would be limited to cases in which the financial impact on the player is "$25,000 or less." Id.

The NBPA's contention that this language change is relevant in this proceeding is both extraordinarily disingenuous and reflective of the weakness of its position on the jurisdictional issue. Even in its current incarnation, Article XXXI, Section 8 still withdraws jurisdiction from the Grievance Arbitrator in two separate and distinct circumstances:  (i) where, as here, the dispute involves "conduct on the playing court," or (ii) where the action taken by the

---

[14]    The Players Association contends that its interpretation of Section 8 is supported by paragraph 19 of the UPC. But that language refers to the "playing floor" and not the "playing court," and therefore supports the NBA's view that the two terms are not one and the same.

27

Commissioner concerns "integrity" issues. The NBA suspensions in this case were imposed for "conduct on the playing court," and not for "integrity" concerns, and the Players Association has no basis for asserting otherwise.[15] Thus, the "integrity" language has no bearing whatsoever on this proceeding, and the NBPA's extended argument concerning it is nothing but a smokescreen. Indeed, in the 1997 Sprewell arbitration, counsel for the Players Association candidly conceded the point when he stated that: "Section 8 of Article XXXI provides that the Commissioner shall hear appeals of any suspension for conduct on the playing court." (See Buchanan Aff., Ex. 32 (quoting NBPA counsel Jeffrey Kessler in Sprewell).)[16]

The Players Association has also suggested that the change in the "integrity" language explains away the many appeals it filed with the Commissioner for player misconduct similar to that at issue here. That argument, too, is meritless. As we have shown above, the NBPA filed appeals to the Commissioner in numerous incidents that both pre-dated and post-dated the language change in September 1995. If the Players Association truly believed – after September 1995 – that it was entitled to challenge before a neutral arbitrator conduct that occurred off the playing floor and outside the "flow of the game," then, thereafter, it would not have filed appeals to the Commissioner for the conduct of Tim Hardaway, Shaquille O'Neal, Reggie Miller, Gary

---

[15]    The NBA, of course, determines the basis upon which its suspensions are issued. Although more is hardly necessary to establish this point, Article XXXI, Section 8(b) is instructive, as it allows the NBA Commissioner to "withdraw" from the Grievance Arbitrator any matter raising "integrity" concerns that has a financial impact of less than $25,000. There is no similar provision authorizing the Players Association to "withdraw" from the Commissioner a matter that it contends raises "integrity" issues.

[16]    See also Ex. 32, Argument of Jeffrey Kessler in Sprewell, Tr. at 53-54 ("The first point is that under Section 8A [sic], any fine or suspension imposed upon a player by the commissioner for conduct on the playing court cannot be grieved at all, period. So that we are not dealing [here] with conduct on the playing court because that cannot be grieved except through this special procedure where the commissioner is the ultimate decision maker.") (emphasis added).

Trent, Clarence Weatherspoon, and Ron Mercer described above, and it would have made an

entirely different argument in the Ewing proceeding before Judge Rakoff in 1997.

### H.    The NBPA Cannot Circumvent the Exclusive Jurisdiction of the Commissioner by Mischaracterizing Its Grievance as a Dispute Over the "Reasonableness" of an NBA Rule.

The NBPA asserts that even if this dispute concerns "conduct on the playing court," it

nevertheless falls within the Grievance Arbitrator's jurisdiction because it involves a challenge to

the reasonableness of a rule – contained in the previously-mentioned "Player Conduct Memo" –

prohibiting players from engaging in violent acts and from entering the spectator stands.  The

rule cited by the NBPA states:

> The NBA will take immediate action against any player who engages in violent actions during a game, including ejection and appropriate fines and/or a suspension.
>
> Also, any player who deliberately enters the spectator stands during a game will be automatically ejected and subject to a fine and/or a suspension . . . The first row of seats is considered the beginning of the stands.  Entering the spectator stands after a game is also prohibited, and appropriate fines and/or a suspension will be imposed.

(Buchanan Aff., Ex. 7.)

The NBPA's argument is no more than a thinly veiled attempt to circumvent the

Commissioner's exclusive jurisdiction over "conduct on the playing court."  As the suspension

letters sent to the defendant players make clear, the basis for the Commissioner's disciplinary

action was Article 35(d) of the NBA Constitution, and not the Player Conduct Memo cited by the

Players Association.  (See Buchanan Aff. ¶ 21, Ex. 20.)  Article 35(d), of course, reflects the

collectively-bargained agreement of the parties that the Commissioner has the authority to fine

and/or suspend players who engage in conduct "at or during" an NBA game that is "prejudicial

to or against the best interests of the Association or the game of basketball."  (Buchanan Aff. ¶

12.)  With or without the Player Conduct Memo, Article 35(d) provided ample authority for the

discipline imposed in this case, and its language is not subject to a challenge of "reasonableness" by the Players Association.[17]

But even if the discipline in this case were imposed pursuant to the Player Conduct Memo, the NBPA's argument would still fail. As an initial matter, the Players Association has made it abundantly clear that – in substance – it is not challenging the authority for the discipline imposed by the Commissioner, but rather the severity of that discipline.[18] This is established in the NBPA's "grievance" letter itself, which asserts that "[t]he discipline imposed by the Commissioner is inconsistent with the terms of the CBA and applicable law, and without just cause," and fails even to mention the "rule" it now claims is the subject of this dispute. (Buchanan Aff., Ex. 23 (emphasis added).) It is also evidenced by the Players Association's contentions at the hearing before the Grievance Arbitrator, where it conceded (through counsel) that it is "not arguing that there's no discipline that's appropriate. We're saying this discipline is vastly excessive. There is discipline that's appropriate." (Id., ¶ 32, Tr. at 118)[19] The Players Association made no argument to the Grievance Arbitrator (nor could they reasonably have done

---

[17]    In this regard, the Player Conduct Memo is properly understood as an amplification of the "prejudicial conduct" authority possessed by the Commissioner under Article 35(d). If, for example, a player were to choke another player on the court during a game, there would be no question but that the Commissioner would have the authority to impose discipline under Article 35(d), regardless of whether "choking" was specifically prohibited in the Player Conduct Memo previously sent to all players. The Players Association cannot bootstrap a memo designed to notify players of certain kinds of "prejudicial conduct" into a limitation on the Commissioner's authority under Article 35(d) and Section 8.

[18]    It is well-established "that the substance, not the phrasing, of the grievance governs its arbitrability," Graphic Communications Int'l Union, Local 735-S v. North American Directory Corp. II, 98 F.3d 97, 102 (3d Cir. 1996), and that a court "must review the specific language of the collective bargaining agreement and the facts alleged in the grievance" to determine the nature of a grievance. Contra Costa Legal Assistance Workers v. Contra Costa Legal Servs. Found., 878 F.2d 329, 330 (9th Cir. 1989) (emphasis in original).

[19]    G. William Hunter, the Executive Director of the NBPA, has been quoted as saying, "[w]e don't condone what happened. Our players should not be going into the stands." Tracy Dodds, Players' union blames refs, security in appeal, Indianapolis Star, Nov. 24, 2004, at D1.

so) that a rule prohibiting players from engaging in violent activity during an NBA game or from
entering the spectator stands to engage the conduct at issue here is an "unreasonable" rule.
Creative arguments aside, the Players Association cannot escape the reality of its claim: that the
suspensions imposed by the Commissioner were too long. Any such claim for conduct "on the
playing court" must be resolved by the Commissioner under Article XXXI, Section 8.

Courts have routinely rejected a union's attempt – like the NBPA's attempt here – to
arbitrate "through the back door" categories of disputes that the parties have agreed would be
excluded from arbitration. Here again, Judge Rakoff's decision in Ewing is directly on point. In
that case, the NBPA asserted – as it does here – that its grievance was not subject to Section 8
because it was challenging the reasonableness of an NBA rule (there, the rule prohibiting players
from leaving the bench during an altercation). In rejecting the NBPA's argument, and holding
that the dispute was not arbitrable because it fell within the exclusive jurisdiction of the
Commissioner pursuant to Section 8, Judge Rakoff stated:

> Plaintiffs argue that [Section 8] refers to in effect the Commissioner's quasi
> judicial functions of determining on a case by case basis with reference to all its
> particularities whether there has been any on-the-playing-court violation, but does
> not deal with the question of whether he can propound without compliance with
> the anti-collusion provisions a blanket rule and then, as they would argue, apply it
> automatically in the circumstances of this case. I think that is far too fine spun an
> argument in the face of language that is so plain, so clear, so unequivocal and so
> on point to the dispute that underlies this controversy.

Ewing v. Stern, Tr. at 59 (emphasis added).

Similarly, Judge Kaplan of this Court recently rejected an attempt by the World Umpires
Association ("WUA") to circumvent a provision in its collective bargaining agreement that
required all disputes involving discipline to be resolved exclusively by the Commissioner. See
Office of Comm'r of Baseball v. World Umpires Ass'n, 242 F. Supp. 2d 380, 381-83, 385-87
(S.D.N.Y. 2003). In that case, the WUA asserted that a grievance protesting a warning letter to

an umpire was subject to review before a neutral arbitrator because the union was not

challenging the discipline imposed, but rather the underlying rules on which the discipline was

based. See id. at 382-83, 386. In rejecting that argument, and holding that the dispute subject to

the Commissioner's exclusive jurisdiction, Judge Kaplan stated:

> Defendant's argument that the grievance it seeks to arbitrate is distinct from a
> challenge to "discipline," because it implicates the reasons relied upon by Nelson
> for issuing the warning letter to Hirschbeck, is unavailing. First, a dispute
> involving discipline often implicates the interpretation of the rules giving rise to
> the discipline. . . . Were the Court to permit the Union to arbitrate the reasons
> underlying Nelson's letter, the exception in Article 10 would be rendered
> toothless. An aggrieved party often could skirt the ban on arbitration of disputes
> involving discipline by arguing that the true nature of the dispute is not the
> discipline applied, but the interpretation of the rules giving rise to the discipline.
> But this is not the bargain the CBA reflects.

Id. at 386. Here, as in World Umpires Ass'n, the NBPA should not be permitted to "skirt the ban

on arbitration" of disputes involving on-the-court discipline imposed by the Commissioner by

mischaracterizing its attack as aimed at the "reasonableness" of an NBA rule.[20]

Finally, and in any event, the provisions of the Player Conduct Memo relied on by the

Players Association are not subject to the "reasonableness" standard contained in Article VI,

Section 8. (See Buchanan Aff., Exs. 7-13.) That provision, which was first added to the CBA in

1999, authorized the NBA to adopt "new" rules governing conduct on the court, subject to

---

[20]    The decisions of Judge Rakoff and Judge Kaplan are in accordance with the decisions of
numerous other courts that have rejected attempts by unions to "grieve through the backdoor" a
dispute that the parties agreed would be excluded from arbitration. See New York News, Inc. v.
Newspaper Guild of New York, 927 F.2d 82, 84 (2d Cir. 1991); United States Postal Serv. v.
American Postal Workers Union, 204 F.3d 523, 530-31 (4th Cir. 2000); Gen. Drivers Local
Union No. 509 v. Ethyl Corp., 68 F.3d 80, 84-85 (4th Cir. 1995); Int'l Union, United Plant Guard
Workers v. Lockheed Martin Util. Servs., Inc., No. 97-3495, 1998 WL 416015, at *4-7 (6th Cir.
July 8, 1998) (decision listed in table at 156 F.3d 1230); Contra Costa Legal Assistance Workers,
878 F.2d at 330; Local Union No. 787, Int'l Union of Elec., Radio & Mach. Workers v. Collins
Radio Co., 317 F.2d 214, 219-220 (5th Cir. 1963) (rejecting union attempt to make dispute
"appear to be something other than what it really is" because "neither party — through one guise
or another — may obtain the intervention of an arbiter when the contract clearly excludes it from
the reach of the grievance machinery"); Journal of Commerce v. Employees Ass'n, No. 87 CIV.
6977 (MJL) 1988 WL 49068, at *2-3 (S.D.N.Y. May 12, 1988).

consultation with the NBPA and a standard of "reasonableness." [21] But the provisions of the Player Conduct Memo regarding player violence and entry into the spectator stands are not new. To the contrary, players have been notified for at least the past eight seasons (and well before 1999) that such conduct is prohibited. (See Buchanan Aff. ¶ 15.) Nor has the Players Association ever previously questioned or challenged these provisions. Accordingly, there is no basis whatsoever for the NBPA's argument under Article VI, Section 8.

## I.    The Question of Arbitrability Is Subject To De Novo Review.

The Players Association contends that the NBA is not entitled to de novo review of the Grievance Arbitrator's determination that he – and not the NBA Commissioner – has jurisdiction to review a challenge to the NBA's suspensions. The basis of that argument is the assertion that the jurisdictional dispute raises only an issue of "procedural arbitrability" of the kind that is typically decided by arbitration. That argument is entirely unsupportable.

First, the NBPA's argument is foreclosed by the Second Circuit's recent decision in Katz v. Feinberg, 290 F.3d 95 (2d Cir. 2002). In that case, the parties in their governing agreement had authorized two arbitrators to resolve disputes – one with general authority under a broad arbitration clause and one with specific authority over a particular type of dispute. Plaintiff argued there, as the Players Association does here, that the question of which arbitrator should decide the dispute at issue was itself resolvable by the arbitrator with broad general authority.

The Second Circuit disagreed. Citing First Options of Chicago, Inc. v. Kaplan, 514 U.S. 938, 944 (1995), the Court noted that an arbitrator is permitted to determine his own authority to

---

[21]    Article VI, Section 8 provides that "[i]n addition to its authority under paragraph 5 of the Uniform Player Contract, the NBA is entitled to promulgate and enforce reasonable rules governing the conduct of players on the playing court that do not violate the provisions of this Agreement. Prior to the date on which any new rule promulgated by the NBA becomes effective, the NBA shall provide notice of such new rule to the Players Association and consult with the Players Association with respect thereto."

hear a dispute <u>only</u> where there is "clear and unmistakable" evidence that the parties specifically agreed to give that power to the arbitrator. See <u>id.</u> at 944; <u>accord</u> <u>AT&T Techs., Inc. v. Communications Workers</u>, 475 U.S. 643, 649 (1986). Moreover, in language that is directly on point here, the Court held that the existence of both broad and narrow arbitration clauses assigning jurisdiction to two different arbitrators "creates an ambiguity, which, under <u>First Options</u>, requires us to assign questions of arbitrability to the district court, not the arbitrator." <u>Katz</u>, 290 F.3d at 97. In this case, the same result must apply: because the CBA contains a specific grant of authority to the NBA Commissioner under Article XXXI, Section 8, the Players Association cannot establish that the parties "clearly and unmistakably" intended to confer jurisdiction in this matter to the Grievance Arbitrator, and thus the issue must, as a matter of law, be determined by the Court.[22]

Even apart from <u>Katz</u>, the question of whether the Grievance Arbitrator has jurisdiction to review the propriety of the Commissioner's suspensions is clearly a matter of "substantive arbitrability" – a concept and phrase that is well understood to refer to the question of "whether the parties have agreed to arbitrate <u>and</u> what issues are included in that arbitration agreement." <u>Dist. 2, Marine Eng'rs Beneficial Ass'n v. Falcon Carriers, Inc.</u>, 374 F. Supp. 1342, 1346 (S.D.N.Y. 1974) (emphasis added); <u>see</u> <u>John Wiley & Sons, Inc. v. Livingston</u>, 376 U.S. 543, 557-58 (1964). "Procedural arbitrability," in contrast, refers to questions of "whether prerequisites such as time limits, notice, laches, estoppels and others conditions precedent to an obligation to arbitrate have been met." <u>Howsam v. Dean Witter Reynolds, Inc.</u>, 537 U.S. 79, 85

---

[22]     That result is even clearer here, since the parties have unequivocally provided in Article XXXI, Section 5(b) of the CBA that questions of substantive arbitrability are not within the jurisdiction of the Grievance Arbitrator. Specifically, Section 5(b) states: "<u>Nor</u>, in the absence of agreement by the NBA and the Players Association, <u>shall the Grievance Arbitrator have jurisdiction or authority to resolve questions of substantive arbitrability.</u>" (emphasis added).

(2002). The Players Association argues, without explanation, that the question of whether the Commissioner or the Grievance Arbitrator has jurisdiction over this dispute meets the foregoing condition because it is a "condition precedent to an obligation to arbitrate," and thus a question of "procedural arbitrability." That is simply a non-sequitur. The determination of the appropriate decision maker for this dispute is not some "condition precedent" – as would be, for example, the filing of a grievance notice within the applicable limitations period – but rather the most fundamental issue of arbitrability that the parties could present.

Furthermore, the Players Association's contention that this case presents nothing more than a "procedural" choice between two "arbitrators" proceeds from a fanciful – and an entirely inaccurate – characterization. Nowhere in the CBA is there any suggestion that the Commissioner is an "arbitrator." To the contrary, the dispute resolution process before the Commissioner (set forth in Section 8) is expressly described as a "Special Procedure" that is carved out of the Grievance Arbitrator's jurisdiction and bears no relation to the arbitration proceedings before the Grievance Arbitrator.[23] The Commissioner is not, like the Grievance Arbitrator, a disinterested third-party; he has been accorded the exclusive authority to hear appeals regarding discipline in connection with the presentation of the NBA's core product (NBA games) precisely because he is the chief executive of the NBA and responsible for the operation and success of the league.[24] An arbitration, on the other hand, is defined as a "method

---

[23]  Indeed, there is no reference in Article XXXI, Section 8(a) even to a "grievance." Rather, that Section speaks only in terms of "dispute" and "appeal."

[24]  There is nothing for the NBPA to make out of the fact that the Commissioner is not a "neutral." As Judge Learned Hand stated some 60 years ago, when contracting parties determine their own method of dispute resolution, they "can ask no more impartiality than inheres in the method they have chosen." American Almond Prods. Co. v. Consolidated Pecan Sales Co., 144 F.2d 448, 451 (2d Cir. 1944), quoted with approval in, Merit Ins. Co. v. Leatherby Ins. Co., 714 F.2d 673, 679 (7th Cir. 1983). Nor has that fact ever concerned the Players Association before. See supra n.15.

35

of dispute resolution involving one or more <u>neutral third parties</u>." <u>Black's Law Dictionary</u> 112

(8th ed. 2004) (emphasis added).

That the appeal procedure reserved to the Commissioner under Section 8 is not in any

sense an "arbitration" was made clear by Judge Rakoff in <u>Ewing</u>. In denying the NBPA's

request for preliminary injunctive relief, Judge Rakoff reviewed the CBA and distinguished the

grievance arbitration proceedings from the non-arbitration proceedings before the Commissioner.

Specifically, Judge Rakoff observed:

> We have an article, Article 31, which is the natural place anyone would look to
> see <u>if something is arbitrable or not</u>, because it is entitled "Grievance and
> Arbitration Procedure;" and among other pertinent things Section 8 of that article,
> entitled "Special Procedures with Respect to Player Discipline," states that "Any
> dispute involving a fine or suspension imposed upon a player by the
> Commissioner or his designee for conduct on the playing court shall be processed
> exclusively as follows:" And then it sets forth provisions that <u>do not include
> reference to the arbitrators.</u>

(<u>Ewing v. Stern</u>, No. 97 Civ. 3578 (JSR), Tr. at 58 (May 16, 1997) (emphasis added).)  Thus,

Judge Rakoff concluded that the dispute before him was not arbitrable because it was instead

within the exclusive jurisdiction of the Commissioner.[25]

Even assuming for the sake of argument that the Commissioner could in any sense be

considered an "arbitrator," the question of whether the merits of this dispute are to be heard by

the Commissioner or the Grievance Arbitrator would nonetheless be a matter to be decided by

the court. <u>Katz</u> could not be clearer on this point. There, the Second Circuit expressly rejected

the argument advanced by the NBPA:  that the issue of selecting between two dispute resolution

provisions is to be decided by one of the potential "arbitrators." Rather, the Second Circuit held

---

[25]     <u>See also</u> <u>Cendant Corp. v. Forbes</u>, 70 F. Supp. 2d 339, 342-43 (S.D.N.Y. 1999) ("When parties
enter into an agreement to submit an otherwise arbitrable question to an appraiser, it is logical to
conclude that, by entering into the appraisal agreement, they intend to remove the question from
the range of arbitrable matters and to be bound by the appraiser's findings."), <u>aff'd mem.</u>, 205
F.3d 1322 (2d Cir. 2000).

that the question of which arbitrator should decide the merits of the dispute was a matter only for

the court. See Katz, 290 F.3d at 96-97; Bear Stearns & Co. v. N.H. Karol & Assocs., Ltd., 728

F. Supp. 499, 500-02 (N.D. Ill. 1989) (holding that a dispute as to whether a matter was

arbitrable before the National Association of Securities Dealers or the American Arbitration

Association was an issue for the court).[26]

The NBPA's reliance on the 1998 decision by John D. Feerick, the former Grievance

Arbitrator, is misplaced. That decision preceded (and indeed was the impetus for) the 1999

amendment of Section 5(b) that expressly prohibited the Grievance Arbitrator from deciding his

own jurisdiction. (Buchanan Aff. ¶ 19.) Moreover, Arbitrator Feerick was not deciding whether

the Grievance Arbitrator or the Commissioner had jurisdiction to hear the merits of the dispute,

but only whether a dispute that was clearly arbitrable was no longer within his jurisdiction

because the CBA had expired. Equally unavailing is the NBPA's reliance on In re John Starks,

No. 00-01 (Mar. 6, 2000), a case in which the CBA's System Arbitrator – whose jurisdiction to

determine arbitrability is not subject to the prohibition in Article XXXI, Section 5(b) applicable

to the Grievance Arbitrator – determined a question of whether a particular dispute was

arbitrable.

---

[26]    See also Merrill Lynch, Pierce, Fenner & Smith Inc. v. Noonan, No. 92 Civ. 3770 (SWK), 1992
WL 196741, at *4-8 (S.D.N.Y. Aug. 3, 1992) (differentiating between matters that are
appropriately resolved by courts and those reserved for arbitrators by deciding which among three
potential arbitrators had jurisdiction to hear the dispute, but deferring to that arbitrator a
procedural question concerning the timeliness of the arbitration filing); Avis Rent A Car Sys.,
Inc. v. Garage Employees Union, Local 272, 791 F.2d 22, 25-26 (2d Cir. 1986) (interpreting
arbitration agreements and determining that selected arbitrator was improper); Cargill Rice, Inc.
v. Empresa Nicaraguense Dealimentos Basicos, 25 F.3d 223, 225-26 (4th Cir. 1994) (finding that
bar on arbitrators determining "their own jurisdiction" precluded arbitrators from participating in
selection process); Hooters of America, Inc. v. Phillips, 39 F. Supp. 2d 582, 619 (D.S.C. 1998)
("[T]he rule is well-established that it is the court's responsibility to interpret an arbitration
agreement's language regarding arbitrator selection."), aff'd, 173 F.3d 933 (4th Cir. 1999).

Accordingly, the Grievance Arbitrator had no authority to determine his own jurisdiction and, therefore, the question of the arbitrability of the Commissioner's suspensions is subject to a fully independent, de novo review by this court. See First Options, 514 U.S. at 943-45; Katz, 290 F.3d at 97. Under a de novo review, the question of arbitrability is considered anew and without deference to any prior decision. See Zervos v. Verizon New York, Inc., 252 F.3d 163, 168 (2d Cir. 2001); Greene v. WCI Holdings Corp., 956 F. Supp. 509, 514 (S.D.N.Y. 1997) ("The term 'de novo determination' has 'an accepted meaning in the law. It means an independent determination of a controversy that accords no deference to any prior resolution of the same controversy.'") (citation omitted), aff'd, 136 F.3d 313 (2d Cir. 1998).

Under that standard, the Grievance Arbitrator's conclusion that this dispute is arbitrable is entitled to no deference whatever, and cannot be relied upon by this Court in any way in its determination of whether the Players Association has demonstrated a likelihood of success on the question of arbitrability.

## III. THE NBPA HAS FAILED TO DEMONSTRATE THAT IT WILL SUFFER IRREPARABLE HARM IN THE ABSENCE OF THE REQUESTED RELIEF.

On a motion for a preliminary injunction, the moving party must demonstrate that without the requested relief, it "is likely to suffer irreparable harm before a decision on the merits can be rendered." Borey, 934 F.2d at 34 (citations omitted).[27] This is a rigorous standard that is strictly construed against the moving party – particularly where, as here, the moving party seeks an affirmative injunction. See Line Communications, 265 F. Supp. 2d at 357 (recognizing

---

[27] Accord Buffalo Forge Co. v. Ampco-Pittsburgh Corp., 638 F.2d 568, 569 (2d Cir. 1981) (there must "be a showing of irreparable harm, the absence of an adequate remedy at law, which is the sine qua non for the grant" of preliminary injunctive relief); Line Communications, 265 F. Supp. 2d at 356-57 (motion for preliminary injunction "must be denied" absent showing of irreparable harm); Jessup v. American Kennel Club, Inc., 862 F. Supp. 1122, 1128-29 (S.D.N.Y. 1994) (declining even to address likelihood of success on the merits where moving party failed to demonstrate irreparable harm).

"'heightened'" burden on party to show irreparable harm where "'the movant seeks to disturb the status quo'") (citation omitted).  The law is crystal clear that when an employee seeks reinstatement pending a determination on the merits – as defendant O'Neal is seeking here -- he must meet the higher standard of a mandatory injunction, or an injunction that goes beyond the preservation of the status quo to command the parties to perform a positive act.  Brown v. New York City. Hlth. & Hosp., No. 96-CV-0156, 1996 WL 68558, at *2 (E.D.N.Y. Feb. 5, 1996).

Where a party can be made whole by monetary damages or by some other form of relief, there can be no finding of irreparable harm.  See Firemen's Ins. Co. v. Keating, 753 F. Supp. 1146, 1154-55 (S.D.N.Y. 1990) (refusing preliminary injunction to enforce contract provision where plaintiff "failed to prove . . . that it will suffer any harm that cannot be fully remedied following a trial on the merits").  This is particularly true in cases of suspension or discharge from employment:

> In the employment context, "[c]ourts are loathe to grant preliminary injunctions," because injuries often associated with employment discharge, such as damage to reputation, financial distress, and difficulty finding other employment, do not constitute "irreparable harm" unless extraordinary circumstances are shown. Plaintiffs wrongfully discharged from employment generally may be made whole by monetary damages and reinstatement after a full trial on the merits.

Piercy v. Fed. Reserve Bank, No. 02 Civ. 5005 (DC), 2003 WL 115230, at *3 (S.D.N.Y. Jan. 13, 2003) (alteration in original; emphasis added; citations omitted).[28]

That NBA players can in fact be made whole after having served suspensions which are ultimately overturned is explicitly recognized by Article XXXI, Section 14(d) of the CBA:

---

[28]     Accord Cooper v. TWA Airlines, LLC, 274 F. Supp. 2d 231, 240 (E.D.N.Y. 2003) (the loss of a job or position "does not constitute harm sufficient to warrant preliminary relief in the absence of other truly extraordinary circumstances," "even in cases where a plaintiff cannot find other employment and suffers financial distress"); Walsh v. Northrop Grumman Corp., 871 F. Supp. 1567, 1571 (E.D.N.Y. 1994) ("In this Circuit, however, it is established that dismissal from employment does not constitute irreparable harm.").

39

> Nothing contained herein shall excuse a player from prompt compliance with any discipline imposed upon him. If discipline imposed upon a player is determined to be improper by a final disposition under this Article XXXI, <u>the player shall promptly be made whole.</u>

CBA Art. XXXI, Sec. 14(d) (emphasis added). Indeed, although there have been hundreds of suspensions of NBA players, no NBA suspension has <u>ever</u> been held to justify a stay or injunction. The consistent and unwavering practice of the NBA is that, in accordance with the agreement of the parties reflected in Article XXXI, Section 14(d), players serve their suspensions and may then seek to be made whole by an award of back pay. As Grievance Arbitrator John Feerick wrote in denying a request to stay an NBA suspension:

> As for the request to stay the suspension, <u>it appears to be without precedent in the sport of basketball.</u> While the Player certainly presents serious arguments with respect to the merits, I am not persuaded that a make whole remedy is impossible after a hearing if the suspensions were set aside. Of course, whatever emotional, psychological or public damage might be done in the meantime may never be perfectly remedied, [but] back pay and an independent neutral's determination of exoneration would go a long way toward righting the wrong done a player whose suspension was set aside. The instant Player is in a position faced by other players who have been suspended and are required to serve their suspensions and then have their hearing. To treat this Player differently would not be fair.

<u>NBPA (Isaiah Rider) v. NBA</u>, at 3 (Oct. 27, 1997) (emphasis added). Dean Feerick's conclusion that a disciplinary suspension does not constitute irreparable harm and may later be adequately remedied by a monetary award, is fully applicable here.

## IV.    THE BALANCE OF HARDSHIPS TIPS DECIDEDLY IN THE NBA'S FAVOR.

The final prong of a preliminary injunction analysis tests the balance of hardships between the parties. This "inquiry asks which of the two parties would suffer most grievously if the preliminary injunction motion were wrongly decided." <u>Tradescape.com v. Shivaram</u>, 77 F. Supp. 2d 408, 411 (S.D.N.Y. 1999).[29] Here, that analysis favors the NBA.

---

[29]    <u>Accord</u> <u>Absolute Recovery Hedge Fund, L.P. v. Gaylord Container Corp.</u>, 185 F. Supp. 2d 381, 388 (S.D.N.Y. 2002) ("'[T]he balance of hardships inquiry asks which of the two parties would

As demonstrated above, "'[a]rbitration is a matter of contract and a party cannot be required to submit to arbitration any dispute which he has not agreed to submit.'" Mount Ararat Cemetery v. Cemetery Workers Union, Local 365, 975 F. Supp. 445, 446 (E.D.N.Y. 1997) (citation omitted).  Consistent with this rule, courts repeatedly have held that subjecting a party to arbitration of a claim that is not otherwise arbitrable "constitutes 'per se irreparable harm.'" Tellium, Inc., 2004 WL 307238, at *3 (emphasis added).[30]  The rationale behind a finding of irreparable harm in such situations is clear:  a party should not be deprived of its contractually-chosen forum for resolving disputes.

In Chicago School Reform Board of Trustees v. Diversified Pharmaceutical Services, Inc., 40 F. Supp. 2d 987 (N.D. Ill. 1999), for example, the parties bargained to exclude from arbitration any dispute more than one year old, leaving such disputes only for judicial resolution. Id. at 988-89, 994-95.  When the defendant sought to institute arbitration over a dispute more than one year old, the plaintiff sought a preliminary injunction to prevent the arbitration.  Id. at 989.  The court granted the request and stayed the arbitration, finding that arbitration of the dispute in question would inflict irreparable harm because the plaintiff would have been "unalterably deprived" of its contract rights and choice of forum:

> Forcing a party to arbitrate a matter that the party never agreed to arbitrate, regardless of the final result through arbitration or judicial review, unalterably deprives the party of its right to select the forum in which it wishes to resolve disputes.  The court therefore finds that sending this case to arbitration would cause the Board irreparable harm.

Id. at 996 (emphasis added).

---

suffer most grievously if the preliminary injunction motion were wrongly decided.'") (alteration in original; quoting Tradescape.com, 77 F. Supp. 2d at 411).

[30]    Accord Mount Ararat, 975 F. Supp. at 446-47 ("[A]s to the irreparable harm element of the preliminary injunction inquiry, Ararat may be presumed to suffer irreparable harm if forced to arbitrate a dispute it did not intend to be subject to arbitration . . . .").

41

The same is true in this case.  The Grievance Arbitrator had <u>no</u> jurisdiction to resolve

questions of arbitrability, which is precisely what he has done in issuing the purported arbitration

award.  Because the NBA never agreed to arbitrate those issues – and, indeed, made clear in the

CBA that issues of substantive arbitrability are for judicial determination only – the NBA will be

irreparably harmed by the granting of the requested relief, which would drastically undermine a

critical and essential pillar of the NBA's disciplinary system by reason of an arbitration on issues

that were not arbitrable.

The NBPA's suggestion that the NBA will suffer no harm if the requested relief is

granted is without merit.  The CBA contains carefully crafted procedures, each of which was

collectively bargained, that are designed to ensure the effective and successful operation of a

professional sports league.  Pursuant to those procedures, the Commissioner is vested with

plenary authority to impose and review disciplinary action for player misconduct that occurs "on

the playing court."  Permitting the individual defendants to return to the court pending resolution

of the NBPA's motion for confirmation of the arbitration award, as the NBPA has requested,

would publicly undermine the Commissioner's authority and effectively eviscerate the delicate

balance of authority contemplated by the CBA.[31]  If the Court were to grant the mandatory

injunction requested by the NBPA, the ability of the Commissioner to react swiftly and

decisively to player misconduct "on the playing court" would be severely hampered, as all of his

decisions in that regard would be vulnerable to second-guessing by the Grievance Arbitrator.

Neither the NBA nor Players Association bargained for such a system.  Because, as shown

---

[31]    This is especially so in this case, where:  (i) the NBPA – both at a hearing conducted by the
Grievance Arbitrator and publicly – has acknowledged that some quantum of discipline was
appropriate for the misconduct in which the defendant players engaged (Buchanan Aff. ¶ 66); (ii)
the Grievance Arbitrator upheld the majority of the suspensions (<u>id.</u>); and (iii) with respect to
defendant O'Neal, the Grievance Arbitrator simply substituted his judgment for that of the
Commissioner.

42

above, the players can eventually be made whole by a monetary award, the balance of hardships tips in favor of the NBA.

## CONCLUSION

For the foregoing reasons, the NBPA's motion for a preliminary injunction should be denied.

Dated:     December 22, 2004
           New York, New York

                    Respectfully submitted,

                    SKADDEN, ARPS, SLATE,
                      MEAGHER & FLOM LLP
                    Jeffrey A. Mishkin (JM 8380)
                    Douglas B. Adler (DA 6013)
                    Anthony J. Dreyer (AD 3571)
                    Four Times Square
                    New York, New York  10036
                    Tel:  (212) 735-3000

                    By: _____
                       /Jeffrey A. Mishkin

                    Attorneys for Plaintiff

                    PROSKAUER ROSE LLP
                    Howard L. Ganz (HG 8644)
                    Daniel R. Halem (DH 3035)
                    1585 Broadway
                    New York, New York  10036
                    Tel:  (212) 969-3035

                    Attorneys for Plaintiff