SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP
Jeffrey A. Mishkin (JM 8380)
Douglas B. Adler (DA 6013)
Anthony J. Dreyer (AD 3097)
Four Times Square
New York, New York  10036
Tel:  (212) 735-3000

PROSKAUER ROSE LLP
Howard L. Ganz (HG 8644)
Daniel R. Halem (DH 3035)
1585 Broadway
New York, New York  10036
Tel:  (212) 969-3035

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

NATIONAL BASKETBALL ASSOCIATION,                      :

                                          Plaintiff,   :

                                                       :      04-Civ.-09528 (GBD)
            – against –                                :

NATIONAL BASKETBALL PLAYERS ASSOCIATION,               :
RON ARTEST, STEPHEN JACKSON, ANTHONY
JOHNSON, and JERMAINE O'NEAL,                          :

                                          Defendants.  :

                                                       :

---

## AFFIDAVIT OF RICHARD W. BUCHANAN IN OPPOSITION TO DEFENDANTS' MOTION TO CONFIRM ARBITRATION AWARD AND FOR INJUNCTIVE RELIEF

I, RICHARD W. BUCHANAN being first duly sworn upon oath, state as follows:

1.      I submit this affidavit in opposition to the motion by the individual defendants and the National Basketball Players Association (the "Players Association" or "NBPA") for injunctive relief and to confirm the arbitration award issued on December 21, 2004.  I have personal knowledge of the facts set forth herein.

2.　　　I am Senior Vice President and General Counsel of plaintiff National Basketball Association ("NBA"). I have been employed continuously by the NBA since 1993, when I was hired as an Assistant General Counsel. I was appointed General Counsel in 1999.

3.　　　In my role as General Counsel, I am directly involved with and oversee, among other things, matters relating to the discipline of NBA players for misconduct. In that connection, I am responsible for reviewing allegations of player misconduct and advising the Commissioner with respect to appropriate disciplinary measures; notifying players of discipline imposed upon them for certain misconduct; processing appeals to the NBA Commissioner filed by the Players Association challenging discipline imposed for conduct on the playing court (including the scheduling of hearings before the Commissioner); negotiating and executing settlements concerning such appeals; ensuring that NBA players are advised on an annual basis of new League rules governing player conduct; and ensuring that the Players Association is also advised of those rules.

4.　　　The NBA is an integrated business enterprise that engages in the production and marketing of an entertainment product known as "NBA Basketball." The NBA consists of thirty member teams, each operating a professional basketball team in a particular geographic location in North America.

5.　　　Defendant NBPA is a labor organization recognized by the NBA and certified by the National Labor Relations Board as the exclusive collective bargaining representative of all NBA players. The collective bargaining relationship between the NBA and the Players Association has existed since 1965.

6.      The NBA and the NBPA are parties to a collective bargaining agreement that covers the period from January 20, 1999, through June 30, 2005 (the "CBA"). The parties are currently engaged in negotiations with respect to a successor agreement.

### The Detroit Incident

7.      The serious and unprecedented event that underlies this proceeding occurred with 45.9 seconds remaining in a November 19, 2004 NBA game between the Indiana Pacers and the Detroit Pistons at The Palace of Auburn Hills (the "Detroit Incident").

8.      The Detroit Incident began when an altercation broke out on the playing floor among players for the Pacers and the Pistons, following a foul committed by defendant Artest on an opposing player, Ben Wallace. The altercation escalated to the point where members of the Pacers engaged in physical confrontations with Palace patrons and others on the playing floor and in the stands. Each of the individually named defendants was involved in some aspect of the incident:

      (a)     Following his altercation with Wallace, defendant Artest entered the stands to confront a spectator, whom he subsequently pushed to the ground. He thereafter returned to the playing floor and struck one spectator in the face and pushed another.

      (b)     Defendant Jackson attempted to instigate a fight with several Pistons players on the playing floor, and then followed defendant Artest into the stands, where he struck one spectator in the face and another in the back of the head. Jackson also spit at two different fans as he left the basketball floor.

      (c)     After the altercation began, defendant Johnson left the immediate vicinity of his team's bench and confronted a spectator on the playing floor, whom he punched and wrestled to the ground.

      (d)     Likewise, defendant O'Neal left the immediate vicinity of his team's bench and attempted to enter the stands, but was restrained by an usher whom O'Neal forcefully shoved over the scorer's table. Defendant O'Neal then

3

proceeded to attack a spectator on the playing floor, whom he punched in the face.

9.      All of the conduct engaged in by the individual defendants on the playing floor and in the stands occurred prior to the announcement by the officiating crew that the game was over.

## The Regulation of Player Conduct in the NBA

10.      Pursuant to the terms of the CBA, each NBA player has entered into a Uniform Player Contract ("UPC"), governing the terms and conditions of his employment. True and correct copies of the UPCs for each of the individual defendants are set forth as Exhibits 1 through 4 of this affidavit.

11.      The conduct of NBA players is governed by various provisions of the CBA and the UPC, and by rules and regulations promulgated by the NBA and its member teams. Of particular relevance here is Article 35 of the NBA Constitution (entitled "Misconduct"), which empowers the Commissioner to fine and/or suspend an NBA player for the causes set forth therein. A true and correct copy of Article 35 of the NBA Constitution is set forth as Exhibit 5.

12.      Article 35(d) of the NBA Constitution provides that:

> If in the opinion of the Commissioner any other act or conduct of a Player at or during an Exhibition, Regular Season, or Playoff game has been prejudicial to or against the best interests of the Association or the game of basketball, the Commissioner shall impose upon such Player a fine not exceeding $35,000, or may order for a time the suspension of any such Player from any connection or duties with Exhibition, Regular Season, or Playoff games, or he may order both such fine and suspension.

13.      Pursuant to Paragraph 5 of the UPC, each NBA player expressly agrees to be bound by Article 35 of the NBA Constitution.

14.      NBA players are – and have been for many years – expressly advised in writing that "violence on the court," including engaging in "violent acts during a game" and deliberately

4

entering "the spectator stands during a game," is prohibited.  These rules are set forth in a Player

Conduct Memo that is distributed to each NBA player and the NBPA at the start of each season.

The Player Conduct Memo expressly sets forth prohibitions against the very types of misconduct

the individual defendants engaged in during the Detroit Incident, and further advises that such

conduct will subject a player to discipline, including a fine and/or suspension.  For example:

> (a)  Under the heading "Violence On the Court," the Player Conduct Memo admonishes that "any player who deliberately enters the spectator stands" during or after a game will be subject to suspension.

> (b)  Under the heading "RULES RELATING TO FIGHTING, FLAGRANT FOULS AND OTHER PLAYING COURT MISCONDUCT," the Player Conduct Memo sets forth prohibitions against fighting, throwing punches, and leaving the bench area during an altercation.

> (c)  Under the sub-heading "OTHER RULES GOVERNING CONDUCT ON THE PLAYING COURT," the Player Conduct Memo sets forth prohibitions against "stimulating or encouraging crowd disorder."

15.    On October 19, 2004, I provided to the Players Association a copy of the Player

Conduct Memo for the 2004-05 NBA season.  A copy of the 2004-05 Player Conduct memo is set

forth as Exhibit 6.  I have provided copies of such Player Conduct Memos to the Players

Association at the start of every NBA season dating back at least to the 1997-98 NBA season.

Copies of the Player Conduct Memos for the 1997-98 through 2003-04 seasons are set forth as

Exhibits 7 through 13.

### The Limited Authority of the Grievance Arbitrator

16.    Article XXXI of the CBA sets forth grievance arbitration procedures for the

resolution of disputes that arise between the NBA and/or its member teams and the NBPA and/or

individual NBA players.  The Grievance Arbitrator's authority is carefully circumscribed,

particularly with respect to disputes involving player discipline.  A copy of Article XXXI of the

CBA is set forth as Exhibit 14.  The CBA expressly withdraws from the jurisdiction of the

Grievance Arbitrator a number of categories of disputes, including, for example, those involving such critical economic issues as the NBA Salary Cap, the NBA Draft, free agency, and the pay scale for Rookie players, all of which are to be heard by a System Arbitrator, not the Grievance Arbitrator. See Article XXXI, Section 1. The Grievance Arbitrator is also precluded from deciding certain injury-related disputes, which are to be heard by a designated physician if a party to the dispute so elects.

17.    The CBA further states that a "fine or suspension imposed by the Commissioner shall be appealable to the Grievance Arbitrator only if it results in a financial impact on the player of more than $25,000." CBA Art. XXXI, Sec. 13 (emphasis added). Even if this financial threshold is met, however, Article XXXI, Section 1(b) states that the Grievance Arbitrator shall have jurisdiction over player discipline only to the extent set forth in Section 8 of the Article XXXI. Section 8 provides explicitly that the Grievance Arbitrator will not have any jurisdiction over certain disciplinary disputes, including those that involve "a fine or suspension imposed upon a player by the Commissioner (or his designee) for conduct on the playing court," regardless of the financial impact on the player. Section 8 states as follows:

> (a)  Any dispute involving (i) a fine or suspension imposed upon a player by the Commissioner (or his designee) for conduct on the playing court (regardless of its financial impact on the player), or (ii) action taken by the Commissioner (or his designee) concerning the preservation of the integrity of, or the maintenance of public confidence in, the game of basketball resulting in a financial impact to the player of $25,000 or less, shall be processed exclusively as follows:

> (i)  Within twenty (20) days following written notification of the action taken by the Commissioner (or his designee), a player affected thereby or the Players Association may appeal in writing to the Commissioner.

> (ii)  Upon the written request of the Players Association, the Commissioner shall designate a time and place for hearing as soon as is reasonably practicable following his receipt of the notice of appeal.

6

(iii) As soon as reasonably practicable, but not later than twenty (20) days, following the conclusion of such hearing, the Commissioner shall render a written decision, which decision shall constitute full, final and complete disposition of the dispute, and shall be binding upon the player(s) and Team(s) involved and the parties to this Agreement.

(iv) In the event such appeal involves a fine or suspension imposed by the Commissioner's designee, the Commissioner, as a consequence of such appeal and hearing, shall have authority only to affirm or reduce such fine or suspension, and shall not have authority to increase such fine or suspension.

(emphasis added).

18.     This exclusive power of the Commissioner regarding "conduct on the playing court" is a critical and indispensable pillar of the NBA's bargained-for system of player discipline, and has appeared unchanged in every collective bargaining agreement between the NBA and the Players Association since 1972. (See Exhibits 15 through 19.) The purpose of this provision is to ensure that the Commissioner alone, and not any outside party, has the sole and exclusive authority to determine appropriate discipline for conduct occurring during the public presentation of the NBA's core product – NBA games.

19.     In addition to precluding the Grievance Arbitrator from hearing challenges to suspensions for "conduct on the playing court," Article XXXI of CBA also expressly precludes the Grievance Arbitrator from determining his own jurisdiction. Article XXXI, Section 5(b) provides:

The Grievance Arbitrator shall not have jurisdiction or authority to add to, detract from, or alter in any way the provisions of this Agreement (including the provisions of this subsection) or any Player Contract. Nor, in the absence of agreement by the NBA and the Players Association, shall the Grievance Arbitrator have jurisdiction or authority to resolve questions of substantive arbitrability.

(emphasis added).

20.     This express limitation on the Grievance Arbitrator's authority to decide

arbitrability grew out of a 1998 dispute between the NBA and the NBPA over whether the courts

or the Grievance Arbitrator had the authority to determine whether a disagreement concerning

player salaries was within the jurisdiction of the Grievance Arbitrator. The Grievance Arbitrator at

the time, John Feerick, concluded that he had authority under the CBA to determine whether the

disagreement was the proper subject of a grievance arbitration. Following that decision, the

parties in 1999 added to the CBA the above-underscored language of Section 5(b).

### The Imposition of Discipline for the Detroit Incident

21.     On November 20, 2004, acting in accordance with his authority under Article 35(d)

of the NBA Constitution, the NBA suspended defendants Artest, Jackson, and O'Neal indefinitely

pending the NBA's investigation of the Detroit Incident. On November 21, 2004, following a

thorough investigation by the NBA, and again pursuant to Article 35(d), the Commissioner

suspended defendant Artest for the remainder of the season, defendant Jackson for thirty games,

defendant O'Neal for twenty-five games, and defendant Johnson for five games (collectively the

"Suspensions"). Copies of the suspension letters sent to defendants Artest, Jackson, Johnson, and

O'Neal are set forth as Exhibit 20. Five other players involved in the Detroit Incident also were

suspended.

22.     The Suspensions were imposed for conduct "on the playing court," within the

meaning of Section 8 of the CBA. Specifically:

> (a)     Defendant O'Neal's suspension involved conduct that included leaving the
> immediate vicinity of his team's bench during the altercation (in violation
> of NBA rules), shoving an usher who was trying to keep him from leaving
> the basketball floor and entering the stands, and punching a spectator on the
> basketball floor;

    (b)    Defendant Johnson's suspension involved conduct that included leaving the immediate vicinity of his team's bench during the altercation (in violation of NBA rules), and punching a spectator on the basketball floor;

    (c)    Defendant Artest's suspension involved conduct that included leaving the basketball floor and deliberately entering the stands to confront and push a spectator, and punching one spectator and pushing another while on the basketball floor; and

    (d)    Defendant Jackson suspension involved conduct that included acting as an escalator rather than as a peacemaker on the basketball floor, leaving the basketball floor and deliberately entering the stands to confront and punch two different spectators, and spitting at two fans as he left the basketball floor.

### The NBPA's Attempts To Avoid
### The Parties' Agreed-Upon Method of Dispute Resolution

23.    On November 22, 2004, the NBPA purported to challenge the Suspensions before the Grievance Arbitrator. (See Exhibit 21.) On November 23, 2004, the NBPA requested that the Grievance Arbitrator convene an expedited hearing. (See Exhibit 22.)

24.    On November 26, 2004, the NBA sent a letter to the Grievance Arbitrator and the NBPA, objecting – by reason of Sections 5(b) and 8 of the CBA – to the commencement of the purported arbitration proceedings. (See Exhibit 23.)

25.    On November 30, 2004, the NBPA responded by sending a 20-page letter (with more than 150 pages of exhibits) to the Grievance Arbitrator, asking him to rule, by December 3, 2004, that he has the authority to determine the arbitrability of the NBPA's claim and that he, rather than the NBA Commissioner, has jurisdiction to resolve it. (See Exhibit 24, without attachments.)

26.    On December 2, 2004, the NBA reiterated its objection to the Grievance Arbitrator's consideration of the matter, and, in order to preserve its entitlement to de novo review of these issues in federal court, refused to participate in a hearing before the Grievance Arbitrator

or otherwise to respond substantively to the NBPA's arguments. (See Exhibit 25.)

27.    On December 3, 2004, despite the clear language in Section 5(b) that should have precluded this result, the Grievance Arbitrator issued a "decision" holding that he "has jurisdiction to determine the arbitrability of this grievance," and setting an expedited hearing to consider both whether "Commissioner Stern's decision is reviewable and the propriety of the suspensions issued by him on November 21, 2004." (See Exhibit 26.) Thus, the Grievance Arbitrator announced his intention to proceed directly to the merits of the dispute, before deciding whether or not he even had jurisdiction to do so.

28.    Having thus usurped the role of the Commissioner, the Grievance Arbitrator, in a telephone conference call with the parties later in the day on December 3, refused to grant the NBA's reasonable request to bifurcate the issues of arbitrability and the propriety of the suspensions. This would have enabled the NBA to secure a judicial determination of the question of arbitrability (assuming the Grievance Arbitrator found the dispute arbitrable) before the commencement of any hearing on the merits. The Grievance Arbitrator declined to afford the NBA that opportunity, and instead set December 9, 2004 as the date on which he would hear both the issue of arbitrability and the merits.

29.    Because the hearing on the merits convened by the Grievance Arbitrator would itself eviscerate the NBA's bargained-for right to have the Commissioner alone decide issues involving discipline for "conduct on the playing court," without interference or reconsideration by outside parties, the NBA declined to participate in the hearing. (See Exhibit 27.)

30.    On December 3, 2004, the NBA initiated this action seeking declarations that: (i) pursuant to the terms of the CBA, the Grievance Arbitrator had no authority to resolve the

10

arbitrability issue; (ii) the dispute the NBPA has attempted to submit to grievance arbitration is not arbitrable and the Grievance Arbitrator has no jurisdiction over that dispute; and (iii) the NBPA's sole remedy to challenge the Suspensions is an appeal to the Commissioner pursuant to Section 8.

31.    On December 7, the Grievance Arbitrator wrote to the NBA urging it to attend and participate in the hearing, and announcing the standard of review he intended to apply to his consideration of the proprietary of the Suspensions, even though he had not yet received a single piece of evidence or heard any argument on that issue. (See Exhibit 28.) The NBA responded the next day, informing the Grievance Arbitrator again that it would not participate in the December 9 hearing. (See Exhibit 29.)

32.    In the NBA's absence, on December 9, 2004, the Grievance Arbitrator held the hearing. A copy of the transcript of the hearing is set forth as Exhibit 30. On December 21, 2004, the Grievance Arbitrator issued his arbitration award. A copy of the award is set forth as Exhibit 31.

### The Proper Interpretation of "Conduct on the Playing Court" Is at Least as Broad as Article 35(d), Which Authorizes the NBA To Impose Discipline for Misconduct "At or During" an NBA Game

33.    As noted above, Article 35(d) of the NBA Constitution empowers the Commissioner to impose discipline for misconduct "at or during an Exhibition, Regular Season, or Playoff Game." This provision is directly related to the provisions of Article XXXI, Section 8 of the CBA, which accords the Commissioner sole, exclusive and final jurisdiction to hear an appeal regarding "conduct on the playing court." In short, Article 35(d) provides the basis for the Commissioner's authority to impose the discipline that Section 8 commits to his sole and exclusive jurisdiction.

34.     The NBA has always understood Article 35(d) and Section 8 to be synonymous –

that is, the phrase "conduct on the playing court" means, at least, conduct at or during an NBA

game. Accordingly, the discipline imposed by the Commissioner under Article 35(d) is only

appealable to the Commissioner under Section 8.

35.     Although the Players Association now argues that there is a significant difference

between the two provisions, its counsel in this case has, on <u>two separate occasions</u> during the

course of other proceedings between the parties, candidly acknowledged and agreed with the

NBA's interpretation:

> [I]f you look, for example, in 35D [sic] [of the NBA Constitution], when they
> are talking about this is the commissioner's ability to discipline for conduct
> of a player at or during an exhibition, regular season or playoff game. <u>So this
> is on-court behavior as we colloquially use that phrase</u>.

<u>See</u> Opening Argument of Jeffrey Kessler in <u>NBPA (Sprewell) v. NBA</u>, at 35:15-25 (Jan. 27,

1998) (emphasis added), set forth as Exhibit 32.

> Because if you look at Article 35 of the NBA Constitution, which both parties cite, which is
> attached to the Uniform Player Contract, it goes through different reasons for suspending. You
> could be suspended for drugs and you could be suspended for gambling and you could be
> suspended for crimes, and in a separate section, in Article 35, <u>you can be suspended for
> on-court behavior</u>.

<u>See</u> Oral Argument of Jeffrey Kessler in, <u>Ewing v. Stern</u>, No. 97 Civ. 3578 (JSR), at 14 (May 16,

1997) (emphasis added), set forth as Exhibit 33.

36.     The Players Association now argues that the Commissioner's exclusive jurisdiction

over discipline for "conduct on the playing court" under Section 8 is limited to conduct occurring

only within the exact confines of the fifty-foot by ninety-four-foot basketball playing floor and

during the "flow of the game." These purported limitations on the Commissioner's authority

under Section 8 appear nowhere in the CBA, the NBA Constitution and By-Laws, any NBA rules,

12

in any prior correspondence of the parties, or in any prior judicial or arbitral decision. As shown in detail below, this newly conceived formulation of the meaning of "conduct on the playing court" defies common sense; is inconsistent with a prior NBA arbitration award (NBPA (Charles Barkley) v. NBA, No. 92-3 (1992)) and a prior judicial decision (Ewing v. Stern, No. 97 Civ. 3578 (JSR) (S.D.N.Y. May 16, 1997)), and years of past practice; and would render the NBA disciplinary system entirely unworkable.

## The *Barkley* Decision

37.    In a 1992 arbitration before NYU Law Professor Daniel Collins arising under the 1988 CBA, the NBPA contended that the Commissioner lacked the authority to issue a suspension without pay to a player who had engaged in an altercation with spectators. See NBPA (Charles Barkley) v. NBA, No. 92-3 (1992), set forth as Exhibit 34. In that case, during a stoppage in play, Charles Barkley walked into the out-of-bounds area underneath the basket and verbally abused and spit on spectators in the stands. (Video of this incident will be provided for the Court's review.)

38.    Under the theory advanced by the NBPA here, one might have expected the Players Association to challenge the Commissioner's jurisdiction on the ground that Barkley's misconduct did not occur "on the playing court," because the player was in the out-of-bounds area and acted outside of the "flow of the game." But the Players Association made no such argument. Instead, the NBPA's only claim was that the Commissioner lacked the authority to order a suspension "without pay."

39.    Arbitrator Collins could not have been clearer in rejecting the NBPA's attempt to avoid the appeals procedure before the Commissioner for which it had collectively bargained. As

13

Arbitrator Collins noted:

> The Impartial Arbitrator believes the language of Article XXVIII, Section 2(f)(1) [now Article XXXI, Section 8] <u>clearly and unambiguously provides that disputes such as those at issue here,</u> i.e., "involving . . . a suspension imposed upon a Player by the Commissioner (or his designee)," <u>are not within the Impartial Arbitrator's contractual jurisdiction.</u> Thus he cannot express any opinion as to the merits of such disputes, including whether the Commissioner of his designee is contractually empowered to impose a suspension without pay. <u>That question can only be addressed under the Agreement by the Commissioner.</u>

<u>Barkley</u> at 7 (emphasis added).

40.     Moreover, Arbitrator Collins agreed that the conduct engaged in by Barkley was conduct "on the playing court": "The Arbitrator finds the issue to be whether a dispute concerning a suspension of a Player by the NBA Commissioner or his designee for conduct on the playing court can only be processed pursuant to the Special Procedure set forth in Article XXVIII, Section 2(f)(1) of the Collective Bargaining Agreement."

41.     Accordingly, Arbitrator Collins found that a "dispute concerning the suspension of a Player by the Commissioner for conduct on the playing court can only be processed pursuant to the Special Procedure set forth in Article XXVIII, Section 2(f)(i) [now Article XXXI, Section 8]." <u>Id.</u> at 7-8.

42.     Although <u>Barkley</u> was decided under Article XXVIII, Section 2(f)(i) of the 1988 CBA, that provision is substantially identical to what is now Article XXXI, Section 8. <u>Compare</u> Exhibit 14 <u>with</u> Exhibit 18.

### The <u>*Ewing*</u> Decision

43.     Similarly, in a 1997 disciplinary dispute arising under the 1995 CBA, this Court came to the same conclusion as Arbitrator Collins in <u>Barkley</u>. <u>See Ewing v. Stern</u>, No. 97 Civ.

3578 (JSR) (S.D.N.Y. May 16, 1997), a copy of which is set forth as Exhibit 33.

44.    In that case, a dispute arose over suspensions imposed by the NBA for a player

altercation occurring out-of-bounds and in the spectator seats behind the basket during a playoff

game. Several players, including Patrick Ewing, left the bench area and walked toward the

altercation. (Video of this incident will be provided for the Court's review.) Here again, the

Players Association did not argue that the misconduct was not "on the playing court," but instead

asserted that the rule enforced by the NBA (prohibiting players from leaving the bench area) was

unreasonable. The NBPA, purporting to commence a grievance arbitration in support of this

position, moved this Court for a stay of the suspensions pending resolution of the arbitration.

45.    Judge Rakoff rejected the NBPA's motion, finding that the Players Association

could not establish a likelihood of success on the merits because the dispute was not arbitrable, but

rather fell within the exclusive jurisdiction of the Commissioner under Article XXXI, Section 8 of

the CBA:

> We have an article, Article 31, <u>which is the natural place anyone would look
> to see if something is arbitrable or not,</u> because it is entitled "Grievance and
> Arbitration Procedure;" and among other pertinent things Section 8 of that
> article, entitled "Special Procedures with Respect to Player Discipline,"
> states that "Any dispute involving a fine or suspension imposed upon a player
> by the Commissioner or his designee <u>for conduct on the playing court shall be
> processed exclusively as follows:</u>" <u>And then it sets forth provisions that do
> not include reference to the arbitrators.</u>

<u>Ewing</u>, 97 Civ. 3578, Tr. at 59 (emphasis added).

## Challenges to Discipline Imposed for
## <u>Conduct at NBA Games Have Been Consistently Made to the Commissioner</u>

46.    In the twelve-plus years since <u>Barkley</u> was decided, the NBPA has repeatedly

recognized through its actions that "conduct on the playing court" should be broadly interpreted to

encompass any player misconduct occurring at an NBA game. In particular, on numerous prior

occasions, the NBPA has filed appeals with the Commissioner – and not grievances with the

Grievance Arbitrator – when challenging discipline imposed for player misconduct occurring at or

during an NBA game (i.e., pursuant to Article 35(d)), even where the conduct took place outside

the confines of the playing floor and outside the "flow of the game."

47.     In the last decade alone, the NBPA has filed appeals to the Commissioner in more

than twenty separate incidents where the conduct at issue did not occur on the playing court and/or

during the "flow of the game."

48.     As discussed below, these prior appeals to the Commissioner reflect the Players

Association's acknowledgement and understanding that "conduct on the playing court" includes

conduct occurring in such off-the-floor locations as the bench area, the press area, the scorer's

table, the exit tunnels, the spectator area, and even the locker rooms.  For example:

(a)     In accordance with Judge Rakoff's opinion in the Ewing matter, the Players
        Association has often appealed to the Commissioner in circumstances
        where players have been suspended for improperly leaving the bench area.
        Since the 1997-98 NBA season, there have been 10 such appeals filed by
        the Players Association.

(b)     On December 30, 2002, Clarence Weatherspoon of the New York Knicks
        shoved Kevin Willis of the San Antonio Spurs into the stands during the
        course of an NBA game.  Weatherspoon grabbed Willis from behind,
        dragged him off the playing floor, and then pushed Willis into the first row
        of stands, after which an altercation ensued.  As a result, the NBA informed
        Weatherspoon on December 31, 2002 that he had violated Article 35(d) of
        the NBA Constitution and was to be suspended for one game, resulting in a
        loss of $55,464 in salary, and fined $20,000 (plus $1,000 for being ejected).
        In response, on January 9, 2003, the NBPA appealed the fine and
        suspension to the NBA Commissioner.  (See Exhibit 35.)

(c)     On March 15, 2002, Tim Hardaway of the Denver Nuggets received a
        technical foul and was subsequently ejected from a game against the
        Orlando Magic.  Play stopped in order for Hardaway to exit the arena.  Prior
        to departing, Hardaway attempted to approach the referee, but was
        restrained from doing so by teammates.  Hardaway then walked to the press
        table, removed a television monitor from the table, and threw it to the

16

playing floor. He continued to walk, pausing in the tunnel to the locker rooms to turn and heckle fans as well as the referee. (Video of this incident will be provided for the Court's review.) As a result of his actions, Hardaway was informed by the NBA on March 19, 2002 that he had violated Article 35(d) of the NBA Constitution and was to be suspended for two games, resulting in a loss of $74,675 in salary, and fined $10,000 (plus $1,000 for being ejected). In response, on April 3, 2002, the NBPA appealed the fine and suspension to the NBA Commissioner. The appeal ultimately was settled, and the terms were set forth in a confirmatory letter to the NBPA identifying "settlement of appeals of on-court discipline filed by players," including Hardaway.[1] (See Exhibit 37.)

(d)     On March 1, 2002, following the conclusion of a game, Reggie Miller of the Indiana Pacers engaged in a shoving match with L.A.'s Kobe Bryant, which ended up out of bounds when Miller pushed Bryant onto the scorer's table. (Video of this incident will be provided for the Court's review.) As a result of his actions, Miller was informed by the NBA on March 5, 2002 that he had violated Article 35(d) of the NBA Constitution and was to be suspended for two games, resulting in a loss of $266,666 in salary, and fined $10,000. In response, the NBPA appealed the fine and suspension to the NBA Commissioner. The appeal ultimately was settled, and the terms were set forth in a confirmatory letter to the NBPA identifying "settlement of appeals of on-court discipline filed by players," including Miller. (See Exhibit 38.)

(e)     On March 11, 2000, after a game between the Denver Nuggets and the Orlando Magic, Ron Mercer entered the Nuggets' locker room and engaged in a verbal and physical altercation with another player that spilled out of the Nuggets' locker room into the corridor. By letter dated March 15, 2000, the NBA informed Mercer that his actions violated Article 35(d) of the NBA Constitution and that he was to be suspended for one game, resulting in a loss of $25,515 in salary, and fined $5,000. By letter dated March 31, 2000, the NBPA appealed the fine and suspension to the NBA Commissioner. The appeal ultimately was settled, and the terms were set forth in a confirmatory letter to the NBPA identifying "settlement of appeals of on-court discipline filed by players," including Mercer. (See Exhibit 39.)

(f)     Similarly, on January 25, 2000, during a game between the Golden State Warriors and the Dallas Mavericks, Gary Trent, a player for Dallas, entered the visitors locker room, which was occupied by the Golden State Warriors. Trent proceeded to the showers, where a player (Vonteego Cummings) was

---

[1]     As noted above, if the appealing party wishes to settle an appeal to the Commissioner, I am responsible for the negotiation and execution of the terms of the settlement with counsel for the Players Association. If a settlement is reached, the terms are memorialized in a settlement letter, a draft of which is provided to the NBPA prior to execution. (See, e.g., Exhibit 36.)

taking a shower after being ejected from the game. Trent made several critical comments about Cummings' actions, leaving only after security arrived. By letter dated January 27, 2000, the NBA informed Trent that his actions violated Article 35(d) of the NBA Constitution and that he was to be suspended for one game, resulting in a loss of $22,222 in salary, and fined $10,000. By letter dated February 8, 2000, the NBPA appealed the fine and suspension to the NBA Commissioner. The appeal ultimately was settled, and the terms were set forth in a confirmatory letter to the NBPA identifying "settlement of appeals of on-court discipline filed by players," including Trent. (See Exhibit 40.)

(g)     On May 14, 1997, at a game between the New York Knicks and the Miami Heat, P.J. Brown of the Heat lifted Knicks' player Charlie Ward into the air and threw him into a group of photographers seated behind the basket, leading to the altercation that was the subject of the Ewing case. (Video of this incident will be provided for the Court's review.) By letter dated May 15, 1997, the NBA informed Brown that his actions violated Article 35(d) of the NBA Constitution and that he was to be suspended for two games, resulting in a loss of $78,049 in salary, and fined $10,000 (plus $1,000 for being ejected). In response, on May 19, 1997, the suspension and fine were appealed to the Commissioner. (See Exhibit 41.)

(h)     On February 6, 1995, during a game between the Houston Rockets and the Portland Trailblazers, after Vernon Maxwell (a player for Houston) was taken out of the game, several fans began heckling him. Maxwell left the bench, ran into the stands and threw a punch at one of the fans. By letter dated February 8, 1995, the NBA informed Maxwell that his actions violated Article 35(d) of the NBA Constitution and that he was to be fined and suspended. By letter dated February 9, 1995, the NBPA appealed the suspension to the Commissioner of the NBA. (See Exhibit 42.)

(i)     On May 13, 1994, during a playoff game between the Chicago Bulls and the New York Knicks, Jo Jo English of the Bulls pushed Derek Harper of the Knicks into the stands and began to fight with him in the seating area surrounding the court. (Video of this incident will be provided for the Court's review.) As a result, on May 16, 1994, the NBA fined English $10,000 and suspended him for one game. On May 27, 1994, the suspension was appealed to the NBA Commissioner. (See Exhibit 43.)

49.     The Players Association has also filed appeals to the Commissioner in numerous instances where the conduct at issue occurred during a stoppage in play or after the game ended, or where the conduct was committed by players who were on the bench or who had been ejected from the game. These appeals reflect the Players Association's acknowledgement and understanding

18

that "conduct on the playing court" includes conduct occurring outside of "the flow of the game."

For example:

      (a)     Vernon Maxwell (punching a fan in the stands) and Patrick Ewing (leaving the bench during an altercation) committed their misconduct after they had been removed from the game and taken their place on the bench;

      (b)     Charles Barkley (spitting on fan) committed his misconduct after play had stopped;

      (c)     Gary Trent (altercation in locker room) committed his misconduct during a game in which he did not play due to injury;

      (d)     Tim Hardaway (throwing a television monitor) committed his misconduct after he had been ejected from the game;

      (e)     Ron Mercer (altercation in locker room) and Reggie Miller (shoving Kobe Bryant onto scorer's table) committed their misconduct after the game had ended; and

      (f)     Shaquille O'Neal, uttered an obscenity in a live television interview after the game had concluded (video of this incident will be provided for the Court's review), leading to a one-game suspension on February 2, 2004 (and thus, a loss of $275,000 in salary) pursuant to Article 35(d) of the NBA Constitution. By letter dated February 6, 2004, the NBPA appealed this discipline to the Commissioner. (See Exhibit 44.)

      50.     As the foregoing examples make clear, the Players Association's contention that "conduct on the playing court" must occur on the basketball floor during the "flow of the game" is simply untenable.

### There Is No Basis for the Players Association's Interpretation of Section 8

      51.     In the thirty-plus years that the CBA has conferred upon the Commissioner exclusive authority over "conduct on the playing court," no Grievance Arbitrator has ever decided the propriety of an NBA fine or suspension for conduct at or during an NBA game. Although the NBPA now contends that, under the 1995 and 1999 CBAs, the Grievance Arbitrator was empowered to hear challenges to Article 35(d) suspensions such as the one imposed here, no

Grievance Arbitrator either before or after the adoption of the 1995 CBA, has ever reviewed, let alone overturned, the merits of a 35(d) suspension. And this is so, despite the fact that the NBA regularly disciplines players for conduct at or during NBA games – indeed, the NBA has imposed player discipline pursuant to Article 35(d) on almost 250 separate occasions alone during the seasons covered by the current (1999) CBA.[2]

52.    In addition to the incidents detailed above in which the NBPA affirmatively filed appeals before the Commissioner for misconduct off the playing floor and outside of the "flow of the game," the Players Association also declined to seek reductions in discipline before the Grievance Arbitrator in numerous other similar incidents of misconduct. For example:

(a)    In 2002, Rick Fox, a player for the Los Angeles Lakers, after being ejected from a game against Sacramento, exited the playing floor through the access tunnel, sprinted down a hallway underneath the stands, and attacked Sacramento's Doug Christie in the opposite exit tunnel, thereby instigating an altercation in the tunnel involving numerous players. Notwithstanding a six-game suspension for Fox (for which he lost $289,349 in salary) and other substantial suspensions imposed by the NBA, the Players Association took no action. (See Exhibit 45.)

(b)    Also in 2002, Golden State's Chris Mills attempted to confront and threaten opposing players outside the locker room following a game. Despite a three-game suspension imposed by the NBA (for which he lose $199,917 in salary), the Players Association took no action. (See Exhibit 46.)

(c)    In 2001, Indiana's Reggie Miller, after exiting the game and sitting on the team bench with 1:58 left in the fourth quarter, threw a piece of gum (from his seated location on the bench) and hit a game official on the other side of the court. Despite a significant suspension (for which he lost $133,334 in salary) and fine imposed by the NBA, the Players Association took no action. (See Exhibit 47.)

(d)    In 1997, Portland's J.R. Rider, during the halftime warm-up period, went into the stands and spit on a spectator in the fourth row. Despite a three-game suspension and a substantial fine imposed by the NBA, the

---

[2]    Specifically, players were disciplined pursuant to Article 35(d) 29 times during the 1998-99 season, 38 times during the 1999-2000 season, 46 times during the 2000-01 season, 45 times during the 2001-02 season, 35 times during the 2002-03 season, and 49 times during the 2003-04 season.

Players Association took no action.  (See Exhibit 48.)

53.    It is incredible to assert – as the Players Association must assert here – that although it has (supposedly) always had the ability to obtain relief from a neutral arbitrator for allegedly excessive discipline imposed by the Commissioner with respect to conduct that took place off the playing floor or outside of the "flow of the game," it has just never before availed itself of that opportunity.  The truth, as the Players Association well knows, is that the CBA precludes such relief, and the NBPA, before now, has never had the temerity to assert otherwise.

54.    The Players Association has pointed to separate suspensions of Dennis Rodman (for kicking a cameraman on the apron of the basketball floor) and Rasheed Wallace (for confronting a referee in the parking area after a game) – as evidence that a suspension imposed for conduct by an NBA player at or during an NBA game was not appealable to the Commissioner.  In each of these instances, the NBA disputed the NBPA's contention that the conduct was not on the playing court (see Exhibits 49 and 50) and the Players Association never pursued any of these matters before the Grievance Arbitrator.  Moreover, one of these examples (Rodman) arose prior to this Court's decision in Ewing (which left no doubt that discipline for conduct occurring off the basketball floor during an NBA game was appealable only to the Commissioner), and the other (Wallace) was settled by a letter agreement in which it was acknowledged that the player had been suspended for on-the court conduct.  (See Exhibit 50.)

55.    The interpretation of "conduct on the playing court" advanced by the Players Association would lead to impracticable – indeed absurd – results.  If, for example, Player A punches Player B while both are on the playing floor, then the Commissioner would, under the NBPA's theory, have the exclusive and unreviewable authority to discipline Player A.  But if the punch knocks Player B into the spectator seats and, from there, Player B lands a retaliatory punch

21

on Player A, the NBPA's theory would subject the Commissioner's discipline of Player B to review by the Grievance Arbitrator. Further, if Player A were then to strike Player B while in the stands, this punch would presumably be reviewable by the Grievance Arbitrator, but Player B's counterpunch – after the players stagger back onto the playing floor – would not be. The resulting mess – in which both the Commissioner and the Grievance Arbitrator would have jurisdiction over half of each player's actions – is not a sensible method for resolving disciplinary disputes and, thus, is not a proper interpretation of the "on the playing court" language.

### Player Conduct Memos

56.    Even if the Players Association had not actively conceded the issue by its numerous appeals to the Commissioner, it was repeatedly and consistently notified that the NBA considered "conduct on the playing court" to encompass conduct at or during an NBA game, yet never challenged that interpretation. This is evidenced by "Player Conduct Memos" distributed by the NBA to every player and the NBPA at the start of each of the past six NBA seasons:

> (a)    Under the heading "Violence On the Court," the Player Conduct Memo admonishes that "any player who deliberately enters the spectator stands" during or after a game will be subject to suspension.

> (b)    Under the heading "RULES RELATING TO FIGHTING, FLAGRANT FOULS AND OTHER PLAYING COURT MISCONDUCT," the Player Conduct Memo sets forth prohibitions against fighting, throwing punches, and leaving the bench area during an altercation.

> (c)    Under the sub-heading "OTHER RULES GOVERNING CONDUCT ON THE PLAYING COURT," the Player Conduct Memo sets forth prohibitions against "stimulating or encouraging crowd disorder."

57.    Despite having received a copy of the Player Conduct Memos for the past six years – including, most recently, on October 18, 2004 – the NBPA never once disputed or challenged the NBA's characterization of "conduct on the playing court" as described in those Memos.

## The *Sprewell* and *Starks* Arbitrations Do Not Support the NBPA's Argument Here

58.     Citing the grievance arbitration in the Latrell Sprewell matter, the NBPA has
argued that it is "well established that an Article 35(d) suspension by the Commissioner is subject
to review by the Grievance Arbitrator." (See Exhibit 24 at 7-8.) However, Sprewell was
suspended pursuant to Article 35(e) of the NBA Constitution, not 35(d), as his misconduct
occurred at a team practice, and not "on the playing court." (See Exhibit 32.) Accordingly, the
Sprewell arbitration is wholly irrelevant to the question of whether a dispute concerning
suspensions imposed under Article 35(d) for conduct at an NBA game is arbitrable. Moreover, far
from being "well established," on the only occasion on which an NBA Arbitrator was ever asked
to review an Article 35(d) suspension by the Commissioner, he determined that the Arbitrator had
no jurisdiction to hear the NBPA's challenge, and that it could only be brought as an appeal to the
Commissioner. NBPA (Charles Barkley) v. NBA, No. 92-3 (1992).

59.     Equally unavailing is the NBPA's reliance on In re John Starks, No. 00-01 (Mar. 6,
2000), a case in which the CBA's System Arbitrator – whose jurisdiction to determine arbitrability
is not subject to the prohibition in Article XXXI, Section 5(b) applicable to the Grievance
Arbitrator – determined a question of whether a particular dispute was arbitrable. See Exhibit 51.

## The CBA Forecloses the NBPA's Claim of Irreparable Harm

60.     The Players Association, through its motion to confirm the arbitration award, has
apparently conceded the propriety of the NBA's suspensions of defendants Artest, Jackson, and
Johnson, and the first 15 games of the 25-game suspension imposed on defendant O'Neal. Thus,
the NBPA's motion only seeks injunctive relief to require the NBA to reinstate O'Neal, following a
suspension of 15 games.

23

61.    The fifteenth game of O'Neal's suspension was served by the defendant on Wednesday, December 22, 2004.  Accordingly, defendant O'Neal has not yet missed any games due to his suspension beyond the number of games that the Grievance Arbitrator and the Players Association have acknowledged as reasonable.

62.    Defendant O'Neal will not suffer any irreparable injury if he is required to serve the remainder of his 25-game suspension, even if the arbitration award is ultimately confirmed.  The CBA is clear that players in the NBA are required to serve their suspensions prior to any challenge or appeal.  In particular, Article XXXI, Section 14(d) of the CBA states as follows:

> Nothing contained herein shall excuse a player from prompt compliance with any discipline imposed upon him.  If discipline imposed upon a player is determined to be improper by a final disposition under this Article XXXI, the player shall promptly be made whole.

CBA Art. XXXI, Sec. 14(d) (emphasis added).  Indeed, although there have been hundreds of suspensions of NBA players, no NBA suspension has ever been stayed or enjoined on any ground – including, but not limited to, the ground that the suspended player would suffer irreparable injury by serving the suspension imposed.

63.    This was, in fact, precisely the issue resolved by Arbitrator Feerick in considering an identical argument raised by the NBPA on behalf of another NBA player who was serving a suspension.  See NBPA (Isaiah Rider) v. NBA (Oct. 27, 1997), set forth as Exhibit 52.  In rejecting the NBPA's claim that the player would be irreparably harmed by serving out his suspension pending appeal, Arbitrator Feerick found:  "I am not persuaded that a make whole remedy is impossible after a hearing if the suspension were set aside."  Id. at 3.  There is no basis for a different result here.

64.    By contrast, the NBA will be irreparably harmed by the granting of the requested

24

relief, which would drastically undermine a critical and essential pillar of the NBA's disciplinary system by reason of an arbitration on issues that were not arbitrable.

65.     The CBA contains carefully crafted procedures, each of which was collectively bargained, that are designed to ensure the effective and successful operation of a professional sports league.  Pursuant to those procedures, the Commissioner is vested with plenary authority to impose and review disciplinary action for player misconduct that occurs "on the playing court." Permitting the individual defendants to return to the court pending resolution of the NBPA's motion for confirmation of the arbitration award, as the NBPA has requested, would publicly undermine the Commissioner's authority and effectively eviscerate the delicate balance of authority contemplated by the CBA.

66.     This is especially so in this case, where:  (i) the NBPA – both at a hearing conducted by the Grievance Arbitrator (see Exhibit 30) and publicly (see Exhibit 53) – has acknowledged that some quantum of discipline was appropriate for the misconduct in which the defendant players engaged; (ii) the Grievance Arbitrator upheld the NBA's suspensions with respect to three of the four defendant players; and with respect to defendant O'Neal, the Grievance Arbitrator simply substituted his judgment for that of the Commissioner.

67.     If the Court were to grant the mandatory injunction requested by the NBPA, the ability of the Commissioner to react swiftly and decisively to player misconduct "on the playing court" would be severely hampered, as all of his decisions in that regard would be vulnerable to second-guessing by the Grievance Arbitrator.  Neither the NBA nor Players Association bargained for such a system.

25

68.     Granting the injunction would also harm the NBA in two additional ways:  first, it would disrupt the competitively-neutral method by which the NBA imposes suspensions to ensure that players miss games immediately following their misconduct; and, second, it would put defendant O'Neal back on the playing floor for the Christmas Day game between the Indiana Pacers and the Detroit Pistons, thereby exacerbating the already-substantial risk that this game (the first meeting of these teams since the Detroit Incident and a game carried on national television) will produce another violent confrontation between Pacers and Pistons players.

I declare under penalty of perjury that the foregoing is true and correct.

Dated:          December 22, 2004
                New York, New York


                                        _____
                                              Richard W. Buchanan


Sworn to before me
this _22nd_ day of _December_, 2004

_____
            Notary Public

My commission expires:


_____

LAURA A. MEDLIN
NOTARY PUBLIC, State of New York
No. 01ME4928207
Qualified in Queens County
Commission Expires April 4, 2006


26