SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP
Jeffrey A. Mishkin (JM 8380)
Douglas B. Adler (DA 6013)
Anthony J. Dreyer (AD 3097)
Four Times Square
New York, New York 10036
Tel: (212) 735-3000

PROSKAUER ROSE LLP
Howard L. Ganz (HG 8644)
Daniel R. Halem (DH 3035)
1585 Broadway
New York, New York 10036
Tel: (212) 969-3035

JAN 2 1

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

NATIONAL BASKETBALL ASSOCIATION,

                              **Plaintiff,**

       –against–

NATIONAL BASKETBALL PLAYERS ASSOCIATION,
RON ARTEST, STEPHEN JACKSON, ANTHONY
JOHNSON, and JERMAINE O'NEAL,

                            **Defendants.**

04-Civ.-09528 (GBD)

**NOTICE OF APPEAL**

---

      PLEASE TAKE NOTICE THAT, pursuant to 28 U.S.C. § 1291, plaintiff National

Basketball Association hereby appeals to the United States Court of Appeals for the Second

Circuit from an order of the Honorable George B. Daniels, U.S.D.J. entered on January 3, 2005,

and from the final judgment entered on January 5, 2005, denying plaintiff's motion to vacate the

December 21, 2004 arbitration award of the Grievance Arbitrator (the "Arbitration Award") and

granting the motion of defendants National Basketball Players Association and Jermaine O'Neal to

confirm the Arbitration Award.

Dated:      January 21, 2005
            New York, New York

                          Respectfully submitted,

                          SKADDEN, ARPS, SLATE,
                            MEAGHER & FLOM LLP
                          Jeffrey A. Mishkin (JM 8380)
                          Douglas B. Adler (DA 6013)
                          Anthony J. Dreyer (AD 3571)
                          Four Times Square
                          New York, New York  10036
                          Tel:  (212) 735-3000


                          By:  _____
                               Jeffrey A. Mishkin

                          Attorneys for Plaintiff-Appellant


                          PROSKAUER ROSE LLP
                          Howard L. Ganz (HG 8644)
                          Daniel R. Halem (DH 3035)
                          1585 Broadway
                          New York, New York  10036
                          Tel:  (212) 969-3035

                          Attorneys for Plaintiff-Appellant

2

## SERVICE LIST

Jeffrey Kessler
Dewey Ballantine LLP
1301 Avenue of the Americas
New York, New York  10019-6092

*Counsel for Defendants*
*National Basketball Association*
*Ron Artest, Stephen Jackson*
*Anthony Johnson, and*
*Jermaine O'Neal*

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-----------------------------------------------------------x
NATIONAL BASKETBALL ASSOCIATION,

                           Plaintiff,

        -against-

NATIONAL BASKETBALL PLAYERS
ASSOCIATION, RON ARTEST,
STEPHEN JACKSON, ANTHONY JOHNSON,
and JERMAINE O'NEAL

                    Defendants.
-----------------------------------------------------------x

04 Civ. 9528 (GBD)

MEMORANDUM OPINION
AND ORDER

GEORGE B. DANIELS, DISTRICT JUDGE:

        Plaintiff National Basketball Association filed suit seeking declaratory judgment

declaring that a Grievance Arbitrator had no jurisdiction to hear a dispute between the National

Basketball Association and the National Basketball Players Association concerning certain

suspensions imposed by the League Commissioner for misconduct by players at an NBA game.

Defendants submitted a motion to confirm the Grievance Arbitrator's award as to defendant

Jermaine O'Neal.  Plaintiff cross-moved to vacate the arbitration award challenging the

arbitrator's jurisdiction to hear and resolve the dispute.  For the reasons stated below, defendants'

motion is granted.

## BACKGROUND

        This case presents a unique set of circumstances which could not have been foreseen by

the parties.  On November 19, 2004, the National Basketball Association ("NBA"),[1] its players

---

[1] The NBA is an integrated business enterprise that engages in the production and
marketing of an entertainment product known as "NBA Basketball."  The NBA consists of thirty
member teams, each operating a professional basketball team in a particular geographic location
in North America.

and its fans witnessed a violent and unprecedented altercation that occurred between and among

players and fans at an Indiana Pacers/Detroit Pistons basketball game in Detroit. The melee that

ensued involved some players entering the stands, and fights between fans and players both in the

stands and on the playing floor. With 45.9 seconds left in the game, defendant Ron Artest of the

Indiana Pacers committed a flagrant foul against Ben Wallace of the Detroit Pistons. The two

players engaged in a shoving match before they were separated by game officials and other

players. As the referees conferred on the players' penalties before the game officially ended, a

spectator threw a beverage that hit Artest as he lay on the scorer's table. Artest responded by

entering the stands and attacking one spectator. Defendant Stephen Jackson followed Artest into

the stands and also engaged in a fight with spectators. Defendant Anthony Johnson left the

immediate vicinity of his team's bench and confronted a spectator. Defendant Jermaine O'Neal

attempted to enter the stands, but was restrained by an arena usher whom O'Neal shoved away.

O'Neal then confronted a spectator on the playing floor, whom he struck.

On November 20, 2004, NBA Commissioner David Stern suspended indefinitely all the

players who participated in the altercation pending further investigation. On November 21, 2004,

Stern announced the suspensions of the following players:[2]

- Pacers forward Ron Artest was suspended for the remainder of the season;

- Indiana guard Stephen Jackson was suspended for 30 games;

- Pacers forward Jermaine O'Neal was suspended for 25 games;

- Indiana guard Anthony Johnson was suspended for five games;

---

[2] In addition, the following players were also suspended by the Commissioner for their involvement in this incident: Ben Wallace was suspended for six games; Elden Campbell, Derrick Coleman and Chauncey Billups were each suspended for one game for leaving the bench during an on-court altercation; Reggie Miller was suspended for one game for leaving the bench during an on-court altercation.

Stern also issued the following statement:

> The penalties issued today deal only with one aspect of this incident – that of player misconduct. The actions of the players involved wildly exceeded the professionalism and self-control that should fairly be expected from NBA players. We must affirm that the NBA will strive to exemplify the best that can be offered by professional sports, and not allow our sport to be debased by what seem to be declining expectations for behavior of fans and athletes alike. There are other issues that the NBA must urgently focus on at this time. First, we must redefine the bounds of acceptable conduct for fans attending our games and resolve to permanently exclude those who overstep those bounds. Participants in and around the court must be assured complete protection from unacceptable fan behavior. Second, we must re-examine the adequacy of our current security procedures in Detroit and our other 28 arenas. The actions at Friday's game, though unprecedented, must now be factored into all efforts to guarantee the well-being of our fans. Third, we must develop and implement new NBA rules to assure that the unavoidable confrontations likely to occur in the heat of competition are not allowed to escalate to the level we witnessed on Friday even prior to the egregious behavior by individuals in the stands.

Affirmation of Ronald Klempner, ("Klempner Aff."), Ex. 17. Each of the suspended players received a letter from the NBA stating that their suspension was premised on the Commissioner's power to suspend pursuant to Section 35(d) of the NBA Constitution. The letter sent to Jermaine O'Neal from Stu Jackson, the Senior Vice President of Basketball Operations of the NBA, indicates that:

> [a]s a result of your actions during the Indiana Pacers at Detroit Pistons game on November 19, 2004, which included striking a spectator and an arena employee, you are hereby suspended without pay for twenty-five (25) games, pursuant to Article 35(d) of the NBA Constitution. The suspension is effective as of this past Saturday night's Pacer's game against Orlando, and will continue through the Pacers' game against Phoenix on January 14, 2005.

Klempner Aff., Ex. 5. Section 35(d) provides that:

> If in the opinion of the Commissioner any other act or conduct of a Player at or during an Exhibition, Regular Season, or Playoff game has been prejudicial to or against the best interests of the Association or the game of basketball, the Commissioner shall impose upon such Player a fine not exceeding $35,000, or may order for a time the suspension of any such Player from any connection or duties with Exhibition, Regular Season, or Playoff games, or he may order both such fine and suspension.

3

NBA Constitution, Section 35(d), Kempler Aff., Ex. 1.

In response to the suspensions, on November 22, 2004, the National Basketball Players Association ("NBPA" or "Union")[3] filed an appeal to the Grievance Arbitrator under Article XXXI of the Collective Bargaining Agreement ("CBA") on behalf of defendants Artest, Jackson, Johnson and O'Neal, as well as five other players who were suspended for their involvement in the altercation.[4]  The NBPA claimed that the discipline imposed by Commissioner Stern was "inconsistent with the terms of the CBA and applicable law, and without just cause." Affidavit of Richard W. Buchanan ("Buchanan Aff."), Ex. 21. The NBPA also requested an arbitration hearing.  On November 26, 2004, the NBA submitted a letter to the Grievance Arbitrator and the NBPA objecting "to any assertion by the Grievance Arbitrator of jurisdiction over any aspect of this dispute." Klempner Aff., Ex. 6. The NBA contested the arbitrator's jurisdiction to hear the appeal or to even decide the arbitrability of the dispute. The NBA argued that the dispute involved an issue of substantive arbitrability that is not within the purview of the Grievance Arbitrator.  The NBA contends that any appeal is solely within the Commissioner's authority to review.

On November 30, 2004, the Union submitted a letter setting forth its position that the dispute was fully within the jurisdiction of the Grievance Arbitrator. The Union argued that the Grievance Arbitrator also had full authority to initially determine whether the Commissioner or the Grievance Arbitrator should hear and resolve the NBPA's appeal. On December 2, 2004, the NBA reiterated its objection to the Grievance Arbitrator's consideration of the matter, and stated

---

[3] The NBPA is a labor organization recognized by the NBA and certified by the National Labor Relations Board as the exclusive collective bargaining representative of all NBA players.

[4] The NBPA, by letter dated November 30, 2004, withdrew the appeal to the Grievance Arbitrator with respect to all players other than defendants Artest, Jackson, Johnson, and O'Neal.

that it would not participate in the arbitration hearing in order to preserve de novo review of

arbitrability in federal district court.[5]

On December 3, 2004, the NBA initiated this action seeking declarations that: (i)

pursuant to the terms of the Collective Bargaining Agreement, the Grievance Arbitrator had no

authority to resolve the question of arbitrability; (ii) the dispute submitted to the Grievance

Arbitrator is not arbitrable and the Grievance Arbitrator has no jurisdiction over this dispute; and

(iii) the NBPA's sole remedy to challenge the suspensions is an appeal to the Commissioner

pursuant to Section 8 of the Collective Bargaining Agreement.

On December 3, 2004, the Grievance Arbitrator issued an initial decision that he "had

jurisdiction to determine the arbitrability of this grievance." Klempner Aff., Ex. 7, In the Matter

of Arbitration Between National Basketball Players Association and National Basketball

Association, Decision of Roger P. Kaplan, Esq. Grievance Arbitrator at 2. In his decision, the

Grievance Arbitrator held that:

> [w]ithout rendering a decision at this time, as to whether this is a substantive or
> procedural arbitrability dispute, it is clear that the parties have an arbitration process in
> place, which must be followed. Without further evidence, I do not believe that the parties
> intended that if the NBA raised any arbitrability issue challenging the Grievance
> Arbitrator's right to hear the dispute, this alone, would preclude arbitration. Therefore,
> under the terms of the CBA, the hearing will either be held before Commissioner Stern or
> before the Grievance Arbitrator. Notwithstanding the provisions of Article XXXI,
> Section 5(b), I find that the broad arbitration clauses contained in Article XXXI, Section
> 1 of the CBA and paragraph 17 of the Uniform Player Contract, warrant a finding that I
> have jurisdiction to determine whether the arbitrability issue raised by the NBA is
> meritorious.

---

[5] Although the parties have submitted a motion to confirm the Grievance Arbitrator's
award as well as a cross-motion to vacate that award, the only issue before this Court is the
Grievance Arbitrator's jurisdiction to review and issue an award in this case. The merits of the
Grievance Arbitrator's award reducing the suspension of Jermaine O'Neal are not before this
Court. Accordingly, this Court reviewed the issue of the Grievance Arbitrator's jurisdiction
using a de novo standard without deference to the Grievance Arbitrator's findings regarding his
jurisdiction.

Id. at 4-5.

On December 3, 2004, the Grievance Arbitrator wrote to the NBA urging it to attend the hearing scheduled for December 9, 2004. The NBA responded by letter on December 6, 2004 to the Grievance Arbitrator that it would not participate in the hearing. The Grievance Arbitrator then sent a letter to the parties on December 7, 2004 stating that the hearing would go forward on December 9, 2004.[6] The Grievance Arbitrator conducted the hearing on December 9, 2004 and issued his arbitration award on December 21, 2004. He found that (i) he has authority to determine arbitrability; (ii) the dispute is arbitrable before the Grievance Arbitrator, and is not within the exclusive jurisdiction of the Commissioner, because the conduct in question did not take place "on the playing court" within the meaning of Article XXXI, Section 8 of the Collective Bargaining Agreement; and (iii) the Commissioner had just cause for his suspensions of defendants Artest, Jackson and Johnson, but did not have just cause to suspend defendant O'Neal for twenty-five games. The Grievance Arbitrator reduced defendant O'Neal's suspension to fifteen games.

In anticipation of the NBA's refusal to comply with the arbitrator's ruling, defendants, on December 23, 2004, moved for a temporary restraining order. By that time defendant O'Neal had already served the 15 game suspension as determined appropriate by the Grievance Arbitrator. After hearing oral argument from both sides, this Court granted defendants' motion and held that "[f]urther enforcement of Commissioner Stern's suspension of Jermaine O'Neal for twenty-five games is hereby stayed until further order of the Court."

---

[6] Section 12(d) of Article XXXI, states "[t]he failure of any party to attend the hearing as scheduled shall not delay the hearing, and the Grievance Arbitrator shall be authorized to proceed to take evidence and issue an award as though such party were present."

## ANALYSIS

The issue before this Court is whether the Grievance Arbitrator had jurisdiction or authority to review an appeal of the suspensions imposed as discipline by the NBA Commissioner.

The NBA makes three arguments in support of their motion to vacate the Grievance Arbitrator's award. They first argue that the question of arbitrability is for the District Court, not the Grievance Arbitrator, because the Collective Bargaining Agreement contains both a broadly worded arbitration clause committing resolution of all disputes to arbitration and a conflicting specific clause assigning a certain decision to the Commissioner, thereby creating an ambiguity as to whether the parties agreed to arbitrate this issue. See Katz v. Feinberg, 290 F.3d 95 (2d Cir. 2002). Second, the NBA argues that only the District Court, and not the Grievance Arbitrator, had authority to decide this dispute because the issue was one of substantive arbitrability and not procedural arbitrability. Finally, the NBA contends that the misconduct at issue involves "conduct on the playing court" which is solely reviewable by appeal to the Commissioner, and not to the Grievance Arbitrator, pursuant to the Collective Bargaining Agreement. The Union moves to confirm the award as to defendant Jermaine O'Neal, arguing that the Grievance Arbitrator properly exercised his authority and jurisdiction over this dispute since it involved player discipline under the Grievance and Arbitration Procedure of the Collective Bargaining Agreement, and is not "on the playing court" conduct solely reviewable by the Commissioner.

A. The Issue of Arbitrability

The NBA argues that pursuant to the principles in Katz v. Feinberg, as well as Article XXXI, Paragraph 5(b) of the Collective Bargaining Agreement, the Grievance Arbitrator was, as

7

a matter of law, precluded from determining his own jurisdiction to decide the issue of arbitrability. The NBA argues that when two clauses arise in a single agreement, one a broadly worded arbitration clause committing the resolution of all disputes to arbitration and the other a specific clause assigning a certain decision to the Commissioner, the parties intent to arbitrate is then ambiguous, warranting the assignment of this question to the district court and not the arbitrator. See Katz, 290 F.3d at 97 (citing First Options Chicago, Inc. v. Kaplan, 514 U.S. 938, 944 (1995).

There is no such ambiguity in the present case. The agreement of the parties to arbitrate disciplinary disputes is clear and unmistakable from the language of the Collective Bargaining Agreement, the NBA Constitution and other supporting documents. Article XXXI, Section 1(a) of the Collective Bargaining Agreement provides for the general arbitrability of "[a]ny dispute (such dispute hereinafter being referred to as a 'Grievance') involving the interpretation or application of, or compliance with, the provisions of this Agreement or the provisions of a Player Contract . . . ." Klempner Aff., Ex. 1. This section, however, does not provide the sole basis of the Grievance Arbitrator's jurisdiction over appeals of the Commissioner's disciplinary actions. The player discipline dispute in the present case is before the Grievance Arbitrator pursuant to Section 1(b) of Article XXXI which provides that "[t]he Grievance Arbitrator shall also have jurisdiction over disputes involving player discipline to the extent set forth in Section 8 below . . . ." Id. This specific arbitrability provision in Section 1(b) is consistent with Section 8, (which outlines the special procedure for appeals to the Commissioner with respect to player discipline involving "on the playing court" conduct), and creates no ambiguity on the issue of arbitrability of discipline disputes.

8

The Grievance Arbitrator had the authority under the terms of the Collective Bargaining Agreement to determine whether he had jurisdiction to hear this player discipline dispute. In addition to Section 1 of the Collective Bargaining Agreement, Section 5(b) explicitly provides

> [t]he Grievance Arbitrator shall have jurisdiction and authority only to: (i) interpret, apply, or determine compliance with the provisions of this Agreement; (ii) interpret, apply or determine compliance with the provisions of Player Contracts; (iii) determine the validity of Player Contracts pursuant to Section 1 of this Article . . .

Id. Moreover, Section 35(h) of the NBA Constitution (attached as an addendum to the Uniform Player Contract) provides that

> [e]xcept for a penalty imposed under Paragraph (g) of this Article 35 [relating to players gambling on the outcome of any game], . . . . *[a]ny such challenge by a player* [to the decisions and acts of the Commissioner pursuant to Article 35] *shall be resolved by the Grievance Arbitrator in accordance with the grievance and arbitration procedures of the collective bargaining agreement.* (Emphasis added).

Id. The Grievance Arbitrator, therefore, was not precluded from determining his jurisdiction on the issue of arbitrability under the principle cited in Katz.[7]

B. Substantive versus Procedural Arbitrability

The NBA further contends that only the District Court, and not the Grievance Arbitrator, had authority to decide this dispute because the issue was one of substantive arbitrability and not procedural arbitrability. Section 5(b) of Article XXXI of the Collective Bargaining Agreement provides that:

---

[7] The Grievance Arbitrator further cited as authority paragraph 17 of the Uniform Player Contract ("UPC") which provides for arbitration of "any dispute arising between the Player and the Team relating to any matter arising under this Contract, or concerning the performance or interpretation thereof . . ., such dispute shall be resolved in accordance with the Grievance and Arbitration Procedure set forth in the NBA/NBPA Collective Bargaining Agreement." Although this section supports a finding of the parties' general intent to arbitrate, this provision provides for disputes between the Player and the Team and not between the Player and the NBA.

> [t]he Grievance Arbitrator shall not have jurisdiction or authority to add to, detract from, or alter in any way the provisions of this Agreement (including the provisions of the subsection) or any Player Contract. Nor, in the absence of agreement by the NBA and the Players Association, shall the Grievance Arbitrator have jurisdiction or authority to resolve questions of substantive arbitrability.

Furthermore, the U.S. Supreme Court has explained the rule that substantive arbitrability is for the court:

> The Congress . . . has by § 301 of the Labor Management Relations Act, assigned the courts the duty of determining whether the reluctant party has breached his promise to arbitrate. For arbitration is a matter of contract and a party cannot be required to submit to arbitration any dispute which he has not agreed so to arbitrate.

Livingston v. John Wiley & Sons, Inc., 313 F.2d 52, 61 (2d Cir. 1963)(citing United Steelworkers of America v. Warrior & Gulf Navigation Co., 363 U.S. 574, 582 (1960)).

The Grievance Arbitrator, based on the controlling case law and the agreement between the parties as captured by the Collective Bargaining Agreement, the Uniform Player Contract, the NBA Constitution and other supporting documents, has no jurisdiction to decide whether parties agreed to arbitrate a particular type of dispute. The issue before the Grievance Arbitrator was not, however, whether appeals of discipline imposed by the Commissioner are arbitrable. They clearly are. Nor was the issue whether appeals of discipline by the Commissioner for conduct "on the playing court" are arbitrable. They clearly are not. The issue before the Grievance Arbitrator was through which process an appeal must be sought and is therefore one of procedural arbitrability, not substantive arbitrability. Section 35(h) of the NBA Constitution, which discusses "Misconduct" generally, provides that "[a]ny such challenge by a player [to decisions and acts of the Commissioner pursuant to Article 35] shall be resolved by the Grievance Arbitrator in accordance with the grievance and arbitration procedures of the

10

collecting bargaining agreement then in effect." Klempner Aff., Ex. 1. Article XXXI of the

Collective Bargaining Agreement, titled "Grievance and Arbitration Procedure" sets forth the

general procedure players must follow when seeking to challenge acts of discipline by the

Commissioner. Article XXXI discusses, among other things, the general scope of the arbitrator's

jurisdiction, the procedure a player must follow when initiating a dispute, the timing of hearings

to hear disputes, the procedure to be followed when filing a dispute, the Grievance Arbitrator's

duty to render a decision and an award, and the proper appointment of a Grievance Arbitrator.

Article XXXI of the Collective Bargaining Agreement, therefore, sets forth the general

procedures players must follow relating to the arbitration of their disputes. Section 8 of Article

XXXI provides for an exception to the general rule of appealing a dispute to the Grievance

Arbitrator. Section 8, titled "*Special Procedure* with Respect to Player Discipline," (emphasis

added), provides that

> [a]ny dispute involving (i) a fine or suspension imposed upon a player by the
> Commissioner (or his designee) for conduct *on the playing court* . . . or (ii) action taken
> by the Commissioner (or his designee) concerning the preservation of the integrity of, or
> the maintenance of public confidence in, the game of basketball resulting in a financial
> impact to the player of $25,000 or less, shall be processed exclusively as follows
>
> (i)    Within twenty (20) days following written notification of the action taken
>        by the Commissioner (or his designee), a player affected thereby or the
>        Players Association may appeal in writing to the Commissioner.
>
> (ii)   Upon written request of the Players Association, the Commissioner shall
>        designate a time and place for hearing as soon as is reasonably practicable
>        following his receipt of the notice of appeal.
>
> (iii)  As soon as reasonably practicable, but not later than twenty (20) days,
>        following the conclusion of such hearing, the Commissioner shall render a
>        written decision, which decision shall constitute full, final and complete
>        disposition of the dispute, and shall be binding upon the player(s) and
>        Team(s) involved and the parties to this Agreement.

11

(iv)   In the event such appeal involves a fine or suspension imposed by the Commissioner's designee, the Commissioner, as a consequence of such appeal and hearing, shall have authority only to affirm or reduce such fine or suspension, and shall not have authority to increase such fine or suspension.

(Emphasis added). Section 8 further outlines the procedure players must use when appealing such a ruling by the Commissioner *to* the Commissioner providing, in pertinent part, that "a player affected . . . may appeal in writing to the Commissioner."[8]

Section 35(h) of the NBA Constitution and Article XXXI of the Collective Bargaining Agreement, therefore, provide players with the rules governing the arbitration of their challenges before the Grievance Arbitrator. Section 8 of Article XXXI provides the exception to this rule in cases where the fine or suspension imposed upon the player by the Commissioner is for "conduct on the playing court." The issue before the Grievance Arbitrator, which he properly articulated in his decision, is "which procedure NBA players must use under the Collective Bargaining Agreement when appealing their suspensions." Klempner Aff., Ex. 10, In the Matter of Arbitration Between National Basketball Players Association and National Basketball Association, Opinion and Award of Roger P. Kaplan, Esq. Grievance Arbitrator at 12. This issue is not one of substantive arbitrability, but is one of procedural arbitrability, which the

---

[8] Further exceptions to the general rule to arbitrate are evident in the supporting documents. Players who are disciplined for wagering on the outcome of any game are subject to Section 35(g) of the NBA Constitution which provides that "the decision of the Commissioner shall be *final, binding, and conclusive and unappealable*. The penalty for such offense shall be within the absolute and sole discretion of the Commissioner and may include a fine, suspension, expulsion and/or perpetual disqualification from further association with the Association or any of its Members." (Emphasis added). Absent provisions that make decisions unappealable or explicitly remove from the Grievance Arbitrator's jurisdiction the authority to rule on a dispute, the parties' intent to arbitrate matters in the Collective Bargaining Agreement, the Uniform Player Contract and the NBA Constitution are clear and unmistakable.

Grievance Arbitrator has jurisdiction to resolve both under the Collective Bargaining Agreement and under supporting caselaw.  See Howsam v. Dean Witter Reynolds, Inc., 537 U.S. 79, 84-85 (2002)(finding that procedural questions, which grow out of the dispute and bear on its final disposition, are presumptively not for the judge, but for an arbitrator, to decide. . . .  These questions include, but are not limited to, whether prerequisites such as time limits, notice, laches, estoppel, and other conditions precedent to an obligation to arbitrate have been met.)(internal citations and quotations omitted).

Disputes such as this, which bring into question the procedures to be followed by parties when instituting grievances, are best left to the arbitrator chosen by the parties to resolve these disputes.  "The ablest judge cannot be expected to bring the same experience and competence to bear upon the determination of a grievance, because he cannot be similarly informed."  Warrior & Gulf Navigation Co., 363 U.S. at 581-82; See also Livingston, 313 F.2d at 62 (opining that "the parties have bargained for a decision by an arbitrator because they thus have the benefit of his creativity and expertise that are in no small measure due to his knowledge of and familiarity with the industry and shop practices constituting the environment in which the terms of collective bargaining agreement were negotiated and assented to").

C.  Conduct on the playing court

Finally, the NBA's primary challenge is to the Grievance Arbitrator's jurisdiction to hear the players' appeal of the Commissioner's suspensions.  The NBA contends that "misconduct at or during a game" constitutes "conduct on the playing court" which is appealable solely to the Commissioner, and not to the Grievance Arbitrator, pursuant to Section 8 of Article XXXI of the Collective Bargaining Agreement.  The Union, on the other hand, argues that "conduct on the

13

playing court" is "meant to apply only to conduct which occurs as part of the playing of the game (such as flagrant fouls, fights between players, confronting referees, etc.)." Defendants' Brief at 3. The parties agree that "conduct on the playing court" is not limited by either the physical dimensions of the basketball court or the time limitations of a professional basketball game.

Both sides argue that a review of the Collective Bargaining Agreement and related supporting documents, the Player Conduct Memos sent to the players, and the history of past grievances between the parties give guidance as to the meaning of "conduct on the playing court." Such a review demonstrates, however, that the definition of "conduct on the playing court" is not as broad as the NBA suggests, nor as narrow as the Player's Union argues. More importantly, the parties have never agreed, nor expressed a view, that fighting or striking a fan alone constitutes what was contemplated as "conduct on the playing court."

1. The Collective Bargaining Agreement and the Uniform Player Contract

The NBA argues that Article 35(d) provides support for a finding that Section 8's "conduct on the playing court" is synonymous with any conduct at or during an exhibition, regular season or playoff game. This argument, however, is inconsistent with the clear language of the NBA Constitution. Article 35(d) provides for fine or suspension when, in the opinion of the Commissioner, any act or conduct of a player "at or during an Exhibition, Regular Season, or Playoff game has been prejudicial to or against the best interests of the [NBA] or the game of basketball." Article 35(h) specifically provides that any challenge by a player to the decisions and acts of the Commissioner pursuant to Article 35, except as to wagering on games, "shall be resolved by the Grievance Arbitrator in accordance with the grievance and arbitration procedures of the collective bargaining agreement then in effect." If the NBA's argument that Article 35(d)

14

and Section 8 are synonymous and all appeals of any Section 35(d) suspensions and fines are

reviewable only by the Commissioner pursuant to Section 8, then players could not have any

right to appeal discipline imposed by the Commissioner to the Grievance Arbitrator under

Section 35(h). There is no such conflict between Section 8, Section 35(d) and Section 35(h).

The scope of the Commissioner's authority throughout the Collective Bargaining

Agreement and the NBA Constitution is very clearly defined. Had the parties intended to give

the Commissioner the authority to both impose fines and suspensions for conduct "at or during"

any game and also sole authority to review all appeals of these very same fines and suspensions,

the parties could have given the Commissioner this authority by using the same explicit language

used elsewhere throughout the CBA. The fact that Article 35(d) gives the Commissioner power

covering conduct "at or during" any game, while Section 8 limits his appeal authority to "conduct

on the playing court" is an indication that the parties did not intend for these sections to be

synonymous, or for these different terms to have exactly the same meaning. See Int'l Fidelity

Ins. Co. v. County of Rockland, 98 F.Supp.2d 400, 412 (finding that "Sophisticated lawyers. . .

must be presumed to know how to use parallel construction and identical wording to impart

identical meaning when they intend to do so, and how to use different words and construction to

establish distinctions in meaning."); see also Reefer and General Shipping Co., Inc., v. Great

White Fleet, LTD., 922 F.Supp. 935, (S.D.N.Y. 1996), aff'd, 107 F.3d 4 (2d Cir. 1997)(finding

that "[a]bsent express provision to the contrary, contractual terms should be construed uniformly

throughout the agreement."). As an example, in regulating the players' ability to place wagers

on the outcomes of games, the Commissioner and the Union very clearly set forth the

unappealability of the Commissioner's decision:

> The Player agrees that if the Commissioner, in his sole judgment, shall find that the Player has bet, or has offered or attempted to bet, money or anything of value on the outcome of any game participated in by any team which is a member of the NBA, the Commissioner *shall have the power in his sole discretion* to suspend the Player indefinitely or to expel him as a player for any member of the NBA, and *the Commissioner's finding and decision shall be final, binding, conclusive and unappealable.* (Emphasis added).

Uniform Player Contract Section 5(e), Conduct, pg. A-4. This same language is repeated in Section 35(g) of the NBA Constitution: "the decision of the Commissioner shall be *final, binding and conclusive and unappealable* . . . . The penalty for such offense shall be within the absolute and sole discretion of the Commissioner. . . ." (Emphasis added). Clearly, therefore, when the parties wanted to define the absolute authority of the Commissioner, they did so in explicit terms.

Furthermore, in different sections throughout the Collective Bargaining Agreement, the Uniform Player Contract and the NBA Constitution, the parties make reference to both "on the court" conduct and "off the court" conduct, evidencing that when they wanted to further define and distinguish those terms, they did so in express language. Section 5 of Article VI requires a player to undergo counseling and a clinical evaluation when that player "has engaged in any type of off-court violent conduct." Section 7(c) of Article VI further provides that the "provisions of subsection (b) [which refer to League Investigations] . . . shall not apply to interviews or meetings: (i) held by the NBA as part of an investigation with respect to alleged *player misconduct that occurred at the site of a game* and (ii) *which take place during the course of, or immediately preceding or following,* such game." (Emphasis added). Finally, Section 8 is entitled "On-Court Conduct," and provides that

> In addition to its authority under paragraph 5 of the Uniform Player Contract, the NBA is entitled to promulgate and enforce reasonable rules governing *the conduct of players on the playing court that do not violate the provisions of this Agreement.*

16

Article VI, Section 8. Klempner Aff., Ex. 1. These provisions clearly evince the parties intent to differentiate "on the court" conduct and "off the court" conduct, and lends no support to the NBA's contention that "conduct on the playing court" is synonymous with conduct "at or during" any game.

### 2. Player Conduct Memos

Moreover, the rules and regulations promulgated pursuant to the authority provided to the NBA under Article VI, Section 8 shows that the NBA sought to differentiate between "on the court" and "off the court" conduct. Every year since 1997, the NBA sends to each player its annual Player Conduct Memo indicating what it considers regulated on the court and off the court conduct. For example, on October 18, 2004, the NBA sent to its players its annual Player Conduct Memo which is "intended as a brief reminder and summary of your duties and obligations with respect to conduct on and off the playing court." The memo specifically outlines two areas where violence has "no place" and where "violent behavior cannot be tolerated under any circumstances": violence on the court and violence off the court. The section entitled "Violence On the Court" provides that the "NBA will take immediate action against any player who engages in violent actions during a game, including ejection and appropriate fines and/or a suspension." Furthermore, "any player who deliberately enters the spectator stand during a game will be automatically ejected and subject to a fine and/or suspension."

In a section entitled "Rules Relating to Fighting, Flagrant Fouls and Other Playing Court Misconduct," the NBA further outlines the rules governing the players' conduct "on the court." The rules governing fighting proscribes the following conduct:

- Any player who throws a connecting OR a non-connecting punch during a game . . . . The foregoing will also apply to comparable methods of striking or attempting to strike *another player* (emphasis added);

17

- Any player who leaves the bench area in connection with an altercation during a game;
- Any player in street clothes who leaves the bench area during a game.

The rules governing flagrant fouls describe a Flagrant "1" as "unnecessary contact committed by a player against an opponent" and a Flagrant "2" as "unnecessary and excessive contact committed by a player against an opponent." Players are also prohibited from

> engaging in improper conduct toward officials. Examples of improper conduct include (but are not limited to) physical conduct with an official that is intentional or reckless, disrespectfully addressing an official (including using profanity), overt actions indicating resentment to a foul call, harassing an official before, during, or after a game, entering the officials' dressing room at any time, or public criticism of an official.

Lastly, additional rules relating to on the court conduct require that: "[d]uring games, players must be seated on the bench while the ball is in play;" "conduct themselves in an appropriate manner while sitting on the bench during games;" "refrain from unnecessarily blocking the view of spectators;" "players are prohibited from stimulating or encouraging crowd disorder;" "refrain from any profane or objectionable language that might be heard by spectators or picked up by radio and/or television microphones in the vicinity of team benches and/or the playing court;" and "refrain from making lewd or objectionable gestures." Furthermore, "[a]t the conclusion of each game and at half-time, players are to leave the court immediately and go directly to their dressing rooms." Also, "[u]pon being notified by an official that he has been ejected from a game, a player must leave the playing area IMMEDIATELY and remain in the dressing room of his team until completion of the game or leave the building." (Emphasis in original). All of these rules are clearly designated as those governing the players' conduct on the court.

In contrast, the section entitled "Violence Off the Court" provides that "[a]ny player who commits an act of violent misconduct against *other team employees* or *a member of the public* will be subject to discipline, including fines, suspensions, or termination of employment."

18

(Emphasis added). That section emphasizes that "the NBA is committed to providing a safe workplace for its employees and will not tolerate conduct that endangers its employees or the general public."

Fighting with or striking a fan has never been characterized as conduct on the playing court. This is understandable since it has absolutely no place in the play of the game of professional basketball. Most of the misconduct on the playing court is prohibited, but unfortunately can be expected and anticipated to occasionally occur. Striking a fan is inexcusable, and appropriately considered something different and much more serious. Many other things can happen, frequently or infrequently, in the heat of competition or the emotion of the game. The Commissioner retains exclusive authority over "on the playing court" discipline in order to minimize misconduct at the arena by players before, during and after the game. He does so by promulgating and enforcing reasonable rules governing conduct on the court in order to ensure that more serious violence does not occur. This dispute is not about the Commissioner's authority to take strong and decisive action to discipline players who strike fans. That authority is unquestionable. However, the NBA's Player Conduct Memo supports a finding that Jermaine O'Neal's actions at issue here, which involve shoving an arena employee and punching a spectator, falls into the category of violence off the court as defined by the NBA's Player Conduct Memo.[9]

### 3. Past Grievances

The NBA further argues, however, that the history of the grievances between the parties

---

[9] Indeed, the letter sent by the NBA to Jermaine O'Neal states: [a]s a result of your actions during the Indiana Pacers at Detroit Pistons game on November 19, 2004, which included *striking a spectator and an arena employee*, you are hereby suspended without pay for twenty-five (25) games, pursuant to Article 35(d) of the NBA Constitution. (Emphasis added). Klempner Aff., Ex. 5.

19

evinces the Union's acknowledgment and understanding that "conduct on the playing court" includes conduct "occurring in such off-the-floor locations as the bench area, the press area, the scorer's table, exit tunnels, the spectator area, and even the locker rooms." Affidavit of Richard W. Buchanan, ¶ 48, pg. 16. The NBA claims that this acknowledgment and understanding by the Union supports the NBA's contention that the incident involving Jermaine O'Neal is conduct on the playing court, and is equally inarbitrable as prior similar conduct for which players were previously disciplined. A review of each prior incident cited by the NBA, which the NBA claims were not submitted to Grievance Arbitration, displays conduct that was clearly prohibited in the Player Conduct Memo as "conduct on the playing court." The NBA cites the following examples of discipline for misconduct on the playing court not subject to appeal by arbitration:

- Patrick Ewing left the bench in connection with an altercation during a game;
- Clarence Weatherspoon fought with player Kevin Willis during a game;
- Tim Hardaway engaged in improper conduct toward a referee and did not leave the court after being ejected;
- Reggie Miller fought with player Kobe Bryant after a game;
- Ron Mercer fought with another player after the game in the locker room area and did not go directly to his dressing room;
- Gary Trent entered the visitors' locker room and got into an altercation with another player rather than going directly to his locker room;
- P.J. Brown fought player Charlie Ward;
- Vernon Maxwell entered the spectator stands during a game;
- Jo Jo English fought with player Derek Harper during a game;
- Shaquille O'Neal uttered an obscenity during a live television interview.

In all of these incidents, the Commissioner had a right to suspend these Players *and* had sole authority to hear their appeals because the disciplined players engaged in misconduct specifically described as "on-the-court conduct."

After a thorough review of the record and extensive arguments of the parties, this Court finds that with regard to defendant Jermaine O'Neal, the Grievance Arbitrator properly considered and determined his authority and jurisdiction to resolve the question of arbitrability. He properly decided that this was an issue of procedural, as opposed to substantive, arbitrability.

The record also supports his finding that the conduct for which Jermaine O'Neal was suspended was discipline reviewable on appeal by the Grievance Arbitrator, rather than solely within the Commissioner's appeal authority as conduct "on the playing court," as the parties to the Collective Bargaining Agreement have used those terms. This Court has determined that this appeal was within the authority and jurisdiction of the Grievance Arbitrator. This Court, however, has not been called upon to determine the merits of the Grievance Arbitrator's reduction of Jermaine O'Neal's suspension from 25 to 15 games. Indeed, there has been no argument made that the merits of that decision was in any way improperly considered in a manner reversible by this Court. Accordingly, this decision in no way opines on the merits of the Grievance Arbitrator's decision to reduce Jermaine O'Neal's suspension.

## CONCLUSION

The NBA's motion to vacate the Grievance Arbitrator's award is denied. The NBPA's motion to confirm the Arbitration Award reducing Jermaine O'Neal's 25 game suspension to 15 games is granted.[10]

Dated: New York, New York
        December 30, 2004

SO ORDERED:

*George B. Daniels*

GEORGE B. DANIELS
United States District Judge

---

[10] Given the unique facts of this case, this decision is limited to the application by defendant O'Neal to confirm the arbitration award as to him. Defendants Johnson, Jackson, and Artest have not moved to confirm the arbitration award as to them. The reward as to them, therefore, will not be confirmed and has no force and effect. The arbitration award relating to defendants Artest, Jackson and Johnson does not change the period of their suspensions. The issues regarding players Artest, Jackson and Johnson are moot and no longer present a live case or controversy ripe for determination. This Court declines to decide or otherwise opine on the appropriateness of those arbitration awards. Those awards will not be confirmed and has, therefore, no force and effect. See In re Summers, 325 U.S. 561, 567 (1945)(in order to present a "case" or "controversy", "[a] declaration of rights as they stand must be sought, not on rights which may arise in the future, ... and there must be an actual controversy over an issue not a desire for an abstract declaration of the law").

21

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------X
NATIONAL BASKETBALL ASSOCIATION,
                                Plaintiff,

                    -against-

NATIONAL BASKETBALL PLAYERS ASSOCIATION,
RON ARTEST, STEPHEN JACKSON, ANTHONY
JOHNSON, and JERMAINE O'NEAL,
                                Defendants.
------------------------------------------------------------X

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:
DATE FILED: 1/5/05

04 **CIVIL** 9528 (GBD)

**JUDGMENT**

Defendants having moved to confirm the Grievance Arbitrator's award as to defendant Jermaine O'Neal; plaintiff having cross-moved to vacate the award, and the matter having come before the Honorable George B. Daniels, United States District Judge, and the Court, on December 30, 2004, having rendered its Memorandum Opinion and Order denying the NBA's motion to vacate the Grievance Arbitrator's award and granting the NBPA's motion to confirm the Arbitration Award reducing Jermaine O'Neal's 25 game suspension to 15 games is granted, it is,

**ORDERED, ADJUDGED AND DECREED:** That for the reasons stated in the Court's Memorandum Opinion and Order dated December 30, 2004, the NBA's motion to vacate the Grievance Arbitrator's award is denied and the NBPA's motion to confirm the Arbitration Award reducing Jermaine O'Neal's 25 game suspension to 15 games is granted.

**Dated:** New York, New York
        January 5, 2005

                            **J. MICHAEL McMAHON**
                            _____
                            **Clerk of Court**

            **BY:**          _____
                            **Deputy Clerk**

THIS DOCUMENT WAS ENTERED